No. 16-1346

IN THE

# United States Court of Appeals
# for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,

Plaintiff-Appellant,

v.

MERUS B.V.,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of New York in
Case No. 14-cv-1650,
Judge Katherine B. Forrest

## CORRECTED BRIEF FOR APPELLANT
## REGENERON PHARMACEUTICALS, INC.

Neal Kumar Katyal
Morgan L. Goodspeed
Matthew A. Shapiro
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Appellant Regeneron Pharmaceuticals, Inc.*

February 16, 2016

[Additional counsel on inside cover]

Christopher P. Borello
Robert S. Schwartz
Michael E. Furrow
Brendan M. O'Malley
FITZPATRICK, CELLA, HARPER &
  SCINTO
1290 Avenue of the Americas
New York, NY 10104
(212) 219-2100
cborello@fchs.com

*Counsel for Appellant Regeneron
Pharmaceuticals, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellant Regeneron Pharmaceuticals, Inc. certifies the following:

1.  The full name of every party or amicus represented by me is: **Regeneron Pharmaceuticals, Inc**.

2.  The real party in interest is: **Regeneron Pharmaceuticals, Inc**.

3.  All parent corporations and any publicly held companies that own 10% or more of the stock of the parties I represent are as follows:

**Regeneron Pharmaceuticals, Inc.**, is a publicly traded corporation that is not majority-owned by any single entity.  Sanofi-Aventis Amerique du Nord owns 10% or more of Regeneron's stock.  The following entities are Regeneron direct or indirect subsidiaries: Regeneron Ireland; Regeneron Ireland Holdings LLC; OSMR Holdings; OSMR International; Regeneron International Holdings LLC; Regeneron Genetics Center LLC; Regeneron UK Ltd.; Regeneron Capital International B.V.; Regeneron International; Regeneron Healthcare Solutions, Inc.; Regeneron Spain, S.L.U.; and Loop Road Holdings LLC.

4.  The names of all law firms and the partners or associates that appeared for the parties now represented by me in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Marshall Alan Camp, Morgan Chu, David I. Gindler, Josh B. Gordon, Andrew Krause, Richard Krebs, Yite John Lu, Keith A. Orso, and Jason George Sheasby of Irell & Manella LLP; Robert Louis Baechtold, Donald Joseph Curry, Susanne Lynn Flanders, and Scott Kenneth Reed of Fitzpatrick, Cella, Harper & Scinto; Susan E. Brune and Charles Anthony Michael of Brune & Richard LLP; Nathan Nobu Lowenstein of Goldberg, Lowenstein & Weatherwax LLP; Suzanne Ilene Novak and Russell Marc Yankwitt of Yankwitt LLP.


Dated:  February 16, 2016                    /s/ Neal Kumar Katyal
                                            Neal Kumar Katyal

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES .................................................. xii

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE SETTING OUT THE FACTS
RELEVANT TO THE ISSUES .............................................................. 4

    I.    The Invention Claimed In The '018 Patent ................................ 4

        A.    Key Scientific Principles ................................................ 4

        B.    Transgenic Mice In 2001 .............................................. 6

        C.    Regeneron's Reverse-Chimeric Mouse ......................... 9

        D.    The '018 Patent And Its Family ................................... 11

    II.    Prosecution History ................................................................. 12

    III.    Procedural History .................................................................. 14

SUMMARY OF THE ARGUMENT ...................................................... 16

ARGUMENT ....................................................................................... 19

    I.    THE DISTRICT COURT'S CLAIM CONSTRUCTIONS
        SHOULD BE REVERSED .................................................... 19

        A.    The '018 Patent Claims A Reverse-Chimeric Mouse,
            And Not A Particular Method For Producing Such A
            Mouse ......................................................................... 19

            1.    Claim Terms And Specification ......................... 19

            2.    Prosecution History ........................................... 22

# TABLE OF CONTENTS—Continued

B. The District Court Misconstrued Each Of The Relevant Claim Terms ...................................................................23

   1. "A Genetically Modified Mouse".......................................24

   2. "Human Unrearranged Variable Region Gene Segments" ..............................................................24

   3. "Inserted" .........................................................................26

II. THE '018 PATENT IS NOT INVALID FOR INDEFINITENESS ...................................................................27

A. The Claim Term "Endogenous Mouse Immunoglobulin Locus" Is Not Indefinite...................................................27

B. Alternatively, This Court Should Vacate The District Court's Inequitable-Conduct Finding ...........................................29

III. THE DISTRICT COURT'S INEQUITABLE-CONDUCT FINDING CANNOT STAND................................................30

A. This Court Should Reverse Because Merus Failed To Prove Materiality........................................................31

   1. The Asserted References Are Not But-For Material ...............................................................31

      a. Even Under Its Broadest Reasonable Construction, The '018 Patent Is Limited To Reverse-Chimeric Mice .......................................32

      b. The Asserted References Are Not Material Under Either BRC .......................................35

         i. Brüggemann Is Cumulative Of Kucherlapati ....................................................38

         ii. Wood Does Not Disclose Targeting The Immunoglobulin Locus, And Is Cumulative Of Lonberg ..................................40

# TABLE OF CONTENTS—Continued

iii.    Taki Does Not Disclose The
Insertion Of Human Unrearranged
Variable Gene Segments, And Is
Cumulative Of Kucherlapati And
Lonberg ..........................................................42

iv.    Zou Does Not Disclose The
Insertion Of Human Unrearranged
Variable Gene Segments, And Is
Cumulative Of Kucherlapati And
Lonberg ..........................................................44

v.    The Asserted References Are No
More Material Combined Than
Alone ..............................................................46

vi.    The European Opposition Briefs Are
Not Material ...................................................48

c.    Related Proceedings Either Confirm The
Lack Of Materiality Or Are Uninformative .............49

2.    Regeneron Did Not Commit Affirmative
Egregious Misconduct ........................................51

a.    The District Court Never Found Deliberate
Conduct....................................................52

b.    The District Court Never Found That The
Alleged Misstatements Were
"Unmistakably False"................................54

B.    In The Alternative, This Court Should Remand For A
Trial On Specific Intent................................................56

1.    The Sanction Must Be Vacated Because The
District Court Failed To Find Bad Faith.............................57

a.    The District Court Did Not Impose A True
"Adverse Inference" ................................................57

v

## TABLE OF CONTENTS—Continued

<u>Page</u>

        b.    The Record Does Not Support The
Necessary Finding Of Bad Faith ...............................59

    2.    Regeneron Is Still Entitled To A Trial On
Specific Intent. ...................................................................61

    3.    At Most, This Court Should Approve Dismissal,
Not A Finding Of Inequitable Conduct ..............................62

CONCLUSION ......................................................................................64

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003) ........................................................27

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
   768 F.3d 1185 (Fed. Cir. 2014) ........................................................31

*ATD Corp. v. Lydall, Inc.*,
   159 F.3d 534 (Fed. Cir. 1998) ..........................................................48

*Aventis Pharm., Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ........................................................19

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986) ....................................................45, 48

*Biogen, Inc. v. Berlex Labs., Inc.*,
   318 F.3d 1132 (Fed. Cir. 2003) ..................................................20, 21

*Chimie v. PPG Indus. Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005) ........................................................27

*Dayco Prods., Inc. v. Total Containment, Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003) ........................................................49

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
   279 F.3d 1022 (Fed. Cir. 2002) ........................................................25

*Facebook, Inc. v. Pragmatus AV, LLC*,
   582 F. App'x 864 (Fed. Cir. 2014) ..................................................32

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
   750 F.3d 1304 (Fed. Cir. 2014) ........................................................20

*GFI, Inc. v. Franklin Corp.*,
   265 F.3d 1268 (Fed. Cir. 2001) ........................................................57

*Halliburton Co. v. Schlumberger Tech. Corp.*,
   925 F.2d 1435 (Fed. Cir. 1991) ........................................................40

# TABLE OF AUTHORITIES—Continued

Page(s)

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238 (1944)................................................52

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) .........................21

*In re Cnty. of Erie*,
    546 F.3d 222 (2d Cir. 2008) ..............................61

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) .........................19

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*,
    991 F.2d 768 (Fed. Cir. 1993) (per curiam) .......................23

*InTouch Techs., Inc. v. VGO Commc'ns., Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) .........................48

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
    845 F.2d 1172 (2d Cir. 1988) ..............................59

*Keystone Driller Co. v. Gen. Excavator Co.*,
    290 U.S. 240 (1933)................................................52

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ..............................58

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)................................................36

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    78 F.3d 540 (Fed. Cir. 1996) (per curiam) ...................29, 30

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) ...................19, 32

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015) .........................27

# TABLE OF AUTHORITIES—Continued

Page(s)

*Nabisco, Inc. v. PF Brands, Inc.*,
  191 F.3d 208 (2d Cir. 1999) .............................................................59

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)......................................................................28

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
  403 F.3d 1364 (Fed. Cir. 2005) ........................................................22

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314, 1324 (Fed. Cir. 2003) ..............................................34

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006) ........................................................21

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................19, 20

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945).........................................................................52

*Regeneron Pharm., Inc. v. Merus B.V.*,
  __ F. Supp. 3d __, No. 14-cv-1650, 2015 WL 6674818
  (S.D.N.Y. Nov. 2, 2015)....................................................................15

*Regeneron Pharm., Inc. v. Merus B.V.*,
  No. 14-cv-1650, 2014 WL 6611510 (S.D.N.Y. Nov. 21, 2014) .................14, 15

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
  306 F.3d 99 (2d Cir. 2002) ...............................................................58

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ........................................................25

*Salahuddin v. Harris*,
  782 F.2d 1127 (2d Cir. 1986) ...........................................................59

*Schering Corp. v. Geneva Pharm., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003) ....................................................55, 56

ix

# TABLE OF AUTHORITIES—Continued

Page(s)

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
  490 F.3d 130 (2d Cir. 2007) ...............................................59

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  537 F.3d 1357 (Fed. Cir. 2008) ....................................36, 57

*Straight Path IP Grp. v. Sipnet EU S.R.O.*,
  806 F.3d 1356 (Fed. Cir. 2015) .........................................34

*Tech. Licensing Corp. v. Videotek, Inc.*,
  545 F.3d 1316 (Fed. Cir. 2008) .........................................27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015)........................................................19

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) (en banc) ...................*passim*

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) .........................................22

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961) ..............................................60

*Verdegaal Bros. v. Union Oil Co. of Cal.*,
  814 F.2d 628 (Fed. Cir. 1987) .....................................36, 41

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) .........................................25

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
  694 F.3d 155 (2d Cir. 2012) ..............................................58

**STATUTES:**

28 U.S.C. § 1295(a)(1)..............................................................3

28 U.S.C. § 1331 .......................................................................3

28 U.S.C. § 1338(a) ..................................................................3

# TABLE OF AUTHORITIES—Continued

Page(s)

28 U.S.C. § 2107 ................................................................. 3

35 U.S.C. § 102 ................................................................ 36

35 U.S.C. § 103 ................................................................ 36

**RULES:**

Fed. R. App. P. 4(a) .......................................................... 3

Fed. R. Civ. P. 37(b)(2) ................................................... 62

Fed. R. Civ. P. 37(b)(2)(A)(v) ........................................ 62

Fed. R. Civ. P. 37(b)(2)(A)(vi) ...................................... 62

Fed. Cir. R. 4 ..................................................................... 3

**REGULATIONS:**

37 C.F.R. § 1.56 ......................................................... 31, 60

37 C.F.R. § 1.141(a) ........................................................ 23

**FOREIGN DECISIONS:**

*Regeneron Pharm. Inc. v. Kymab Ltd.*,
  [2016] EWHC87, [97-98, 304-309] (Eng.) ...................... 50

F3315 Oral Proceedings in Appeal No. T2220/14-3.3.08
  (Eur. Patent Office Bd. App. Nov. 9, 2015) ................... 50

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant Regeneron Pharmaceuticals, Inc. states that no other appeal from the civil action in the district court that is the subject of the present appeal was previously before this Court, or any other appellate court.  To the best of counsel's knowledge, there is no case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

Since the 1970s, the biotechnology industry has invested billions of dollars in developing antibodies to treat serious human diseases.  Lab mice have been the tool of choice for scientists, as they can be genetically modified to produce antibodies useful in human therapies.  Taking antibodies from wild-type mice and injecting them directly into humans is risky; the human body often rejects mouse antibodies as foreign agents.  So scientists have instead focused on genetically engineering mice to produce *human antibodies*, or as close an approximation as possible.  The more human-like the antibodies are, the less likely they will be rejected by the human body.

Regeneron's scientists had a different idea.  They realized that if a mouse was genetically engineered to produce antibodies that were *too human*, that change would interfere with the effectiveness of the mouse's natural immune system.  So they bucked the prevailing trend and developed a mouse that would produce part-mouse, part-human antibodies, which they called "reverse-chimeric" antibodies.  Their theory was that retaining a key portion of mouse genetic material would allow the mouse to mount robust immune responses, comparable to the immune responses of wild-type mice.  Later, scientists could replace that mouse genetic material in the lab, and could create a fully human antibody.  It was a more time-intensive process, to be sure, but Regeneron's pioneering efforts paid off.

The patent-in-suit, U.S. Patent No. 8,502,018 (the "'018 Patent") claims the reverse-chimeric mouse that Regeneron invented in the early 2000s. A249-272. In 2014, Regeneron sued Merus B.V. for infringement of the '018 Patent. Merus responded that it had not infringed, that the Patent was invalid, and that the Patent was unenforceable because Regeneron had committed inequitable conduct in proceedings before the PTO.

The District Court sided with Merus, but only by repeatedly overlooking the central innovation of the '018 Patent: a mouse capable of generating reverse-chimeric antibodies. At claim construction, it focused on a particular *method* described in the specification and separately patented by Regeneron, instead of the "genetically modified mouse" that the Patent claims. A272. Its focus on that method also contributed to an erroneous indefiniteness finding. And in assessing the materiality prong of inequitable conduct, the District Court determined that a broad array of genetically modified mice were relevant, regardless of whether they could produce reverse-chimeric antibodies. A straightforward reading of the Patent dictates that this Court should reverse the District Court's claim construction, invalidity, and materiality decisions. To the extent this Court reaches the intent prong of inequitable conduct, it should vacate the District Court's decision.

## JURISDICTIONAL STATEMENT

Regeneron appeals from a final judgment of the U.S. District Court for the Southern District of New York entered on November 18, 2015.  A1-2.  The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Regeneron filed a timely notice of appeal on December 17, 2015.  *See* 28 U.S.C. § 2107; Fed. R. App. P. 4(a); Fed. Cir. R. 4; A183-185.  This Court has exclusive appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in construing the relevant claim terms of the '018 Patent.

2.      Whether the District Court erred in holding the '018 Patent invalid for indefiniteness and, if not, whether the District Court's finding of inequitable conduct should be vacated as superfluous.

3.      Whether the District Court erred in holding the '018 Patent unenforceable for inequitable conduct, including finding that certain references were but-for material, finding that Regeneron had engaged in affirmative egregious misconduct, and imposing an "adverse inference" of specific intent as a sanction for supposed litigation misconduct.

## STATEMENT OF THE CASE SETTING OUT
## THE FACTS RELEVANT TO THE ISSUES

**I.    The Invention Claimed In The '018 Patent**

**A.    Key Scientific Principles**

Antibodies, sometimes called "immunoglobulins" (or further abbreviated as "Ig"), are proteins generated by an organism's immune system.  They bind to foreign substances, or "antigens," that invade the organism.  Humans naturally produce antibodies to attack common antigens.  But antibodies can also be administered as therapeutic agents to treat serious medical conditions, including cancer, autoimmune diseases, eye diseases, and cardiovascular diseases.

Antibodies have a "Y" shape.  The "Y" consists of four chains of amino acids: two longer "heavy" chains, and two shorter "light" chains.  Each of the chains, in turn, consists of two regions: a "variable" region toward the top of the "Y," and a "constant" region toward the bottom.  The variable regions are so-named because they vary significantly from antibody to antibody, allowing different antibodies to bind to different antigens.  The constant regions, meanwhile, remain the same for all antibodies within a certain class.  A712-713.

In the antibody depicted below, the heavy chains are blue and the light chains are green; the variable regions are darker and the constant regions are lighter.



Antibodies are produced by specialized cells called "B cells." The production of antibodies—and, critically, the generation of a diverse repertoire of different antibodies—is complex. The short version: An organism inherits a variety of genetic material, including the building blocks for antibodies. The organism's B cells randomly select gene segments from the inherited set of unrearranged "blocks" and join the chosen blocks together into one unit, through a process called rearrangement. Those rearranged units are genes, each of which encodes either a heavy chain or a light chain. Four chains, as discussed above, assemble to form one antibody.

The slightly longer version: In both humans and mice, the unrearranged gene segments (which, to reiterate, are later rearranged to make the genes that encode the chains that make up the antibody) are located on specific chromosomes.

The location on a chromosome where these gene segments are found is called a "locus." A718. The heavy-chain locus includes three categories of gene segments: V, D, and J. The light-chain locus includes only two categories of gene segments: V and J. A717. In the rearrangement process described above, a B cell randomly combines a V, D, and J (for heavy chains) and a V and J (for light chains) into a single unit that makes up the variable region of an antibody. The variety of gene segments within each category—in a human, about 65 functional V gene segments, 27 Ds, and 6 Js in the heavy chain locus—allows for the production of diverse antibodies. A721. When combined with other methods of B-cell diversification, a human immune system can "generate a virtually infinite repertoire of antibodies from the limited repertoire of available genes." A717.

## B.    Transgenic Mice In 2001

Scientists have long recognized that antibodies may be used as therapeutic agents, and that antibodies useful to humans may be developed in mice. The first therapeutic antibodies produced using mice were *fully mouse* antibodies. Essentially, scientists immunized a mouse with a particular antigen, so that the mouse's immune system would begin producing antibodies against that antigen. A728-729. The problem, however, was the utility of the antibodies produced. When those fully mouse antibodies were administered to human patients as

therapy, the human body often recognized them as foreign invaders and triggered its own immune response. A729-730.

To address the limitations of fully mouse antibodies, scientists began creating *chimeric* antibodies. They used newly developed recombinant DNA technology to combine human DNA with mouse DNA in the lab. In particular, they paired mouse variable regions (DNA encoding the top of the "Y"-shaped antibody) with human constant regions (DNA encoding the bottom of the "Y"). They hoped that using a human constant region would prevent the immune response triggered by fully mouse antibodies, while keeping a mouse variable region would preserve the antibodies' ability to bind to antigens. A730. The hope was only partially realized; there were still adverse immune responses in humans.

As technology advanced further, scientists were able to decrease even more the amount of mouse DNA by replacing much of the DNA encoding the variable region with human DNA as well. The results were *humanized* antibodies with human constant regions and mostly human variable regions, up to 90% human overall. A731.

In what seemed at the time like the final frontier, scientists next developed methods for inserting unrearranged human immunoglobulin gene fragments into the mouse genome. The goal was to create mice that would themselves generate *fully human* antibodies, with both a human variable region and a human constant

region. These fully human antibodies were thought to be ideal therapeutic tools, because they would not cause adverse immune responses in human patients. A732. As a result, the focus of the industry in the 1990s and early 2000s was on genetically engineering mice that could generate these fully human antibodies. A745; *see also* A2395.

This steady progression from fully mouse to fully human antibodies is illustrated below:



The leading work in the field as of 2001 is exemplified by two publications, U.S. Patent No. 6,114,598 ("Kucherlapati") and U.S. Patent Publication No. 2006/0015957 ("Lonberg"). Both describe a "knockout plus transgene" method for genetically engineering mice. Under that method, human variable and human constant region gene segments are randomly integrated into the mouse genome, while the mouse's own antibody genes are "knocked out" by targeted deactivation of the mouse immunoglobulin locus. A3819; A3593-3594. This method takes advantage of the mouse's natural rearrangement of V, D, and J gene segments, but

uses fully human building blocks.  A2386.  At least in theory, the genetically

modified mouse would produce a diverse repertoire of ready-to-use human

antibodies.

### C.    Regeneron's Reverse-Chimeric Mouse

Scientists at Regeneron took a step back from the industry's "the-more-

human-the-better" trend.  They realized that the commercially available mice that

produced fully human antibodies lacked the robust immune responses of wild-type

mice.  A2399.  Although fully human antibodies were therapeutically useful, the

mice genetically engineered to produce them were generating antibodies that were

fewer, less diverse, or less able to bind to target antigens than the antibodies

produced by wild-type mice.  To solve this problem, one of Regeneron's founders

suggested a counterintuitive approach:  Why not genetically engineer mice that are

*less* human?  More specifically, he proposed creating mice that would generate

*reverse-chimeric* antibodies, with human variable regions and mouse constant

regions.  A2387.  His hypothesis was that mice producing reverse-chimeric

antibodies might have a more robust immune response than mice producing fully

human antibodies, because retaining the mouse constant region was vital to proper

B-cell development.  A2387-2390.

Because the proposed reverse-chimeric antibodies would retain a mouse

constant region, a second step was necessary before they could be therapeutically

9

useful.  First, human variable-region DNA would be extracted from the

mouse.  Second, it would be combined in the lab with human constant-region

DNA, to produce a gene encoding a fully human antibody.  A2391; A2920-2921.

That extra step was also a counterintuitive change from the prior-art mice, which

could themselves produce fully human antibodies ready for immediate use.  But to

Regeneron, the extra step made all the difference; as hypothesized, its mice

showed marked improvement in the health of their B-cell populations.  A476-480;

*see generally* A3908-3913.

    The radical nature of Regeneron's invention can be best understood by

adding the reverse-chimeric antibodies to the figure shown above:



    Helpfully, Regeneron had already created a tool for introducing large

sequences of DNA (such as human variable region gene segments) into specific

locations in the mouse genome, by use of Large Targeting Vectors for Eukaryotic

Cells, or "LTVECs."  LTVECs are useful in a method for incorporating exogenous

DNA into mice known as "gene targeting," which stands in contrast to "random

integration." Random integration involves inserting a DNA fragment into a mouse embryo, followed by random incorporation into the genome. A89. The major shortcoming of this method is that one never knows where in the mouse's genome the DNA fragment will be integrated. *Id.* Gene targeting, by contrast, allows researchers to pinpoint a particular location. A90.

### D.    The '018 Patent And Its Family

The '018 Patent emerged from a family of applications that originated in December 2000, when Regeneron filed a patent application disclosing the use of LTVECs to genetically modify an endogenous gene or chromosomal locus. That application ultimately issued as U.S. Patent No. 6,586,251. A959-980; A1408; A1413-1414. In February 2001, Regeneron filed a continuation-in-part, disclosing the use of LTVECs to genetically modify embryonic stem cells. That continuation-in-part ultimately issued as U.S. Patent No. 6,596,541. A981-1009; A1415-1419.

Regeneron subsequently filed a divisional of the '541 Patent that, after several continuations, issued as the '018 Patent. In contrast to the prior patents, the claims of the '018 Patent pertain exclusively to a particular kind of genetically modified mouse, rather than any process for genetically modifying a mouse. Specifically, Claim 1, which is the focus of this appeal, claims a "genetically modified mouse, comprising in its germline human unrearranged variable region

11

gene segments inserted at an endogenous mouse immunoglobulin locus." A272. The '018 Patent specification overlaps extensively with the '251 Patent specification, but it also contains a prophetic Example 3 detailing a multi-step process for preparing reverse-chimeric mice and discussing the potential advantages of such mice over the prior-art mice. *See* A267-268. Among other things, it explains that reverse-chimeric antibodies "will interact more efficiently with the other components of the mouse B cell receptor complex . . . . These interactions are important for a strong and specific immune response, for the proliferation and maturation of B cells, and for the affinity maturation of antibodies"—all benefits that the Regeneron's scientists anticipated would flow from retaining the mouse constant region. A267 at 20:57-65.

## II.    Prosecution History

During the prosecution of the '018 Patent, the PTO initially rejected Claims 1-19 as anticipated by the Lonberg reference because some reverse-chimeric antibodies had been observed in the Lonberg mice, and rejected Claim 20 as obvious. A376-388. Dr. Tor Smeland, Regeneron's in-house counsel responsible for prosecuting the global family of applications, filed a response distinguishing Lonberg on the ground that the reverse-chimeric antibodies observed were the accidental byproduct of a random process, because Lonberg did not "disclose a mouse comprising in its germline human unrearranged variable region gene

12

segments inserted at a mouse immunoglobulin locus." A408. The PTO

nevertheless maintained the rejections. A428.

Shortly thereafter, Dr. Smeland and Dr. Brendan Jones, an outside patent

agent retained to assist with Regeneron's patent prosecution, elaborated on the

distinctions between the '018 Patent and Lonberg in filings and an in-person

meeting with the PTO. A448-461; A538. On April 22, 2013, following the

meeting, the PTO posted an entry on the docket for Regeneron's application, titled

"Reasons for Allowance." A546-548. And on April 26, the PTO issued a Notice

of Allowance, explaining that "[t]he prior art does not teach or suggest a

genetically modified mouse comprising, in its germline cells, human unrearranged

variable region gene segments inserted at an endogenous mouse immunoglobulin

locus." A531.

On April 24, 2013, just two days after the PTO's docket indicated that

the '018 Patent would issue, a pseudonymous third-party submission[1] was filed in

one of Regeneron's related U.S. patent prosecutions. The submission cited three

references—called Brüggemann, Zou, and Taki—and alleged that each was

relevant to the claims pending in the related application. A3902-3907. Upon

learning of the references, Dr. Jones analyzed their materiality to the '018 Patent

and documented his reasoning in a detailed memorandum. He concluded that the

---

[1]    The submission was signed by "Bev Cleary," but no one going by that name
was registered to practice before the PTO. A3903.

references either were not relevant or were cumulative of other references that had been disclosed, particularly Lonberg and Kucherlapati, and thus did not require re-opening the '018 examination. A1900-1905. Dr. Smeland conducted his own analysis and reached the same conclusion.

Meanwhile, Regeneron had been prosecuting a related patent application before the European Patent Office, and the claims in that application issued in September 2012 as European Patent 1360287 (the "EP '287 Patent"). A3860-3901. In June 2013, Merus and another competitor filed briefs opposing the issuance of the EP '287 Patent and citing various references, including Brüggemann, Zou, Taki, and a reference called Wood. A3930-3991. Dr. Smeland and Dr. Jones once again reviewed the references and opposition briefs and once again concluded that they either were not relevant or were cumulative. A1906-1910.

The '018 Patent issued on August 6, 2013. A249-274.

## III.    Procedural History

In 2014, Regeneron sued Merus in the Southern District of New York, asserting that Merus's transgenic mouse infringed the '018 Patent. A631-667. The District Court heard argument and expert testimony on claim construction and essentially adopted Merus's proposed constructions of the relevant claim terms. A10-68; *see Regeneron Pharm., Inc. v. Merus B.V.*, No. 14-cv-1650, 2014 WL

6611510 (S.D.N.Y. Nov. 21, 2014).  The court also declared one term indefinite. A59-63.  In light of those rulings, Regeneron and Merus jointly stipulated to a judgment of non-infringement and invalidity.  A3-9.

In addition, Merus asserted a counterclaim of unenforceability due to inequitable conduct.  A1932-2011.  Merus argued, among other things, that Regeneron's patent prosecutors had withheld the four references (the "Asserted References") cited in the third-party submission in the related U.S. patent prosecution and in the European opposition briefs, with the specific intent to deceive the PTO.

The District Court scheduled a trial on Merus's inequitable-conduct counterclaim.  On the eve of trial, however, a dispute arose over whether Regeneron had improperly withheld as privileged certain documents that, according to Merus, should have been disclosed.  The District Court decided to bifurcate the trial according to the two elements of inequitable conduct: the materiality of the Asserted References and specific intent to deceive the PTO.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).

Following the trial on materiality, the District Court concluded that the Asserted References were material.  A131-144; *Regeneron Pharm., Inc. v. Merus B.V.*, No. 14-cv-1650, 2015 WL 6674818 (S.D.N.Y. Nov. 2, 2015).  The court

further found that Regeneron had engaged in affirmative egregious misconduct—an alternative to but-for materiality—based on certain technical statements made in the '018 Patent's specification and in a slide presentation Regeneron had submitted during prosecution, which the court considered incomplete or misleading.  A155-160.

The second scheduled trial, on specific intent, never occurred.  The District Court canceled the trial and imposed what it called an "adverse inference" of specific intent as a sanction for what it regarded as misconduct by Regeneron's trial counsel.  A181.  As a result, the District Court never considered any actual evidence of intent.

## SUMMARY OF ARGUMENT

The District Court fundamentally misunderstood the invention claimed by the '018 Patent.  The patent claims a reverse-chimeric mouse, yet the District Court construed it to claim only a mouse produced through a specific LTVEC method outlined in parts of the specification.  The court thereby committed one of the most fundamental errors in all of patent law: importing limitations from the specification into the claims.

That error also led the District Court to erroneously deem the term "mouse immunoglobulin locus"—and the entire '018 Patent along with it—indefinite.  But in any event, one did not need to know the precise location of the far end of the

16

mouse immunoglobulin locus to target the locus, as the District Court held.  At a

minimum, if this Court disagrees, then the District Court's inequitable-conduct

finding is superfluous and should be vacated.

The District Court's misunderstanding of the '018 Patent infected its

inequitable-conduct finding, too.  Under *Therasense*, Merus bears the burden to

prove by clear and convincing evidence both that the Asserted References are

material and that Regeneron withheld those references with the specific intent to

deceive the PTO.  649 F.3d at 1287.  Merus failed on both fronts.

As an initial matter, the materiality of the Asserted References must be

assessed against the "broadest reasonable construction" of the '018 Patent.  Here,

that construction should reflect the basic features of a reverse-chimeric mouse: a

human variable region and a mouse constant region.  Not one of the Asserted

References discloses such features or suggests any reason to deviate from the

industry's "the-more-human-the-better" norm.  And even under the District

Court's faulty broadest reasonable construction, the Asserted References do not

disclose key elements in Claim 1 of the Patent and teach nothing material that was

not already before the PTO.  The District Court's findings to the contrary suffered

from fundamental scientific and legal misunderstandings that render them clear

error.

As an alternative to its but-for materiality finding, the District Court held that Regeneron had engaged in affirmative egregious misconduct. But *Therasense* makes clear that affirmative egregious misconduct is limited to deliberate schemes to defraud the PTO, and the District Court never found that any individual knowingly submitted unmistakably false information to the PTO. In particular, the alleged misstatements here concerned scientific issues that were hotly contested by Regeneron and Merus. A patent holder should not be subject to a finding of affirmative egregious misconduct whenever it loses a battle of the experts at trial.

Even if this Court concludes that Merus satisfied the materiality prong, it should still vacate the finding that Regeneron acted with the specific intent to deceive the PTO. The District Court imposed what it called an "adverse inference" of intent as a sanction on Regeneron's trial counsel. That sanction required a finding of bad faith, which the District Court never made and which the record does not support. Beyond that, litigation misconduct could have justified, at most, the *dismissal of Regeneron's suit* against Merus. But inequitable conduct is a far more severe penalty, resulting in the *complete loss of Regeneron's patent*. Whatever else this Court decides, then, it must at least vacate the District Court's inequitable-conduct finding.

# ARGUMENT

## I.    THE DISTRICT COURT'S CLAIM CONSTRUCTIONS SHOULD BE REVERSED.

### A.    The '018 Patent Claims A Reverse-Chimeric Mouse, And Not A Particular Method For Producing Such A Mouse.

#### 1.    Claim Terms And Specification

Claim construction is a question of law that this Court reviews de novo.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en

banc).[2]  "It is a 'bedrock principle' of patent law that 'the claims of a patent define

the invention to which the patentee is entitled the right to exclude.'"  *Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure*

*Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir.

2004)).  And "[t]here is a heavy presumption that claim terms are to be given their

ordinary and customary meaning," *Aventis Pharm., Inc. v. Amino Chems. Ltd.*, 715

F.3d 1363, 1373 (Fed. Cir. 2013)—that is, "the meaning that the term would have

to a person of ordinary skill in the art in question at the time of the invention,"

*Phillips*, 415 F.3d at 1313.

---

[2]    Although subsidiary factual findings are reviewed for clear error, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015), the District Court made clear that its claim construction did not involve any such findings, *see* A28 n.12 ("There are certain instances, *not relevant here*, when this Court has been required to make factual findings in connection with some aspect of claim construction." (emphasis added)).

Claim 1 of the '018 Patent claims "[a] genetically modified mouse, comprising in its germline human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus."  A272.  Its plain terms are simple:  The claim refers only to a kind of mouse, and not a method for producing such a mouse.  Thus, the invention claimed by the '018 Patent cannot be anything other than a specific kind of genetically modified mouse—nothing more, nothing less.

The District Court nevertheless held that the '018 Patent claims a mouse produced using only one specific method—namely, the LTVEC method described nowhere in the claims but rather in portions of the specification.  A41-48.  That was error.  This Court has repeatedly admonished lower courts not to import limitations from a patent's specification into its claims.  *See, e.g.*, *Phillips*, 415 F.3d at 1323.   Instead, the specification may be read to limit the meaning of claim terms only in cases of lexicography or disavowal.  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  The District Court never purported to apply either exception.  In failing to do so, it committed "one of the cardinal sins of patent law—reading a limitation from the written description into the claims."  *Phillips*, 415 F.3d at 1320 (internal quotation marks omitted).

The cases the District Court cited to justify its reliance on the specification are readily distinguishable.  In *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132

20

(Fed. Cir. 2003), this Court limited a patent involving the production of a human interferon in a hamster ovary cell to a single disclosed method for introducing human interferon genes into the cells.  But the claims in *Biogen* were expressly drawn to "a method."  *Id.* at 1134-35.  Here, by contrast, *none* of the '018 Patent's claims recites any method for producing the claimed genetically modified mouse.

In the other two cases cited by the District Court, this Court used the specification to give a narrow meaning to an undefined claim term.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (limiting "fuel injection system component" to a fuel filter); *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1339-40 (Fed. Cir. 2006) (limiting "customer" to a retail, book-buying customer).  The District Court here, by contrast, did not use the specification to define a claim term, but rather to impose a freestanding limitation on the claim terms.

Finally, the District Court noted various instances where the specification uses the phrase "the method of the invention," and it analogized to cases in which this Court limited the claimed invention based on the specification's use of the phrase "the present invention."  A45-46.  Unlike those cases, the specification here does not limit "the invention" to a method; the specification also describes preferred embodiments like cells, antibodies, and mice.  *See, e.g.*, A261 at 7:6-35.  In addition, as discussed below, the '018 Patent specification added material that

21

was not found in earlier Regeneron applications claiming various other inventions, including the LTVEC method. All of the instances of the phrase "the method of the invention" appear in the portion of the specification that came from the earlier applications and describe the use of LTVECs in eukaryotic cells; none appears in the added material. A959-980; A1310-1337. To limit the '018 Patent's "invention" to a LTVEC method would thus be to ignore other, contrary portions of the intrinsic evidence. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

In short, the District Court fundamentally misunderstood the claim-construction enterprise when it stated that "[c]laim construction that limits the scope of a claim may . . . be based on the scope implicit in the specification rather than explicit disavowal." A34. None of this Court's cases countenance such a freewheeling approach.

### 2.     Prosecution History

As the District Court noted, intrinsic evidence, including the prosecution history, can inform claim construction. *See* A29 (citing *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005)). Yet the District Court failed to heed its own teaching, largely ignoring the '018 Patent's prosecution history and the Patent's place within a larger family of patents. That history confirms what the claims say: They are drawn to a mouse, not a method.

22

At the time Regeneron filed the application for the '018 Patent, it had already claimed the LTVEC method in other patents in the family. *E.g.*, A959-1009. Indeed, in response to one of those applications, the PTO issued a restriction notice requiring Regeneron to choose among claims directed to genetically modified mice, methods for producing those mice, or antibodies generated by the mice. A1338-1343; *see* 37 C.F.R. § 1.141(a). Regeneron elected to prosecute the method claims in that application. A981-1009; A1415-1419. It filed subsequent applications claiming the un-elected inventions, including the application that ultimately issued as the '018 Patent.

The District Court emphasized the fact that during prosecution Regeneron had cited the VelocImmune® mouse, which was developed using LTVECs. A47-48. But a claimed invention cannot be limited to its commercial embodiment. *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (per curiam). And in any event, Regeneron had argued that the VelocImmune® mouse had unexpected properties vis-à-vis the prior art based on the structure of the mouse's genome, not the method by which the mouse was produced. A1418-1419.

## B.     The District Court Misconstrued Each Of The Relevant Claim Terms.

The District Court's errant approach to claim construction infected its construction of each of the claim terms pertinent to Regeneron's infringement suit.

### 1.    "A Genetically Modified Mouse"

With regard to the term "a genetically modified mouse," the District Court concluded that "[t]he entire Specification and history of the '018 Patent support[] that each of these words refer to a mouse, the genes of which have been modified, *using the particular method described in the Specification*."  A42 (emphasis added).  For all the reasons given above, that conclusion contravenes the terms' ordinary meaning, misreads the specification, and ignores the prosecution history.

### 2.    "Human Unrearranged Variable Region Gene Segments"

The District Court broke down this term into three component parts, and it misconstrued each one.

*First*, the District Court construed the word "human" to refer only to naturally occurring human variable region gene segments, and not synthesized human segments as well.  The court's main rationale for this conclusion was that, as of the '018 Patent's application date, "synthetic DNA was not compatible with LTVECs" because "synthetic DNA segments were just too short."  A49.  Again, though, the '018 Patent does not claim only mice genetically modified using LTVECs, so there is no reason to limit the term "human" to be compatible with LTVECs.  Moreover, ample intrinsic evidence discloses synthesizing human variable region gene segments and expressly refers to such synthetic segments as "human."  A1431-1439; A1444-1451.

The District Court's construction of "human" in Claim 1 also violates the maxim that terms should be construed consistently across claims. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). The District Court construed "human" in the term "human constant region gene" in a number of other claims to mean human or synthetic. A66-67. Indeed, some of those other claims *depend from* Claim 1, thus necessarily incorporating the same meaning of "human" as in Claim 1. The District Court tried to justify its approach by citing two cases ascribing different meanings to the same terms in different claims. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327-29 (Fed. Cir. 2006); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002). But each case involved a vague term ("gap" and "substantially," respectively) that could take on different meanings in different contexts. Not so "human."

*Second*, the District Court construed the word "unrearranged" to require that the DNA sequence be in "germline configuration." A52. That is, it required the same linear arrangement of DNA segments that occurs in the immunoglobulin locus of a germline cell, thereby excluding immunoglobulin loci that had in any way been "reorganized in a lab." *Id.* But a DNA sequence may be "reorganized in a lab" in many ways other than "rearrangement." "Rearrangement" refers only to V(D)J recombination, A721-722; A857, and cited prior art explained that

25

"unrearranged," when "used in reference to a V segment[,] refers to the configuration wherein the V segment is not recombined so as to be immediately adjacent to a D or J segment." A1124; A1426-1439. That intrinsic evidence sheds much more light on the meaning of the term "unrearranged" in the '018 Patent than the immunology textbooks on which the District Court relied. A53.

*Third*, the District Court construed the phrase "variable region gene segments" to require that all V, D, and J segments (for the heavy chain) and all V and J segments (for the light chain) be contiguous or "stitched together." The court reasoned that "[t]he point of the LTVEC method is that the variable region gene *segment*"—by which the court apparently meant the collection of variable region gene *segments* being inserted—"would be contiguous." A54 (emphasis added). But the '018 Patent does not require that the variable region gene segments be inserted as one contiguous piece, let alone using the LTVEC method. Moreover, intrinsic evidence, including the preferred embodiment of Example 3, describes the insertion of variable region gene segments that are not "contiguous," that is, are not inserted in one step as a single piece. A267-269; A957; A1422-1444.

### 3. "Inserted"

The District Court construed the word "inserted" to mean a "single-step process" whereby exogenous DNA is added, without deleting or replacing any endogenous DNA. A participle like "inserted," however, is not necessarily a

process term.  *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371-72 (Fed. Cir. 2003).  Rather, it refers to the structural relationship between the exogenous DNA and the endogenous locus following insertion.  So understood, "inserted" has an ordinary meaning to a person skilled in the art that may encompass not only addition of exogenous DNA but also deletion or replacement of endogenous DNA.  A1452-1453.  The District Court's contrary construction raises a host of problems—most notably, improperly excluding the preferred, multi-step embodiment of Example 3.  A1452-1458; *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005).

## II.    THE '018 PATENT IS NOT INVALID FOR INDEFINITENESS.

### A.    The Claim Term "Endogenous Mouse Immunoglobulin Locus" Is Not Indefinite.

When it reached the claim term "endogenous mouse immunoglobulin locus," the District Court deemed it indefinite.  That was error.

Indefiniteness is a question of law that this Court reviews de novo.  *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015).  A party challenging a claim as indefinite must prove indefiniteness by clear and convincing evidence.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).  A claim is not indefinite so long as it, "viewed in light of the specification and prosecution history, inform[s] those skilled in the art about

27

the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

The District Court concluded that the term "endogenous mouse immunoglobulin locus" was indefinite because the LTVEC method described in portions of the specification supposedly requires knowing the location of the 5' end of the locus, but the exact location had not yet been mapped in 2001. A59. Once again, however, the '018 Patent does not claim only a mouse produced using the LTVEC method. *See supra* pp. 19-23.

In any case, the location of the 5' end is immaterial. A scientist in 2001 could target specific parts of the locus without knowing the location of the 5' end. The District Court's only statement to the contrary was that "if one skilled in the art did not know with reasonable certainty where the 5-prime of the immunoglobulin locus was, the insertion of the genomic DNA segment might not fall within the locus at all—defeating the point of the invention." A59. The court offered no record citation for that proposition. Instead, it went on to justify its finding that the location of the 5' end of the locus was unknown in 2001. That is a distinct point and is largely irrelevant.

The relevant point is that the term "endogenous mouse immunoglobulin locus" informed scientists about the scope of the invention with reasonable certainty. Scientists could target—and in fact had targeted—specific parts of the

locus based on known information about its size and sequence. A1462-1480; *see also* A2482-2483. Indeed, the District Court's analogy to a football field was apt, though not quite for the reasons the District Court thought. According to the District Court, "to place the ball at the 50 yard line, one needs to know where that is." A93. Fair enough. But one does not need to know the location of *both end zones* in order to find the 50-yard line; knowing the location of one is enough. Likewise, it was enough that scientists knew the location of certain portions of the mouse immunoglobulin locus, such as the 3' end of the variable region, to be able to target a specific part of the locus.

Merus's own materiality expert later conceded the two premises that lead to this conclusion: He acknowledged that, under the District Court's construction, Claims 1-5 require only use of LTVEC1 (the first step in the multi-step LTVEC method detailed in Example 3), A2657-2658, and he agreed with Regeneron's expert that LTVEC1 does not target the 5' end of the locus, A2653; A2658.

### B.    Alternatively, This Court Should Vacate The District Court's Inequitable-Conduct Finding.

If this Court nevertheless affirms the District Court's judgment of invalidity, it should vacate the further finding of inequitable conduct, consistent with its prior practice. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 78 F.3d 540, 545-46 (Fed. Cir. 1996) (per curiam). The inequitable-conduct ruling, this Court has explained, "is redundant under these circumstances." *Id.* at 546. Given the invalidity holding,

"[t]here is no risk that others will be subject to infringement suits in the future," and, consequently, "[t]here is no need to secure this court's determination regarding the unenforceability of an invalid patent." *Id.*

The District Court's inequitable-conduct finding in this case would be equally "redundant" if this Court agreed with the District Court that the '018 Patent is invalid for indefiniteness. *Id.* After it deemed the claim term "endogenous mouse immunoglobulin locus" indefinite, the District Court entered an order granting "[j]udgment of invalidity due to indefiniteness as to each of the '018 patent claims." A8. That judgment alone, if affirmed, forecloses not only Regeneron's infringement claims against Merus, but any other infringement claims against any potential defendant. "There is no risk that others will be subject to infringement suits in the future" based on any of the '018 Patent's claims. *Lamb-Weston*, 78 F.3d at 546. Because there would thus be no reason for this Court to proceed to review, let alone affirm, the District Court's inequitable-conduct finding, this Court should vacate that finding if it concludes that the '018 Patent is invalid for indefiniteness.

## III. THE DISTRICT COURT'S INEQUITABLE-CONDUCT FINDING CANNOT STAND.

After claim construction, the District Court turned to Merus's counterclaim that Regeneron had committed inequitable conduct in failing to disclose the Asserted References to the PTO. Under *Therasense*, Merus's burden was to prove

both materiality and specific intent by clear and convincing evidence. 649 F.3d at 1287. "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290. Here, the District Court's materiality finding was clearly erroneous and its intent finding legally baseless, making its overarching inequitable-conduct determination an abuse of discretion. *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014).

### A.    This Court Should Reverse Because Merus Failed To Prove Materiality.

#### 1.    The Asserted References Are Not But-For Material.

*Therasense* established a new standard for materiality, in part to combat the "overdisclosure of marginally relevant prior art to the PTO." 649 F.3d at 1291. This Court rejected the traditional Rule 56 standard, under which information is material if it establishes a prima facie case of unpatentability. *Id.* at 1294 (citing 37 C.F.R. § 1.56). Instead, it imposed a demanding but-for materiality test, which requires Merus to demonstrate that "the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291.

### a.   Even Under Its Broadest Reasonable Construction, The '018 Patent Is Limited To Reverse-Chimeric Mice.

In assessing but-for materiality, this Court gives claims their broadest reasonable construction ("BRC").  *Therasense*, 649 F.3d at 1291-92.  The BRC of a claim term may be the same as the *Markman* construction, or it may be broader.  *See Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 869 (Fed. Cir. 2014).

Here, the BRC and the *Markman* construction are largely coextensive.  Most issues discussed at claim construction, such as whether the '018 Patent is limited to the LTVEC method, had no perceptible impact on the District Court's materiality analysis.  Only one aspect of the BRC may have affected materiality: whether the '018 Patent claims a reverse-chimeric mouse with a human variable region *and* a mouse constant region.  It does, and the District Court erred in holding otherwise.

Again, Claim 1 of the '018 Patent claims a "genetically modified mouse, comprising in its germline human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus."  A272.  The District Court stated that the BRC of Claim 1 does not "preclude human constant region gene segments."  A118; *see also* A122.  It believed that the claim's "sole requirement" is that a mouse have a human variable region, regardless of whether that mouse has a human constant region or a mouse constant region.  A118.

32

That is wrong, for several reasons.  To begin, the claim language itself implies that the mouse constant region will not be modified.  The claim describes a genetically engineered mouse in which "human unrearranged variable region gene segments" are inserted at the "endogenous mouse immunoglobulin locus."  The plain language indicates that the claimed mouse has an *endogenous mouse locus* (including the constant region), with the exception of specific human DNA inserted into the locus (the variable region).  It nowhere suggests any other type of modification to the locus.

To the extent there is any ambiguity in the claim terms, the specification resolves the debate.  The specification describes the production of "hybrid antibodies containing human variable regions and mouse constant regions."  A267 at 20:37-39; *see also* A269 at 24:4-6 ("transgenic mouse will have a genome comprising entirely human heavy and light chain variable gene loci operably linked to entirely endogenous mouse constant region").  That concept is not merely mentioned in passing; rather, the specification makes clear that the reverse-chimeric mouse is the *central innovation* of the invention, which distinguishes it from the prior-art mice.  *See* A267 at 20:52-55 ("[the claimed] mouse will create antibodies that are human variable region-mouse constant region, which will have the following benefits over the previously available" mice).  Moreover, the '018 Patent is deafeningly silent in the opposite direction.  Even Merus's expert

admitted that there is nothing in the specification "about modifying the mouse constant region," and that the specification does not describe any construct capable of doing so.  A2652-2657.

Finally, the prosecution history confirms what the claim and specification already make clear.  During prosecution, Regeneron unambiguously disclaimed any construction that would not cover reverse-chimeric mice.  Its claims should therefore be so limited now.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (where patentee disavows a more expansive meaning to obtain a patent, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim").  Regeneron argued to the PTO that there was no teaching or motivation in the prior art "for making a human variable/mouse constant antibody from an endogenous mouse locus."  A410; *see also* A2748-2750.  In distinguishing Lonberg, for example, Regeneron argued that "the loci of the claims form rearranged human variable/mouse constant genes" and that the resulting antibody would have "human variable/mouse constant" heavy and light chains.  A454.  The District Court dismissed this critical evidence as mere "advocacy," A127, ignoring entirely this Court's admonition that "the prosecution history . . . is to be consulted even in determining a claim's broadest reasonable interpretation," *Straight Path IP Grp. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1362 (Fed. Cir. 2015).

34

As support for its contrary BRC, the District Court offered a single statement from the '018 Patent: "Another preferred embodiment includes an antibody comprising <u>human and non-human constant regions</u>." A119 (citing A261 at 7:19-23) (emphasis in original); *see also* A127 (cross-referencing same statement). Although superficially appealing, the cited statement is irrelevant. That is because the '018 Patent's preferred embodiments include a number of *antibodies* that might eventually be produced. Regeneron agrees that, in order to create therapeutically useful antibodies, the reverse-chimeric antibodies produced by the claimed mouse must later be modified after DNA is extracted from the mouse, by replacing the mouse constant regions with human constant regions. *See* A267 at 20:44-46; A269 at 24:9-18. Thus, while certain *antibodies* disclosed in the specification may have human constant regions, the claimed *mouse* itself produces only reverse-chimeric antibodies.

### b.    The Asserted References Are Not Material Under Either BRC.

In concluding that the Asserted References were material, the District Court never actually explained why they would have rendered the '018 Patent unpatentable. It is, of course, *Merus's* burden to prove that the Asserted References are but-for material, not *Regeneron's* burden to hypothesize about their relevance—a point the District Court failed to appreciate. *See Therasense*, 649 F.3d at 1287. Yet the District Court never stated that the Asserted References

would have anticipated the claims in the '018 Patent or would have rendered them obvious.  *See* 35 U.S.C. §§ 102, 103.  To anticipate a claim, the prior art must teach every element of the claim.  *Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  To render a claim obvious, the prior art must demonstrate that the claimed invention would have been obvious to a person of ordinary skill in the art, at the time of filing.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).  Instead of applying those standards, the District Court simply declared the Asserted References material according to some unstated measuring stick.

Under any standard, though, the District Court was required to assess the references that *were not* disclosed to the PTO against the references that *were*.  "It is well-established . . . that information is not material if it is cumulative of other information already disclosed to the PTO."  *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1367 (Fed. Cir. 2008).  Put differently, if the PTO had already learned the relevant information from some other source, then an undisclosed source would not have moved the needle.

That was the case here.  Even the District Court's (incorrect) BRC includes at least three key elements: (1) a mouse with a genetically modified germline, (2) in which human unrearranged variable gene segments, (3) have been inserted

into the immunoglobulin locus.  A122.  The Asserted References have a number of glaring omissions, and are cumulative anyway:

- **Brüggemann** is cumulative of Kucherlapati.

- **Wood** does not teach targeting the immunoglobulin locus.  On all three elements, it is also cumulative of Lonberg.

- **Taki** does not teach the insertion of human unrearranged variable gene segments.  On targeting, it is also cumulative of Kucherlapati and Lonberg.

- **Zou** does not teach the insertion of human unrearranged variable gene segments.  On targeting, it is also cumulative of Kucherlapati and Lonberg.

Under a correct BRC, the District Court's error is even clearer.  As explained above, Claim 1 covers reverse-chimeric mice with a *human variable region* and a *mouse constant* region.  None of the Asserted References teaches that combination, and most affirmatively teach away from it.

- **Brüggemann**, to the extent it specifies, discloses both a *human variable* region and a *human constant* region.

- **Wood**, to the extent it specifies, discloses a *human variable* region and prefers a *human constant* region.

- **Taki** discloses both a *mouse variable* region and a *mouse constant* region.

- **Zou** discloses a *mouse variable* region and a *human constant* region.

### i.    Brüggemann Is Cumulative Of Kucherlapati.

Brüggemann is a 7-page review paper that summarizes the use of transgenic mice to express human antibodies. And of those seven pages, the District Court acknowledged that only one section merits any discussion. A133. In fact, its materiality determination turned on a single sentence in which Brüggemann muses about replacing the mouse loci with human loci:

> An attractive alternative [to the random integration of human genes] would be to replace the mouse Ig loci with the human Ig loci; in this way it might also be possible to retain and exploit any possible regulatory sequences in the mouse loci that are located distal to protein-coding regions.

A3917. Brüggemann further indicates, with no elaboration, that "much of the DNA of the mouse Ig loci" might be replaced with human DNA. A3918. It does not specify that the mouse constant region should be retained, or that any portion of the mouse locus should be retained at all. In other words, Brüggemann's speculative sentence merely extends the traditional "the-more-human-the-better" approach from random integration to targeted replacement with a fully human immunoglobulin locus.

More fundamentally, Brüggemann is not material because it is cumulative of Kucherlapati. Kucherlapati, which Regeneron submitted to the PTO, includes a

passage that is functionally identical to the above-quoted sentence from

Brüggemann.  Kucherlapati observes that

> the target [or mouse] locus may be substituted with the analogous
> xenogeneic [or human] locus.  In this way, the xenogeneic locus will be
> placed substantially in the same region as the analogous host locus, so that
> any regulation associated with the position of the locus will be substantially
> the same for the xenogeneic immunoglobulin locus.

A3821 at 10:50-55.  Put another way, Kucherlapati and Brüggemann disclose the

same possibility of replacing a mouse locus with a human locus, and connect it

with the same benefit of preserving normal regulatory sequences.  The only

difference between the two is that Kucherlapati thereafter discloses even *more* than

Brüggemann, because it moves beyond mere speculation and suggests one possible

mode of implementation.  *See* A3821 at 10:55-64.

The District Court determined that Kucherlapati did not render Brüggemann

cumulative for two reasons.  First, it stated that Kucherlapati was not enabled and

"cannot render a reference to an *enabled* device cumulative."  A145 (emphasis

added).  But to the extent Kucherlapati is not enabled with respect to the targeted

replacement of the entire immunoglobulin locus, *Brüggemann is not enabled*

*either.*  Brüggemann openly admits as much, pointing out that its "ambitions have

not yet been realized."  A3917.  Second, the District Court stated that the relevant

sentence in Kucherlapati is different from the relevant sentence in Brüggemann.

A147-148.  It offered no reasoning for that conclusion.  Instead, it paraphrased

Brüggemann, quoted Kucherlapati, and concluded its analysis abruptly—perhaps

misunderstanding that the two sources describe the same concept.  Word choice

alone, of course, is not enough to make "uncited prior art . . . more material than

that before the examiner."  *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d

1435, 1441 (Fed. Cir. 1991).

> ### ii.    Wood Does Not Disclose Targeting The Immunoglobulin Locus, And Is Cumulative Of Lonberg.

Wood discloses a randomly integrated human transgene, without any

inactivation of the endogenous locus.  A3447-3448.  It never mentions targeting

the endogenous locus, and provides no mechanism for doing so.  Merus's own

expert admitted as much.  *See* A2812; *see also* A2694.  Without targeting the

locus, Wood is missing a key claim element and is far less advanced than the

references before the PTO.

The District Court's reasoning to the contrary was contradictory and legally

erroneous.  The District Court first stated, without pointing to a particular portion

of the reference, that "Wood teaches a targeted insertion . . . at the mouse locus."

A135.  On the very next page, it corrected itself, noting instead that "Wood *does*

*not* target insertion at the Ig locus."  A136 (emphasis added).  Having

acknowledged that, however, the District Court further reasoned:  "It is certainly

true that Wood does not target insertion at the Ig locus, but nor does he exclude

insertion at the locus." *Id.* That remarkable statement is not how the analysis works. It does not matter whether Wood overtly *excludes* each and every element in Claim 1 of the '018 Patent; it matters whether it discloses those elements. *See Verdegaal Bros.*, 814 F.2d at 631 (requiring that "each and every element as set forth in the claim [be] found, either expressly or inherently described, in a single prior art reference").

On top of that, Wood does not disclose a reverse-chimeric mouse. The District Court disagreed only because it misread a portion of Wood that in fact teaches *the opposite*. According to the District Court, "Wood indicates that a skilled artisan may take advantage of the endogenous mouse μ (mu) constant region." A135. Not quite. What Wood actually says is that "[t]he μ region may be of exogenous origin or from the animal itself, *but is preferably human*." A3449 (emphasis added). In other words, Wood acknowledged that some constant region must be present, but—consistent with the prevailing wisdom—preferred to use a human constant region.

Even if Wood's statement about the μ constant region were relevant in isolation, it is cumulative of Lonberg. Almost quoting verbatim from Wood, Lonberg states that constant region gene segments are "preferably a μ gene, and more preferably a human or murine μ gene." A3610 at [0283]. For that reason, too, Wood cannot be but-for material.

### iii. Taki Does Not Disclose The Insertion Of Human Unrearranged Variable Gene Segments, And Is Cumulative Of Kucherlapati And Lonberg.

Taki discloses the insertion of a *mouse rearranged* variable region at the immunoglobulin locus, meaning that the mouse will make only one specific, fully mouse antibody. A3926. The mice created using the insertion described in Taki are useful for testing "antigen-specific" phenomena, but are not useful for the generation of therapeutic antibodies. A3928.

Taki is missing two components of the "human unrearranged variable" element: It involves neither human nor unrearranged variable gene segments. The District Court concluded, with little explanation, that there was no substantial difference between *rearranged* and *unrearranged* gene segments. *See* A136-137. That conclusion makes little sense in light of the overriding purpose of the '018 Patent, which is to produce a diverse range of therapeutic antibodies for use in humans. A267; A3279-3280. Even had the District Court been right on that point, it would not have lessened another stark difference between Taki and the '018 Patent: Taki teaches insertion of *mouse* variable gene segments, while the '018 Patent claims a mouse with *human* variable gene segments. In other words, the mouse claimed in the '018 Patent is a reverse-chimeric mouse, and the mouse disclosed in Taki is a mouse with entirely mouse DNA.

The District Court overlooked this central difference, concluding that Taki "provides the motivation to target human variable region DNA into the mouse Ig locus," without discussing the critical word "human." A137. The source of its oversight appears to be a fundamental misunderstanding of Taki. Elsewhere in its opinion, the District Court described Taki as inserting exogenous, or *human*, rearranged variable gene segments. A146. Taki teaches no such thing, and the District Court's misperception of the science meant that the yawning gap between Taki and the '018 Patent went unaddressed.

If Taki is relevant at all, it is relevant only in teaching targeted insertions at the immunoglobulin locus. On that front, it is cumulative of Kucherlapati and Lonberg. Kucherlapati, in the same passage that renders Brüggemann cumulative, discloses inserting "the xenogeneic locus . . . substantially in the same region as the analogous host locus," and describes using homology arms to do so. A3821 at 10:50-64. In other words, it teaches targeted insertion at the immunoglobulin locus. The District Court inexplicably dismissed this as "only vague targeting," and mistakenly touted Taki as "targeting exogenous variable region DNA"—again, *human* DNA. A146.

Although the parties dispute which aspects of Kucherlapati are enabled, it is enough that Lonberg teaches targeting, too. To be sure, the human gene segments in Lonberg are incorporated through random integration, as the District Court

43

noted.  A137.  But Lonberg also teaches targeting the mouse immunoglobulin

locus with a marker gene.  A3611 at [0298].  It specifically notes that such

targeting may be accomplished "via homologous recombination" using "targeting

vector[s]," *id.*, no different from the targeting method described in Taki.  In other

words, if all that Taki teaches is targeted modification of the immunoglobulin

locus, Lonberg already covers that ground.[3]

### iv.    Zou Does Not Disclose The Insertion Of Human Unrearranged Variable Gene Segments, And Is Cumulative Of Kucherlapati And Lonberg.

Zou discloses a mouse with a mouse variable region and a (mostly) human

constant region.  A3924.  Zou does not modify the mouse variable region at all, but

rather focuses on producing antibodies with "human instead of mouse constant

regions."  *Id.*  Put differently, the '018 Patent discloses the insertion of human

variable regions; Zou does not.  Zou discloses the insertion of human constant

regions; the '018 Patent does not.  Zou, in short, exemplifies the early chimeric

mouse technology, *see* A3921, and does not disclose key elements in the '018

Patent.

The District Court concluded that Zou was but-for material because it

"provides significant motivation to target the mouse Ig locus with human Ig

---

[3]    Lest there be any doubt, another cited reference, Jakobovits, teaches targeting the immunoglobulin locus as well.  *See* A3848 (using "site-specific recombination for modification of immunoglobulin loci").

DNA." A140. That conclusion ignores the fundamental distinction that Zou targets the locus with human *constant region* DNA, and the '018 Patent targets the locus with human *variable region* DNA. To the extent that Zou teaches targeting the locus—the one point of similarity between Zou and the '018 Patent —that general teaching is cumulative of Kucherlapati and Lonberg, for the reasons discussed above.

There is a single sentence in Zou that the District Court also highlighted for the proposition that Zou teaches the retention of the mouse constant region: "[T]he entire $C\gamma1$ gene is replaced by its human counterpart, except for the exons encoding the transmembrane and cytoplasmic portions of the $\gamma1$ chain; we hoped in this way to minimize the danger of disturbing membrane expression and signaling of the humanized IgG1 in the mouse." A3922. Read in context, replacing almost an entire mouse constant gene with its human counterpart while retaining one small portion is a far cry from preserving the mouse constant region, as the '018 Patent teaches. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) (cautioning against "select[ing] a single line" and reading it "out of context" to inflate the relevance of prior art). Moreover, to the extent this single sentence in Zou suggests retaining some portion of the mouse constant region, the '018 Patent focuses on a different portion altogether. Instead of the transmembrane region and cytoplasmic tail (which do not form a part of

45

secreted antibodies that have a fully human constant region), the '018 Patent emphasizes the mouse Fc region—a significant region that Zou replaces with a human version. *Compare* A267 at 20:55-65 (Patent's explanation that mouse Fc region is critical for appropriate B-cell signaling), *with* A2818-2819 (Merus's expert's testimony that Zou uses fully human Fc region).

### v.    The Asserted References Are No More Material Combined Than Alone.

Combining the Asserted References does not change the analysis, as they do not supply any material information that Kucherlapati and Lonberg omit. Kucherlapati and Lonberg taught the inactivation of the mouse immunoglobulin locus, paired with randomly integrated human transgenes, in order to create a mouse that produces human antibodies. Lonberg also taught targeting the mouse immunoglobulin locus, not just to inactivate it but to insert a marker gene. *See* A3611 at [0298]. And Kucherlapati taught the targeted insertion of a human locus to replace the entire mouse locus. *See* A3821 at 10:50-51.

For the reasons discussed above, Brüggemann simply echoes, in more generalized fashion, the statement in Kucherlapati about targeting the entire locus. Of Taki, Wood, and Zou, only Wood discloses the use of human variable region

gene segments.[4]  But Wood is in effect a more primitive version of Lonberg, in that Wood discloses a randomly integrated human transgene *without* targeted inactivation of the mouse locus.  *See* A3447-3448.  And of Taki, Wood, and Zou, only Taki and Zou disclose targeting the mouse locus.[5]  Taki substitutes a rearranged mouse VDJ for a J region, and Zou substitutes a human gamma for a mouse gamma in the constant region.  Those types of targeting, which use then-available technology limited to small portions of the immunoglobulin loci, are comparable in scale to Lonberg's and Kucherlapati's substitution of a selection marker for a J region.  *See* A3611 at [0298]; A3821 at 9:7-24.  Another portion of Lonberg also teaches the substitution of a rearranged mouse VDJ for a D region, comparable to the teaching in Taki.  A3659 at [0676].

Thus, the Asserted References taken as a whole are no more material than they are taken singly.  They would not have motivated the invention described in the '018 Patent, and the District Court gave no explanation for concluding otherwise.  Even assuming that, as the District Court stated, "a skilled artisan *could* combine" the Asserted References to come up with the invention in the '018 Patent, A141, that is not enough.  This Court has reversed similar obviousness

---

[4]    The District Court mistakenly described Zou and Taki as involving *human* variable region gene segments.  A141.  Taki involved mice with fully mouse DNA, and Zou involved mice with a mouse variable region.  *See supra* pp. 42-44.

[5]    For the reasons described above, the District Court was incorrect to state that Wood targeted the endogenous locus, A141.  *See supra* pp. 40-41.

findings where the evidence showed at most that "one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns., Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

The deficiencies in the District Court's analysis are even starker under the proper BRC, which requires retention of the mouse constant region. The Asserted References nowhere suggest reversing the dominant trend toward mice with fully human immunoglobulin loci. The District Court's passing suggestion that the Asserted References may have motivated a reverse-chimeric mouse, A142, thus reflects the hindsight bias that this Court has repeatedly cautioned against. *See, e.g.*, *InTouch*, 751 F.3d at 1351; *Bausch & Lomb*, 796 F.2d at 448.

### vi.    The European Opposition Briefs Are Not Material.

The District Court also found that the European Opposition Briefs filed by competitors in 2013 were but-for material. A144. That finding is legally baseless. The Opposition Briefs are advocacy papers that cite prior art. Either the underlying sources are material, or they are not; the litigation documents describing those sources cannot independently be material. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) ("Although international search reports may contain information material to patentability . . . , *it is the reference itself*, not the information generated in prosecuting foreign counterparts, that is

material to prosecution in the United States.") (emphasis added). The District Court did not cite a single case for the proposition that advocacy papers drafted by a competitor years after a patent's filing date can ever be material.

### c.    Related Proceedings Either Confirm The Lack Of Materiality Or Are Uninformative.

The District Court sought to buttress its clearly erroneous materiality finding by pointing to other rejections in the '018 Patent's family. *See* A149-154. Although the rejection of a substantially similar claim in another patent might be relevant to materiality, *Therasense* dictates that such rejections cannot bear the weight the District Court gave them here. After all, pre-*Therasense* cases had concluded that rejections (which are, in effect, only prima facie determinations of unpatentability issued before the patentee provides further explanation) were material under the then-prevailing "reasonable examiner" test for materiality. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003). But *Therasense* specifically overruled that test. *See* 649 F.3d at 1294-95.

In any event, the most significant related patent in this case—and the only one given its own section in the District Court's analysis—has been upheld, cutting *against* a finding of materiality. The District Court looked to the EP '287 Patent, which it described as "the European counterpart to the '018 Patent." A153. The District Court believed that its views on materiality were confirmed because "the Opposition Division of the European Patent Office revoked EP '287 in its

entirety." A154.  Tellingly, that revocation was *overturned* by the European

Technical Board of Appeal shortly after the District Court issued its decision.  *See*

F3315 Oral Proceedings in Appeal No. T2220/14-3.3.08, at 11 (Eur. Patent Office

Bd. App. Nov. 9, 2015), *available at* https://goo.gl/0BuJBq (written decision

pending).  Similarly, the High Court of Justice of England and Wales has recently

concluded that Regeneron's reverse-chimeric mouse is novel and non-obvious,

notwithstanding the Asserted References.  *See Regeneron Pharm. Inc. v. Kymab*

*Ltd.*, [2016] EWHC87, [97-98, 304-309].

 Meanwhile, the PTO rejections that the District Court cited are not

illuminating in light of the cumulativeness of several references.  A rejection that

cites Brüggemann, *see* A150-151, for example, does not mean that Brüggemann is

the only source for a particular proposition.  The same proposition may be found in

another reference—like Kucherlapati, which was before the PTO.  *See supra*

pp. 38-39.  Similarly, the fact that a rejection may have listed some of the Asserted

References alongside Kucherlapati and Lonberg, *see* A152-153, does not mean that

the Asserted References are not cumulative of Kucherlapati and Lonberg.  To be

sure, the PTO trains its examiners not to list cumulative references that "would

*clearly fall* if the primary rejection were not sustained."  MPEP § 706.02 (emphasis

added).  But it is a thin reed for the District Court to seize onto a PTO examiner's

*initial* decision with respect to *different* claims, applying a *different* standard for

cumulativeness.  That guesswork is more than counterbalanced by the on-point

decisions of multiple European courts.

### 2.     Regeneron Did Not Commit Affirmative Egregious Misconduct.

Apparently as an alternative to its finding of but-for materiality,[6] the District

Court held that "Regeneron" had committed affirmative egregious misconduct by

making certain allegedly false statements to the PTO during prosecution of

the '018 Patent.  A160.  That alternative holding must be reversed.

Affirmative egregious misconduct is a narrow "exception" to the "general

rule" that "but-for materiality . . . must be proved to satisfy the materiality prong of

inequitable conduct."  *Therasense*, 649 F.3d at 1292.  This Court emphasized in

*Therasense* that the standard for proving affirmative egregious misconduct is very

high.  In particular, "neither mere nondisclosure of prior art references to the PTO

nor failure to mention prior art references in an affidavit constitutes affirmative

egregious misconduct."  *Id.* at 1292-93.  Rather, as the word *egregious* suggests, a

court may dispense with the but-for-materiality requirement only in "extraordinary

circumstances."  *Id.* at 1293.

---

[6]     The District Court addressed affirmative egregious misconduct under the
same heading as intent, rather than with but-for materiality.  It thus appears that the
District Court may have mistakenly viewed affirmative egregious misconduct as
bound up with the intent prong.

In elaborating what constitutes extraordinary circumstances, *Therasense* noted that the doctrine of affirmative egregious misconduct "incorporates elements of" three Supreme Court decisions concerning the unclean hands doctrine. *Id.* at 1292; *see Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), *overruled on other grounds by Standard Oil Co. v. United States*, 429 U.S. 17 (1976); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933). Each of those cases, this Court explained, involved a "'deliberately planned and carefully executed scheme' to defraud the PTO and the courts," *Therasense*, 649 F.3d at 1292 (alteration omitted) (quoting *Hazel-Atlas*, 322 U.S. at 245). Indeed, the conduct at issue included perjury, suppression and fabrication of evidence, and bribery. *Id.* at 1293 (citing *Precision*, 324 U.S. at 816-20; *Hazel-Atlas*, 322 U.S. at 240; *Keystone*, 290 U.S. at 243). What all of that conduct has in common is the deliberate submission of "unmistakably false" information, in order to deceive the PTO into issuing a patent. *Id.* at 1292. No such circumstances are present here.

### a.    The District Court Never Found Deliberate Conduct.

The District Court never made any finding that any individual at Regeneron knew he was submitting false information. The court pointed to three instances of supposed misconduct: (1) certain statements in the specification that supposedly "create[d] the inaccurate impression" that a scientist did not need to know the

complete sequence of the mouse immunoglobulin locus in order to use a quantitative assay to detect modifications of allele; (2) allegedly "incomplete and/or inaccurate" statements in the specification regarding the LTVEC method, which, according to the court, obscured the fact that "the disclosures in the specifications of the '018 Patent were . . . insufficient to practice the invention"; and (3) certain statements in a presentation provided to the PTO by Dr. Smeland that, according to the court, wrongly suggested Regeneron had already created the VelocImmune® mouse at the time of the application.  A156-158.

What is missing from the District Court's opinion is any finding that anyone *knew* that these statements were false—even assuming that they were.  The District Court never found that anyone *knew* that any of the statements in the specification regarding the quantitative assay or LTVEC method were false.  It did not find that Dr. Andrew Murphy, an inventor on the '018 Patent who provided various scientific materials to Dr. Smeland, *knew* that the presentation would be submitted to the PTO; nor did it find that Dr. Smeland, who submitted it, *knew* that anything in the presentation was false.  Having failed to make these findings, the District Court did not find (and could not have found) that anyone at Regeneron deliberately submitted false information.

**b.    The District Court Never Found That The Alleged Misstatements Were "Unmistakably False."**

Under *Therasense*, it is not enough that a statement made to the PTO was incomplete or potentially misleading; it must have been "*unmistakably false*." *Therasense*, 649 F.3d at 1292 (emphasis added).  That makes sense, as any other rule would mean that a statement to the PTO could give rise to a finding of affirmative egregious misconduct whenever a court subsequently disagreed with it. The District Court here never found that the statements at issue were *unmistakably false*.  Nor could it have, given that each of the statements was true, or at the very least subject to reasonable debate.

First, while the District Court found "persuasive[]" Merus's expert's contention that "one would need to know the full sequence of the mouse Ig loci" in order to "confirm an appropriate targeting" of the locus using a quantitative assay, A156, Regeneron introduced expert testimony that, as of 2001, it was not uncommon to forgo sequencing the entire region one was seeking to replace, depending on the method, A2499.  Just because the District Court may have found Merus's contrary testimony more "persuasive[]," it hardly follows that the statements in the specification regarding the assay were "unmistakably false."

Second, the District Court also found "persuasive[]" Merus's expert's contention that statements in the specification regarding the LTVEC method were "incomplete and/or inaccurate."  A157.  In particular, the District Court concluded

that a scientist would need to know the location of the 5' end of the mouse immunoglobulin locus in order to practice the LTVEC method, but that the location was unknown in 2001. *Id.* Regeneron, however, introduced expert testimony showing that the location of the 5' end was irrelevant; indeed, the dispute between Regeneron and Merus over whether the '018 Patent was indefinite turned on that issue. *See supra* pp. 27-29. The District Court also pointed to a presentation to Regeneron's board stating that the LTVEC method required the use of "proprietary technology," which the District Court thought was not disclosed in the '018 Patent. A157-158. But the court failed to grasp that the "proprietary technology" was the LTVEC method disclosed in the first part of the specification and claimed in Regeneron's earlier patents. A court's debatable findings regarding indefiniteness or enablement in the face of conflicting expert testimony cannot render contrary statements in the specification "unmistakably false."

Third, according to the District Court, statements in a presentation submitted during prosecution touting the benefits of Regeneron's VelocImmune® mouse were false because the VelocImmune® mouse did not exist in February 2001. A158-160. But Regeneron never contended that its commercial VelocImmune® mouse existed at the time of the invention. The patent's description of a reverse-chimeric mouse was in a prophetic example, which was "set forth in the present tense to indicate that [it had] not [been] carried out," *Schering Corp. v. Geneva*

*Pharm., Inc.*, 339 F.3d 1373, 1376 n.1 (Fed. Cir. 2003); *see* A267-269.  Further,

the slide presentation was submitted in response to an obviousness rejection to

provide data showing that Regeneron's commercial embodiment of the mouse

exhibited unexpected results as compared to competitors' transgenic mice.  A457-

461.  The District Court's falsity finding was therefore premised on a

misconception of patent law, and it made no finding that the data submitted to the

PTO was actually untrue.

    *Therasense* makes clear that these sorts of statements and battles of the

experts cannot constitute affirmative egregious misconduct.  Were it otherwise, a

court would be able to tack on a finding of affirmative egregious misconduct every

time it disagreed with a patentee's scientific contentions.  That would undo this

Court's decision in *Therasense* to "tighten[] the standards for finding" inequitable

conduct "in order to redirect a doctrine that has been overused to the detriment of

the public."  649 F.3d at 1290.  The District Court's affirmative-egregious-

misconduct finding must be reversed.

### B.     In The Alternative, This Court Should Remand For A Trial On Specific Intent.

    Even assuming the Asserted References were material, that is not enough to

render the patent unenforceable for inequitable conduct.  Merus must also prove

that somebody at Regeneron acted with the *specific intent* to deceive the PTO.

*Therasense*, 649 F.3d at 1290.  That is no easy task; it requires Merus to

demonstrate that a specific intent to deceive is "the single most reasonable inference able to be drawn from the evidence." *Id.* (quoting *Star Sci.*, 537 F.3d at 1366).

Remarkably, the District Court never required Merus to make any showing whatsoever of specific intent—let alone the demanding showing required by *Therasense*. It canceled the planned trial, precluded the testimony of Regeneron's patent prosecutors, and purported to draw an "adverse inference" that Regeneron had acted with the intent to deceive the PTO, in order to punish the perceived misconduct of Regeneron's trial counsel. A181. With no additional analysis, it then simply concluded that its "adverse inference" was "the single most reasonable inference" under *Therasense*. *Id.* That conclusion ignores governing Second Circuit law on sanctions,[7] and undercuts this Court's governing law on inequitable conduct. It should be vacated.

### 1.     The Sanction Must Be Vacated Because The District Court Failed To Find Bad Faith.

#### a.     The District Court Did Not Impose A True "Adverse Inference."

Although the District Court labeled its sanction an "adverse inference," it was no such thing. In the Second Circuit, "a party's intentional destruction of

---

[7]     This Court applies the law of the relevant regional circuit with respect to privilege disputes that do not implicate substantive patent law. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1272 (Fed. Cir. 2001).

evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). That is, an adverse inference is an inference about *a particular piece of missing evidence*, "which usually is employed in cases involving spoliation." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). An adverse inference may also be imposed where evidence is not timely produced for use at trial. *Id.* at 107. In either instance, it functions the same way: The trier of fact may conclude that the missing evidence would have supported the other party's claim or defense.

Here, the District Court used the "adverse inference" label without applying it to any particular piece of evidence. Based on trial counsel's designation of certain documents as privileged, the District Court "impose[d] the sanction of an adverse inference *as to the intent* of Smeland and Murphy with regard to inequitable conduct during patent prosecution." A181 (emphasis added). In other words, it decided the ultimate issue of specific intent against Regeneron. That is a sanction tantamount to dismissal. *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (deciding a critical element against a party is "a harsh sanction, one akin to dismissing the action altogether").

Dismissal "is a drastic remedy that should be imposed only in extreme circumstances." *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988) (quoting *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986)). It accordingly requires an express finding of willfulness or bad faith. *Id.* The District Court made no such finding here, and its severe sanction must be vacated for that reason alone. *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (finding abuse of discretion where district court entered default judgment without necessary findings).

### b.    The Record Does Not Support The Necessary Finding Of Bad Faith.

Even if the District Court *had* made an express finding of bad faith, such a finding would have been an abuse of discretion. Each of the instances of purported discovery misconduct recounted in the opinion below reflects reasonable litigation choices (or, at the very worst, reasonable misunderstandings about the scope of any privilege waiver) by Regeneron's trial counsel. And courts should be especially reluctant to ascribe bad faith to attorneys for vigorously litigating attorney-client privilege disputes. *Cf. Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003). To take the two main examples that the District Court mentioned:

_The Jones Memo_.  The District Court criticized Regeneron's positions regarding "the Jones Memo."  A163-170.  Regeneron had argued that its production of a memorandum and charts created by Dr. Jones, A1899-1910, did not waive the attorney-client privilege because the documents were drafted pursuant to Dr. Jones's independent obligation as a patent prosecutor, _see_ 37 C.F.R. § 1.56, not as communications to the client.  To be sure, when Dr. Jones later discussed the substance of the memorandum with his client, those communications were privileged.  But Regeneron did not believe that the privilege attached to the documents themselves, which were created for a separate purpose. _See United States v. Kovel_, 296 F.2d 918, 922 (2d Cir. 1961) ("What is vital to the privilege is that the communication be made . . . for the purpose of obtaining legal advice from the lawyer.").  As for the District Court's subsequent review to determine the scope of the resulting waiver, the parties reasonably relied on conflicting interpretations of a prior discovery order.  A2083-2084.  And, as the District Court acknowledged, it was "a good-faith dispute."  A2084.

_The Smeland Trial Affidavit_.  The District Court also pointed to perceived discovery problems shortly before trial.  A170-179.  It highlighted Dr. Smeland's trial affidavit and concluded that _any_ discussion of Dr. Smeland's beliefs or understandings about prior art automatically constituted a broad waiver of the attorney-client privilege.  A172-175.  Regeneron, meanwhile, had argued that

Second Circuit law did not compel such a conclusion. It believed that Dr. Smeland could testify about his understandings of prior art, which had been made public through the prosecution record, so long as he did not put *the substance of a privileged communication* at issue. *See In re Cnty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008). Regeneron reasonably disputed the conclusion that it could not, consistent with its prior claim of privilege, "delv[e] into state of mind or knowledge to defend against the claim of inequitable conduct." A176.[8]

## 2. Regeneron Is Still Entitled To A Trial On Specific Intent.

This Court need not engage in every minute detail of the parties' discovery disputes to determine that the District Court abused its discretion here. The critical legal question is whether the District Court was entitled to enter a finding of specific intent to deceive the PTO, based on the privilege disputes discussed briefly above. The answer is no: Even a cursory glance at the complex record reveals that Regeneron zealously litigated its positions in good faith.

As a result, if it does not reverse outright on the materiality prong, this Court should vacate the inequitable-conduct finding and remand for a trial on the specific

---

[8]     In the course of assessing the Smeland affidavit, the District Court also stated that other non-privileged documents had been improperly withheld. A178. But it never identified specific documents, making it impossible for Regeneron to respond. As explained in Regeneron's briefing below, the District Court may have misunderstood that many documents at issue had in fact been produced, and were listed in the privilege log only because they were *also* attached to logged privileged communications. *See* A3409.

intent prong.  An adverse inference cannot relieve Merus of its burden to prove, in view of all the evidence, the ultimate question under *Therasense*: that "the specific intent to deceive [is] the single most reasonable inference able to be drawn from the evidence."  649 F.3d at 1290 (internal quotation marks omitted).  Regeneron is still entitled to a trial at which it can produce other evidence or testimony (including the memorandum and charts drafted by Dr. Jones, *see* A1899-1910), can point to evidence and expert testimony admitted at the materiality stage, and can refute Merus's trial narrative.  *Therasense* demands as much.

### 3.     At Most, This Court Should Approve Dismissal, Not A Finding Of Inequitable Conduct.

In some ways, the most troubling aspect of the District Court's opinion is that the court did more than decide this case against Regeneron; it entered a finding of inequitable conduct that nullifies the '018 Patent altogether.  As far as Regeneron is aware, that is an unprecedented sanction.

The harshest sanctions listed under Federal Rule of Civil Procedure 37(b)(2) are dismissing an action and entering judgment against a party.  *See* Fed. R. Civ. P. 37(b)(2)(A)(v), (vi).  In other words, a party acting in bad faith might deserve to lose its case based on litigation misconduct.  So even if the District Court somehow believed that Regeneron's trial counsel had acted in bad faith, the most extreme sanction would have been to dismiss Regeneron's patent infringement suit against Merus.

A finding of inequitable conduct is an entirely different sanction.  If that finding stands, Regeneron loses not just its claims against Merus but its rights under the entire '018 Patent.  It can no longer enforce its patent against *anyone*.  As *Therasense* explained, "inequitable conduct regarding any single claim renders the entire patent unenforceable."  649 F.3d at 1288.  And such a deficiency "cannot be cured by reissue or reexamination."  *Id.* (citation omitted).  Equally disturbing, Regeneron's patent attorneys—who, because of a sanction imposed on its trial attorneys, were never allowed to defend themselves by testifying to their good intent—now face severe collateral consequences, including reputational costs and potential disciplinary actions.  *See id.* at 1288 (noting the "ruinous consequences for the reputation of [a] patent attorney").  A finding of inequitable conduct is, in short, a sanction different in kind from dismissal:  It results in the loss of a valuable property right, the loss of future claims against third parties, and the imposition of serious collateral consequences.

Those repercussions should not be visited upon a patent holder and patent prosecutors in the circumstances here.  Before triggering what this Court has called "the atomic bomb of patent law," *id.* (internal quotation marks omitted), a judge must have a real factual basis to find that a patent holder actually deceived the PTO.  It cannot sanction trial counsel for alleged discovery misconduct through an inequitable-conduct "finding" that is no more than a legal fiction.  Thus, even if

this Court determines that the District Court acted within its discretion in all other respects, it should vacate the inequitable-conduct finding and remand with instructions to dismiss Regeneron's infringement suit against Merus.

## CONCLUSION

For all the foregoing reasons, this Court should reverse the District Court's claim constructions, invalidity finding, and inequitable-conduct finding. Alternatively, this Court should either (1) affirm the invalidity finding and vacate the inequitable-conduct finding, or (2) vacate the inequitable-conduct finding and remand the case for a trial on specific intent or with instructions to dismiss Regeneron's infringement suit.

Respectfully submitted,

/s/ Neal Kumar Katyal
Neal Kumar Katyal
Morgan L. Goodspeed
Matthew A. Shapiro
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

Christopher P. Borello
Robert S. Schwartz
Michael E. Furrow
Brendan M. O'Malley
FITZPATRICK, CELLA, HARPER &
   SCINTO
1290 Avenue of the Americas
New York, NY 10104
(212) 219-2100
cborello@fchs.com

*Counsel for Appellant Regeneron*
*Pharmaceuticals, Inc.*

**ADDENDUM**

# ADDENDUM

Page(s)

Final Judgment ...........................................................................A1

Joint Stipulation of Invalidity and Non-Infringement ....................................... A3-9

Opinion & Order (Claim Construction) ......................................................... A10-68

Opinion & Order (Inequitable Conduct) ....................................................... A69-182

United States Patent No. 8,502,018 ........................................................ A249-274

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Regeneron Pharmaceuticals, Inc.,

        Plaintiff/Counterclaim
        Defendant

    vs.

Merus B.V.,

        Defendant/Counterclaim
        Plaintiff

Civil Action No. 14-CV-1650 (KBF)
[rel. 14-CV-1651 (KBF)]

**ECF CASE**

Honorable Katherine B. Forrest

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 18 2015
```

## [PROPOSED] FINAL JUDGMENT

WHEREAS, Plaintiff/Counterclaim Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron") and Defendant/Counterclaim Plaintiff Merus B.V. ("Merus") have previously stipulated to noninfringement and invalidity due to indefiniteness of claims 1-20 of U.S. Patent No. 8,502,018 ("the '018 Patent"), which was so ordered by the Court (ECF No. 271);

WHEREAS, Merus continued to pursue its Third Amended Counterclaim asserting unenforceability of the '018 Patent as being procured through inequitable conduct (ECF No. 225);

WHEREAS, the Court issued an August 6, 2015 Memorandum Decision & Order (ECF No. 411) and a November 2, 2015 Opinion & Order (ECF No. 423), finding that Regeneron engaged in inequitable conduct in connection with prosecution of the '018 Patent;

In light of the foregoing, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.    Merus's Third Amended Counterclaim for a declaration that the '018 Patent is unenforceable is **GRANTED** and **FINAL JUDGMENT** is hereby **ENTERED** for the reasons set forth in the Court's Opinion & Order dated November 2, 2015 (ECF No. 423);

2.      In accordance with the Joint Stipulation and Order of Invalidity and Non-Infringement dated February 24, 2015 (ECF No. 271), Regeneron's claim for patent infringement (ECF No. 1) is **DENIED** and Merus's counterclaim for declaratory judgment of noninfringement (ECF No. 225) is **GRANTED** and **FINAL JUDGMENT** is hereby **ENTERED**;

3.      In accordance with the Joint Stipulation and Order of Invalidity and Non-Infringement dated February 24, 2015 (ECF No. 271), Merus's counterclaim for declaratory judgment of invalidity (ECF No. 225), due to indefiniteness, is **GRANTED** and **FINAL JUDGMENT** is hereby **ENTERED**; and

4.      **IT IS FURTHER ORDERED** that any requests for attorney's fees and/or costs are deferred until after resolution of any appeal of this Final Judgment.  To the extent that Regeneron does not appeal this Final Judgment, Merus may make a motion for attorney's fees and/or costs within fourteen (14) days after the expiration of the deadline for Regeneron to file a notice of appeal.

       **SO ORDERED**


Dated:  New York, New York

November 18, 2015

_____
**KATHERINE B. FORREST**
United States District Judge


2


A2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc., | Civil Action No. 14-CV-1650 (KBF) |
| Plaintiff/Counterclaim Defendant | |
| vs. | |
| Merus B.V., | |
| Defendant/Counterclaim Plaintiff | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED FEB 2 4 2015

### JOINT STIPULATION AND [PROPOSED] ORDER OF INVALIDITY AND NON-INFRINGEMENT OF U.S. PATENT NO. 8,502,018

Plaintiff/Counterclaim Defendant Regeneron Pharmaceuticals Inc. ("Regeneron") and Defendant/Counterclaim Plaintiff Merus B.V. ("Merus"), by their undersigned counsel, hereby stipulate and agree, and respectfully submit this Stipulation to the Court to be "So Ordered", as follows:

1.    WHEREAS, Plaintiff Regeneron filed this lawsuit against Defendant Merus on March 11, 2014;

2.    WHEREAS, Count I of Regeneron's complaint alleges that Merus has infringed and is infringing one or more claims of U.S. Patent No. 8,502,018 ("the '018 patent");

3.    WHEREAS, Regeneron asserted claims 1-2, 6-12 and 16-19 of the '018 Patent (the "Asserted Claims") against certain Merus technology, identified in Regeneron's August 10, 2014 infringement contentions, which are incorporated by reference herein, as Accused Instrumentalities;

4.    WHEREAS, Regeneron agrees claims 3-5, 13-15 and 20 of the '018 Patent (the "Non-Asserted Claims") do not cover Merus's Accused Instrumentalities, and that Merus's Accused Instrumentalities have not and do not infringe (literally or under the doctrine of equivalents) the Non-Asserted Claims.

5.    WHEREAS, Merus has filed counterclaims in this action seeking a declaratory judgment that (1) the '018 patent is not infringed; (2) is invalid; (3) is unenforceable; and (4) Merus seeks attorneys' fees pursuant to 35 U.S.C. § 285 (D.I. 225);

6.    WHEREAS, after receiving briefing and expert declarations from the parties, and holding a full day hearing, including with live expert testimony and oral argument on claim construction issues, the Court issued an Opinion & Order on November 21, 2014 construing the meaning of disputed terms of the asserted claims of the '018 patent (D.I. 210);

7.    WHEREAS, in the Opinion & Order, the Court ruled "that there is clear and convincing evidence that as of 2001 the metes and bounds of the [endogenous mouse immunoglobulin] locus were not identified with reasonable certainty; the scope of the term also lacks reasonable certainty and is therefore indefinite." (D.I. 210 at 50-54);

8.    WHEREAS, in the Opinion & Order, the Court also construed the terms "a genetically modified mouse"; "human unrearranged variable region gene segments"; "inserted"; "at"; "linked" "operably linked"; "does not comprise a human immunoglobulin constant gene" and "lacks a human constant region gene" (*see* D.I. 210);

9.    WHEREAS, the Court's October 17, 2014, Decision and Order concerning Regeneron's motion to amend its infringement contentions states: Regeneron "has not provided proper infringement contentions. It has therefore not provided infringement contentions asserting the doctrine of equivalents in proper form, and it is now too late to do so.

Its motion to amend to add contentions pursuant to the doctrine of equivalents is therefore denied." (D.I. 184);

10.   WHEREAS, Regeneron respectfully disagrees with the Court's construction of claim terms in D.I. 210, the finding of indefiniteness in D.I. 210, and the Court's rulings in D.I. 184, and reserves all rights to appeal the foregoing;

11.   WHEREAS, based on the Court's construction of the disputed terms "inserted," "linked," "operably linked," "does not comprise a human immunoglobulin constant region gene," "lacks a human constant region gene," "genetically modified mouse," and "human unrearranged variable region gene segments" and the Court's ruling concerning doctrine of equivalents in D.I. 184, Regeneron stipulates that, subject to its rights to appeal all appealable issues, the Merus Accused Instrumentalities have not infringed and do not infringe any claims of the '018 patent;

12.   WHEREAS, based on the Court's ruling as to the term "endogenous mouse immunoglobulin locus", Regeneron hereby stipulates that, subject to its rights to appeal all appealable issues, all claims of the '018 patent are invalid due to indefiniteness;

13.   WHEREAS, based on the foregoing, the parties stipulate to entry of partial judgment of Merus's counterclaim I for a declaratory judgment that the Merus Accused Instrumentalities have not and do not infringe the claims of the '018 patent, and Merus's counterclaim II for a declaratory judgment of invalidity due to indefiniteness of the claims of the '018 patent, (D.I. 225 at ¶¶62-65);

14.   WHEREAS, Regeneron reserves the right to assert infringement of the Asserted Claims by the Merus Accused Instrumentalities to the extent that the finding of indefiniteness (see D.I. 210) and one or more of the Court's claim constructions (see D.I. 210)

and/or the ruling that Regeneron is not permitted to rely on the doctrine of equivalents (see D.I. 184) are modified on appeal;

15.    WHEREAS, Merus disagrees that Regeneron may assert infringement of the Asserted Claims by the Merus Accused Instrumentalities as set out in paragraph 14, and cannot do so without modifications to the Court's Opinion and Order as set out in paragraphs 16-19.

16.    WHEREAS, Merus asserts that each of the Court's construction of the disputed terms precludes Regeneron from asserting infringement (literal or doctrine of equivalents) of each Asserted Claim against Merus's Accused Instrumentalities, such that Regeneron may not assert infringement as to any Asserted Claim without modification of the terms "genetically modified mouse", "human unrearranged variable region gene segments"; may also not assert infringement of Asserted claims 1-2, 6-9, 10 without additional modification to the terms "inserted" and "at"; may also not assert infringement of Asserted Claims 8, 10, 11-12, 16-19 also without additional modification to the terms "linked" and "operably linked"; and may also not assert infringement of Asserted Claims 10, 11-12, 16-19 also without additional modification of terms "does not comprise a human immunoglobulin constant gene" and "lacks a human constant region gene";

17.    WHEREAS, Merus further asserts that the Court's ruling that the term "endogenous mouse immunoglobulin locus" is indefinite also precludes Regeneron from asserting infringement (literal or doctrine of equivalents) of each Asserted Claim against Merus's Accused Instrumentalities;

18.    WHEREAS, Merus further asserts that Regeneron's failure to properly provide infringement contentions, including its failure to break out its claims into elements, or provide infringement contentions as to the doctrine of equivalents in proper form, as chronicled

**A6**

in D.I. 184, further precludes Regeneron from asserting doctrine of equivalents infringement against Merus's Accused Instrumentalities;

19.     WHEREAS, based on the above, Merus asserts that Regeneron may not assert infringement (literal or doctrine of equivalents) against Merus's Accused Instrumentalities, unless four or more of the Court's constructions are modified (depending on the Asserted Claims), and the Court's ruling of indefiniteness is modified, and that Regeneron may not assert doctrine of equivalents infringement for failure to provide infringement contentions on this issue and failure to abide by the Court's Local Rules;

20.     WHEREAS, Regeneron disagrees with Merus's assertions, characterizations, and arguments in Paragraphs 16-19.

21.     WHEREAS, the Court shall retain jurisdiction over Merus's counterclaim III for a declaratory judgment that the '018 patent is unenforceable as procured by inequitable conduct and applicable remedies in D.I. 225 and D.I. 241;

22.     WHEREAS, the parties reserve all rights to pursue each and every claim, argument, defense and remedy available to them subject to any reversal, modification or remand upon appeal consistent with the appellate mandate, including attorneys' fees;

23.     WHEREAS, the Court has determined that a consolidated appeal on all claims in this action would be most efficient (D.I. 253);

24.     WHEREAS, to the extent that post-adjudication of Merus's counterclaim III, and post-appeal a final judgment in this action is reversed in whole or in part, the parties reserve all claims, arguments, remedies and defenses to the extent consistent with the appellate mandate.

**PURSUANT TO THE FOREGOING STIPULATION, IT IS ORDERED and ADJUDGED THAT**

1.  Judgment that the Merus Accused Instrumentalities do not infringe each of the '018 patent claims is hereby entered;

2.  Judgment of invalidity due to indefiniteness as to each of the '018 patent claims is hereby entered; and

3.  In light of the foregoing, Merus's Counterclaim I for a Declaratory Judgment of noninfringement of the claims 1-20 of the '018 patent and Merus's Counterclaim II for a Declaratory Judgment of invalidity due to indefiniteness of claims 1-20 of the '018 patent is GRANTED.

SO ORDERED

Dated: 2/24/15

_____

KATHERINE B. FORREST
United States District Judge

A8

Dated: New York, New York
      February 23, 2015

Kirkland & Ellis LLP

Patricia A. Carson
Peter B. Silverman
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Merus B.V.*

CHRISTOPHER P. BORELLO
cborello@fchs.com
SCOTT K. REED
sreed@fchs.com
ROBERT L. BAECHTOLD
rbaechtold@fchs.com
ROBERT S. SCHWARTZ
rschwartz@fchs.com
MICHAEL E. FURROW
mfurrow@fchs.com
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100

*Attorneys for Plaintiff Regeneron
Pharmaceuticals, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

REGENERON PHARMACEUTICALS,        :
INC.,                            :
                                 :
                   Plaintiff,    :
                                 :
           -v-                   :
                                 :
MERUS B.V.,                      :
                                 :
                   Defendant.    :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED NOV 2 1 2014

14 Civ. 1650 (KBF)

OPINION & ORDER
(CLAIM CONSTRUCTION)

KATHERINE B. FORREST, District Judge:

Regeneron Pharmaceuticals, Inc. ("Regeneron") commenced this action

against Merus B.V. ("Merus") and Ablexis LLC ("Ablexis"), on March 14, 2014,

alleging infringement of U.S. Patent No. 8,502,018 (referred to as the "Patent" or

the "'018 Patent"). On July 3, 2014, defendants responded to the complaint

asserting, inter alia, invalidity and non-infringement. On November 3, 2014,

Ablexis settled. The instant Opinion & Order constitutes the Court's

determinations as to claim construction.

Claim construction is fundamentally concerned with determining what

invention is covered by the patent-in-suit to assist the fact finder in considering

ultimate issues: is the invention x or is it y? Do its boundaries end here or there?

Must it be made this way, can it be made that way, or can it be made any way at

all? And on. Put otherwise, before determining whether a patent has been

infringed, one must understand the invention it seeks to cover. Given the resources

**A10**

allocated to, and diverse outcomes of claim construction proceedings, it is plain that patent holders are frequently mistaken as to the nature and scope of their invention. While they believe (or assert) that they hold a patent disclosing one invention, claim construction may reveal quite another invention altogether. If a patent holder's view is overly broad, such position may reveal wishful thinking or short-sightedness during prosecution; no matter, claim construction reveals actual metes and bounds.

Regeneron and Merus are here engaged in this now somewhat routine exercise of debating what invention the Patent in fact discloses. Regeneron asserts that what the specification of the '018 Patent (the "Specification") repeatedly refers to as "the invention" is not that which is claimed. It asserts further that over the years, the Specification was mined for other inventions and claims than those here at issue, and that as a result, the claims in the '018 Patent are several steps removed from the language of the Specification itself. According to Regeneron, a few preferred embodiments, read as standing alone and removed from surrounding context, support its view of its claims here: that the '018 Patent – and Claim 1 as an example – broadly encompasses a genetically modified mouse with a particular gene segment (human unrearranged variable region) inserted at a particular location in a mouse (the immunoglobulin locus). Regeneron asserts that how it made the mouse is unimportant; the Patent merely discloses one possible method.

Construed as plaintiff asserts, Regeneron holds a patent to a mouse modified to include a human DNA sequence at the immunoglobulin locus, leaving the mouse

**A11**

constant regions intact.  (Transcript of 9/12/14 Proceedings, ECF No. 161 ("Transc.") 32:8-14.)  The technology for making the mouse with such characteristics was, according to Regeneron, already known.  (Transc. 33:11-16.)  Thus, plaintiff asserts that it invented a mouse which can be genetically modified using any number of available methods, involving the insertion of a human or synthetic gene segment somehow at or near the immunoglobulin locus.  Regeneron's construction posits a patent with extraordinarily broad reach.

By contrast, defendant Merus asserts that the invention disclosed in the '018 Patent is far narrower and ultimately bounded by the particular method for genetically modifying a mouse with which the Specification is principally concerned. Merus asserts that, for instance, Claim 1 discloses a mouse made only by a particular process.  Merus characterizes the invention in Claim 1 as a product-by-process claim.  Whether characterized as a product-by-process claim or simply defined by the Specification, Merus's point is the same: that Regeneron's '018 Patent concerns a mouse genetically modified in a specific way.  Mice genetically modified in any number of different manners – but which ultimately share a similar genetic profile – are, according to Merus, outside of the Patent's scope.  This debate as to scope pervades the parties' positions on claim construction. This Court generally agrees with the constructions Merus proposes, limiting the Patent to a far narrower scope than that asserted by Regeneron.

In connection with this claim construction proceeding, the Court received a number of written submissions including briefs and declarations from experts

3

**A12**

skilled in the art.[1]  (ECF Nos. 96, 103, 104, 105, 107, 108, 113, 114, 115, 116, 117,

123.)  The parties' experts also appeared at a live hearing before the Court on

September 12, 2014 during which they were subject to cross examination.[2]  (ECF

No. 161.)

Jeffrey Ravetch, M.D., Ph.D., submitted declarations and testified on behalf

of Regeneron.  Ravetch has substantial qualifications in the areas relevant to the

technology in the '018 Patent.  Notably, however, he submitted his initial declaration

– in which he opines that each of the terms in dispute are unambiguous and would

be well known to one skilled in the art at the time of application – without

reviewing any of the Patent's prosecution history.  (Transc. 62:15-16.)  The bulk of

Ravetch's declaration, as well as his presentation to the Court, concerned technical

background in the area of molecular biology.  Defendant does not dispute the

technical "tutorial" aspects of Ravetch's presentation.  (Transc. 80:19 – 81:06.)

Ravetch's views on claim construction comprise fewer than 10 pages of his initial 56

page submission.  As to each term at issue, Regeneron has taken the position that it

needed no construction and was clear to one of ordinary skill in the art at the time.

Dr. Raphael Clynes submitted declarations and testified on behalf of Merus.

Like Ravetch, he has substantial experience in the area.  Clynes had read and

---

[1] The parties made a number of submissions – the last of which were filed after the hearing on claim
construction.  The matter became fully submitted only on September 22, 2014.
[2] Ablexis and Regeneron settled subsequent to the September 12, 2014 claim construction hearing.
The Court therefore disregards Ablexis's submissions relating to claim construction and testimony
elicited from its expert, William T. Garrard, Ph.D.

considered the prosecution history of the patent-in-suit in connection with his initial opinions. (Clynes Decl. ¶ 14.)

Both experts agree that the operative date from which they assess the meaning of claim terms is February 16, 2001 – the date of filing for U.S. Patent Application No. 09/784,859.

## I.    THE PATENT AND RELATED TECHNOLOGY

The '018 Patent is entitled "Methods of Modifying Eukaryotic Cells."[3]  It is a continuation-in-part of an application tracing back to an initial filing on February 16, 2001.  The Abstract describes the invention as, "A method for engineering and utilizing large DNA vectors to target, via homologous recombination, and modify, in any desirable fashion, endogenous genes and chromosomal loci in eukaryotic cells." Subsequent to the February 2001 application, and prior to issuance of the '018 Patent, Regeneron obtained two other patents sharing the same Specification: U.S. Patent Nos. 6,586,251 and 6,596,541.[4]

The technology at issue in the Patent is described by Clynes as "the use of a particular method for generating genetically modified mice which may be used as a

---

[3] "Eukaryotic cells" are cells that have different compartments that serve distinct roles; for instance, chromosomes are housed within the cell nucleus. (Clynes Decl. n.2.)  Eukaryotic cells comprise humans, mice and other higher order life; they are distinguished from bacteria which have no cellular compartments. (Clynes Decl. n.2.)

[4] Both of these patents largely concern method claims; Patent No. 6,596,541 also contains product-by-process claims related to a "method for creating and screening eukaryotic cells which contain modified endogenous genes or chromosomal loci".  Regeneron asserts that the existence of these patents covering the method disclosed in the shared specification supports its view that the claims in the '018 Patent do not depend on the method used.  This argument is based in rhetoric and not patent law.  No principle of patent law provides that claims in any patent can, may or must be read apart from their accompanying specification.  That claims are in a divisional or continuation-in-part patent does not alter these principles.  In short, 35 U.S.C. § 112 applies to all patents and their respective claims.

research tool for drug discovery. The mice claimed by the '018 patent are engineered by a specific process to contain human DNA inserted in the genome of the mouse." (Clynes Decl. ¶ 17.)

As stated above, the parties generally agree on the basic principles of molecular biology and genetic engineering which inform the claims in the '018 Patent.[5] The Court refers to the declaration of Ravetch at ¶¶ 14-97 for basic technical background and shall not repeat most of the undisputed principles here. The Court includes below certain principles particularly relevant to the Court's determinations herein.

A.    Certain Technical Principals

Deoxyribonucleic acid ("DNA") is a molecule in a cell which carries the genetic material for living organisms. DNA is capable of self-replication and synthesis. It consists of a double-stranded molecule that pairs in a double-helical structure: "One end of each strand is called the 5-prime (5') end, and the other is called the 3-prime (3') end." (Ravetch Decl. ¶ 15.) The 5-prime and 3-prime ends define the boundaries of a strand of DNA. DNA molecules are made up of chemical building blocks called "nucleotides". (Id. ¶ 16.) Nucleotides on the two strands of the double-helix pair with one another in complementary units called "base pairs" ("bp"). (Id.) The base pairings connect the individual DNA strands to each other to form the double-helix. (Id.) The unique sequence of bases on a given strand

---

[5] There are certain disagreements between the parties, including, inter alia, the possible size of synthetic DNA segments in 2001, and whether the boundaries of the immunoglobulin locus were known in 2001. Relevant disagreements are discussed infra.

represents a code; a gene is a unit of DNA that includes the sequence of bases representing the codes for the amino acids that comprise a particular protein.  (Id. ¶ 17.)

Genes are expressed by cells as proteins through processes commonly referred to as "transcription" and "translation".  (Id. ¶ 18.)  Before transcription and translation, the two strands of DNA that constitute a gene unwind from their double-helix configuration.  (Id.)  During "transcription", machinery in the cells reads the DNA sequence of one of the DNA strand's, nucleotide by nucleotide, and uses it as a template to produce an intermediate molecule called messenger RNA (abbreviated as mRNA).  (Id.)  The structure of a protein gives rise to its biologic activity.  (Id. ¶ 19.)

The typical function of "B cells" is to make antibodies.  Antibodies are also known as "immunoglobulins" and abbreviated as "Ig".  (Id. ¶ 23.)  They are a particular type of protein.  They are typically depicted as having a structure shaped like the letter "Y".  (Id. ¶ 24.)  The Y structure consists of four chains of amino acids: two identical light chains and two identical heavy chains.  Each light chain pairs with a partner heavy chain, and then each heavy-light chain pair associates with an identical heavy-light chain pair to form the "Y" structure.  See Figure 1 below:



(Defs' Resp. Claim Constr. Br., ECF No. 103, at 7.)  Each heavy chain and light chain is comprised of a "constant" region and a "variable" region.  (Ravetch Decl. ¶ 25.)  In both heavy chains and light chains of an antibody, the region at the tip of the "Y" is the "variable region".  The other region on each heavy chain and light chain is called a "constant region".  (Id.)  While variable regions of antibodies differ extensively, the constant regions remain relatively the same within a given type.  (Id. ¶ 29.)  See Figure 2:



(Defs' Resp. Claim Constr. Br., at 7.)

Because antibodies are proteins composed of amino acids, they are encoded by genes composed of DNA nucleotides.  (Id. ¶ 33.)  The DNA that encodes antibody variable regions is assembled from separate gene "segments".  (Id. ¶ 34.)  A gene

8

that encodes the heavy chain variable region of an antibody is assembled from three gene segments, named variable (V or $V_H$), diversity (D or $D_H$) and joining (J or $J_H$) segments, where the subscript "H" indicates the gene segment that forms part of the antibody heavy chain. (Id.) A gene that encodes the light chain variable region of an antibody is assembled from two gene segments, named variable (V or $V_L$) and joining (J or $J_L$) segments, where the subscript "L" similarly indicates the light chain. (Id. ¶ 35.) These gene segments are joined together to form contiguous variable region gene segments (VDJ for heavy chains, and VJ for light chains) through DNA rearrangement mechanisms. (Id.)

In both humans and mice there is one gene locus containing the genetic material used for expressing heavy chains, and two gene loci containing genetic material used for expressing light chains. (Id. ¶ 36.) Through a process known as V(D)J recombination, the DNA sequence encoding a variable region of an antibody heavy or light chain is created at each Ig gene locus by selecting and joining together one each of the many V, D and J gene segments (for heavy chains) or V and J gene segments (for light chains) present at the locus. (Id. ¶ 44.) V(D)J recombination is referred to as "somatic recombination". (Id. at ¶ 49.) See Figure 3:



(Defs' Resp. Claim Constr. Br., at 8.)

There are – and at the time of the invention there already were – numerous methods for incorporating exogenous DNA into mice. (Id. ¶ 81.) The first method was the insertion of a "transgene" by random integration. (Id.) A "transgene" is a DNA sequence originating from outside the host organism. (Id.) One may create a "transgenic mouse" by injecting an exogenous DNA fragment into a fertilized mouse egg. (Id.) The DNA fragment is then incorporated spontaneously into a random chromosomal location in the genome of the embryo. (Id.) The exact location where the transgene DNA ends up in the genome is random. (Id. ¶ 82.) This process is known as "random integration". Random integration may result in the location of the added DNA in an area which is more or less transcriptionally active and can also disrupt or render nonfunctional DNA regions into which it integrates. (Id.) In

10

other words, the inserted DNA may or may not be where you want it to be in the mouse genome.

Non-randomized methods of genetic modification are referred to as "gene targeting". (<u>Id</u>. ¶ 83.) The key technique used for targeted gene modification is called "homologous recombination." (<u>Id</u>. ¶ 85.) The '018 Specification teaches a method of homologous recombination. A DNA construct, known as a "targeting vector" must be created to modify a gene using homologous recombination. (<u>Id</u>.) A "vector" is a vehicle which holds the DNA sequence to be incorporated into the mouse genome.[6] (<u>Id</u>.) To facilitate homologous recombination, the DNA sequence of interest is flanked by "homology arms"; these arms consist of DNA fragments that are substantially the same in sequence as the sequences that flank the target DNA sequence being replaced or augmented in the genome. (<u>Id</u>.) These arms allow the targeting construct to align with the host genome to ensure modification at the desired position. (<u>Id</u>.)

One wishing to exchange a number of variable gene segments of a mouse with their human equivalents, requires choosing a homology arm upstream (5') of the chromosomal fragment to be exchanged, and a homology arm downstream (3') of that fragment. (<u>Id</u>. ¶ 87.) These homology arms therefore flank the set of human variable gene fragments that one wishes to introduce into the mouse genome. (<u>Id</u>.)

---

[6] The '018 Patent refers to "large" DNA vectors; such vectors have a size of 20 kilobases ("kbs") or more. The size of a strand of DNA is referred by the number of base pairs ("bp"), including in terms of kilobase pairs (1kb= 1,000 base pairs) and megabase pairs (1 mb = 1,000,000 base pairs). (Clynes Decl. ¶ 27.) "LTVEC" is an acronym developed in the '018 Patent which stands for "large targeting vector for eukaryotic cells."

If homologous recombination occurs in the homology arms, the exchange of the

mouse segments with their human counterparts has been accomplished.  (Id.)[7]  See

Figure 4:



(Defs' Resp. Claim Constr. Br., at 9.)

Over time, it has been found that human gene segments are able to

rearrange in a mouse to produce a broad spectrum of VDJ and VJ regions (for heavy

and light chains) that are expressed in antibodies.  (Id. ¶ 93.)

B.    The '018 Patent

LTVECs – that is, large targeting vectors for eukaryotic cells – and the use(s)

to which they are put in connection with homologous recombination, is at the core of

the '018 Patent.  LTVECs are "derived from fragments of cloned genomic DNA

---

[7] Certain stretches of DNA that are important in regulating transcription are referred to as
"regulatory elements".  "Promoters" are one such type.  (Clynes Decl. ¶¶ 29-30.)  Promoters are
usually located at the 5', or upstream.  Other regulatory elements may be located downstream or at
the 3' end.  (Clynes Decl. ¶ 30.)  The boundaries of a gene are determined by the gene's regulatory
elements located most upstream of the 5' end and most downstream of the 3' end of the coding
sequence of that gene.  (Clynes Decl. ¶ 30.)  Thus, the boundaries of the 5' and 3' regulatory elements
define the boundaries of the gene.

larger than those typically used by other approaches intended to perform homologous targeting in eukaryotic cells." ('018 Patent, 9:39-42.) As set forth above, as well as in the Specification, a "targeting vector" is a "DNA construct that contains sequences 'homologous' to endogenous chromosomal nucleic acid sequences flanking a desired genetic modification(s). The flanking homology sequences, referred to as the 'homology arms', direct the targeting vector to a specific chromosomal location within the genome. . ." ('018 Patent, 8:66-9:4.)

All of the figures in the Specification show versions of homologous recombination with LTVECs of various types and sizes, none smaller than 20 kb. For instance, Figure 1 in the Specification shows a DNA "modification cassette" (or insert) being transferred by homologous recombination into a large targeting vector in a mouse's genome:



Figures 4A-4D show a human insert in a LTVEC of 200-300 kbs:



The Specification states that the "use of LTVECs provides substantial advantages" over current methods of homologous recombination. ('018 Patent, 1:37-38.) "LTVECs can be more rapidly and conveniently generated from available libraries of large genomic DNA fragments (such as YAC and BAC libraries)[8] than targeting vectors made using current technologies." ('018 Patent, 1:40-44.) "The present invention" is described as providing for "a rapid, convenient and streamlined method for systematically modifying virtually all the endogenous genes and chromosomal loci of a given organism." ('018 Patent, 1:51-54.)

---

[8] "YAC and BAC" libraries are able to produce artificial yeast and bacteria chromosomes. (Ravetch Decl. ¶ 96.)

The Specification describes prior genetic modification methods as limited by "size considerations" – the "size of the homology arms are restricted to less than 10-20 kb in total". ('018 Patent, 2:17-19.) Thus, the ability of the invention to "utilize targeting vectors with homology arms larger than those used in current methods" would be "extremely valuable". ('018 Patent, 2:21-23.) The use of "long regions of homology could increase the targeting frequency of "hard to target" loci in eukaryotic cells. . ." ('018 Patent, 2:31-33.) In terms of the prior art, the Specification notes there "is still a need for a rapid and convenient methodology that makes possible the use of targeting vectors containing large regions of homology so as to modify endogenous genes or chromosomal loci in eukaryotic cells". ('018 Patent, 2:59-63.) "In accordance with the present invention, Applicants provide novel methods that enable the use of targeting vectors containing large regions of homology so as to modify endogenous genes or chromosomal loci in eukaryotic cells via homologous recombination. Such methods overcome the [limitations in the prior art]". ('018 Patent, 2:64-67 – 3:2.)

In the summary of "the Invention," the Specification states, "In accordance with the present invention, Applicants have developed a novel, rapid, streamlined and efficient method for creating and screening eukaryotic cells which contain modified endogenous genes or chromosomal loci." ('018 Patent, 3:11-14.) The method uses LTVECs, introduces them into eukaryotic cells to modify the endogenous genes or chromosomal locus of interest, and analyzing the cell with an

16

**A25**

assay for modification of the allele ("MOA assay").  ('018 Patent, 3:15-25.)  The '018

Specification references a number of preferred embodiments including:

> "[A] method for genetically modifying an endogenous gene or chromosomal locus in eukaryotic cells [using LTVECs]" ('018 Patent, 3:27-30.)

> "Another embodiment of the invention is a method wherein the genetic modification to the endogenous gene or chromosomal locus comprises deletion of a coding sequence, gene segment, or regulatory element . . ." ('018 Patent, 3:40-43.)

> "An alternative embodiment of the invention is a method wherein the alteration of a coding sequence, gene segment, or regulatory element comprises a substitution, addition, or fusion . . . " ('018 Patent, 3:48-51.)

> "An additional preferred embodiment is one in which the LTVEC is capable of accommodating large DNA fragments greater than 20 kb, and in particular large DNA fragments greater than 100 kb."  ('018 Patent, 3:67 – 4:3.)

> "Yet another preferred embodiment is a genetically modified eukaryotic cell that is produced by the method of the invention."  ('018 Patent, 4:6-8.)

> "A preferred embodiment of the invention is a non-human organism containing the genetically modified endogenous gene or chromosomal locus produced by the method of the invention."  ('018 Patent, 4:8-11.)

> "A preferred embodiment of the invention is a method for genetically modifying an endogenous gene or chromosomal locus of interest in mouse embryonic stem cells, comprising: [obtaining and using LTVECs] . . ." ('018 Patent, 4:65 – 5:16.)

> "Also preferred is a genetically modified mouse embryonic stem cell produced by this method; a mouse containing a genetically modified endogenous gene or chromosomal locus produced by this method; and a mouse produced from the genetically modified mouse embryonic stem cell."  ('018 Patent, 5:16-21.)

> "Another preferred embodiment is a mouse containing a genetically modified endogenous gene or chromosomal locus of interest, produced by a method comprising the steps of: [obtaining and using LTVECs] . . ." ('018 Patent, 5:22-43.)

> "Also preferred is a transgenic mouse having a genome comprising entirely human heavy and light chain variable region loci operably linked to

[entirely[9]] endogenous mouse constant region loci such that the mouse produces a serum containing an antibody . . . a transgenic mouse containing an endogenous variable region locus that has been replaced with an homologous or orthologous human variable locus, such mouse being produced by a method comprising [obtaining and using LTVECs] . . ." ('018 Patent, 7:24-54.)

All preferred embodiments set forth in the Specification reference the LTVEC method within the same paragraph.[10]

## II.   TERMS AT ISSUE

Merus has requested that the Court construe the terms set forth below.[11] Regeneron has taken the position that no term requires construction; it has therefore offered no alternative construction.

1.   A genetically modified mouse;

2.   human unrearranged variable region gene segments;

3.   inserted;

4.   at;

5.   endogenous mouse immunoglobulin locus;

6.   linked / operably linked; and

---

[9] A subsequent embodiment eliminates the word "entirely". ('018 Patent, 7:30-35.)

[10] Regeneron's position on claim construction requires reading the first two of this series of three preferred embodiments as disclosing a mouse genetically modified without regard to method. This position, and also as discussed below, focuses on the separation by semi-colon of the series of three preferred embodiments, with only the final embodiment (separated by a comma) directly connected to the LTVEC process. Regeneron's interpretation of this (long) sentence is incorrect. The series of three embodiments are purposefully linked together because of similarity, and as demonstrated by the absence of a period between them. To include two preferred embodiments not requiring reference to the LTVEC process with a third that does, would, in the context of the Specification, make no sense. No such dramatic differentiation between the embodiments is suggested.

[11] Ablexis separately requested that the term "a mouse constant region" be construed; as Ablexis has settled, the Court does not construe this term.

      7.    does not comprise a human immunoglobulin constant gene / lacks a human constant region gene

## III.   APPLICABLE LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is generally a question of law for the Court.  See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).[12] Determining the meaning of terms within a claim assists the fact finder in making subsequent and ultimate decisions as to, inter alia, whether an invention has in fact been infringed, or is in fact valid.  The purpose of claim construction is to define terms so that the jury may be properly instructed.  See Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he trial court in a patent case must at minimum take steps to assure that the jury understands that it is not free to consider its own meanings for disputed claim terms and that the district court's claim construction, determined as a matter of law, is adopted and applied by the jury in its deliberation of the facts.").

In construing a term, the Court seeks to determine what that term would have meant to one "of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (citations omitted). Although terms are generally construed as they would be understood by one of ordinary skill in the art, it is possible for a patentee to have set forth a particular and different meaning for a term within a claim; in such a case, the lexicography of

---

[12] There are certain instances, not relevant here, when this Court has been required to make factual findings in connection with some aspect of claim construction.  See JobDiva, Inc. v. Monster Worldwide, Inc., No. 13 Civ. 8229 (KBF), 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014).

the patentee governs. See, e.g., Silicon Graphics, Inc. v. ATI Techs., Inc., 607 F.3d

784, 789 (Fed. Cir. 2010); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570,

1578 (Fed. Cir. 1995) ("The terms in a claim . . . are not given their ordinary

meaning to one of skill in the art when it appears from the patent and file history

that the terms were used differently by the applicant.").

A.   Evidence Used in Claim Construction

The claims of a patent do not stand alone; they are part of "a fully integrated

written instrument." Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 978).

To interpret the meaning – including scope – of a patent's claims, a court may use

intrinsic and, if necessary, extrinsic evidence. See Nazomi Commc'ns, Inc. v. Arm

Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005) (instructing courts to look to

intrinsic evidence first). Intrinsic evidence includes the claims, the specification, as

well as a patent's prosecution history. See All Dental Prodx, LLC v. Advantage

Dental Prods., Inc., 309 F.3d 774, 780 (Fed. Cir. 2002) ("Foremost among the tools of

claim construction is of course the claim language itself, but other portions of the

intrinsic evidence are clearly relevant, including the patent specification and

prosecution history."); see also Phillips, 415 F.3d at 1312 ("It is a 'bedrock principle'

of patent law that 'the claims of a patent define the invention to which the patentee

is entitled the right to exclude.'" (quoting Innova/Pure Water, Inc. v. Safari Water

Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004))).

Every inventor is required to disclose the invention so as to "allow persons of

ordinary skill in the art to recognize that [the inventor] invented what is claimed."

Billups-Rothenberg, Inc. v. Associated Regional and University Pathologists, Inc.,
642 F.3d 1031, 1036 (Fed. Cir. 2011); 35 U.S.C.A. § 112 ("The specification shall
contain a written description of the invention, and of the manner and process of
making and using it").  The "written description requirement exists to ensure that
inventors do not 'attempt to preempt the future before it has arrived.'"  Billups-
Rothenberg, 642 F.3d at 1036 (citing Fiers v. Revel, 984 F.2d 1164, 1171 (Fed. Cir.
1993)).  The written description requirement precludes premature claims and
requires the disclosure of an actual invention.  Novozymes A/S v. DuPont Nutrition
Biosciences APS, 723 F.3d 1336, 1345 (Fed. Cir. 2013).

Claims must be read in light of the specification.  See Phillips, 415 F.3d at
1315.  The purposes of the specification are to teach and enable those of skill in the
art to make and use the invention and to provide a best mode for doing so.  Id. at
1323.  One skilled in the art is "deemed to read the claim term not only in the
context of the particular claim in which the disputed term appears, but in the
context of the entire patent, including the specification."  Id. at 1313.  The
specification is always "highly relevant" to claim construction analysis; it is the
"single best guide to the meaning of a disputed term."  Id. at 1315 (quoting Vitronics
Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (internal quotation
mark omitted)); see also On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d
1331, 1338, 1340 (Fed. Cir. 2006) ("[T]he scope and outer boundary of claims is set
by the patentee's description of his invention," and "the claims cannot be of broader
scope than the invention that is set forth in the specification.").

"[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope." On Demand, 442 F.3d at 1340. The specification therefore provides guidance as to the meaning of claims – and how they should be construed – even if such guidance is not in a definitional format. Id. (citing Bell Atlantic Network Svcs., Inc. v. Covad Comms. Group, Inc., 262 F.3d 1258, 1268–69 (Fed. Cir. 2001)); Netword LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("[Plaintiff's] argument that the district court improperly limited the scope of Claim 1 by importing the caching and pulling functions from the specification misperceives the role of claim construction in an infringement analysis. The role is neither to limit nor to broaden the claims, but to define, as a matter of law, the invention that has been patented . . .").

Examples of courts construing terms based on the specification in a manner that limits claim scope are useful (as that is what the Court similarly does here). In On Demand, the Federal Circuit found that since "the focus of the [] patent is immediate single-copy printing and binding initiated by the customer and conducted at the customer's site," the district court erred in construing the term "customer" more broadly to include anyone who buys goods or services. On Demand, 442 F.3d at 1340. The Federal Circuit relied upon the fact that the specification "repeatedly reinforces its usage of the term 'customer' as the retail consumer." Id.

In <u>Biogen, Inc. v. Berlex Labs., Inc.</u>, 318 F.3d 1132 (Fed Cir. 2003), the Federal Circuit addressed whether the broad language of certain claims directed to the production of human beta interferon protein in Chinese hamster ovary cells were correctly construed as limited to the use of a single DNA "construct." The construct was to introduce both a selectable marker gene and the human interferon gene into the host cell. <u>Id</u>. at 1133-34. Among the claims at issue were Nos. 66 and 68:

> 66. A Chinese hamster ovary cell having incorporated therein an expressible gene encoding human á- or â-interferon, or a progeny thereof.

> 68. A Chinese hamster ovary cell having incorporated into its chromosome an expressible gene encoding human interferon, or a progeny thereof.

<u>Id</u>. at 1334. It was conceded that these claims did not mention the use of a single DNA construct. <u>Id</u>. at 1135. Based on the specification, prosecution history and expert testimony, however, the district court construed all claims as requiring use of a single construct. <u>Id</u>. In particular, both the district court and Federal Circuit deemed it critical that the specification discussed only a single DNA construct. <u>Id</u> Berlex, the patent holder, argued that it was irrelevant to the cell claims whether transformation of the Chinese hamster ovary cell is achieved by single or multiple constructs. <u>Id</u>. Biogen responded that except for a few undeveloped sentences, the entire specification was directed solely to the invention whereby a single DNA construct is used to carry linked interferon and marker genes into the Chinese hamster ovary cell. <u>Id</u>. at 1136. The district court and Federal Circuit agreed. The Federal Circuit repeated the established rule that "'when the claims are written

23

**A32**

more broadly than the disclosure warrants' they may be construed 'to preserve the validity of the claims with respect to their original intended scope.'" Id. at 1140 (quoting Texas Instruments, Inc. v. Int'l Trade Comm'n, 846 F.2d 1369, 1371-72 (Fed. Cir. 1988)).

Similarly, in Honeywell Intern., Inc. v. ITT Indus., Inc.. 452 F.3d 1312 (Fed. Cir. 2006), the Federal Circuit affirmed the district court's construction of the term "fuel injection system component" as limited to a fuel filter. The Federal Circuit agreed with the district court that the written description was limited to fuel filters and addressed problems in fuel filter design. Id. at 1314. Both the Federal Circuit and district court found it significant that the specification referred to a fuel filter as "the invention" in several places. Id. at 1316. The patent holder, Honeywell, argued that the district court erred in its construction – and that it had improperly imported a limitation from the specification into the claims, thereby improperly limiting the scope of the claims. Id. at 1317. The Federal Circuit disagreed. Citing Phillips, 415 F.3d at 1315, it reiterated that the claims cannot go further than the invention disclosed in the specification. Id. at 1318. "The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." Id.; see also Netcraft Corp. v. Ebay, Inc., 549 F.3d 1394, 1398 (Fed. Cir. 2008) (while use of the phrase "the present invention" does not automatically limit the meaning of claim terms in all circumstances, it may when read as such in the context of the specification and prosecution history).

Claim construction that limits the scope of a claim may, therefore, be based

on the scope implicit in the specification rather than explicit disavowal.

Astrazeneca AB v. Mutual Pharmaceutical Co., Inc., 384 F.3d 1333, 1339-40 (Fed.

Cir. 2004) (lexicography does not require rigid formalism such as "I define _____ to

mean _____,"; the specification may define claim terms by implication).  The

specification acts as a dictionary even when it defines terms by implication and not

an explicit statement of redefinition.  Bell Atl. Network Svcs., 262 F.3d at 1268.

Somewhat in tension with the above is another core principle: that a

specification should not be read so as to limit a claim.  See Absolute Software, Inc.

v. Stealth Signal, Inc., 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (declining to import

a limitation into the claim where a portion of specification identified the purported

limitation as one of "two optional features" despite earlier references in the

specification requiring the invention to include both features); Netword, 242 F.3d at

1352.  Thus, although specifications contain one or more examples of the

embodiment of an invention, they need not contain every possible embodiment, and

courts should not read into the claims limitations based on the embodiments in the

specification.  See Phillips, 415 F.3d at 1323; see also Innogenetics, N.V. v. Abbott

Labs., 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("[The defendant] argues that a

patent can never be literally infringed by embodiments that did not exist at the

time of filing.  Our case law allows for after-arising technology to be captured within

the literal scope of valid claims that are drafted broadly enough.").  The

reconciliation between these principles is – in practice – based on whether

disclosures imply the sought breadth, including (for instance) additional embodiments or not.

Several aspects of the patent prosecution history can be of significant use during claim construction.  Statements the patentee may have made in connection with patent prosecution are binding if used to obtain patentability.  See Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("[T]he prosecution history (or the file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." (quoting Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985) (internal quotation marks omitted))); see also Kripplez v. Ford Motor Co., 667 F.3d 1261, 1266 (Fed. Cir. 2012) ("A patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer.").  The prosecution history provides evidence of how the patentee understood and explained his invention to the Patent Office.   Phillips, 415 F.3d at 1317.

Statements made by a patentee during prosecution prevent claim terms from becoming ever-changing as the need and situation changes.  See Southwall Techs., 54 F.3d at 1578 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'").

Courts should generally construe claims so as to preserve their validity.  See Amgen Inc. v. Hoechst Marion Roussel, Inc., 469 F.3d 1039, 1042 (Fed. Cir. 2006); Phillips, 415 F.3d at 1327.  If a claim is fairly susceptible of two constructions, the construction which will secure to the patentee his (or an) actual invention should be adopted.  Smith v. Snow, 294 U.S. 1, 14 (1935); Amgen, 469 F.3d at 1042. Consistent with those principals, the Court cannot enlarge the claims beyond the limitations imposed by the patentee.  Amgen, 469 F.3d at 1042; Phillips, 415 F.3d at 1319.

Parties do not always agree, as is the case here, that a particular claim requires construction.  There are numerous instances in which one party asserts that the plain and ordinary meaning informs one of ordinary skill in the art of all that he or she needs to know, while an opposing party disputes that position.  In such cases, the Court ordinarily should construe the claim.  See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when . . . reliance on a term's 'ordinary' meaning does not resolve the parties' dispute. . . . In this case, . . . claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit.").

B.    Product-by-Process Claims

Claims may be written or construed to contain both a product and a process; such claims are referred to as "product-by-process" claims.  Product-by-process

claims are often – but not always – written in a format of "x product, manufactured by y process."  See, e.g., Abbott, 566 F.3d at 1286; Southwall Techs., 54 F.3d at 1576.  In product-by-process claims, both the product and the process terms separately and together serve as limitations in defining infringement.  Abbott Laboratories v. Sandoz, Inc., 566 F.3d 1282, 1291 (Fed. Cir. 2009) (en banc).  When claims are written to include both a product and process, the process detailed thereby is as much a part of the invention as the resulting product.  Id. at 1293 ("'process terms in product-by-process claims serve as limitations in determining infringement.'") (quoting Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834, 846-47 (1992)); see also Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1372 (Fed. Cir. 2007).

There is a clear and direct relationship between the principles which inform a court's determination of when a specification limits breadth of a patent, and when a product claimed may be limited by the process by which it was made.  Whether described by reference to one set of cases (limited by the specification, see e.g., On Demand, 442 F.3d at 1340; Phillips, 415 F.3d at 1315; Vitronic, 90 F.3d at 1582) or the other (product-by-process claims, see e.g., Anderson, 474 F.3d at 1372; Atlantic Thermoplastics, 970 F.2d at 846-47) the point is the same: a product claimed is limited by that which has been disclosed in the specification.[13]  In all events, the patent can be no broader than the outer boundaries of the specification.[14]

---

[13] "Disclosed" here refers to the invention, not merely a listing of preferred embodiments.

[14] In Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361 (Fed. Cir. 2007), the Federal Circuit found that the district court's limitation of the product (a pellet) to compositions with certain properties was not unduly narrow.  Id. at 1367.  The case involved two groups of patents: one covered

28

C.    Indefiniteness

"[A] patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2129 (2014); see also Interval Licensing LLC v. AOL, Inc., No. 2013-1282, 2014 WL 4435871, at *5 (Fed. Cir. Sept. 10, 2014) ("Although absolute or mathematical precision is not required, it is not enough, as some of the language in our prior cases may have suggested, to identify 'some standard for measuring the scope of the phrase.'").

This requirement is referred to as "definiteness." It embodies the important function of "appris[ing] the public of what is still open to them." Id. (quoting Markman, 517 U.S. at 373) (internal quotation marks omitted). The requirement that a claim be precise enough to afford clear notice of what is claimed thereby eliminates the temptation to later inject ambiguity into the scope of a patent. Id. ("[A]bsent a meaningful definiteness check, . . . patent applicants face powerful incentives to inject ambiguity into their claims."). A claim which fails to meet the "reasonable certainty" requirement is indefinite, see id., and thus not entitled to

---

compositions capable of being extruded into structural members, and another covered the extruded structural members themselves. In construing this second group, the Court limited the scope of the composite structural members to those including an intermediate step of pelletization or linear extrusion. Id. at 1375. The court observed that "[t]he specification ... indicates that the claimed physical properties of the composite structural members are attributable to the process that is used to make them, a process that includes pelletization." Id. at 1372." In other words, the Federal Circuit found that the portions of the specification describing how the physical properties of the claimed composite structures are obtained make clear that the formation in a particular manner is not merely a preferred embodiment but is rather a critical element of the process that produces the structures. Id. at 1367.

patent protection, see United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 233 (1942) ("To sustain claims so indefinite as not to give the notice required by the statute would be in direct contravention of the public interest which Congress therein recognized and sought to protect.").

Patents entitle the holder to a presumption of validity of its claims. See 35 U.S.C. § 282 ("A patent shall be presumed valid."). As a result, a party seeking to have a claim declared "indefinite" must present clear and convincing evidence. Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1338 (Fed. Cir. 2008) ("To the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence.").

## IV.   THE COURT'S CONSTRUCTIONS

Merus's proposed constructions share a common theme: that the method of genetically modifying eukaryotic cells described in the Specification is an essential limitation on the metes and bounds of the claims. As discussed above, Merus asserts that the "genetically modified mouse" is not made by any process other than the LTVEC method disclosed. Plaintiff Regeneron asserts that while that method is disclosed in the Specification, the invention set forth in the claims is not defined by that method; that is, the mouse, in Claim 1 for instance, may have been genetically modified by some other (non-LTVEC) method.

The legal principles set out above are directly applicable to the parties' respective arguments. Such principles include: First, the law is clear that the

30

**A39**

claims define the invention.  See Liquid Dynamics Corp. v. Vaughan Co., Inc., 355 F.3d 1361, 1368 (Fed. Cir. 2004).  Second, a patentee is not entitled to more than he has disclosed in the specification.  Phillips, 415 F.3d at 1315.  Third, while the specification is the most important guide to understanding the claims, see Multiform Desiccants Inc. v. Medzam Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998), a court should not read limitations in the specification into the claims, see Liebel–Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004).  And, sifting through these principles, whatever the metes and bounds of an invention are, the inventor is entitled to its full breadth.  See TI Group Automotive Systems (North America), Inc. v. VDO North America, LLC, 375 F.3d 1126, 1138 (Fed. Cir. 2004).  The Court is mindful of the following principles as well: patents serve a critical public notice function, see Johnson & Johnston Associates v. R.E. Service Co., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc), and that the public must be able to read the claims in light of the specification and be able to understand that as to which the inventor has exclusive rights, see Nautilus, 134 S. Ct. at 2129.  At oral argument on claim construction, Regeneron's counsel posed the question, "who owns the silence?"  (Transc. 248:12-14.)  These principles lead to the following conclusion: if there was truly silence and no disclosure, the public owns the silence; if there was actual or implicit disclosure, the patentee owns the silence.

As to each of the terms set forth below, Regeneron asserts that no construction is necessary, that the plain and ordinary meaning is clear to one skilled in the art at the time.  Merus disagrees, as does this Court.  Regeneron's

position ignores that "plain and ordinary meaning" concerns both technical concepts (what a word means) and scope (how far does that meaning extend).  In taking the position that the terms required no construction, Regeneron focused only on "what the words mean" – and very little on scope.  Of course, that is an agreed starting point – and often an endpoint when the specification does not dictate otherwise.  But, as here, when the specification may be read to define boundaries as to those otherwise ordinary terms, that too must be taken into account.

Fundamentally, the parties' disputes on claim construction are not so much as to English and technical meaning as to scope.  When the parties dispute the meaning as well as scope of terms, it is the Court's role to resolve that dispute.  O2 Micro Int'l Ltd., 521 F.3d at 1361.  The Court generally construes each of the disputed terms as Merus proposes: when the claim terms are read in overall context of the Patent, there is no doubt that the scope of the '018 Patent is far narrower than Regeneron asserts.  All claim terms must be read in light of the LTVEC method that is at the heart of the invention.

A.      "A genetically modified mouse"

Merus asserts that the term "a genetically modified mouse" should be construed as "A transgenic mouse produced by the process of using LTVECs to modify embryonic stem cells and using a quantitative assay to detect modification of allele in those cells." (Joint Cl. Constr. Chart ("JCC") at 1.) According to Merus, this term defines the product created by the method described in the remainder of the

claim.[15]  Regeneron asserts that this term requires no construction and that a person of ordinary skill in the art would understand the term "genetically modified mouse" without further definition.  (Ravetch Decl. ¶ 101.)  The dispute here is as to scope: the question is the extent to which the breadth of otherwise clear terms is informed by the Specification and other intrinsic evidence.  There is no real dispute that in terms of the plain meaning, one of ordinary skill in the art at the time would generally understand that a "genetically modified mouse" is a mouse that has been genetically modified in some way.  Here, the nature of the dispute between the parties means that the exercise of claim construction requires more than this.  It requires asking how those words are understood against the intrinsic evidence.  In that regard, it is clear that Merus's proposed construction is correct.

The entire Specification and history of the '018 Patent supports that each of these words refer to a mouse, the genes of which have been modified, using the particular method described in the Specification.  Basic principles of claim construction support the Court's view.  First, it is axiomatic that a patentee cannot claim more than that which he has invented.  <u>On Demand</u>, 442 F.3d at 1340.  Second, the specification is always highly relevant to claim construction and is usually the single best guide.  <u>Vitronics</u>, 90 F.3d at 1582.  Third, when claims are worded more broadly than the disclosure warrants, they may be construed to

---

[15] Merus refers to this term and, for instance, Claim 1, as identifying a product-by-process claim.  As discussed above and <u>infra</u>, whether described as a product-by-process claim or limited to that which was disclosed in the Specification, the end result is the same.

preserve the validity of the claims with regard to their intended scope. Biogen, 318 F.3d at 1140.[16]

The phrase "genetically modified mouse" is not a term written in a vacuum. See Phillips, 415 F.3d at 1315. It is written against the detailed Specification. The Specification is almost exclusively concerned with the use of large targeting vectors ("LTVECs") – larger than those used in the prior art – for homologous recombination. (Clynes Decl. ¶¶ 70-71.) There is no genetic modification described as part of the invention which does not use LTVECs and the LTVEC method.[17] Thus, it would be contrary to a host of basic principles of claim construction to read this term as somehow having a broader meaning than that implicitly or explicitly disclosed in the Patent. Indeed, if the Court were to agree with Regeneron's asserted scope, it would violate the principle that claims should be construed so as to preserve their validity, see Amgen Inc., 469 F.3d at 1042, because such breadth would violate the written description requirement.

Regeneron relies very heavily on Example 3 to support the breadth of its view of scope. Notably, Example 3 is entitled "Use of LTVECs to Produce Chimeric and Human Antibodies". ('018 Patent, 19:35-40.) Regeneron's focus is on only a portion of the content in Example 3; and based on this portion – ignoring the title of the section and what immediately follows – asserts that this portion functions as a

---

[16] To the extent claims exceed their disclosure, they may be subject to an invalidity determination pursuant to 35 U.S.C. § 112.
[17] As Clynes notes, the use of LTVECs constituted the key to the inventions. (Clynes Decl. ¶ 60.) Multiple references in the Specification describe the critical use of LTVECs in connection with the invention. Figures 4A-4D demonstrate that role.

"specification within a specification": that is, that this portion is sufficient to disclose, on a standalone basis, the genetically modified mouse claimed. The argument reads the section entitled "Brief Description" ('018 Patent, 20:36-21:60) as if it were unconnected to the following section, "Materials and Methods" ('018 Patent, 21:61-24:24). The two sections are intertwined; and Regeneron's reading therefore distorts the Patent. First, as stated, Example 3 is entitled "Use of LTVECs to Produce Chimeric and Human Antibodies"; second, following the "Brief Description" section, the "Materials and Methods" section discloses steps necessary to do precisely that to which the title refers. LTVECs are integral to that process. To the extent the particular <u>steps</u> are exemplar only, that allows the use of LTVECs with other steps – fewer steps or more steps – but not the elimination of LTVECs altogether. LTVECs, in other words, may be used in a number of ways to do the same thing.

Textual support for the Court's narrowed construction is found throughout the Specification. The Specification differentiates the invention disclosed from prior art and references the problem it solves in terms of the use of LTVECs. As Clynes states, the "theory of the '018 patent is that using longer than normal homology arms to produce a targeting vector will cause that vector to insert a larger fragment of cloned genomic DNA (as opposed to synthetic DNA) than previously thought possible." (Clynes Decl. ¶ 61.) For instance, the Specification states outright that the use of LTVECs provides "substantial advantages over current methods" ('018 Patent, 1:37-43; Clynes Decl. ¶ 25); and "Applicants contend that the novelty of the

35

**A44**

method of the invention lies in the unique combination of those steps and techniques coupled with the never-before-described method of introducing a LTVEC directly into eukaryotic cells to modify a chromosomal locus, and the use of quantitative MOA assays . . . This novel combination represents a significant improvement over previous technologies . . ." (see '018 Patent, Example 3, 19:35-24:24, as discussed supra) (see also Clynes Decl. ¶¶ 56-59, 71-72).

In addition, Claim 1 when read holistically, itself uses process terms such as "modified", "inserted" and "linked." These process words support the requirement that some process has occurred to create the "genetically modified mouse". This process is not a mystery, it is described and referenced throughout the Specification: the Specification discloses a method of "inserting" the DNA, the size of the DNA segment, when to get it, as well as a method to obtain the linkage of a human gene segment to a mouse constant region, and thereby to accomplish the genetic modification of the mouse. The Specification refers to no other process besides the LTVEC process described.

In addition, the Specification itself tells the reader what the invention is: there are over 20 instances in which the Specification refers to the "method of the invention" (see, e.g., '018 Abstract, "A method for engineering and utilizing large DNA vectors . . . as well as the use of these cells to generate organisms bearing genetic modification"; '018 Patent, 1:46-50, 1:51-54; 2:64-67; 3:2-7; 3:11-14; 4:3-6, 4:6-8; 4:8-11, 4:11-14, 10:39-42, 12:40-45, 15:5-8, 15:17-32, 15:52-54, 15:55-64, 17:66-18:2, 18:46-49, 18:52-56, 18:59-19:3); every disclosure of a prophetic transgenic

36

**A45**

mouse refers to the method (see, e.g., '018 Patent 7:24-54, 15:55-66, "such mouse being produced by a method" refers back to a "transgenic mouse").

When there are disputes as to what the invention is, courts often refer to what the specification stated on the subject, in particular by using phrases such as "the present invention".  See Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1353-54 (Fed. Cir. 2010); Edwards Lifesciences LLC v. Cook, Inc., 582 F.3d 1322, 1330 (Fed. Cir. 2009); NetCraft, 549 F.3d at 1398 ("[W]e agree with the district court that the common specification's repeated use of the phrase 'the present invention' describes the invention as a whole."); Honeywell, 452 F.3d at 1318; SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed. Cir. 2001).  When a method is used to describe how to prepare "the present invention", a court may construe the product with reference to the process. See, e.g., Verizon Services Corp. v. Vonacre Holdings Corp., 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention"); In re Fenofibrate Patent Litig., No. 11 MDL 2241 (JSR), 2011 WL 10901800 at *2-6 (S.D.N.Y. Aug. 23, 2011).

The prosecution history also supports the Court's construction.  The "invention" is referred to as a "method" more than a dozen times by both Regeneron and the examiner (see Clynes Decl. Ex. 15, '176 Appl., July 26, 2012, Reply to Non-Office Action, at 8, 9; Ravetch Reply Decl. Ex. 3, '176 Appl., Oct. 11, 2012, Final Rejection, at 14, 15; Ravetch Reply Decl. Ex. 6, '176 Appl., Jan. 11, 2013, Reply to

Final Office Action, at 11; Ravetch Reply Decl. Ex. 4, '176 Appl., Feb. 1, 2013,

Advisory Action, at 18.) Moreover, in addressing the draft claims reciting the term

"genetically modified mouse", the applicants drew a distinction between the prior

art and the "claimed method" or a mouse made by the claimed method. (Clynes

Decl. ¶¶ 76-77.) For instance, in responding to a rejection, as anticipated, of claims

very similar to those here, the applicants stated,

> "[N]o teaching, motivation, suggestion, or pressure to develop a method for
> making a human variable/mouse constant antibody from an endogenous
> mouse locus through rearrangement of germline sequences at the endogenous
> locus was recognized in the art at the time the application was filed."

> "The claimed method is not a combination of prior art elements, according to
> known methods."

> 'The claimed method does not represent use of a known technique employed
> in similar gene targetings to improve the Lonberg method."

(Clynes Decl. ¶ 77, Ex. 15, '176 Appl., July 26, 2012, Reply to Non-Final Office

Action, at 8-9.)

Regeneron itself relied upon its own VelocImmune mouse during patent

prosecution; the VelocImmune mouse is made with the LTVEC method. (Clynes

Decl. ¶¶ 79-80; Transc. 130:21-131:1.) In January 2013, applicants relied on the

success of the VelocImmune mouse to argue the claims that ultimately issued in the

'018 Patent were not obvious. (Clynes Decl. ¶ 78, Ex. 16, '176 Appl., Jan. 11, 2013,

Reply to Final Office Action, at 11-12.) The applicants asserted that the claimed

method results in a particular mouse with certain characteristics. Id. And, that

"[m]ice made according to the pending claims . . ." exhibit certain characteristics.

Id.  Further, applicants submitted an exhibit describing that the mice were made with the VelociGene and VelociMouse technologies.  (Clynes Decl. ¶¶ 79-80.)

Read in context, the term "genetically modified mouse" can only refer to a mouse modified using the LTVEC process.  Whether this limitation is described in terms of the scope of the Specification (and that the inventor cannot claim more than he has discovered), or as a product-by-process claim is ultimately beside the point.  The bottom line result is the same.

B.  "human unrearranged variable region gene segments"

Merus asserts that the term "human unrearranged variable region gene segments" should be construed as "A contiguous stretch of cloned human genomic DNA containing variable region gene segments (V, D and J for the heavy chain / V and J for the light chain) in germline configuration, i.e. as it is in the human genome before the development of B cells."  (JCC at 1; Transc. 131:15-132:1.)  Regeneron argues that this term requires no construction. (Ravetch Decl. ¶ 103.)  The issue is, again whether the terms are limited in scope by virtue of the Specification and other intrinsic evidence.  They are.  The Court agrees with Merus's proposed construction.

The disputes as to this term breaks into three parts: (1) whether the DNA segments are human DNA – that is, taken or cloned from a human host – or may be synthetic, and (for instance) created from a library of DNA sequences (see, e.g., Clynes Decl. ¶¶ 86-87); (2) what the term "unrearranged" means; and (3) whether the "variable region gene segments" requires one contiguous segment of the V, D

39

**A48**

and J region or whether the V, D and J segments may be assembled one by one and stitched together.

### 1. human vs. synthetic

As to the first issue: the Specification, read as one of ordinary skill in the art at the time, requires the DNA segment to be human (that is, taken from or cloned from a human); it may not be synthetic. The key legal principle is that the specification must be read according to the standard of what it meant to one skilled in the art as of the application date. W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1556, (Fed. Cir. 1983). That date is February 16, 2001. It is not appropriate to read the Specification as of a later point in time. At that time, synthetic DNA was not compatible with LTVECs: in 2001 synthetic DNA segments were just too short. The '018 Patent describes LTVECs as larger than prior art genetic segments – which were typically between 10-20 kb. (See, e.g., '018 Patent, 2:17-20: describing limitations of prior art as "restricted to less than 10-20 kb in total." '018 Patent, 2:64-3:2, 3:67-4:3: describing the invention as "targeting vectors containing large regions of homology . . . to overcome the above-described limitations. . .".) In February 2001, synthetic DNA was not typically used to create DNA segments of greater than 20 kbs. In his declaration, Clynes stated that synthetic DNA could only achieve a length of 10 kb in 2001; and that lengths of 20-100 kb of synthetic DNA were not achieved until 2004-08. (Clynes Decl. ¶ 103.) In 2001, DNA synthesis was still in its infancy and producing synthetic DNA fragments greater than a few kb long via this method was difficult and could not be

40

**A49**

readily accomplished by one of ordinary skill in the art. (Id. ¶¶ 50, 101-103.)  As of that time, persons of skill in the art had not synthesized fragments of DNA larger than 10 kb, which is smaller than either of the homology arms to be integrated when using the LTVEC method.  (Id. ¶ 103.)  To have created larger synthetic DNA segments would have consumed significant resources and time by those of *extraordinary* skill in the art. (Id.)  The Specification is clear that LTVECs require much larger fragments.  The '018 Specification was therefore referring to human – not synthetic – DNA.  That technical advances now allow synthetic DNA in larger sizes – and make LTVECs of synthetic DNA now possible – does not itself alter the invention.  The invention is construed as of 2001 – not some later date.  See Novozymes A/S, 723 F.3d at 1345 (the written description requirement precludes premature claims).

Moreover, the Specification supports the DNA as human: the only DNA sequences disclosed in the Specification are cloned human DNA – not synthetic DNA. (See '018 Patent, 7:24-30, 22:5-14, 24:4-6).  The '018 Patent teaches the benefit of human sequences. ('018 Patent, 21:54-60.)  At the hearing, Clynes explained that the use of synthetic DNA was inconsistent with the '018 Patent as the patent language indicated "the intent is to move the entire human locus". (Transc. 129:20-130:5.)  Indeed the Specification, including Example 3 (a prophetic example), confirms human genomic DNA.  ('018 Patent, 24:4-6, 7:24-30.)  The Specification in fact teaches away from synthetic DNA "the method of the invention makes possible the precise modification of large loci that cannot be accommodated

41

**A50**

by traditional plasma-based targeting vectors because of their size limitations."
('018 Patent, 10:39-42.)  Nowhere does the specification describe use of DNA
synthesis.  (Clynes Decl. ¶ 97.)

The Specification also describes transformation with cloned genomic human
DNA: "One embodiment of the invention is a method of replacing, in whole or in
part, a non-human eukaryotic cell, an endogenous immunoglobulin variable region
gene locus with an homologous or orthologous human gene locus comprising: a)
obtaining a large <u>cloned</u> genomic fragment containing, in whole or in part, the
homologous or orthologous human gene locus…" ('018 Patent, 5:44-50) (emphasis
added).  And "comprising <u>entirely human</u> heavy and light chain variable region
loci…" ('018 Patent, 7:24-30) (emphasis added).

Finally, the '018 Patent never discloses the use of synthetic DNA to target
the endogenous mouse immunoglobulin locus.  As discussed above, while there were
size limitations on synthetic DNA segments, they did exist – and if the applicants
wanted to allow for synthetic DNA and likely anticipated technical advances, they
could easily have done so.

In addition, Merus asserts that Regeneron distinguished the '018 Patent from
the use of "synthetic loci" during prosecution.  The PTO rejected the claims as
anticipated by Lonberg & Kay. Plaintiff distinguished the '018 Patent from Lonberg
on the basis that, "The cited portions of Lonberg leave no doubt whatsoever that the
Lonberg mouse construction instructions were to build a transgenic mouse that
makes fully human antibodies from transgenes that are distant from endogenous

42

**A51**

mouse immunoglobulin loci, i.e., they are synthetic loci randomly inserted into the mouse genome. . ." (Clynes Op. Decl., Ex. 16, '176 Appl., January 11, 2013, Reply to Final Office Action, at 5-6.)

### 2. Unrearranged

Turning to the word "unrearranged", Merus asserts that it means the DNA sequence is in "germline configuration", that is, prior to any rearrangement or recombination occurring through the natural process of B-cell development. (Clynes Decl. ¶¶ 91, 105; Transc. 131:20-132:1.) Merus takes issue with DNA segments reorganized in a lab as constituting an "unrearranged" segment. Regeneron asserts that "unrearranged" means just that; it is not rearranged but is "capable of rearranging." Regeneron further asserts that, as used in reference to the V segment, "unrearranged" refers to the configuration wherein the V segment is not recombined so as to be immediately adjacent to a D or J segment. Regeneron's position construes the term "unrearranged" more broadly than the clear implications of the Specification.

The Specification itself never uses the term "unrearranged" – it only references DNA rearrangement as the natural process that occurs during B-cell development – not prior to B-cell development. ('018 Patent, 19:42-50; 20:41-43.) A comparison of Claim 1 to Claim 6 highlights the existence of some difference between the parties' constructions. Claim 6 claims human variable region gene segments are "capable of rearranging" to form the gene ('018 Patent, 29:39-41); Claim 1 refers only to "unrearranged." Claim 6 would therefore be superfluous if

Claim 1's reference to "unrearranged" meant the same thing. (<u>Compare</u> Claim 1 to
Claim 6.) Courts are to construe terms so as to retain their validity – and
redundancy would require the elimination of Claim 1 or 6. <u>Biogen</u>, 318 F.3d at
1140.

The difference between the two positions – Regeneron's and Merus's –
amounts to a difference between whether unrearranged requires "germline
configuration". (Regeneron asserts "no", Merus asserts "yes"). Clynes stated that
immunology literature as of 2001 supports his (and Merus's) view of the distinction.
(Clynes Decl. ¶ 107.) Immunology textbooks as of 1999 and 2000 use
"unrecombined" as synonymous with "unrearranged" and rearranged as occurring
during the development of B-cells (also known as "somatic recombination").
According to Clynes, engineered DNA, or DNA that is <u>reorganized in a lab</u> prior to
being inserted into a mouse, would not have been considered by one of ordinary skill
in the art to be "unrearranged." (<u>Id</u>. ¶ 109.)

The prosecution history also supports the Court's construction. (<u>Id</u>. ¶¶ 110-
113.)[18] The applicants distinguished between "human rearranged variable region
gene segments inserted at endogenous mouse loci" versus randomly inserted
synthetic loci. (<u>Id</u>. ¶111.) In doing so, the applicants effectively indicated that their
invention was different from prior art that had used randomly inserted synthetic
loci.

[18] European proceedings also support the Court's construction. (Clynes Decl. ¶¶ 114-115.)

3. <u>Variable Region Gene Segments</u>

The debate between the parties as to "variable region gene segments" relates to whether the DNA at issue may be "stitched together" or should be contiguous. The point of the LTVEC method is that the variable region gene segment would be contiguous. It is a "fundamentally different approach to use an engineered construct to stitch together various bits from the human genome to create a smaller recombination substrate . . ." (Transc. 134:6-8.) As described above, "variable region gene segments" encompass variable region DNA that is the V, D, and J gene segments for the heavy chain and V and J gene segments for the light chain. That is, the phrase "variable region" captures these gene segments as a group versus as individual (V, D, or J) gene <u>segments</u>. When the applicants wanted to use the word "segments" (as they did in Claim 20), they did so. The Court construes "variable region" to have meaning rather than being a synonym for individual V, D, or J gene segments.

Support for this construction is found throughout the Specification. The Specification describes obtaining the human DNA as contiguous human genomic DNA obtained from BACs that span the entire VDJ region of the human heavy chain locus. ('018 Patent, 22: 5-15, "Large insert (BAC) clones spanning the entire VDJ region of the human heavy chain locus are isolated. . .") Figure 4A similarly refers to DNA swaths including all of the V, D and J segments.

Clynes agrees that the genomic DNA must be contiguous and he relates to the point of the invention: the use LTVECs, which permit targeted insertion of a

45

large swath of cloned human DNA, had not previously been possible. (Clynes Decl. ¶ 95.) The invention obviates the need to produce a genetically modified mouse by using smaller and restructured fragments of variable gene segments such as in Fig. L. (Id.) This benefit is demonstrated through the initial step of obtaining "Large Genomic DNA Clone Containing the Gene(s) or Chromosomal Locus (Loci) of Interest." ('018 Patent, 11:15-16.) As Clynes explained at the hearing, "the patentees wished to take the entire human immunoglobulin locus without any modification and drop it into the mouse genome." (Transc. 132:5-7) (emphasis added).

In addition, the inventors distinguished the "variable region gene segments" made by the claimed method from one using a minilocus: "The VelocImmune technology . . . encompasses a method of generating a high specificity fully human antibody to a select antigen . . . In an alternative approach, others have utilized a 'minilocus' approach in which an exogenous Ig locus is mimicked through inclusion of individual genes from the Ig locus. . ." (Id. ¶¶ 125, 128 (emphasis added)); see also Clynes Op. Decl. Ex. 31, '103 Patent, 10:42-45, 10:60-63.) Clynes also refers to a variety of Regeneron internal documents to show that at the time of the invention, the inventors did not possess an invention covering insertion of individual V, D and J segments. (Clynes Decl. ¶¶ 121-124.)

C.    "inserted"

Merus asserts that the term "inserted" should be construed as "One step addition of DNA, without replacing or deleting any native DNA as a result of the

46

**A55**

addition." (JCC at 2.) Regeneron asserts that this term requires no construction. (Ravetch Decl. ¶ 110.) With that said, Regeneron also asserts that the term "inserted" may implicitly include a "deletion" of a DNA fragment or the "replacement" of a host DNA fragment with a fragment DNA sequence. The Court agrees with Merus's construction.

Regeneron's broad construction is inconsistent with the ordinary meaning of the term "inserted." To "insert" something requires but a single step. (Clynes Decl. ¶ 140.) In addition, differences between Claim 1 and Claim 11 support the term "insertion" as equivalent to "placement of a DNA fragment in" – and not "placement of a DNA fragment in, subsequent to or preceding the deletion or replacement of . . .": Claim 1 allows only for insertion and Claim 11 allows for insertion, deletion or replacement.

In addition, the Specification supports a distinction between the single insertion step and a multi-step process. When different steps were involved, they were specifically called out: "The region to be modified and replaced using bacterial homologous recombination can range from zero nucleotides in length (creating an insertion into the original locus) to many tens of kilobases (creating a deletion and/or replacement of the original locus)." ('018 Patent, 12:14-18, Clynes Decl. ¶ 141.)

The Specification also refers to other instances in which insertions, deletions and replacement or substitution are called out separately: "'Gene targeting' is the modification of an endogenous chromosomal locus by the insertion into, deletion of,

or replacement of the endogenous sequence via homologous recombination using a targeting vector." ('018 Patent, 9:12-15, Clynes Decl. ¶ 143.)  And "[t]his modification of allele (MOA) includes, but is not limited to, deletions, substitutions, or insertions of as little as a single nucleotide or deletions of many kilobases spanning a gene(s) or chromosomal loci of interest, as well as any all possible modifications between these two extremes." ('018 Patent, 9:45-50.) (See also '018 Patent, 3:40-48, 12:14-18.)

The prosecution history of the '018 Patent further supports the Court's construction.  (See, e.g., Clynes Decl. ¶ 144.)  For example, applicants in the '234 application in 2000 distinguished between deletion, alteration, insertion, and replacement.  The method of Claim 1 distinguished between "insertion of a new coding sequence, gene segment, or regulatory element; creation of a conditional allele; or replacement of a coding sequence or gene segment from one species."  (Id.) (emphasis added).

Clynes stated that as of 2001, skilled artisans distinguished between three types of modifications by homologous recombination: deletion, insertion and replacement.  (Clynes Decl. ¶¶ 51, 142.)  His review of the '018 Specification was consistent with the recognition of this distinction.  (Id. ¶ 53) ('018 Patent, 9:12-15; 9:40-50).  He stated that textbooks and basic dictionaries of biological terms also distinguished between these terms.  (Clynes Decl. ¶ 53.)

D.    "at"

Merus asserts that term "at" should be construed as "Into the locus, as opposed to near the locus, by the locus or around the locus." (JCC at 2.)  Regeneron asserts that this term requires no construction.  The issue between the parties again concerns scope: the more leeway as to the word "at", the broader the scope. The Court agrees with Merus's proposed construction.

The term "at" is used in the final phrase of Claim 11: "wherein the mouse constant region is at an endogenous mouse immunoglobulin locus."  (See Clynes Decl. ¶ 147.)  According to Clynes, "[g]iven that the mouse constant region exists within the locus, it is clear that is what the patentees intended by the use of the word "at".  (Id.) (emphasis added).  Regeneron's own expert, Ravetch, concedes that the term "at" is equivalent to the term "within".  The term "at" therefore defines a boundary as "within the bounds of the locus".  (Id. ¶ 149; Ravetch Op. Decl. ¶ 114; Reply Decl. ¶ 145.)

The prosecution history of the '018 Patent uses "at" and "in" the locus interchangeably: "None of the cited paragraphs [in the prior art] suggest or even hint at placing unrearranged human immunoglobulin gone segments at an endogenous mouse locus, much less a functional endogenous mouse locus. . . . There is absolutely no hint or suggestion in Lonberg to employ a functional endogenous mouse locus having inserted unrearranged human immunoglobulin variable region gene segments in the functional locus."  (Clynes Decl. ¶ 148, citing Ex. 16, '176 Appl., January 11, 2013 Reply to Final Office Action, at 5-6.)

Figure 4B of the '018 Patent shows the constant region <u>in</u> the locus.

Nothing in the intrinsic evidence suggests a construction of the word "at" as "near", "around" or "by" the locus.  There is not, for instance, any description of insertion near to or in general proximity of the locus of interest.

E.     "endogenous mouse immunoglobulin locus"

Merus asserts that the term "endogenous mouse immunoglobulin locus" is indefinite.  (JCC at 2.)  It argues that the size, sequence and borders of the immunoglobulin locus was undefined the time the application was filed on February 16, 2001.  (Clynes Decl. ¶ 150.)  According to Merus, the intrinsic evidence provides no clarity.  Regeneron argues that this term has sufficient definition and in fact requires no construction at all.  (Ravetch Decl. ¶¶ 110-114.)  The Court agrees with Merus that there is clear and convincing evidence that as of 2001 the metes and bounds of the locus were not identified with reasonable certainty; the scope of the term also lacks reasonable certainty and is therefore indefinite.  Put otherwise, if one skilled in the art did not know with reasonable certainty where the 5-prime of the immunoglobulin locus was, the insertion of the genomic DNA segment might not fall within the locus at all – defeating the point of the invention.  Lack of boundaries is particularly important when comparing prior art methods of random integration with the advance that the LTVEC method is supposed to bring: targeted genetic modification.  In such context, being "in the vicinity" but not actually "in the locus" is not enough and does not reflect the invention: without adequate

information as to the 5-prime, one skilled in the art could not practice the invention or be certain that he was not infringing it.

The endogenous mouse immunoglobulin locus is the chromosomal location where the DNA that regulates and encodes the heavy chain and two light chains are present.  (Clynes Decl. ¶ 151.)  The Specification never uses the term "endogenous mouse immunoglobulin locus" and never informs the reader how to find the immunoglobulin locus.  It mentions the use of "structural or functional data" to select "a" locus ('018 Patent, 11:17-22, "[a] gene(s) or locus (loci) of interest can be selected based on specific criteria, such as detailed structural or functional data, or it can be selected in the absence of such detailed information as potential genes or gene fragments become predicted through the efforts of the various genomic sequencing projects . . ."), but provides no specific data for locating the "endogenous mouse immunoglobulin locus," nor does it suggest that genomic sequencing has predicted its location.  (Clynes Decl. ¶ 155.)   In particular, the 3' and 5' borders are not provided in the Specification and the number of variable region gene segments are not provided.

The lack of information as to the location of the locus reflects the absence of such information in 2001.  The record before the Court reveals that, as of 2001, the boundaries of that locus were not known.  In terms of the regulatory regions, there is limited disclosure for the 3' and none for the 5'.  Literature demonstrates that in 2001 the 5' border was not known. (See Clynes Op. Decl., Ex. 5, 46, 47, 50; Ravetch Reply Decl., Ex. 41.)  For instance, in 2006 – five years after the Application was

filed – Pawlitzsky et al. stated that "the 5' border of IgH and its flanking region have not been characterized." (Clynes Op. Decl., Ex. 46.)  And in 2006, Johnston et al. stated, "The mechanisms that regulate variable (V) gene selection during the development of the mouse IgH repertoire are not fully understood, due in part to the absence of the complete locus sequence."  (Clynes Op. Decl., Ex. 47.)  As late as 2011, Ebert et al. wrote, "In contrast, regulatory elements other than the VH gene promoters are not yet known . . ." (Clynes Op. Decl., Ex. 50.)  Regeneron's internal documents suggest that the inventors did not in fact know the length of the locus. (Clynes Decl. ¶ 43, Ex. 51, Lab Notebook of Dr. Stevens, June 20, 2001, "the boundaries for the endogenous mouse immunoglobulin loci were not known in 2001, though it was generally known that they were located somewhere within chromosomes 12 (heavy), 6 (kappa) and 16 (lambda)".)  Ravetch concedes that the size of the locus was unknown.  His shifting positions reflect the general uncertainty: his opening declaration referred to 2.3 megabases, but that number was changed to 2.741 megabases in his deposition.  In 2014, Murphy et al. referred to it as 2.6 megabases.[19]  (Ravetch Depo. at 265-66, "Q: why do you think the '018 inventors directed people to use the SEQ ID NO. 5-6, which have nothing to do with the endogenous mouse immunoglobulin locus, to replace the locus? . . . A: . . . My interpretation is it shouldn't be there.")  He then testified that the correct SEQ ID that one would use to locate the homology arms to target the mouse immunoglobulin locus was not provided for in the patent.  (Id. at 264-65.)  Ravetch

---

[19] At his deposition in this matter, Ravetch testified that he believes that the 1 megabase size cited in the Specification was a typographical error. (Ravetch Depo., at 223).

also testified that certain functions involved in Ig locus regulation were unknown at the time. (Id. at 276-77.)

As for locus size, Figures 4A-4D cite to SEQ ID No: 5 and 6, which concern "OCR 10", which has no relation to the mouse immunoglobulin locus. ('018 Patent, 8:32-35) (Transc. 77:10-14, 78:13-15). At his deposition, Ravetch conceded this point. The locus length is described as approximately 1 megabase ('018 Patent, Figure 4A-4D); however, the information the Specification provides is simply wrong. (Ravetch Depo., at 223.) Other literature refers to the locus as at least twice that length; the prosecution history refers to the length as between 1 megabase and 3 megabases; Regeneron's "VelocImmune" mouse, which it asserted was the commercial embodiment of the invention, references the DNA insert into a region of 3 megabases. (VelcoImmune Exhibit ('176 Application)) (Clynes Decl. ¶¶ 155, 159, 166; Transc. 136:3-15). Ravetch conceded that as of the date of the invention, the 5' region of the heavy chain locus had not yet been physically mapped but that it was known that a V gene segment from the J558 V gene segment family was at the 5' end of the locus. (Ravetch Reply Decl. ¶ 139; Transc. 137:2-10.)

To add to the ambiguity, one skilled in the art attempting to practice (or avoid) the invention in the '018 Patent also lacks information as to the strain of mouse to which the immunoglobulin locus related. There is significant diversity in strains of mice and diversity in the IgH locus between different strains. Without knowing the particular strain of mouse the inventors used, one skilled in the art could not know the metes and bounds of the invention. (See Clynes Decl. ¶¶ 33, 179;

53

**A62**

Clynes Opp. Decl. Ex. 52, referring to the European Opposition against EP 1360287, and Regeneron's July 16, 2014 response to the oppositions, Statement of Craig H. Bassing, Ph.D. (Ex. D. 78) at ¶18.)  Ravetch conceded that there are strains of mice the genome of which have likely not yet been characterized. (Ravetch Depo., at 270).[20]

The Supreme Court has set forth the standard for indefiniteness as an instance in which a claim, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, 134 S.Ct. at 2124.  The term "endogenous mouse immunoglobulin locus" was not defined in 2001.  One would have had to guess and be lucky to get it right.  The "reasonable certainty" required by the Supreme Court is lacking.[21]

    F.      "linked" and "operably linked"[22]

Merus asserts that the term "linked" should be construed as "covalently bonded", and that the term "operably linked" should be construed as "covalently bonded such that the rearranged human variable region causes the expression of the mouse constant region gene." (JCC at 2, 3; Clynes Decl. ¶ 182.) Regeneron

---

[20] The Specification makes it clear that both the regulatory and coding segments of the locus were at issue.  See Figure 4B; see also Ravetch Depo., at 241-42.)

[21] Regeneron argues that questions of indefiniteness should await a later stage of the proceedings – and not be resolved as a part of claim construction.  That argument, however, asks this Court to either arrive at a construction for a term which is indefinite – or to ignore its responsibilities during claim construction.  It will do neither.  If during claim construction, it becomes clear that a claim cannot in fact be construed due to indefiniteness, there is no legal principle for the Court to withhold its determination on that issue. See, e.g., Teva Pharm USA, Inc. v. Sandoz, Inc., 723 F.3d 1363, 1367-69 (Fed. Cir. 2013).

[22] These terms are found in Claims 8, 11-19.

asserts that this terms requires no construction. (Ravetch Decl. ¶ 115.) The issue concerns scope: Merus arguing for narrower scope and Regeneron broader. The Court agrees with Merus's proposed construction.

Linked nucleotide bases comprise a DNA sequence. (Clynes Decl. ¶ 183.) Nucleotide bases are connected to each other by a chain of covalent bonds to form a DNA sequence. (Id.) A complementary sequence of DNA is linked by hydrogen bonds; the interaction between the two sequences gives DNA its double-helix shape. (Id.) Every nucleotide on a given sequence is linked to other nucleotides via a phosphate backbone and linked to the complementary strand of DNA via hydrogen bonds. (Id. ¶ 184.) Thus, "linked" has several potential meanings to one skilled in the art:

- covalent bonds linking a DNA sequence

- hydrogen bonds linking one strand to its complimentary strand

- linkage of one nucleotide base to another

- linkage of nucleotide bases as links of a chain

(Id.) The Patent reads:

> Claim 8: The mouse of claim 1, wherein rearrangement of the human variable gene segments in the mouse results in a variable region that comprises a rearranged human variable region gene **linked** to a mouse constant region gene.

> Claim 11: A genetically modified mouse, comprising in its germline human unrearranged variable region gene segments **linked** to a mouse constant region gene, wherein the mouse lacks a human constant region gene, and wherein the mouse constant region gene is at an endogenous mouse immunoglobulin locus.

> Claim 18: The mouse of claim 11, wherein rearrangement of the human variable gene segments in the mouse results in a variable region that comprises a rearranged human variable region gene **operably linked** to a mouse constant region gene.

('018 Patent, 29:45-48, 29:54-59, 29:30:35-38.)  According to Clynes, one of ordinary skill in the art is 2001 would read the claims here against the Specification as using the word "linked" to mean that covalent bonds exist between and among nucleotides in a given sequences.  (Clynes Decl. ¶ 185.)  Thus, Claims 8 and 11 require that the human variable region gene be covalently bonded to the mouse constant region gene (versus some other form of linkage).

The term "operably linked", as used in Claim 18, includes a limitation ("operably") and therefore must be narrower than "linked" generally.  This is based on the legal principles referred to above that courts should construe claims so as to be valid, see Biogen, 318 F.3d at 1140, and give meaning to each term, see Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1368 (Fed. Cir. 2008).  The term "operably linked" appears in the Specification in the context of a preferred embodiment in Claim 18: "a transgenic mouse having a genome comprising entirely human heavy and light chain variable region loci **operably linked** to entirely endogenous mouse constant region loci such that the mouse produces a serum containing an antibody comprising a human variable region and a mouse constant region in response to antigenic stimulation." ('018 Patent, 7:24-30.)

In the prosecution history, the inventor states: "'operably linked' implies that (transcriptional) activity of the gene loci is linked.  The term 'operably linked' is commonly used when refers to the linkage between a promoter and a gene as the

56

**A65**

promoter directs transcription of the gene . . ." (Clynes Op. Decl., Ex. 53, Feb. 27, 2006 Non-Final Office Action, at 12.)

Based on the intrinsic and extrinsic evidence, "operably linked" indicates a functional relationship between the "rearranged human variable region gene" and a "mouse constant region".  (Clynes Decl. ¶ 187.)

G.    "does not comprise a human immunoglobulin constant gene" and "lacks a human constant region gene"[23]

Merus asserts that both of these terms should be construed as "The mouse lacks DNA that regulates or encodes a constant region gene that originates from a human (i.e., genomic)".  (JCC at 3.)  Merus further argues that the term "a constant region gene" means DNA that regulates and encodes a constant region. Regeneron asserts that this claim does not require construction. (Ravetch Decl. ¶¶ 119-121.) The dispute here generally (but not entirely) mirrors that discussed above in connection with the term "human unrearranged variable region gene segments". (Clynes Decl. ¶ 135.)  Here, however, instead of requiring use of cloned genomic DNA that originates from a human, these claims require its absence.  (Id.)

There is no definition or description of this term in the Specification or prosecution history.  Plaintiff has not provided any way to decide whether a sequence of DNA can be considered "human" based on sequence similarity.

One question is whether what must be lacking or absent is a human constant region gene or whether it can be synthetic but have a sequence found in humans.

_____

[23] These terms are found in dependent Claim 10 ("The mouse of claim 1, wherein the mouse does not comprise a human immunoglobulin constant gene"), independent Claim 11 ("lacks a constant region gene") and dependent Claims 12-19.

The use and import of the term "human" is, however, different in these claims from that in, for instance, Claim 1. In Claim 1, the human DNA sequence at issue is <u>inserted</u> using a LTVEC. The size limitations of DNA sequences in 2001 are one basis of the Court's determination that human means not synthetic in that context. As used in these claims here, however, the size of the sequence is irrelevant as it must be absent. Thus, this rationale is not equivalent between the terms. The Court finds no reason why the absence of the human DNA sequence cannot be both the absence of both human and synthetic (in human sequence) DNA.

It is true that terms should generally be construed consistently across claims. <u>See</u> <u>Southwall Techs.</u>, 54 F.3d at 1579; <u>Rexnord Corp. v. Laitram Corp.</u>, 274 F.3d 1336, 1342 (Fed. Cir. 2001). However, that principle gives way when logic and particular context dictate otherwise. <u>See</u> <u>Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.</u>, 442 F.3d 1322, 1327-29 (Fed. Cir. 2006) (construing the claim term "gap" as having different meanings in different claims based on those claims' different geometrical contexts); <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) (interpreting "substantially" in two different ways where term was used in "two contexts with a subtle but significant difference").

The Court agrees, however, that what must be lacking is the entire, contiguous region of the constant gene. In other words, if a human or synthetic constant gene <u>segment</u> is present, that is not inconsistent with these claims. (<u>See</u>

58

**A67**

discussion of "regions" above). Thus, the Court here interprets "region" as it did above as contiguous (V, D and J) versus as segments.

Accordingly, the Court construes this term as "The Mouse lacks DNA that regulates or encodes a constant region gene that originates from a human or is in human sequence."

## V.  CONCLUSION

The Court's determinations as to claim construction are as set forth above.


SO ORDERED.

Dated:     New York, New York
           November 2↓, 2014

                                        _K̲__B̲.̲_F̲o̲__
                                         KATHERINE B. FORREST
                                        United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
REGENERON PHARMACEUTICALS, :
INC., :
:
Plaintiff, :
Counterclaim-Defendant, :
:
-v- :
:
MERUS B.V., :
:
Defendant, :
Counterclaim-Plaintiff. :
------------------------------------------------------------ X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: November 2, 2015

14 Civ. 1650 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On March 11, 2014, Regeneron filed twin patent infringement actions:

one against Merus B.V. ("Merus"), a company based in the Netherlands, and

another against Ablexis LLC ("Ablexis"). (See ECF No. 1.) In short complaints,

each consisting of a few substantive paragraphs, Regeneron accused both companies

of infringing U.S. Patent No. 8,502,018 ("'018 Patent").[1] Merus answered and

counterclaimed, arguing that the '018 Patent was unenforceable due to Regeneron's

conduct during patent prosecution. (See ECF Nos. 72, 225.) This litigation ensued.

Following issuance of this Court's opinion on claim construction, (ECF No. 210)

Regeneron stipulated that its infringement claim as to Merus[2] must fail if the

Court's constructions withstand challenge on appeal. (ECF No. 271.) Thereafter,

---

[1] Merus moved to dismiss the complaint as failing to fulfill basic notice requirements set forth in Rule 8 of the Federal Rules of Civil Procedure and the standard set out by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Though agreeing that the complaint was sparse, the Court nonetheless found it was minimally sufficient and denied the motion. (ECF No. 71.)
[2] Ablexis settled with Regeneron prior to claim construction.

1

all that remained was Merus's counterclaim for inequitable conduct. On June 9-15, 2015 the Court held a bench trial on that claim. Set forth below are the Court's findings of fact and conclusions of law.

Based on substantial evidence adduced at trial – as well as certain instances of Regeneron's litigation conduct – it is clear that this litigation should never have been commenced. It is not unusual for one litigant to argue as much at the outset of a case, but it is much rarer for the evidence to prove it to be true. It is true here. Throughout the history of this case Regeneron has sought to discover how it needed to define its invention to have it fit a cognizable theory of infringement; it has had to contort science, the documentary record, and an alleged commercial embodiment to make them fit the framework of a specification that described a far broader, not as useful, and possibly altogether different invention; and it has demonstrated that the invention disclosed in the '018 Patent is not the same as that Regeneron described during prosecution to the U.S. Patent & Trademark Office ("PTO"). As it turns out, the invention that Regeneron's technical expert, Marjorie A. Oettinger, Ph.D., described is interesting and might in fact lead to the discovery of therapeutically useful antibodies, but it is simply not the invention disclosed in the '018 Patent.

It is unfortunate that this case has been marked by troubling litigation tactics, and doubly so as the purpose of this final proceeding was to determine whether Regeneron had engaged in inequitable conduct or affirmative egregious misconduct during patent prosecution. Troubling litigation tactics were on display

2

**A70**

soon after this case was filed and continued into the trial. Based upon the Court's assessment of the evidence, it appears that the very birth of this patent was beset by misconduct as well. And so it has come full circle. That which was obtained by misconduct ends as a result of misconduct.

I.     THE '018 PATENT

Regeneron's '018 Patent is the subject of this proceeding. Entitled "Methods of Modifying Eukaryotic Cells," it is one of a number of patents and/or related patent applications in the same family and sharing some or all of the same specification. (See '018 Patent,[3] "Related U.S. Application Data.") The original application to which the '018 Patent traces back was initially filed on February 16, 2001. (Id.) As discussed in several parts of this Opinion, this date – February 16, 2001 – plays an important role in defining the invention; that is, in determining what it is and what it simply cannot be.

Regeneron describes the invention disclosed in the Patent as a mouse with normal immune response useful for discovering therapeutic antibodies. According to Regeneron, mice described by prior art had deficient immune response. The invention involves, in part, the targeted insertion of unrearranged human variable region DNA segments into an endogenous mouse (murine[4]) immunoglobulin ("Ig") locus. According to Regeneron, this would result in a mouse with human variable

---

[3] The '018 Patent is PX 1.
[4] Of, relating to, or involving mice.

regions and mouse constant regions, that is, a "chimeric" or "reverse chimeric"[5] mouse. Notably, and as described further below, Regeneron's view of the invention necessarily presumes a multi-step process. The process could unfold in two different ways. It could be achieved by making two targeted insertions into the same mouse Ig loci, one of human heavy chain variable regions and a subsequent and further targeted insertion of human light chain variable regions. Or, alternatively, it could be achieved by initial insertion of heavy and light chain variable regions into two separate mice and the subsequent breeding of the two mice, resulting in a mouse with both human heavy and light chain variable regions.

An aspect of this targeted insertion is, according to Regeneron, placement at a precise point: the human variable region gene segments must be adjacent to the mouse constant regions. Regeneron's technical expert, Dr. Oettinger, refers to this as "functional" linkage. In addition, Regeneron asserts that a necessary part of this invention includes retention of mouse regulatory regions, specifically the transmembrane and cytoplasmic tail. Regeneron asserts that the commercial embodiment of the invention is its VelocImmune mouse. These aspects of the invention are important to the issues here before the Court. A differently defined invention runs directly into the prior art Merus claims Regeneron failed to disclose during patent prosecution.

---

[5] The term "chimeric" comes from Greek mythology, in which the Chimera was a fire-breathing monster made up of parts from different animals: a lion's body, topped with dual lion and goat heads, and ending in a serpent for a tail. In usage today the term typically refers to something comprising more than one animal. The term "reverse chimeric" here means having the mouse as the primary animal to which the human DNA is added; the animal is "chimeric" as it is composed of DNA from two animals, and "reverse chimeric" as it is composed primarily of non-human DNA to which human DNA has been added.

According to Merus, the invention (and claim 1 in particular) does not contain all of the limitations Regeneron now asserts. As an initial matter, it is not limited to mice with entirely human variable regions and entirely mouse constant regions, but may include those with combined human and mouse variable regions (that is, there is an insertion of human variable, but no deletion of the mouse, or insertion of human heavy chain leaving the mouse light chain, or vice versa). In addition, according to Merus, although claim 1 specifies that the insertion must occur into the Ig locus, it does not require insertion at the particular point within the locus (adjacent to, but neither overlapping with nor short of, the mouse constant region) as Regeneron now asserts; and this lack of specificity could lead to a mouse with an impaired immune response. Finally, according to Merus, the VelocImmune mouse, which Regeneron represented to the PTO was the commercial embodiment of the '018 Patent, did not exist in February 2001; Regeneron only succeeded in making it several years later, after a number of failed attempts – and then by a process different from that disclosed in the '018 Patent.

## II.    DESCRIPTION OF THE TECHNOLOGY IN THE PATENT

According to the specification of the '018 Patent, the method used to engineer this chimeric mouse involves "utilizing large DNA vectors to target, via homologous recombination, and modify, in any desirable fashion, endogenous genes and chromosomal loci in eukaryotic[6] cells." ('018 Patent, "Abstract.") The large DNA

---

[6] "Eukaryotic cells" are cells that have different compartments that serve distinct roles; for instance, chromosomes are housed within the cell nucleus. (Clynes Decl., ECF No. 105, p. 11, n. 2.) Eukaryotic

vectors used in this process are defined in the specification as "LTVECs" – that is, large targeting vectors for eukaryotic cells.  LTVECs are "derived from fragments of cloned genomic DNA larger than those typically used by other approaches intended to perform homologous targeting in eukaryotic cells."  (Id., 9:39-42.)  A "targeting vector" is "a DNA construct that contains sequences 'homologous' to endogenous chromosomal nucleic acid sequences flanking a desired genetic modification(s).  The flanking homology sequences, referred to as the 'homology arms', direct the targeting vector to a specific chromosomal location within the genome. . ."  (Id., 8:66-9:4.)

---

cells are the building blocks of humans, mice, and other higher order life; they are distinguished from bacteria which have no cellular compartments. (Id.)

All of the figures in the specification show versions of homologous recombination with LTVECs of various types and sizes, none smaller than 20 kilobases ("kb"). For instance, Figures 1 and 2 in the specification show a DNA "modification cassette" (or insert) being transferred by homologous recombination into a large targeting vector in a mouse's genome:



(Id., Fig. 1.)



(Id., Fig. 2.)

Figures 4A-4D of the '018 Patent show a human insert in a LTVEC of 200-300 kbs:



Figure 4A Human Ig heavy chain locus (total length ≈1Mb, not drawn to scale):

Figure 4B Mouse IG heavy chain locus (total length ≈1Mb, not drawn to scale):

Figure 4C LTVEC2:

Figure 4D LTVEC1:

The specification states that "use of LTVECs provides substantial advantages over current methods" of homologous recombination. (Id., 1:37-38.) "LTVECs can be more rapidly and conveniently generated from available libraries of large genomic DNA fragments (such as BAC and PAC libraries[7]) than targeting vectors made using current technologies." (Id., 1:40-43.) "The present invention" is described as providing for "a rapid, convenient, and streamlined method for

---

[7] BAC and PAC are acronyms that respectively stand for "bacterial artificial chromosome" and "P1-derived artificial chromosome."

systematically modifying virtually all the endogenous genes and chromosomal loci of a given organism." (Id., 1:51-54.)

The specification also states that "[i]n accordance with the present invention, Applicants provide novel methods that enable the use of targeting vectors containing large regions of homology so as to modify endogenous genes or chromosomal loci in eukaryotic cells via homologous recombination. Such methods overcome the [limitations in the prior art.]" (Id., 2:64-3:2.)

In the "Summary of the Invention," the specification states, "In accordance with the present invention, Applicants have developed a novel, rapid, streamlined, and efficient method for creating and screening eukaryotic cells which contain modified endogenous genes or chromosomal loci." (Id., 3:11-14.) The method uses LTVECs, introduces them into eukaryotic cells to modify the endogenous chromosomal locus of interest, and analyzes the cell with an assay[8] for modification of the allele[9] ("MOA assay"). (Id., 3:15-25.) The '018 specification references thirty (30) preferred embodiments, including several which are far broader than the invention Regeneron now describes. For instance,

- "A preferred embodiment of the invention is a method for genetically modifying an endogenous gene or chromosomal locus in eukaryotic cells [using LTVECs]." (Id., 3:27-30.)

- "Yet another preferred embodiment is a genetically modified eukaryotic cell that is produced by the method of the invention." (Id., 4:6-8.)

---

[8] An assay is a quantitative or qualitative test of a substance.
[9] An allele is one of two or more versions of a gene.

Certain embodiments make clear that <u>deletions</u> and <u>insertions</u> of genetic sequences are separate and distinct concepts, and that one is not assumed within the other (that is, an insertion of a genetic sequence does not necessarily imply a deletion of a sequence). For instance,

- "Another embodiment of the invention is a method wherein the genetic modification to the endogenous gene or chromosomal locus comprises <u>deletion</u> of a coding sequence, gene segment, or regulatory element; <u>alteration</u> of a coding sequence, gene segment, or regulatory element; [or] <u>insertion</u> of a new coding sequence, gene segment, or regulatory element . . ." (<u>Id.</u>, 3:40-43 (emphasis added).)

- "An alternative embodiment of the invention is a method wherein the alteration of a coding sequence, gene segment, or regulatory element comprises a <u>substitution, addition, or fusion</u> . . ." (<u>Id.</u>, 3:48-51 (emphasis added).)

- "Also preferred is a transgenic mouse having a genome comprising entirely human heavy and light chain variable region loci operably linked to entirely endogenous mouse constant region loci such that the mouse produces a serum containing an antibody . . . ; a transgenic mouse containing an endogenous variable region locus that has been <u>replaced</u> with an homologous or orthologous human variable locus, such mouse being produced by a method comprising [obtaining and using LTVECs]." (<u>Id.</u>, 7:24-38 (emphasis added).)

Other embodiments directly contradict Regeneron's description in this proceeding of its invention as requiring a mouse with <u>entirely</u> human variable regions and <u>entirely</u> mouse constant regions. For instance,

- "One embodiment of the invention is a method of replacing, <u>in whole or in part</u>, in a non-human eukaryotic cell, an endogenous immunoglobulin variable region gene locus with an homologous or orthologous[10] human gene locus comprising [using the LTVEC process to] introduce[e] the LTVEC … into the eukaryotic cells to replace, in whole or in part, the endogenous immunoglobulin variable gene locus…" (<u>Id.</u>, 5:44-60 (emphasis added).)

- "Another embodiment of the above method is a method wherein [certain steps] are repeated until the endogenous immunoglobulin variable region gene locus is replaced <u>in whole</u> with an homologous or orthologous human gene locus." (<u>Id.</u>, 6:11-15 (emphasis added).)

- "Another embodiment of the method is one in which the immunoglobulin variable gene locus is a locus <u>selected from</u> the group consisting of a) a variable gene locus of the kappa light chain; b) a variable gene locus of the lambda light chain; and c) a variable gene locus of the heavy chain." (<u>Id.</u>, 6:16-20 (emphasis added).)

- "Also preferred is an embryonic stem cell wherein the mouse heavy chain variable region locus is <u>replaced, in whole or in part</u>, with a human heavy chain variable gene locus; an embryonic stem cell of claim wherein the mouse kappa light chain variable region locus is <u>replaced, in whole or in part</u>, with a human kappa light chain variable region locus; an embryonic stem cell wherein the mouse lambda light chain variable region locus is <u>replaced, in whole or in part</u>, with a human lambda light chain variable region locus; and an embryonic stem cell wherein the heavy and light chain variable region gene loci are <u>replaced, in whole</u>, with their human homologs or orthologs." (<u>Id.</u>, 7:6-18 (emphasis added).)

---

[10] "Homologous" means "two or more nucleic acid sequences that are either identical or similar enough that they are able to hybridize to each other or undergo intermolecular exchange." ('018 Patent, 9:9-11.) An "orthologous" sequence refers to "a sequence from one species that is the functional equivalent of that sequence in another species." (<u>Id.</u>, 9:51-53.)

12

**A80**

- "Yet another preferred embodiment is an antibody comprising a human variable region encoded by the genetically modified variable gene locus of described above; an antibody further comprising a non-human constant region; and an antibody further comprising <u>a human constant region</u>." (<u>Id.</u>, 7:19-23 (emphasis added).)

- "Also preferred is a transgenic mouse having a genome comprising <u>entirely human</u> heavy and light chain variable region loci operably linked to <u>entirely endogenous mouse constant region loci</u> such that the mouse produces a serum containing an antibody comprising a human variable region and a mouse constant region in response to antigenic stimulation; a transgenic mouse having a genome comprising <u>human</u> heavy and/or light chain variable region loci operably linked to <u>endogenous mouse constant region loci</u> such that the mouse produces a serum containing an antibody comprising a human variable region and a mouse constant region in response to antigenic stimulation…" (<u>Id.</u>, 7:24-35 (emphasis added; note inclusion of the word "entirely" in the first example and the absence of that word in the second).)

Notably, the preferred embodiments are consistent with Merus's description of the invention and, as described below, the broadest reasonable construction of the claims.

A.    <u>Certain Technical Principals Relevant to this Opinion</u>[11]

Technical experts retained by Regeneron and Merus testified at the trial: Marjorie A. Oettinger, Ph.D. for Regeneron and Geoff Davis, Ph.D., for Merus.  Both have substantial expertise in their fields.  The Court relies upon both in its findings with regard to various basic technical principles relevant to the issues before the

---

[11] The Court set forth a similar section on Technical Principles in its <u>Markman</u> decision.  (ECF No. 210.)  This section has been modified to reflect trial testimony and documents received into evidence in this proceeding.  Notably, Merus's expert, Geoff Davis, Ph.D., proceeded in a similar manner in his Trial Declaration by incorporating by reference the background technical information the Court had previously received in connection with claim construction.  (<u>See</u> Davis Tr. Decl. ¶ 16.)

Court.[12]  Where one differed from the other in a material way, several examples of which are described in this Opinion, the Court found Dr. Davis more persuasive and his opinions based on a more substantial foundation.  All technical determinations included in this Opinion constitute findings of fact.

The technology relating to the '018 Patent generally involves a method to genetically modify mice to contain large fragments of human genomic DNA by use of targeting vectors (described below) and assay.  The goal is to produce antibodies useful in drug discovery and, eventually, production of potentially useful therapeutic antibodies. (Davis Tr. Decl.[13] ¶ 17.)  DNA is a molecule in a cell which carries the genetic material for living organisms and is capable of self-replication and synthesis.  It consists of a double-stranded molecule that pairs in a double-helical structure: "One end of each strand is called the 5-prime (5') end, and the other is called the 3 prime (3') end."  The 5-prime and 3-prime ends define the boundaries of a strand of DNA.  One of the issues before the Court – and which was also at issue during claim construction – is whether the metes and bounds of the 5' end of the immunoglobulin locus was sufficiently understood as of the relevant date, February 16, 2001.  The concern is whether practicing the invention required defining the 5' end of the locus, which is the beginning of the variable region.  Merus asserts that without such definition, targeted insertion of a human variable region gene segment could miss the locus altogether, or it could fall short of

---

[12] See Trial Aff. of Dr. Marjorie A. Oettinger (ECF No. 345) and Trial Decl. of Dr. Geoff Davis. (ECF No. 338); see also Trial Tran. 650:4-916:12 (Oettinger testimony) and Trial Tran. 117:3-473:4 (Davis testimony).

[13] Dr. Davis's trial declaration was filed under seal.  (See ECF No. 338.)

insertion at a point that would reliably produce a useful antibody. Regeneron, in contrast, asserts that while the precise metes and bounds of the 5' end were not known in 2001, enough was known as to the size of the loci to allow for practice of the invention. As discussed below, the Court is persuaded by Merus's expert Dr. Davis on this point and disagrees with Regeneron.

DNA molecules are made up of chemical building blocks called "nucleotides". Nucleotides on the two strands of the double-helix pair with one another in complementary units called "base pairs." The base pairings connect the individual DNA strands to one another to form the double-helix. The unique sequence of bases on a given strand represents a code; a gene is a unit of DNA that includes the sequence of bases representing the codes for the amino acids that comprise a particular protein. In this case, the concept of kilobase pairs has some relevance. The term "kilobase pairs" refers to a DNA strand 1,000 base pairs long. In the '018 Patent, a core aspect of the invention is the utilization of a large fragment of DNA – measured in kilobase pairs – for targeted insertions.[14]

Genes are expressed by cells as proteins through processes commonly referred to as "transcription" and "translation". Before transcription and translation, the two strands of DNA that constitute a gene unwind from their double-helix configuration. During transcription, machinery in the cells reads the DNA sequence of one of the DNA strands, nucleotide by nucleotide, and uses it as a

---

[14] During claim construction, one issue was whether, as of February 2001, Regeneron was actually able to successfully insert a DNA fragment of such length.

template to produce an intermediate molecule called messenger RNA (abbreviated as mRNA). The structure of a protein gives rise to its biologic activity.

A key benefit of the invention as described in the '018 Patent is successful B cell replication. "B cells" make antibodies. Antibodies are also known as "immunoglobulins." They are a particular type of protein with the potential to bind specifically to foreign antigens. (Oettinger Trial Aff.[15] ¶ 22.) All immunoglobulins have a similar structure. (Id. ¶ 23.) They are typically depicted as having a structure shaped like the letter "Y". (See id. Fig. 1.) The Y structure consists of four chains of amino acids: two identical light chains and two identical heavy chains. Each light chain pairs with a partner heavy chain, and then each heavy-light chain pair associates with an identical heavy-light chain pair to form the "Y" structure. See Figure 1[16] below:



Each Ig heavy or light chain is composed of several regions. (Oettinger Trial Aff. ¶ 24.) Within an immunoglobulin subunit, there are regions with extensive amino acid sequence variations between them, which are called "variable" regions.

---

[15] Dr. Oettinger's trial affidavit was filed under seal. (See ECF No. 345.)
[16] Figures in this opinion without a specifically identified source are not found in the '018 Patent.

(Id.)  Regions that show no sequence variation within a species are called "constant" regions.  (Id.)  Each heavy chain and light chain is comprised of a "constant" region and a "variable" region.   In both heavy chains and light chains of an antibody, the region at the tip of the "Y" is the variable region.  The other region on each heavy chain and light chain is the constant region.  See Figure 2:



The heavy chains are referred to by the letters of the Greek alphabet.  The heavy chains of the different classes of immunoglobulins, IgM, IgD, IgG, IgA and IgE, are referred to as μ (mu), δ (delta), γ (gamma), α (alpha) and ε (epsilon), respectively.  (Id. ¶ 27.)  Oettinger states that "a comparison of the constant regions between different species … reveals important differences.  For example, although the amino acid sequences of the constant regions of mouse and human IgG1 have about 70% sequence identity, there are numerous amino acid substitutions that distinguish one from the other. These species-species features are important when considering the functional and antigenic properties of human immunoglobulins introduced into a different species…" (Id.)

Important to the issues before this Court is the fact that, as Dr. Oettinger testified and as further set forth in Dr. Davis's Trial Declaration (See Davis Tr.

17

**A85**

Decl. ¶ 322), replacement of an entire variable region requires at least two steps: replacement of the heavy chain of the variable region, and replacement of the light chain. (ECF No. 398, 674:2-19.) Insertion of an entire exogenous variable region requires two similar insertion steps – one for the heavy chain and one for the light. It would not matter which order such replacement or insertion was accomplished – but it cannot be accomplished in a single step. (Id., 674:20-675:2.)

Antibodies are proteins composed of amino acids, encoded by genes composed of DNA nucleotides. The DNA that encodes antibody variable regions is assembled from separate gene "segments." A gene that encodes the heavy chain variable region of an antibody is assembled from three gene segments, named the variable (V or $V_H$), diversity (D or $D_H$) and joining (J or $J_H$) segments (the subscript "$_H$" indicates the gene segment that forms part of the antibody heavy chain). A gene that encodes the light chain variable region of an antibody is assembled from two gene segments, named the variable (V or $V_L$) and joining (J or $J_L$) segments (the subscript "$_L$" similarly indicates the light chain). These gene segments are joined together to form contiguous variable region gene segments (V(D)J for heavy chains, and VJ for light chains) through DNA rearrangement mechanisms. (Oettinger Tr. Aff. ¶ 35.) The genetic structure of the immunoglobulin loci together with the capacity of immunoglobulin DNA to (1) rearrange, (2) switch, and (3) further mutate, allows for the production and development of a diverse antibody repertoire; these activities may also be referred to generally as recombination, isotype switching, and hypermutation. (Davis Tr. Decl. ¶ 22.)

18

**A86**

In order to generate mice that produce humanized antibodies, the '018 Patent sets out a method of integrating human genomic immunoglobulin DNA into the mouse genome.  (Id. ¶ 23.)  In both humans and mice there is one gene locus containing the genetic material used for expressing heavy chains, and two gene loci containing genetic material used for expressing light chains.  Through a process known as V(D)J recombination, the DNA sequence encoding a variable region of an antibody heavy or light chain is created at each Ig gene locus by selecting and joining together one each of the many V, D and J gene segments (for heavy chains) or V and J gene segments (for light chains) present at the locus.  (Oettinger Tr. Aff. ¶ 41.)  V(D)J recombination is referred to as "somatic recombination".  See Figure 3:



V(D)J recombination (i.e., somatic recombination) is part of the process of B cell development essential to encode a complete antibody.  All antibodies made by

one B cell are identical. (Id. ¶ 29.) Thus, in order to have a diversity of antibodies, a diversity of B cells is required. B cell rearrangement is essential to that process. Somatic mutations (i.e., changes in DNA sequences in B cells as opposed to germline cells) then further act to increase the affinity of an antibody with a given specificity. (Id.) "B cells arise in the bone marrow, where lymphoid progenitor cells develop into 'immature' B cells." (Id. ¶ 30.) During this developmental process, rearrangements take place in the immunoglobulin genes. This is the "V(D)J recombination" discussed above. (Id.) If a successful gene rearrangement takes place, the B cell eventually acquires the capacity to display a "B cell receptor" on its surface; this B cell receptor is a "membrane-bound version of an immunoglobulin." (Id.)

Successful rearrangement of the heavy chain locus allows the B cell to produce a membrane-bound μ (mu) chain. (Id. ¶ 43.) In early B cell development, the membrane-bound μ (mu) chain is the first functional Ig subunit that is expressed: at this time, the light chain genes have not yet rearranged and the B cell does not make the complete B cell receptor, so the B cell is not capable of specific antigen recognition. (Id.) At this stage, only a membrane-bound μ (mu) heavy chain is expressed and the cell that carries it is referred to as a "pre-B cell." (Id.) The membrane-bound μ (mu) chain is anchored in the membrane of the pre-B cell with the bulk of its mass facing outward. (Id. ¶ 44.) The membrane-bound μ (mu) chain forms a complex with two so-called "surrogate" light chains and two

"accessory proteins;" this complex is referred to as the pre-B cell receptor ("pre-BCR"). (Id. ¶ 45.)

The μ (mu) region, which has both a transmembrane domain and a cytoplasmic tail, plays an important role in this proceeding. Regeneron asserts that a benefit of the invention in the '018 Patent is <u>retention</u> of a mouse μ (mu) region when human (heavy and light chain) variable regions have been inserted. Merus argues – and Davis persuasively supports this argument – that nothing in claims 1-5 requires retention of the murine μ (mu) region.

There are – and at the time of the invention in February 2001 there already were – numerous methods for incorporating exogenous DNA, such as human DNA, into mice. The first method was the insertion of a "transgene" by random integration. A "transgene" is a DNA sequence originating from outside the host organism. One may create a "transgenic mouse" by injecting an exogenous DNA fragment into a fertilized mouse egg. (See ECF No. 400, 850:10-20; Davis Tr. Decl. ¶¶ 19, 59.) The DNA fragment is then incorporated into a random chromosomal location in the genome of the embryo. The exact location where the transgene DNA ends up in the genome is random. This process is known as "random integration". Random integration may result in the location of the added DNA in an area which is more or less transcriptionally active and can also disrupt or render nonfunctional DNA regions into which it integrates. In other words, the inserted DNA may or may not be where you want it to be in the mouse genome.

Non-randomized methods of genetic modification also existed prior to February 2001. The methods are sometimes generally referred to as "gene targeting." (Davis Tr. Decl. ¶ 19.) The key technique used for targeted gene modification that had been developed before 2001 is called "homologous recombination." (See, e.g., id. ¶¶ 18-20.) Homologous recombination relies on a vector (one can think of this as a "chunk") comprised of the foreign DNA that one seeks to insert, flanked by regions of DNA that are homologous to the desired integration site, known as the homology arms. (Id. ¶ 19.) To facilitate homologous recombination, the DNA sequence of interest is flanked by "homology arms;" these arms consist of DNA fragments that are substantially the same in sequence as the sequences that flank the target DNA sequence being replaced or augmented in the genome. These arms allow the targeting construct to alight with the host genome to ensure modification at the desired position. Targeted insertion directs the DNA from the vector to integrate at a particular site (or location) without changing the nearby regions of the host genome (this is an "insertion"), or it can direct the foreign DNA to replace a portion of the host genome with the foreign DNA to be integrated ("replacement" or "substitution"); this may include a deletion step. (Id.)

An example of targeted insertion – without deletion – is shown below in Figure 4 as integrated DNA without removing the DNA of the targeted genome:



Insertion without deletion differs from "replacement" or "substitution" of mouse DNA with homologous human DNA. Implicit in replacement or substitution is the concept of removal, or possibly other inactivation, of the original gene segment. In this way, the mouse DNA would not be present (or active) in the mouse cell and the human DNA would be. (Davis Tr. Decl. ¶ 19.)

The '018 Specification teaches a method of homologous recombination between a mouse and human in which the specific target is the immunoglobulin locus. In the '018 Patent, the mouse is the host, and a portion of an homologous human gene segment (here, some or all of the variable region) is inserted into the mouse's immunoglobulin locus. To do this, a "targeting vector" must be created. As described above, a "vector" is a vehicle which holds the DNA sequence (or gene segment) that the scientist intends to be incorporated into the mouse genome. To

23

**A91**

facilitate homologous recombination, the DNA sequence of interest is flanked by "homology arms"; these, again, are DNA fragments that are substantially the same in sequence as the sequences that flank (or are at either end) of the target DNA sequence being replaced or augmented in the genome. These arms allow the targeting construct to align with the host genome to ensure modification at the desired position. Put otherwise, to drop the gene sequence into a particular locus you need a beginning and end that matches the beginning and end of the same sequence in the host; and to review (because this is complicated stuff) the entire segment is called the vector and the beginning and ends are the "arms" or "homology arms" of that vector.

When the amino acid sequence of a protein is represented in a linear fashion, it is represented by convention with the "amino-terminal" end on the left and the "carboxyl-terminal" end on the right. (Oettinger Trial Aff. ¶ 28.) For nucleic acids such as DNA, the "upstream" or "5'" ("five-prime") portion is shown on the left and the "downstream" or "3'" ("three-prime") portion is shown on the right, with the encoding sequence in the middle. (Id.)

One can think of this as a section of rope with a knot on one end signifying the 5' end of the locus, the middle section as a gene segment, and a knot on the far end as the 3' end of the locus. Thus, the immunoglobulin loci have a 5' end and a 3' end; in between are the heavy and light chain variable region gene segments and the heavy and light chain constant region segments, with the variable segments arranged at the 5' end and the constant segments toward the 3' end. One can think

24

**A92**

of the 5' and 3' ends as the boundary lines of the locus.  Outside of the 5' and 3' one

is outside of the locus; inside the boundary lines are all of the various regions

including the variable regions (heavy and light) and constant regions (heavy and

light).  Thus, knowing the 5' and 3' defines the playing field – but where on the

playing field one desires to place the "ball" (or gene segment), if one desires a

specific location, requires additional information.

Continuing with our playing field analogy, to place the ball at the 50 yard

line, one needs to know where that is.  Of course, one also needs to know whether

the coach cares where on the field the ball is placed, or whether the intent is just to

get it onto the field.  The "coach" (scientist) may be indifferent.  This concept is

important for the invention at issue in the '018 Patent – both because Merus claims

that the metes and bounds of the 5' was unknown in February 2001, and because

Regeneron now claims that the location within the locus (in our analogy, the precise

point on the playing field) at which the targeting needs to occur, is quite specific.  As

discussed below, Regeneron asserts (through Dr. Oettinger) that the insertion of the

human DNA segment must occur distal to, and upstream of, the 5' such that it is

next to, but not within, the area which contains the mouse constant regions.

Thus, performing targeted insertion of variable gene segments into the

immunoglobulin locus of a mouse requires choosing a homology arm upstream (5') of

the chromosomal fragment, and a homology arm downstream (3') of that fragment.

If homologous recombination occurs within the boundaries established by the

homology arms, the insertion has been accomplished. Figure 4 is worth repeating here to illustrate this:



Notice that in the figure above, depicting an example of insertion, the transgene (that is, the gene from the outside human organism) has been added into, but has not replaced, the existing genes in the mouse. As discussed, a separate process would be required to delete the pre-existing homologous segment, or to inactivate it.

Over time, scientists skilled in the art have found that human gene segments inserted into a mouse genome, and into the immunoglobulin gene in particular, are able to rearrange and thereby produce a broad spectrum of VDJ and VJ regions (for heavy and light chains) that are expressed in antibodies.

The method set forth in the '018 Patent may result in genetically modified mice that can produce antibodies useful in drug discovery and downstream production of potentially useful therapeutic antibodies. (Davis Tr. Decl. ¶ 17.) As discussed below, that same method may also, however, produce a mouse capable of

producing inferior or even useless antibodies.[17] This might occur if (1) the insertion occurs in the gene (e.g. somewhere on the playing field) at a point that is not next to the constant region – perhaps even within the constant region; (2) the inserted human gene segment is only one portion of the variable region (e.g. heavy but not light chain or vice versa), or (3) the homologous mouse gene segment is not deleted or inactivated, but instead continues to exist within the locus.

It should be clear by this point that Drs. Oettinger and Davis do not agree on various technical aspects of the invention. Indeed, they disagree on certain fundamental points. In making its determinations herein, the Court has read the material submitted by each and had the opportunity to see them on cross-examination and redirect, and also to pose certain questions itself. While the Court does find Dr. Oettinger experienced in the relevant area, the Court credits Dr. Davis's views on technical aspects in which they differ, including on the invention. That is due to the reasoned basis for Dr. Davis's views, the evidence he brought to bear to support his views, and how he responded on cross examination. As stated above, the Court's technical statements are, therefore, findings of fact.

Among their disagreements is whether insertion of the human V-D-J/V-J (that is, both heavy and light chain variable regions) and deletion of the homologous mouse sequences leaves intact all of the sequences, including regulatory sequences, necessary to enable the production of useful antibodies. Dr. Oettinger asserts that it does, and Dr. Davis disagrees. Dr. Davis testified credibly that "[t]here are …

---

[17] As Dr. Davis notes, creation of an antibody is not a requirement of claims 1-5 of the '018 Patent. (Davis Tr. Decl. ¶ 44.)

important differences between the loci in organization, regulation and existence of embedded genes associated with other functions in the organism, which do not comport with the assertion" that all necessary sequences for proper transcription, recombination and/or class switching are left intact. (Id. ¶ 27.) One example highlights the importance of this disagreement.

Following its submission of the '018 Patent Application, Regeneron learned that embedded in the mouse heavy chain Ig locus there are genes (referred to as ADAM6) that are important for mouse fertility. If those genes are deleted according to the instructions set forth in the '018 Patent (and as referenced in Figures 4A-D of the '018 Patent), the resulting mouse will be infertile or have impaired fertility. (Id. ¶ 28; DX 159, at 734, 737; see also DX 3, U.S. Patent No. 8,642,835 at 1:15-28.)

## ADAM6 genes found in mouse and human IgH loci



## FIELD OF INVENTION

Genetically modified mice, cells, embryos, and tissues that 15
comprise a nucleic acid sequence encoding a functional
ADAM6 locus are described. Modifications include human
and/or humanized immunoglobulin loci. Mice that lack a
functional endogenous ADAM6 gene but that comprise
ADAM6 function are described, including mice that com- 20
prise an ectopic nucleic acid sequence that encodes an
ADAM6 protein. Genetically modified male mice that com-
prise a modification of an endogenous immunoglobulin $V_H$
locus that renders the mouse incapable of making a functional
ADAM6 protein and results in a loss in fertility, and that 25
further comprise ADAM6 function in the male mice are
described, including mice that comprise an ectopic nucleic
acid sequence that restores fertility to the male mouse.

Another point of difference concerns the identity of light and heavy chains. For instance, Dr. Davis takes issue with Dr. Oettinger's assertion that a naturally occurring Ig molecule always has two identical light chains and two identical heavy chains. Dr. Davis states, with support, that (for example) the IgG4 is "inherently unstable" and "exchange of HL pairs may occur resulting in different heavy chains and/or light chains in the circulation." (Davis Tr. Decl. ¶ 25.) He further states, with support, that while Dr. Oettinger asserts that the unrearranged variable region gene structures of heavy and light chains are similar, they are not always so. (Id. ¶ 27.) For instance, mouse heavy and light chain Ig loci organization and content are different. "[T]he mouse endogenous lambda locus has regulatory elements, and constant regions sandwiched between V and J gene segments." (Id. ¶ 29.)

29

A97



According to Dr. Davis, and the Court credits his testimony in this regard, if one skilled in the art were to follow the targeting strategy set forth in the '018 Patent for the lambda locus, he or she would be removing mouse constant regions and regulatory elements within that locus.  (Id. ¶ 30.)  This conflicts with Dr. Oettinger's assertion that the invention requires maintaining the totality of the mouse constant region intact.  (Id. ¶ 31.)[18]

## III.    PROSECUTION HISTORY OF THE '018 PATENT

U.S. Patent Application No. 13/164,176 (the '176 Application), entitled "Method of Modifying Eukaryotic Cells," was filed on June 20, 2011. (See '018 Patent.)  The application issued as U.S. Patent No. 8,502,018 (the '018 Patent) on August 6, 2013, to inventors Drs. Andrew J. Murphy and George D. Yancopoulos, (Id.) and was assigned to Regeneron.

---

[18] One of the more curious moments in the trial was when Dr. Oettinger testified that she had been instructed not to talk to the inventor – Dr. Andrew J. Murphy – about the '018 Patent.  While lawyers understandably try to prevent or limit interactions among trial witnesses to avoid claims that testimony is coordinated, that ought to be balanced against providing an expert with access to an important source of information as to how the invention developed and the intended scope of the claims, etc., namely the inventor himself.

As originally filed, claim 1 of the '176 Application describes "A genetically modified mouse, comprising in its germline human unrearranged variable gene region segments inserted at a mouse immunoglobulin locus." (DX 2 at 44.)  But for the later inclusion of the word "endogenous", this is identical to claim 1 of the '018 Patent as issued.

On January 26, 2012, the PTO issued a Non-Final Office Action rejecting claims 1-19 of the '176 Application as being anticipated by a Lonberg reference, 2006/0015957 (Id. at 128-39.)  That Office Action stated, in part:

> Lonberg and Kay teach heterologous unrearranged immunoglobulin human heavy and light chain transgenes useful for producing transgenic mice…and transgenes are typically integrated into host chromosomal DNA, into germline DNA.
>
> …
>
> Lonberg and Kay teach the production of chimeric human variable region/mouse constant region antibodies through trans-switching…thus the mouse does not comprise a human immunoglobulin constant region gene.  (Id. at 131-32.)

On July 26, 2012, Regeneron's Dr. Tor Smeland, in-house counsel responsible for prosecuting that application and others in the same family in the United States and Europe, replied to this Office Action.  He argued, inter alia, that unlike the '176 Application, Lonberg teaches random and not targeted insertion:

> Lonberg does not disclose a mouse comprising in its germline human unrearranged variable region gene segments inserted at a mouse immunoglobulin locus.  Instead, Lonberg discloses transgenes that are apparently randomly inserted at (unknown) loci. Lonberg simply lacks description of the claimed chimeric locus of claim 1. Amended claim 11 and amended claim 20 also recite a chimeric endogenous locus, which is not disclosed in Lonberg.  Thus, regardless of whether Lonberg disclosed chimeric human variable/mouse constant antibody proteins,

31

**A99**

> Lonberg does not anticipate the claims because a disclosure of trans-switching does not disclose … endogenous mouse loci that are modified as claimed…
>
> …
>
> The claimed method does not represent a selection from predictable solutions, i.e., the claimed method was not "obvious to try" at the time it was filed.  An obvious to try argument assumes a design need or market pressure to solve a recognized problem in order to achieve an anticipated success.  <u>The art never recognized (1) that there was a "problem" to be solved in making antibodies from an endogenous mouse locus, or (2) that there was a design need or market pressure to achieve success at modifying an endogenous mouse immunoglobulin locus to make a chimeric endogenous locus.</u>  (<u>Id.</u> at 160-61, 163 (emphasis added).)

On October 11, 2012, the PTO mailed a Final Office Action, rejecting the pending claims of the '176 Application.  The Final Office Action maintained the rejection of claims 1-19 as anticipated by Lonberg. (<u>Id.</u> at 180.)

In a January 11, 2013 Reply to the Final Office Action, Regeneron amended claim 1 to include the additional limitation that the human unrearranged variable region gene segments would be inserted at "<u>an endogenous</u>" mouse immunoglobulin locus.  (<u>Id.</u> at 202.)  In connection with that amendment Regeneron stated:

> The Lonberg paragraphs cited by the Examiner merely disclose that human transgenes for making human antibodies were mentioned in the art.  None of the cited paragraphs suggest or even hint at placing unrearranged human immunoglobulin gene segments at an endogenous mouse locus, much less a functional endogenous mouse locus.  The cited portions of Lonberg leave no doubt whatsoever that the Lonberg mouse construction instructions were to build a transgenic mouse that makes fully human antibodies from transgenes that are distant from endogenous mouse immunoglobulin loci; i.e., they are synthetic loci randomly inserted into the mouse genome at a locus distant from any functional mouse immunoglobulin locus.  Indeed, as is described in detail elsewhere in Lonberg, the Lonberg transgenic mouse requires that endogenous mouse immunoglobulin loci (both heavy and light chain loci) must be rendered non-functional so as to

allow the fully human immunoglobulin transgenes to make fully human antibodies. There is absolutely no hint or suggestion in Lonberg to employ a functional endogenous mouse locus having inserted unrearranged human immunoglobulin variable region gene segments in the functional locus. (Id. at 204-05.)

The reply also represented that the VelocImmune mouse is the commercial embodiment of the invention:

> However, regardless of whether the Examiner has made a prima facie case of obviousness with respect to claim 20, Applicants submit that claim 20 is patentable because the claimed mouse exhibits features entirely unexpected in lights of the teachings of prior art (e.g., Lonberg, Brüggemann, Kawasaki, and Popov). The features of mice having disabled endogenous immunoglobulin loci and comprise transgenes that make antibodies with human variable domains have been disclosed in peer-reviewed publications disclosed in the information disclosure statement filed in this application, dated 20 September 2011. **The claimed mice, an embodiment of which is known in the art as a VELOCIMMUNE humanized mouse**, perform surprisingly and unexpectedly better than mice with disabled endogenous loci that express antibodies from randomly inserted transgenes (as in all of the references cited by the Examiner). (Id. at 209 (emphasis added).)

Attached to Regeneron's reply was a slide presentation (id. at 214-32) that Dr. Smeland provided to the PTO, and which he and Brendan Jones, an outside patent attorney retained to represent Regeneron in the final stages of prosecution of the Patent, relied on in a meeting with the PTO. (See id. at 290.) That presentation contains information which Merus asserts is false and was known to be false at the time. It concerns the VelocImmune mouse to which Dr. Smeland's January 2013 reply referred.[19] Various figures in that presentation describe ways

---

[19] This presentation forms the basis of Merus's "egregious misconduct" claim. In this portion of the Opinion the Court reviews that presentation in connection with its role in the chronology of later prosecutions. The Court returns to the presentation again later in this Opinion when discussing the "egregious misconduct" claim in particular.

in which the VelocImmune mouse was made. These figures are consistent with the presentation's assertion that the VelocImmune mouse was "Created only by virtue of VelociGene & VelociMouse technologies." (Id. at 215.)

As discussed more fully below, this Court agrees with Merus that these slides provide certain misleading and inaccurate information. First, as of February 2001, the VelocImmune mouse did not exist – Regeneron had been unable to make it. (See, e.g., DX 145[20]; REGN-AM-10055694.) Yet the presentation suggests it did. In addition, on slide 10, a figure depicts the locus construction for the VelocImmune mouse. It indicates that Regeneron replaced a 3 mb segment with a 150 kb segment in a single step; that is, that both insertion and deletion occurred simultaneously. (DX 2 at 224.) This was not in fact the process used to produce the VelocImmune mouse. (Davis Tr. Decl. ¶ 279.) As discussed above, to insert both human heavy and light chain variable regions requires two steps (or a breeding step), and a third step is required to delete or inactivate the homologous mouse sequence in order to obtain therapeutically useful antibodies.

Moreover, in February 2001 (and for a substantial number of years thereafter), Regeneron had not succeeded in inserting and deleting a portion of mouse IgH DNA that was over 200 kb. (See, e.g., DX 145; REGN-AM-10055694.) Nevertheless, the '018 Patent depicts this in Figure 4 and the presentation indicates that insertion and deletion on this scale had occurred. Figure 4 of the '018 Patent

---

[20] Regeneron has argued that references to the contents of this exhibit should be redacted from this Decision. The Court disagrees. The contents of DX 145 were thoroughly discussed in open court during the trial and in Dr. Davis's Trial Declaration. The Court considers the contents of this exhibit relevant to this Decision and thus includes them without redaction.

shows a replacement of approximately 200-300 kb of human immunoglobulin DNA for mouse immunoglobulin DNA. ('018 Patent at Fig. 4).

In addition, the presentation discusses the ability of the VelocImmune mouse to preserve the transmembrane and cytoplasmic DNA of the endogenous mouse immunoglobulin locus as among its benefits over prior art mice. (DX 2 at 219, 222.) The presentation discusses the preservation of these regions as the "VelocImmune Hypothesis." (Id. at 226.) But neither the claims nor the specification contains such a limitation. (See '018 Patent, 3:27-8:3, 29:24-30:64.) Moreover, this concept was not novel. One of the references Regeneron had not disclosed to the PTO (and at issue in this proceeding), Zou, in 1994 disclosed the preservation of mouse constant cytoplasmic and transmembrane domains and stated that the mice produced humanized antibodies "at the same level and efficiency as wild-type mice produce murine IgG1 antibodies." (DX 72, Zou, et al. (1994) at 1099.) These undisclosed results undercut the claims of the VelocImmune mouse's superiority found in Dr. Smeland's January 2013 presentation, which extolled "Normal variable region usage and junctional diversity," as well as "Normal numbers and distribution of B cells in spleen and lymph node" and "Normal B cell differentiation in bone marrow." (DX 2 at 227; Davis Tr. Decl. ¶ 349.)

Dr. Andrew Murphy of Regeneron was one of the authors (but not presenters) of the slides that were provided to the PTO during patent prosecution. Prior to creating the January 2013 slide deck, Dr. Murphy had been told by another pioneering scientist in the field who had been on Regeneron's Scientific Advisory

Board, Dr. Frederick W. Alt, that assertions that VelocImmune mice demonstrated no major defects in B cell differentiation "could be a little misleading." (DX 223 at 10039849; DX 111 REGN-AM-00061940) Dr. Alt shared this comment in an August 15, 2011 message that provided comments on a manuscript Dr. Murphy had sent Dr. Alt and others the prior March. In the March email, which was titled "VelocImmune manuscripts," Dr. Murphy had told the recipients they were "listed as a co-author in one or both of the enclosed manuscripts," and asked for any edits. (DX 112.)

In his comments on August 15, 2011, Dr. Alt responded to an assertion in the manuscript that read "No major defects were observed in B cell differentiation in any of the VelocImmune mice. The introduction of human IgH variable segments does not appear to affect either the pro B to pre-B transition nor do human IgK variables affect the proB to B transition." (DX 223 at 10039848.) Dr. Alt wrote that, in his view, this statement was "correct but perhaps could be a little misleading." (Id. at 10039849.) He explained that

> when we looked at bone marrow BM there was a profound block in the pro-B and pre-B transition, suggesting that there is significant selection/expansion of the 3 human VH locus to get a normal percentage of B cells in the periphery.... [I]n reality if you have too few human VH then you may have impaired development and therefore the number of VHs is important, but once you have a certain number of VH genes (for example 18 in Velcoimmune), there is no obvious developmental impairment." (Id.)

Another recipient of that same email, Dr. Klaus Rajewsky, also provided comments to Dr. Murphy. He advised Dr. Murphy that "[s]ince the first paper deals in depth with the issue of replacing mouse by human immunoglobulin gene

segments, it may be appropriate to quote the first paper(s) demonstrating such replacements, which were actually done in my lab almost 20 years ago. The references are attached." (DX 113.) One of the attached references was the Zou reference that is alleged to be one of the Withheld References in this proceeding.[21]

Having received this information from both Drs. Alt and Rajewsky, and without any evidence in the record suggesting his colleagues' comments were unfounded or incorrect, Dr. Murphy nevertheless assisted in authoring the presentation to the PTO that continued to assert that the VelocImmune mouse with 3 VH gene segments was "normal" meaning "identical to wild-type mouse littermates," ignoring Dr. Rajewsky's prior lab work and the Zou publications. (DX 2 at 227.)[22]

---

[21] Dr. David Valenzuela, a recipient of both Dr. Murphy's email and Dr. Rajewsky's response, sent a copy of both to Venus Lai (Regeneron's Executive Director of VelociGene Operations and Trangenics), stating "Venus, this is becoming a bit of an embarrassment, don't you think?" (DX 120; ECF No. 241 ¶ 93.) Lai responded:
"Very embarrassing…indeed!! I have to comment that I don't always trust what Drew said or his ideas…I found he often quoted that wrong paper and said the wrong things and no one ever corrected him?! It is really bad that at his level, he should be hold [sic] accountable to the information he provides because everyone takes his words for real. I did correct him a couple of times in the past (when we met 1:1) but I have given up because there's no point to correct him when it did nothing. I found that in general, some old-timers at Regeneron are not well read and tend to just open their mouths and make big statements as though we are the first (but often these ideas are just copy-cat)." (DX 120 at 10332541; ECF No. 241 ¶ 94.)
Regeneron has argued that the content of this email should be redacted on the basis of possible reputational harm. The Court disagrees. Today, the litigation process frequently exposes records of electronic communications that, in retrospect, may be embarrassing. The Court considers the contents of this email, which do not disclose anything having competitive sensitivity, relevant to this Decision. The Court disagrees with the argument that this statement presents any particularly unusual reputational issues. It is a statement of opinion relevant to the issues before the Court, and it therefore appears without redaction.
[22] Notably, after receiving the comments from Drs. Alt and Rajewsky, Dr. Murphy did in fact add the Zou (1994) citation to the paper on which he had requested comments. Dr. Murphy also then submitted his paper regarding the VelocImmune mouse to journals for peer review – and was rejected on the basis that it "lack[ed] sufficient conceptual novelty to be of general interest to the broad readership of [Nature Biotechnology] given that it describes an application of a previously published technology." (DX 222 at 10034040.)

Following receipt of the January 2013 presentation from Dr. Smeland, the PTO issued an Advisory Action maintaining the rejection of claims 1-19 as anticipated by Lonberg, and claim 20 remained rejected in view of Lonberg and other references.  (Id. at 241, 248.)  Shortly thereafter, on February 19, 2013, Regeneron retained Brendan Jones, Ph.D., to assist with prosecution.  (Id. at 268.) Drs. Jones and Smeland together planned an in-person meeting with the PTO at which Regeneron relied on the previously provided slide deck described above.  That meeting occurred on March 11, 2013.  (Id. at 290.)

Following that meeting, the Examiner prepared the following notes: "Applicant's representatives discussed that Lonberg does not teach integration of human unrearranged immunoglobulin genes into an endogenous site of a mouse immunoglobulin locus as required by the instant claims."  (Id.)  The Examiner agreed to review the pending application.  (Id. at 301.)

On April 26, 2013, the PTO issued a Notice of Allowance for the '176 Application.  (Id. at 285.)  In the statement of reasons for allowance, the Examiner stated that "[t]he prior art does not teach or suggest a genetically modified mouse comprising, in its germline cells, human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus."  (Id. at 283; ECF No. 241 ¶ 172.)  The applicant transmitted the fee on June 28, 2013 and the patent issued as the '018 Patent on August 6, 2013. (DX 2 at 328-29, 339; '018 Patent.)

IV.    LEGAL STANDARDS FOR A FINDING OF INEQUITABLE CONDUCT

Merus asserts that Drs. Smeland and Murphy violated their duty of candor and engaged in inequitable conduct. Merus also alleges that Drs. Smeland and Murphy engaged in egregious affirmative misconduct by, inter alia, making false and misleading statements and including false and misleading results in the January 2013 presentation. Regeneron does not contest that both of these individuals had a duty of candor to the PTO, but vigorously contests whether that duty was violated, whether any non-disclosure rose to the level of inequitable conduct as defined by Therasense, and whether either Drs. Smeland or Murphy engaged in egregious misconduct.

Each individual associated with the prosecution of a patent has a duty of candor and good faith to the PTO. 37 C.F.R. § 1.56(a). This duty includes a "duty to disclose to the Office all information known to that individual to be material to patentability…" Id. The doctrine of inequitable conduct – which can render a patent unenforceable – has origins in those duties as well as a lengthy body of caselaw. In 2011, the Federal Circuit made it clear, however, that the statutory duties of candor and disclosure and the caselaw doctrine of "inequitable conduct" are not always coextensive. See Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1291-1292 (Fed. Cir. 2011) (en banc).

"As an equitable doctrine, inequitable conduct hinges on basic fairness." Id. at 1292. "[A]s a general rule, this doctrine should only be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." Id. (citing Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d

1357, 1366 (Fed Cir. 2008)).  The Federal Circuit's <u>en banc</u> decision in <u>Therasense</u>
sets forth the governing legal standard.  After noting that asserting claims of
inequitable conduct had "become a significant litigation strategy" that can "cast a
dark cloud over a patent's validity and paint the patentee as a bad actor" and
increase the costs and complexity of infringement litigation, <u>id.</u> at 1288, the Court
proceeded to "tighten[] the standards for finding both intent and materiality in
order to redirect a doctrine that has been overused to the detriment of the public."
<u>Id.</u> at 1290.

A court's determination of inequitable conduct proceeds in two parts: the
accused infringer, who bears the burden of proof on this claim, must prove both that
a nondisclosed reference was material and that the patent applicant acted with the
requisite intent.  See <u>id.</u>

"[A]s a general matter, the materiality required to establish inequitable
conduct is but-for materiality.[23]  When an applicant fails to disclose prior art to the
PTO, that prior art is but-for material if the PTO would not have allowed a claim
had it been aware of the undisclosed prior art." <u>Id.</u> at 1291.  The Court is therefore

---

[23] The Federal Circuit has explicitly stated that the required level of materiality is not that found in
PTO Rule 56.  Rule 56 provides that information is material if it is not cumulative and "(1) It
establishes, by itself or in combination with other information, a <u>prima facie</u> case of unpatentability
of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an
argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability."
37 C.F.R. § 1.56(b).  Importantly, Rule 56 provides that "[a] <u>prima facie</u> case of unpatentability is
established when information compels a conclusion that a claim is unpatentable…before any
consideration is given to evidence which may be submitted in an attempt to establish a contrary
conclusion of patentability."  <u>Id.</u>  The Federal Circuit found this definition to be overly broad. <u>See</u>
<u>Therasense</u>, 649 F.3d at 1294.  The Court stated, "Because Rule 56 sets such a low bar for
materiality, adopting this standard would inevitably result in patent prosecutors continuing the
existing practice of disclosing too much of the prior art of marginal relevance and patent litigators
continuing to charge inequitable conduct in nearly every case as a litigation strategy." <u>Id.</u> at 1295.

required to place itself in the shoes of a patent examiner and determine whether it would have allowed the claim "if it had been aware of the undisclosed reference." Id. In making its determination as to materiality, "the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." Id. at 1291-92 (citing Manual of Patent Examining Procedure ("MPEP") §§ 706, 2111 (8th ed. Rev.8, July 2010)).[24]

Whether prior art is material is determined by one with ordinary skill in the art. Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1324 (Fed. Cir. 1999). A court can take into account the inferences and creative steps that a person of ordinary skill in the art would employ when deciding whether a claimed combination of prior art would render an invention obvious. DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1366-68 (Fed. Cir. 2006).[25]

A finding by a district court that withheld information, such as a prior art reference, renders one or more claims invalid (for instance, by rendering it obvious or anticipated), indicates that the reference is necessarily but-for material. Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d 1324, 1334 (Fed. Cir. 2012); Am. Calcar, Inc. v. Am. Honda Motor Co., 651 F.3d 1318, 1334 (Fed Cir. 2011); Therasense, 649 F.3d

---

[24] In this regard, the Federal Circuit has stated that the patentability of a claim will often "be congruent with the validity determination – if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO." Therasense, 649 F.3d at 1292.

[25] To determine that a patent is invalid based on obviousness requires proof by clear and convincing evidence; that is not the standard the Court applies in its determination of but-for materiality – which is preponderance of the evidence giving the claims their broadest reasonable construction. See Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1189 (Fed. Cir. 2014); Therasense, 649 F.3d at 1291-92.

at 1292 (finding reference was "necessarily material" where the jury and court found reference anticipated asserted claims).

Of particular importance here is the treatment of prior art in connection with other related patent applications. Rejections over withheld prior art in other patent applications with similar claims is evidence of materiality. See Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1368 (Fed. Cir. 2003) ("We hold that a contrary decision by another examiner reviewing a substantially similar claim meets the Akron Polymer 'reasonable examiner' threshold materiality test of 'any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.'… A prior rejection of a substantially similar claim refutes, or is inconsistent with the position that those claims are patentable. An adverse decision by another examiner, therefore, meets the materiality standard under the amended Rule 56."); see also, Larson Mfg. Co. of S. Dakota v. Aluminart Prods. Ltd., 559 F.3d 1317, 1339 (Fed Cir. 2009) ("Because the Third and Fourth Office Actions contained another examiner's adverse decisions about substantially similar claims, and because the Third and Fourth Office Actions are not cumulative to the First and Second Office Actions, the district court correctly found the withheld Office Actions material."); McKesson Info. Solutions, Inc. v. Bridge Med., Inc., 487 F.3d 897, 918-925.

A reference is not but-for material if it is merely cumulative. See, e.g., Larson, 559 F.3d at 1331; McKesson, 487 F.3d at 913; Dig. Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1319 (Fed. Cir. 2006) ("However, a withheld otherwise

**A110**

material prior art reference is <u>not</u> material for purposes of inequitable conduct if it is merely cumulative to that information considered by the examiner."); <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d 1172, 1179 (Fed. Cir. 1995); <u>Litton Indus. Prods. Inc. v. Solid State Sys. Corp.</u>, 755 F.2d 158, 167 (Fed. Cir. 1985). A reference is cumulative when it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." <u>Regents of the Univ. of Calif. v. Eli Lilly & Co.</u>, 119 F.3d 1559, 1575 (Fed. Cir. 1997). When a particular reference discloses a limitation of particular importance not elsewhere disclosed, it is not cumulative. <u>McKesson</u>, 487 F.3d at 914. Similarly, when a reference contains a more complete combination of the elements claimed, it is not cumulative even if the elements are before the examiner in other references. <u>Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.</u>, 204 F.3d 1368, 1374 (Fed. Cir. 2000).

Finally, the mere existence of differences between a withheld reference and the claims does not, alone, render the reference immaterial. <u>See</u> <u>McKesson</u>, 487 F.3d at 915 (citing <u>Li Second Family Ltd. v. Toshiba Corp.</u>, 231 F.3d 1373, 1380 (Fed. Cir. 2000)).

Materiality and intent are separate, independent prongs of the inequitable conduct inquiry. <u>Therasense, Inc. v. Becton, Dickinson & Co.</u>, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). The requisite specific intent to deceive must be proven by clear and convincing evidence. <u>Id.</u> "[A] court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to

submit it to the PTO does not prove specific intent to deceive." Id. (citing Star Sci.,
Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "To prevail
on a claim of inequitable conduct, the accused infringer must prove that the
patentee acted with the specific intent to deceive the PTO." Id. "In a case involving
nondisclosure of information, clear and convincing evidence must show that the
applicant made a deliberate decision to withhold a known material reference." Id.
(emphasis in original) (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181
(Fed. Cir. 1995)). The Court stated further, "[i]n other words, the accused infringer
must prove by clear and convincing evidence that the applicant knew of the
reference, knew that it was material, and made a deliberate decision to withhold it."
Id.

To meet the clear and convincing evidence standard, "the specific intent to
deceive must be 'the single most reasonable inference able to be drawn from the
evidence.'" Id. (quoting Star, 537 F.3d at 1366). "Indeed, the evidence 'must be
sufficient to require a finding of deceitful intent in the light of all circumstances.'"
Id. (emphasis in original) (quoting Kingsdown Med. Consultants, Ltd. v. Hollister,
Inc., 863 F.2d 867, 873 (Fed. Cir. 1988)). Direct evidence of intent is not, however,
required; a court may infer intent from circumstantial evidence. Id. An inference of
intent to deceive is appropriate where the applicant engages in "a pattern of lack of
candor" including where the applicant repeatedly makes factual representations
"contrary to the true information he had in his possession." Apotex Inc. v. UCB,
Inc., 763 F.3d 1354, 1362 (Fed. Cir. 2014).

The only exception to the requirement of a showing of but-for materiality is where one owing a duty of candor has engaged in affirmative egregious misconduct. Therasense, 649 F.3d at 1292. "This exception to the general rule requiring but-for proof incorporates elements of the early unclean hands cases before the Supreme Court, which dealt with 'deliberately planned and carefully executed scheme[s]' to defraud the PTO and the courts." Id. (alteration in original) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245 (1944)). The submission of an unmistakably false affidavit has been deemed material misconduct. Id. Other forms of misconduct that have been deemed material include fabricating evidence submitted to the PTO, executing a deliberately planned scheme to defraud the PTO, and concealing a rejection over prior art from a related application. See Apotex, 763 F.3d at 1361-62; Intellect Wireless, Inc. v. HTC Corp., 732 F.3d 1339, 1341-46 (Fed. Cir. 2013). Finding such misconduct material makes sense: "After all, a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect the issuance of the patent." Id. (citing Hazel-Atlas, 322 U.S. at 247).

V.    TIMELINE OF THE DUTIES OF CANDOR AND DISCLOSURE

Regeneron's duties of candor and disclosure spanned the period from February 16, 2001 to partial issuance on August 6, 2013. Dr. Murphy signed the Inventor Declaration when the '176 Application was filed in February 2001. (DX 2 at 50-51; ECF Nos. 225, 241 ¶ 71.) He "acknowledged [his] duty to disclose information of which I am aware that is material to the examination of this

45

**A113**

application…" (DX 2 at 50; ECF Nos. 225, 241 ¶ 72.)  Dr. Smeland worked with others to prepare and prosecute the '176 Application.  (ECF Nos. 225, 241, ¶ 74; PX 840, Smeland Dep. Tr. at 67:21-24; 70:12-14.)  Dr. Smeland has also been involved in litigation efforts against Merus – including the instant litigation – since 2011; he oversaw outside counsel on patent prosecution and litigation. (DX 335, Smeland Dep. Tr. 72:19-25, 81:15-24, 134:4-135:17; DX 184 Entry Nos. 738-40, 745-47, 1327.)

Prior art was raised during the European Opposition and before issuance of the '018 Patent.  The Notice of Allowance for the '018 Patent was issued on April 26, 2013; a European Opposition setting forth various undisclosed references was filed on June 12, 2013, and the '018 Patent issued on August 6, 2013.

## VI.    BROADEST REASONABLE CONSTRUCTION

Based upon the applicable legal standards, the first step in the Court's inquiry is whether Regeneron failed to disclose but-for material information to the PTO.  But-for materiality requires that the Court place itself in the shoes of a patent examiner and determine whether, had the reference(s) been before the examiner at the time, the claims of the patent would have issued.  Therasense, 649 F.3d at 1291-92.

In order to determine whether a reference is but-for material, a court proceeds in two steps:  first, the Court must determine the broadest reasonable construction ("BRC") for the claim(s), using principles applicable to claim construction, and second, based on that construction, the Court must determine whether a reasonable patent examiner (who is, by definition, one skilled in the art)

46

**A114**

would have allowed the claim(s) had he or she known of the undisclosed information.  Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1189 (Fed. Cir. 2014).  The BRC is determined based on the claim language itself "in light of the specification as it would be interpreted by one of ordinary skill in the art." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (quoting In re Am. Acad. of Sci. Tech. Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004)).  The "broadest reasonable construction" for a claim or term may well be different from that which the court may have previously determined during claim construction, but it cannot be narrower.  Facebook, Inc. v. Pragmatus AV, LLC, 582 F. App'x 864, 869 (Fed. Cir. 2014).

There are 20 claims in the '018 Patent – of which claims 1, 11 and 20 are the only independent claims.

Claim 1 of the '018 Patent provides:

> A genetically modified mouse, comprising in its germline human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus. ('018 Patent, 29:24-26.)

Claim 11 provides:

> A genetically modified mouse, comprising in its germline human unrearranged variable region gene segments linked to a mouse constant region gene, wherein the mouse lacks a human constant region gene, and wherein the mouse constant region gene is at an endogenous mouse immunoglobulin locus. (Id., 29:53-59.)

Claim 20 provides:

> A mouse, comprising a modification in the germline of the mouse, wherein the modification comprises:
> a.  a hybrid heavy chain locus comprising an insertion of human immunoglobulin heavy chain V, D, and J gene segments, wherein

47

**A115**

the human heavy chain immunoglobulin V, D, and J gene segments are linked to a mouse immunoglobulin heavy chain gene, wherein the mouse immunoglobulin heavy chain gene is at an endogenous mouse immunoglobulin locus;

b.   a hybrid light chain locus comprising an insertion of human immunoglobulin light chain V and J gene segments, wherein the human V and J gene segments are linked to a mouse immunoglobulin light chain constant region gene sequence; wherein (a) rearranges to form a hybrid heavy chain sequence comprising a human variable region linked to a mouse constant region, and (b) rearranges to form a hybrid light chain sequence comprising a human variable region linked to a mouse constant region, and wherein the mouse is incapable of forming an antibody that comprises a human variable region and a human constant region.  (Id., 30:39-64.)

To determine the BRC of claim 1, which is sufficient for this proceeding,[26] the

Court applies the principles of claim construction set forth in a vast number of

decisions of the Federal Circuit.  The Court's goal is to determine the broadest

reasonable construction that the claim would have meant "to a person of ordinary

skill in the art in question at the time of the invention, i.e., as of the effective filing

date of the patent application."  Phillips, 415 F.3d at 1313.  The claims of a patent

do not stand alone; "[r]ather, they are part of 'a fully integrated written

instrument.'"  Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d

967, 978 (Fed. Cir. 1995)).  To interpret the meaning – including scope – of a

patent's claims, a court may use intrinsic and, if necessary, extrinsic evidence.  See

Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005)

(instructing courts to look to intrinsic evidence first).  Intrinsic evidence includes

the claims, the specification, as well as a patent's prosecution history.  See All

---

[26] The Court uses, as Merus did in its submissions in this proceeding, claim 1 as exemplary.  Merus's allegations of unpatentability in view of the Withheld References extend to claims 2-5 as well.

Dental Prodx, LLC v. Advantage Dental Prods., Inc., 309 F.3d 774, 780 (Fed. Cir. 2002) ("Foremost among the tools of claim construction is of course the claim language itself, but other portions of the intrinsic evidence are clearly relevant, including the patent specification and prosecution history."); see also Phillips, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004))).

A basic principle of claim construction is that the claims must be read in light of the specification. See id. at 1315. "[T]he purpose of the specification is to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." Id. at 1323. One skilled in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313. The specification is always "highly relevant" to claim construction analysis; it is the "single best guide to the meaning of a disputed term." Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)); see also On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1338, 1340 (Fed. Cir. 2006) ("[T]he scope and outer boundary of claims is set by the patentee's description of his invention," and "the claims cannot be of broader scope than the invention that is set forth in the specification.").

**A117**

A.    The Court's BRC

Applying these principles, the Court finds that the broadest reasonable construction of claim 1 is as follows:

**The BRC of "genetically modified mouse"** is a mouse, the genes of which have been modified, using the particular LTVEC method described throughout the specification. This interpretation is based on the language of the claim, the specification, and the Court's crediting the testimony of Dr. Davis.

**The BRC of "human unrearranged variable region gene segments"** is a DNA variable gene segment that is of human origin and that is unrearranged. Unrearranged means that it is in its germline configuration. This interpretation is based on the language of the claim, the specification, and the Court's crediting the testimony of Dr. Davis.

As used in this element, "variable region" includes the V, D and J segments. It also includes the variable regions of both the heavy and light chains.

Notably, the construction of this claim term does not preclude the presence of mouse variable region gene segments, nor does it preclude human constant region gene segments. The sole requirement imposed by this element – read in light of the claim language and the specification – is that there be at least some human unrearranged variable region gene segments, not only those. This is supported by certain of the preferred embodiments set forth above which include some human variable region segments and allow for equivalent mouse segments. For instance, one preferred embodiment is "an embryonic stem cell wherein the mouse heavy

50

**A118**

chain variable region locus is replaced, <u>in whole or in part</u>, with a human heavy chain variable gene locus; an embryonic stem cell of claim wherein the mouse kappa light chain variable region locus is replaced, <u>in whole or in part</u>, with a human kappa light chain variable region locus; [and] an embryonic stem cell wherein the mouse lambda light chain variable region locus is replaced, <u>in whole or in part</u>, with a human lambda light chain variable region locus …" ('018 Patent, 7:6-14 (emphasis added).)

Another preferred embodiment includes an antibody comprising <u>human and non-human constant regions</u>. (<u>Id.</u>, 7:19-23.)

Merus argues that the BRC for this element must also include the limitation of a contiguous stretch of human variable region DNA. The Court finds that the broadest reasonable construction does not require such a limitation, though it is a better reading of the requirements set forth in the specification.[27] The specification is concerned with a method of genetic modification involving large targeting vectors or LTVECs. A LTVEC is defined as a contiguous fragment of DNA that is more than 20 kb. There is no necessary reason why, for instance, three LTVECS having 20 kb of regions for integration could not be integrated together to form the insertion cassette.

**The BRC of "inserted"** is just that, "to put into." To insert something means to add it into. Insertion does not include "deletion."[28] It is different from and not synonymous with "substitution" or "replacement." The specification

---

[27] This is a broader construction than that the Court determined during claim construction.
[28] This too is a broader construction than that the Court determined during claim construction.

**A119**

distinguishes between insertions, deletions, replacement, and substitution,

indicating a distinction between the words.  For instance, it states:

> "Another embodiment of the invention is a method wherein the genetic modification to the endogenous gene or chromosomal locus comprises deletion of a coding sequence, gene segment, or regulatory element; alteration of a coding sequence, gene segment, or regulatory element; insertion of a new coding sequence, gene segment, or regulatory element; creation of a conditional allele; or replacement of a coding sequence or gene segment from one species with an homologous or orthologous coding sequence from a different species."  ('018 Patent, 3:40-48 (emphasis added).)

At another point, it states:

> "Another embodiment is a method of replacing, in whole or in part, in a non-human eukaryotic cell, an endogenous immunoglobulin variable region gene locus with an homologous or orthologous human gene locus further comprising the steps: e) obtaining a large cloned genomic fragment containing a part of the homologous or orthologous human gene locus that differs from the fragment of (a); f) using bacterial homologous recombination to genetically modify the cloned genomic fragment of (e) to create a second LTVEC; g) introducing the second LTVEC of (f) into the eukaryotic cells identified in step (d) to replace, in whole or in part, the endogenous immunoglobulin variable gene locus…"  (Id., 5:61-67, 6:1-5 (emphasis added).)

This interpretation is based on the language of the claim, the specification, and the

Court's crediting the testimony of Dr. Davis.

**The BRC of "at"** is into or next to – whether the 'next to' is upstream or

downstream.[29]  Thus, insertion "at" the Ig locus means in or within the locus – not

at a specific point narrower than that.  In other words, to use the analogy discussed

much earlier in this Opinion, this element of the claim requires that the DNA

---

[29] This is broader than the Court's claim construction as determined during claim construction.

segment be inserted onto the playing field – there is no requirement that it end up at the 10 yard line, the 30 yard line or the 50 yard line.

This interpretation is based on the language of the claim, the specification, and the Court's crediting the testimony of Dr. Davis.

**The BRC of "endogenous mouse immunoglobulin locus"** is the entire endogenous mouse Ig locus, whatever its metes and bounds. It includes both the 5' and 3'. As the Court found during claim construction, and as both experts agreed during the trial on inequitable conduct, the size, sequence and borders of the locus had not been defined at the time the application was filed on February 16, 2001. (See Trial Tran. 740:16-20.) Thus, if one of skill in the art did not know where the 5' was located with precision, the targeted insertion anticipated by the '018 Patent might occur in the wrong place. The entire point of the targeted insertion is that it be into the Ig locus – not proximate to or close by, but within it.

Regeneron's internal lab notebooks further confirm that the inventors did not know the length of the locus at the time the application was filed. (ECF No. 105, Clynes Decl. ¶ 43 ("the boundaries for the endogenous mouse immunoglobulin loci were not known in 2001, although it was generally known that they were located somewhere within chromosome 12 (heavy), 6 (kappa) and 16 (lambda)"); ECF No. 210 at 51.)[30]

Another difficulty with targeting an insertion into the Ig locus is that the size of the locus can change depending on the strain of mouse. (Davis Tr. Decl. ¶ 252.)

---

[30] The Court's decision on claim construction discusses further evidence supporting the indefiniteness of the 5' as of February 2001. (ECF No. 210, pp. 51-53.)

Without knowing the strain of mouse, one would not be able to know the precise meets and bounds of the locus.

This interpretation is based on the language of the claim, the specification, and the Court's crediting the testimony of Dr. Davis.

**The Court's BRC of Claim 1 as a Whole**: Taking these elements together, the Court finds that the broadest reasonable construction of claim 1 allows for the following:

> 1. A genetically modified mouse that is comprised of human unrearranged variable region gene segments that have been inserted into its Ig locus;
>
> 2. The human variable region gene segment may be heavy chain or light chain or both;
>
> 3. The constant region of the above mouse may be human or mouse;
>
> 4. The mouse variable region may or may not have been deleted;
>
> 5. The transmembrane and cytoplasmic tail of the variable region may or may not be human; and
>
> 6. The insertion of the unrearranged human variable region gene segments may or may not be functionally linked to the constant region.

During claim construction, the Court construed the claims as follows:

| Term | Construction |
|------|--------------|
| a genetically modified mouse | A transgenic mouse produced by the process of using LTVECs to modify embryonic stem cells and using a quantitative assay to detect modification of allele in those cells. |
| human unrearranged variable region gene segments. | A contiguous stretch of cloned human genomic DNA containing variable region gene segments (V, D and J for the heavy chain / V and J for the light chain) in germline configuration, i.e. as it is in the human genome before the development of B cells. |
| Inserted | One step addition of DNA, without replacing or deleting any native DNA as a result of the addition. |
| at | Into the locus, as opposed to near the locus, by the locus or around the locus |
| endogenous mouse immunoglobulin locus | Indefinite as to the metes and bounds of the locus and scope. |

B.    <u>Regeneron's BRC</u>

At trial, Regeneron's technical expert, Marjorie A. Oettinger, Ph.D., construed the claims of the '018 Patent differently and much more narrowly.

At the outset of this discussion, it is worth noting that throughout this litigation Regeneron has taken vastly different positions on its own construction of its claims. Dr. Oettinger's proposed broadest reasonable construction is far, far narrower than that which Regeneron itself advocated during claim construction. At that time – in July 2014 – Regeneron took the position that claim 1 was a single element and needed no construction – it was plain on its face. That position compares to the following proposed construction, set forth in Exhibit B to Dr. Oettinger's Trial Affidavit – now posited as the broadest reasonable construction:

- ■ Dr. Oettinger construed the element **genetically modified mouse** to mean: "The claimed mouse has a germline genome comprising, at its

endogenous immunoglobulin locus, human unrearranged heavy and/or light chain variable region gene segments inserted at an endogenous mouse constant region such that the human variable region genes are functionally linked, i.e. the resultant mouse is capable of producing an antibody comprising a human variable region and a mouse constant region." (Oettinger Tr. Aff, Exh. B at 1.)

- Dr. Oettinger construed only the term "unrearranged" in the element "**human unrearranged variable region gene segments**;" she construed that term to mean "not rearranged but capable of rearranging." (Id. at 3-4.)

- Dr. Oettinger construed the element **"inserted at an endogenous mouse immunoglobulin locus" to mean**: "[m]odified in its germline to insert human unrearranged variable region gene segments at the endogenous mouse immunoglobulin locus functionally linked to mouse constant region gene segments, such that the resultant mouse is capable of producing antibodies comprising a human variable region and a mouse constant region."  (Id. at 6.)

- Dr. Oettinger construes claim 2 as she does claim 1, "wherein the human unrearranged variable region gene segments are heavy chain gene segments, and the mouse immunoglobulin locus is a heavy chain locus." (Id. at 9.)

**A124**

■ Dr. Oettinger also construes claim 3 as she does claim 1, "wherein the human unrearranged variable region gene segments are light chain gene segments, and the mouse immunoglobulin locus is a light chain locus." (Id.)

■ Dr. Oettinger construes claim 4 as she does claim 3, "wherein the light chain gene segments are human kappa light chain gene segments." (Id. at 10.)

■ Dr. Oettinger construes claim 5 as she does claim 1, "wherein the unrearranged variable region gene segments are contained on a genomic DNA fragment larger than 20 kb." (Id.)

In sum, Dr. Oettinger construes claim 1 as providing for a genetically engineered mouse, modified in its germline by insertion of human heavy and/or light chain unrearranged variable region gene segments at the endogenous mouse immunoglobulin locus in a manner so as to functionally link those segments with the mouse constant region which is retained in its entirety, and in which the homologous mouse variable region is deleted and no longer present. (See, e.g., Oettinger Tr. Aff. ¶ 111.)[31] Implicit in her construction is a multi-step process: she

---

[31] In this regard the following chronology is notable: in her first report, Dr. Oettinger construed the phrase "genetically modified mouse" of claim 1 to require, inter alia, "human heavy and light chain variable region gene loci inserted at an endogenous mouse constant region." (See Trial Tr. 664:7-11 (emphasis added).) When she was deposed on those opinions, she dropped the word "and" – revising the construction to "human variable region gene loci inserted at an endogenous mouse constant region." (Trial Tr. 662:3-13, 665:1-17; 668:6-18.) At trial, she modified her construction yet again to "heavy and/or light chain regions." (Oettinger Tr. Aff. ¶¶ 68, 111, Exh. B; Trial Tr. 681:1-682:8 (emphasis added).) At trial she also changed from requiring operable or functional linkage as part of claim 1 to requiring what she referred to as "proper" insertion of human unrearranged DNA at the mouse Ig locus, i.e. "upstream of the constant region" so as not to "delete the mu enhancer sequence." (Trial Tr. 686:19-688:18, 734:21-735:20.) Thus, rather than requiring insertion "at" the endogenous

conceded at trial that insertion of variable region heavy chain and variable region light chain gene segments cannot occur simultaneously. (Trial Tr. 665:20-666:4, 675:1-10.) Achieving a fully human variable region therefore requires at least two insertion steps (one for the heavy chain and one for the light chain) and either a deletion step or a breeding step (to breed a mouse with a heavy chain insertion with one with a light chain insertion – however, this would result in rearrangement, thus running afoul of the "unrearranged" limitation). (Trial Tr. 665:18-667:7.) Dr. Oettinger also testified that in addition, to achieve an entirely human variable region would also require a deletion step, in order to remove the mouse variable region segments. (Trial Tr. 690:13-18.)

Dr. Oettinger urged that her construction was supported by concepts she believed were implicit and would be readily apparent to one skilled in the art. In particular, as she understood the goal of the patent to be the creation of therapeutically useful antibodies, achievement of that goal could only occur if, for instance, her imposed limitations were included. A hybrid (human/mouse) variable region would not express therapeutically useful antibodies, and she therefore assumes that the patent avoids the pitfall by <u>requiring</u> insertion of both heavy and light chain variable regions as well as deletion of the murine. She also understands the '018 Patent to require placement of the inserted variable regions at just the right place on the playing field – so that they are "functionally linked" to the constant region. Again, without such linkage the resulting antibodies (if any) might

---

mouse constant region, she altered her construction to require insertion "upstream" of the mouse constant region. (Oettinger Tr. Aff. ¶ 111; Trial Tr. 735:21-736:8, 743:14-744:21.)

well not be therapeutically useful.  Dr. Davis disagreed with Dr. Oettinger's implied limitations.  The Court finds that his position is supported by substantial evidence and more consistent with that of one skilled in the art as of February 2001.  Dr. Oettinger's reading of the Patent is an attempt to reconcile a goal with the claims; if the claims do not achieve the goal, however, it is the claims which are deficient.  One cannot simply read into the claims all that may be necessary and desirable to achieve the goal.

Another implicit limitation Dr. Oettinger imposes is on the constant region.  She opines that because claim 1 mentions only modifications of the mouse **variable** region, not the mouse constant region, the mouse constant region must be retained in its entirety.  According to Dr. Oettinger "there is no mention of inserting human constant region genes or of modifying the mouse constant region in any way" in the specifications.  (Oettinger Tr. Aff. ¶ 112.)  She is incorrect, as demonstrated by the preferred embodiments which the Court has set out in detail above.  Finally, she supports her construction with reference to the presentation Dr. Smeland provided to the PTO that states that the anticipated modification "swap[s] in only human variable regions" and "replace[s] mouse variable region with human in situ, while leaving the normal mouse constant regions intact." (Id. ¶ 114 (alterations in original, emphasis added).)  But here again, both Dr. Oettinger and Dr. Smeland err by trying to address an obvious deficiency in claim language by advocacy.

In her trial testimony, Dr. Oettinger references "functional linkage" between the human variable and mouse constant region segments. (Id. ¶ 119.)  She asserts

that her use of this phrase does not import a limitation into claim 1; instead, in her view, she is using that concept to "explain that the human variable region gene segments are inserted in such a way that the mouse is capable of undergoing all the necessary steps to eventually transcribe a reverse chimeric antibody gene and produce a reverse chimeric antibody." (Id.)  She differentiates this from the use of the word "linked" in claim 8 and the phrase "operably linked" in claim 18 as references to "rearranged human variable region gene segments, not human unrearranged variable region gene segments of claim 1." (Id.)  In fact, nothing in claim 1 requires any linkage; this again is an attempt to salvage a claim which could otherwise result in a mouse with a useless Ig locus.  Moreover, Dr. Oettinger never persuasively differentiates between being "functionally linked" and "linked" or "operably linked," which runs her testimony headlong into the doctrine of claim differentiation, which dictates that "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1369 (Fed Cir. 2007) (quoting Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999)).

Dr. Oettinger also adds a limitation that the insertion must occur not only in or at the immunoglobulin locus, but upstream of the mouse constant region.  She again asserts that this must occur in order for the basic goal of the Patent to create useful human antibodies to occur.  In addition, Dr. Oettinger's construction limits claim 1 to a single preferred embodiment.  This is contrary to basic principles of

claim construction.  See, e.g., Acumed LLC v. Stryker Corp., 483 F.3d 800, 807 (Fed Cir. 2007) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." (quoting Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed Cir. 2005))).  Dr. Oettinger focuses on Example 3, and particularly LTVEC 1 depicted in Figure 4B, to the exclusion of the other embodiments.  (Oettinger Tr. Aff. ¶ 111-12.)

Dr. Oettinger's construction of claim 1 also embodies additional limitations contained in other claims in the Patent, rendering those claims superfluous.  This runs afoul of one of the most basic canons of claim construction that a term should not be construed to contain a limitation already present in some claims but not others.  See, e.g., Woods v. DeAngelo Marine Exhaust, Inc., 692 F.3d 1272, 1285 (Fed. Cir. 2012); Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1326 (Fed. Cir. 2003); Wright Med Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1445 (Fed. Cir. 1997).

Dr. Oettinger thus imports into claim 1 limitations found only in other claims:  "operably linked" (claim 18), preservation of the mouse constant region (claim 8), requirement of a reverse chimeric or hybrid locus (claim 20), and exclusion of a human constant region (claim 10).  The Court asked Dr. Oettinger what she understood to be the difference between claim 1 and claim 11.  (Trial Tr. 865:2-867:12, 870:22-871:10, 879:20-880:6.)  Dr. Oettinger responded that the "lacks a human constant region gene" limitation of claim 11 permitted a transgene to be inserted randomly into the mouse of claim 1, but not claim 11.  Put another way,

61

claim 1 can include a human constant region gene and claim 11 cannot.  (Id. 865:2-866:25.)  Dr. Oettinger could not, however, identify any reason why insertion of a human constant region gene would have any value in the invention.  (Id. 867:2-871:4.)

Finally, the evidence further established that Dr. Oettinger's reading of claim 1 includes limitations not found in claim 1 but which are found in draft claims of related applications.  (ECF No. 310 ¶¶ 116-126.)[32]

The Court did not find Dr. Oettinger's construction as stated at trial, or in its two prior iterations, persuasive.  The construction as stated at trial is far too narrow given the claim language and the content of the specifications.  None of her constructions were supported by the substantial and persuasive evidence that Dr. Davis's constructions were, and her constructions required the addition of words and phrases not present in the claim and that in fact eliminate the differentiation between, inter alia, claim 1 and claim 11.

Dr. Davis's reasoned and well-supported criticism of these constructions was manifold.

First, he convincingly supported the position that insertion "at the endogenous" immunoglobulin locus was not sufficiently defined in 2001 to allow one

___

[32] After Regeneron disclosed the Withheld References in those applications, the Examiners rejected those claims.  (ECF No. 310 ¶¶ 113-115, 129-130, App. B.)  Regeneron then added limitations such as operably linked/operable linkage to a mouse constant region in an attempt to overcome the rejection in light of the WR.  (Id. ¶ 131, App. B.)  This further demonstrates that Regeneron did not view such a limitation as inherent in claim 1 in the '018 Patent or initial drafted claims of related applications. (Id. ¶ 347.)

skilled in the art to practice the invention. The metes and bounds of the 5' of the locus were unknown. (Davis Tr. Decl. ¶ 100.)

Second, he convincingly argues that the LTVEC method which is central to the Patent was not enabled in 2001. (Id. ¶ 101.)

The evidence is overwhelming that Dr. Oettinger's construction is not a "broad" construction at all – let alone the "broadest reasonable" construction. It is exceedingly narrow – perhaps the narrowest possible construction. This is a finding of fact based upon the Court's review of the record in light of how Dr. Davis opined one of ordinary skill in the art would understand the claim as of 2001 (this determination necessarily includes the Court's factual determination as to what one skilled in the art would include within various scientific concepts within the claim, so the Court's determination is not and could not be one solely of law).

VII.  MATERIALITY OF THE WITHHELD REFERENCES

Using the BRC of the '018 Patent, the Court next examines the information allegedly withheld from the PTO. The Court's task is to determine whether, construing the terms pursuant to the BRC, the PTO would have allowed the claims had such information been before it. Four references known to Regeneron's Drs. Smeland and Murphy were not disclosed to the PTO during patent prosecution:

> 1.  DX 70 – Marianne Brüggemann & Michael S. Neuberger, "Strategies for Expressing Human Antibody Repertoires in Transgenic Mice", 17(8) Review Immunology Today 391 (1996) ("Brüggemann");

> 2.  DX 6 – WIPO Patent Publication No. WO 91/00906 entitled "Chimeric and Transgenic Animals Capable of Producing Human Antibodies" credited to Clive Wood et al. ("Wood");

3.    DX 78 – Shinsuke Taki et al., "Targeted Insertion of a Variable Region Gene into the Immunoglobulin Heavy Chain Locus", 262 Science 1268 (1993) ("Taki"); and

4.    DX 72 – Yong-Rui Zou et al, "Cre–*loxP*-mediated Gene Replacement: A Mouse Strain Producing Humanized Antibodies", 4(12) Current Biology 1099 (1994) ("Zou").[33]

These references are referred to collectively as the "Withheld References" or "WR". In addition, Merus asserts that during prosecution of the '018 Patent, Regeneron failed to disclose Merus's Statement of Facts and Arguments ("Merus's Brief") or Kymab's Statement of Facts and Arguments ("Kymab's Brief," together the "European Opposition Briefs"), in opposition to European Patent No. 1,360,287. (See DX 380, Regeneron's First Supplemental Responses to Fifty of Merus's Requests for Admission, Nos. 61-64, 83-84.)

The principal question before the Court is whether, individually or collectively, these references meet the rigorous but-for standard of materiality required by Therasense.[34] They do. The "PTO would not have allowed [this] claim had it been aware of the undisclosed prior art." Therasense. Inc. v. Becton, Dickinson & Co., 659 F.3d 1276, 1291 (Fed Cir. 2011) (en banc). In making this determination, the Court "appl[ies] the preponderance of the evidence standard and give[s] claims [in the '018 Patent] their broadest reasonable construction." Id. at

---

[33] In response to requests for admission, Regeneron admitted that Dr. Smeland did not disclose any of the four references to the PTO. (RFAs 49-56.)

[34] As discussed below, a second principal question is of course intent. Here, due to the discovery misconduct which the Court has found and which was extraordinary by any standards, the Court imposes the sanction of an adverse inference as to intent.

1291-92 (citing <u>Manual of Patent Examining Procedure</u> ("MPEP") §§ 706, 2111 (8th ed. Rev.8, July 8, 2010)).

Importantly, and supportive of this Court's determination, each of the Withheld References has formed a part of the basis for either outright rejection or other action by the PTO in connection with other applications in the same family of patents.

The Court discusses its determinations with regard to each of the Withheld References below.

A. <u>Brüggemann</u>

The parties have focused particular attention on one section in the Brüggemann reference: "Replacing mouse Ig genes with human genes." (DX 70 at 394.) That section states:

> The approaches described above involve the random integration of exogenous mouse human transloci into the mouse genome; these transgenic animals are then crossed with mice carrying disruptions of their own endogenous Ig loci. <u>An attractive alternative would be to replace the mouse Ig loci with the human Ig loci; in this way it might also be possible to retain and exploit any possible regulatory sequences in the mouse loci that are located distal to protein-coding regions.</u> While such ambitions have not been realized, successful replacement of small portions of the mouse genome have been described…[citing, <u>inter alia</u>, Zou]…Furthermore, technologies for directed gene replacement (e.g. using the Cre–<i>loxP</i> system) might allow the generation of animals in which <u>much of</u> the DNA of the mouse Ig loci is substituted by human Ig-gene DNA. (<u>Id.</u> at 394-95 (emphasis added).)

Notably, Brüggemann cites to Zou (another Withheld Reference) to accomplish partial replacement of the mouse Ig locus with human Ig DNA.

Dr. Davis testified credibly that, more particularly, Brüggemann teaches integrating human unrearranged variable region gene segments into the Ig locus. (Davis Tr. Decl. ¶¶ 81, 115.)   He also persuasively opines that this reference also discloses that "directed gene replacement" allows much of the DNA of the mouse Ig loci to be substituted by human DNA.  (Id. ¶ 81.)  In addition, use of the phrase "much of" would have been reasonably understood by one of skill in the art to refer to a replacement in whole or in part, which is similar to the "in whole or in part" references in the '018 Patent; and also allows for insertion of an entirely human gene segment and retaining an entirely mouse gene segment, just as in the '018 Patent. (Id. ¶ 82.)

Finally, the evidence clearly establishes that Brüggemann discloses the desirability of inserting human gene segments into the mouse Ig locus. Brüggemann provides the explicit motivation of having the ability to exploit regulatory sequences "distal to protein-coding regions."  (DX 70 at 394; Davis Tr. Decl. ¶ 81.)

The Court finds that Brüggemann is but-for material and that the PTO would not have allowed claims 1-5 of the '018 Patent had Brüggemann been before the Examiner.

B. Wood

The parties have focused particularly on "Example 2" from the Wood reference.  That example states:

66

**A134**

<u>Construction of an Unrearranged Human Ig Gene in a Cosmid Vector</u>

Another unrearranged DNA fragment construct according to this invention comprises an unrearranged human $V_H$ gene segment, the human $J_H$ locus, with a single upstream, unrearranged D segment, the murine μ [mu] gene including its upstream μ [mu] switch region, the murine gamma 2b switch region, the human gamma 1 coding region. The murine μ [mu] may be changed for the human μ [mu] region, since both regions have been found to signal allelic exclusion in the transgenic mouse models.  (DX 6 at 32:10-20.)

Wood discloses insertion of human variable region gene segments upstream of an endogenous mouse constant region, to produce a genetically modified mouse. (<u>Id.</u> at 1:4-9, 2:8-25, 6:11-20, 9:7-10; 9:19-10:10, 19:13-18, Davis Tr. Decl. ¶¶ 91-93.) Wood indicates that a skilled artisan may take advantage of the endogenous mouse μ (mu) constant region (that is, from the animal itself), or may alternatively produce a transgene that includes human V, D and J segment(s), that adds an exogenous mouse μ (mu) constant region.  (DX 6; Davis Tr. Decl. ¶¶ 91-93.)  A skilled artisan would understand that Wood teaches a targeted insertion of exogenous human V, D and J gene segments (or contiguous genomic unrearranged human variable region gene segments) at the mouse locus to be used in conjunction with the endogenous mouse constant region.  (DX 6; Davis Tr. Decl. ¶¶ 91-94.)  Wood also motivates a person of ordinary skill in the art to use an endogenous mouse constant μ (mu) region for purposes of allelic exclusion.  (DX 6; Davis Tr. Decl. ¶ 93.)  One skilled in the art would understand Wood to be disclosing the possibility of a reverse chimeric mouse, or a mouse with a reverse chimeric locus.  (In this regard, he also cites K.R. Thomas et al, for techniques for obtaining chimeric and transgenic animals.) (DX 6 at 20:4-6; Davis Tr. Decl. ¶ 95.)

Dr. Oettinger argues that because the insertion disclosed in Wood is not targeted at the Ig locus, not all of the benefits provided by the '018 Patent are present. (Trial Tr. 856:21-858:5)   It is certainly true that Wood does not target insertion at the Ig locus, but nor does he exclude insertion at the locus.  Thus, Wood is appropriately understood as including but not limiting insertion at the Ig locus.  To the extent that insertion occurs outside the locus, it is possible – though there is no actual evidence in the record apart from Oettinger's ipse dixit – that all the benefits that could result from the '018 Patent might not be available.  This, however, overlooks the fact that the '018 Patent allows for targeted insertion without deletion of the homologous mouse gene segment, potentially also decreasing or even eliminating the hoped-for benefits, and if the insertion occurs in a location not functionally linked to the mouse constant regions, there could also be a diminution or elimination of benefits.  Thus, there is no evidence from which the Court can draw a conclusion that fewer benefits are necessarily available from Wood than from the '018 Patent.

The Court finds that Wood is but-for material and that the PTO would not have allowed claims 1-5 of the '018 Patent if Wood had been before the Examiner.

C.   Taki

The Taki reference describes the targeted insertion of rearranged mouse variable region into the Ig locus. (DX 78, at 1266.)  The parties have appropriately focused on the entirety of the article.  The key point of disagreement between the parties' technical experts is whether targeted insertion of rearranged mouse

68

**A136**

variable region gene segments is sufficiently different from targeted insertion of

<u>unrearranged</u> human variable region gene segments to render this reference

immaterial.  As a matter of law, the mere existence of differences between a

withheld reference and the claims does not, alone, render the reference immaterial.

<u>See</u> <u>McKesson Info. Solutions, Inc. v. Bridge Med., Inc.</u>, 487 F.3d 897, 915 (Fed Cir.

2007) (citing <u>Li Second Family Ltd. v. Toshiba Corp.</u>, 231 F.3d 1373, 1380 (Fed. Cir.

2000)).

    Dr. Davis has provided persuasive testimony and support for his position that

the reference is material – and that the difference of "rearranged" versus

"unrearranged" does not undermine that materiality.  Taki states, in part:

> We designed a targeting vector in order to introduce a rearranged $V_H$
> region gene … into a chromosomal position where rearranged $V_H$ genes
> locate, 5' to the heavy chain enhancer.…  A successful targeting event
> would yield an IgH locus carrying the $V_H$ T15 gene in the position of $J_H$
> … (DX 78 at 1268.)

    The evidence before the Court overwhelmingly supports but-for materiality of

Taki.  Taki teaches targeting at the specific locus – the Ig locus – with operable

linkage (the $V_H$T15 gene would be in the position of the $J_H$ segment and thus

proximate to the mouse constant region), taking advantage of the mouse regulatory

and constant regions.  Taki, in short, provides the motivation to target human

variable region DNA into the mouse Ig locus.  Taki contrasted the mouse disclosed

by this reference (a second generation mouse) with one made with random

integration – such as that by Lonberg.  During prosecution of the '018 Patent, Dr.

Smeland similarly argued that the targeted insertions into the Ig locus was a point

of difference from Lonberg.  As a result, Dr. Smeland's argument itself further reinforces the persuasive evidence that Taki is not cumulative of Lonberg.  In addition, Taki articulates several of the benefits that Dr. Smeland told the patent Examiner had never before been recognized (DX 2 at 163), and which Dr. Smeland argued were "entirely unexpected" by producing antibodies from an endogenous mouse Ig locus. (Id. at 211 (arguing that it was unexpected that mice having exogenous human Ig DNA inserted at the mouse Ig locus "would exhibit essentially normal B cell development and have essentially normal immune systems…" ); Davis Tr. Decl. ¶ 57.)  Clearly, the fact that Taki discloses those same benefits and results disputes the novelty Dr. Smeland asserted with regard to the '018 Patent.

The Court finds that the Taki reference is but-for material and that the PTO would not have allowed claims 1-5 of the '018 Patent if Taki had been before the Examiner.

### D.    Zou

The Zou reference concerns Cre–*loxP*[35] recombination, a type of recombination carried out by a bacterial enzyme and not homologous recombination.  The '018 Patent refers to use of a *loxP* technique in Figures 4C and 4D as well.  The parties have focused on the entirety of the reference.  The article begins:

> The bacteriophage-derived Cre–*loxP* recombination system operates
> efficiently in mammalian cells.  This system is particularly useful in
> gene-targeting experiments in the mouse, and has already been used to

---

[35] The term "Cre–*loxP*" refers to a method for the introduction of genetic modifications into specific genes by homologous recombination using Cre a site-specific, bacteriophage P1-derived recombinase. The Cre recombinase cuts at the *loxP*-tagged genes.

generate 'clean' deletions of target genes in the germ line, as well as to inactivate target genes in a conditional manner.

....

Results: We used the Cre–*loxP* system, in mouse embryonic stem cells, to replace the mouse gene Cγ1, which encodes the constant region of the heavy chain of IgG1 antibodies, with its human counterpart. The mutation was transmitted through the mouse germ line, and the resulting mutant mice were crossed with mice expressing κ [kappa] light chains with a human, instead of a mouse, constant region. Mice homozygous for both mutations produce humanized κ[kappa]-chain-bearing IgG1 antibodies at the same level and efficiency as wild-type mice produce murine antibodies.

...

Conclusions: Cre–*loxP*-mediated gene replacement is a simple and efficient general method of targeted mutagenesis in the mouse. (DX 72 at 1099.)

Later in the article, Zou et al. described their results more fully:

We used Cre–*loxP*-mediated gene replacement in our attempt to generate a mouse strain that would produce antibodies with constant (C) regions of human rather than mouse origin.… In these mutants, the entire Cγ1 gene is replaced by its human counterpart, except for the exons encoding the transmembrane and cytoplasmic portions of the γ1 chain; we hoped in this way to minimize the danger of disturbing membrane expression and signaling of the humanized IgG1 in the mouse. (Id. at 1100.)

Zou teaches targeted insertion of human gene segments into an endogenous mouse Ig locus. The resulting mouse would have human constant region gene segments, but would retain murine transmembrane and cytoplasmic tail gene segments.

The evidence convincingly demonstrates that to one skilled in the art, Zou teaches targeted insertion of human Ig DNA into the mouse Ig locus and notes that doing so produces humanized antibodies at the same level of efficiency as wild-type

71

**A139**

mice. Thus, it teaches the very same benefits that Regeneron's Dr. Smeland represented to the PTO were novel and unexpected. This reference further teaches the importance of retaining the transmembrane and cytoplasmic tail of the mouse constant region to achieve normal production of antibodies. This reference provides significant motivation to target the mouse Ig locus with human Ig DNA.

The Court finds that the Zou reference is but-for material and that the PTO would not have allowed claims 1-5 of the '018 Patent if Zou had been before the Examiner.

E.    Withheld References as a whole

It is also helpful to place the claim language of the '018 Patent directly alongside the Withheld References.

A genetically modified mouse: this alone was not novel or asserted by Regeneron to be the basis for the novelty of its invention. (See Davis Tr. Decl. ¶¶ 105-06.) Long homology arms were, for instance, previously known in the art. (See, e.g., DX 77; DX 9, U.S. Patent No. 6,069,010 at Figs. 2A-C, 4:3-16; Davis Tr. Decl. ¶ 107.)

Comprising in its germline: Zou teaches germline modifications to the mouse in the form of modifications of integrated human Ig DNA that were passed down to subsequent generations. Brüggemann reports Zou's germline transmissions. (Davis Tr. Decl. ¶ 111.) Wood taught a chimeric or transgenic non-human eukaryotic animal having incorporated into its germline unrearranged DNA fragments bearing exogenous Ig gene segments. (Id. ¶ 112.) Taki taught "a method

72

**A140**

of generating 'second generation' Ig transgenic mice, in which the transgene behaves like a normal rearranged Ig gene in terms of B cell-specific expression, class switching, and somatic hypermutation." (Id. ¶ 113.) Taki also notes production of a mouse "strain" – suggesting germline modification. (Id.)

Human unrearranged variable region gene segments: Brüggemann teaches the desirability of inserting a human Ig locus into a mouse Ig locus. (Id. ¶ 115.) Zou and Taki both teach methods with respect to a contiguous set of human V, D, and J gene segments (heavy chain) and V and J (light chain). (Id.)[36]

Inserted at an immunoglobulin locus: Taki, Zou, Brüggemann, and Wood all provide specific motivation for targeting into the endogenous mouse Ig locus to produce a genetically modified mouse, and one that is capable of producing humanized antibodies having normal somatic hypermutation and isotype switching. (Id. ¶ 125.) Taki taught targeted insertion of a variable region gene into the mouse Ig heavy chain locus. (Id. ¶ 127.) Moving from this to the light chain locus was not a substantial step. Moreover, Zou taught replacing a heavy-chain C-region gene with a human counterpart, and combining this mutation with a similar one in the κ [kappa]-chain locus, resulting in a mouse strain with κ [kappa]-chain bearing IgG1 antibodies with human instead of mouse constant regions. (Id.) Zou also taught single step insertion (that is, insertion without deletion) followed by deletion.

In addition, Dr. Davis persuasively opined – with support – that a skilled artisan could combine the teachings of Wood and Taki and/or Zou to identify the

---

[36] As discussed below, interpretations by various examiners of related applications (the '842 and '473) also cited Brüggemann to make a similar point. (See also Davis Tr. Decl. ¶ 120, 122.)

region within the locus for targeted insertion of human unrearranged variable region gene segments.  (Id. ¶ 133.)

Claim 2: Claim 2 differs from claim 1 insofar as the DNA inserted is human unrearranged variable heavy chain, targeted to the heavy chain locus.  Taki, Zou, and Brüggemann all teach targeting the endogenous heavy chain locus.  Use of heavy chain variable DNA is described by Taki (for mouse rearranged), in Wood (for human unrearranged variable region segments), and more generally in Brüggemann.  (Id. ¶ 135.)

Claims 3 and 4: Claim 3 differs from claim 2 in that it is concerned with unrearranged variable region light chain (inserted into the Ig locus).  Taki, Zou, Brüggemann and/or Wood disclose instructions and motivations for targeting specific known regions of the light chain locus with homologous human DNA.  (Id. ¶ 136.)  Zou and Wood both specifically disclose modifications of the light chain.  (Id.)

Claim 5: Claim 5 requires the unrearranged variable region to be greater than 20 kb.  As discussed below, Yang discusses this, as does Kucherlapati.  A person reading the teachings of Zou, Taki, Brüggemann, and Wood would, in light of the art at that time, have the information to produce a mouse with the elements of claim 5.  (Id. ¶ 138.)

Beyond this, Dr. Davis persuasively opines – with support – that even using Dr. Oettinger's flawed claim constructions, the Withheld References are nonetheless but-for material.  (Id. ¶¶ 145-64.)  The Court agrees with Dr. Davis's views in this regard.

Regeneron's repeated explanation as to why the Withheld References are not but-for material is that the '018 Patent discloses a <u>reverse</u> chimeric mouse, one that features human variable and mouse constant regions in the mouse Ig locus. This argument ignores the essential point that claim 1 allows for a partially human/partially mouse variable; the same is true for the constant region. Thus, focusing on the novelty of <u>entirely</u> human variable is fundamentally inaccurate.

With regard to Brüggemann, Regeneron specifically argues that this reference concerns replacing an entire mouse Ig loci with an entire human while the '018 Patent teaches retaining an entirely mouse constant. In fact, as described elsewhere herein, the '018 Patent also allows for a human or mouse constant. As for Zou, Regeneron primarily reiterates the cumulativeness arguments this Court rejects below.

F.    The European Opposition Briefs

Davis testified credibly that a skilled artisan reading the European Opposition Briefs would recognize the key teachings of the Withheld References and how they applied to the '018 Patent . (<u>Id.</u> ¶¶ 238-54.) The European Opposition briefs discuss each of the Withheld References in detail. The evidence at trial persuasively supports them. A skilled artisan would have understood that, as a result, the Withheld References were (if accurately described in the briefs) material. (<u>Id.</u> ¶ 254.) A skilled artisan reading both the Opposition Briefs and then the references themselves would have been able to confirm the faithful and accurate description of the references in those briefs and would have thus been led

inexorably to an understanding of their relevance and but-for materiality.  (Id.)
Kucherlapati and the European Opposition Briefs, read together – again, with
confirmation of a faithful description of the references – would have prevented
issuance of claims 1-5 of the '018 Patent.  (Id.)

The Court finds that if the European Opposition Briefs had been read
together with the references that were already before the Examiner, the Examiner
would have understood the relevance and but-for materiality of the four WR
discussed in detail above.   The Court finds that one skilled in the art would
therefore understand that the Opposition Briefs are but-for material and that the
PTO would not have allowed claims 1-5 of the '018 Patent they had been before the
Examiner.

## VII.    CUMULATIVENESS OF THE WITHHELD REFERENCES

Regeneron argues that even if the Withheld References and the European
Opposition Briefs are material in some sense (a point it vigorously contests), they
are in all events cumulative of  references that were disclosed to the PTO,
particularly Kucherlapati,[37] Lonberg, and Jakobovits.  (See '018 Patent, References
Cited.)  The parties introduced extensive evidence at trial as to whether these three
references render the Withheld References and the European Opposition Briefs
cumulative.  Based on the persuasive and well supported testimony of Dr. Davis,

---

[37] References to "Kucherlapati" refer to U.S. Patent No. 6,114,598, issued to Raju Kucherlapati et al. on June 5, 1995.  (See DX 5.)

and the Court's assessment of the less persuasive and shifting explanations by Dr. Oettinger, the Court finds that they do not. (Davis Tr. Decl. ¶¶ 201-37.)

Far from cumulative, each of the Withheld References provides specific teachings, disclosure and motivation for performing targeted insertion of exogenous DNA into the Ig locus that are not contained in what the Examiner already had before it (including, <u>inter alia</u>, Kucherlapati, Lonberg, and Jakobovits.) (Davis Tr. Decl. ¶¶ 201-206.) One skilled in the art and who had knowledge of each of the Withheld References as well as Kucherlapati, Lonberg and Jakobovits, would understand that the genetically modified mouse disclosed in claim 1 of the '018 Patent was disclosed by the Withheld References but not in the prior art that was shared with the Examiner. (Davis Tr. Decl. ¶ 203-04.) Indeed, at several points in patent prosecution Regeneron itself focused on the shortcomings of the disclosed prior art to argue in favor of the instant application, and thereby highlighted the fact that certain aspects disclosed in the Withheld References did not appear in the prior art shared with the Examiner and thus that the references were not all cumulative of one another. The Court finds that an Examiner with such knowledge would not have allowed claims of the '018 Patent.

A.    <u>Kucherlapati</u>

The evidence demonstrates that Regeneron argued in European Opposition proceedings that Kucherlapati was not enabled. (Davis Tr. Decl. ¶¶ 201-17, 220.) As a matter of law, a reference to a non-enabled device cannot render a reference to an enabled device cumulative. <u>Cf.</u> <u>In re Antor Media Corp.</u>, 689 F.3d 1282, 1287

(Fed. Cir. 2012) ("A prior art reference cannot anticipate a claimed invention 'if the allegedly anticipatory disclosures cited as prior art are not enabled.'" (quoting Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1354 (Fed. Cir. 2003))).

But in addition, the evidence demonstrates that Kucherlapati does not contain the same teachings and motivations disclosed in Taki. (Davis Tr. Decl. 227-35.) Taki is more specific in terms of targeting. As discussed above, Taki discloses targeting exogenous variable region DNA at a specific position upstream of the 5' heavy chain enhancer and mouse constant region. This specific integration allows for the exogenous Ig DNA to express and experience good somatic hypermutation, isotype switching and B cell development. In contrast, Kucherlapati discloses only vague targeting.

Taki also provides different motivations than Kucherlapati: Taki includes the motivation to target the endogenous mouse Ig heavy chain locus with functional exogenous variable region DNA to allow the exogenous Ig variable region DNA to "participate in isotype switching and undergo somatic hypermutations." (Id. ¶ 227.) Kucherlapati does not. (Id. ¶ 228.) Taki reports that "present data establish a method of generating 'second generation' Ig transgenic mice, in which the transgene behaves like a normal rearranged Ig gene in terms of B cell-specific expression, class switching, and somatic hypermutation." (Id. ¶¶ 229, 233; DX 78 at 1270.) No reference before the PTO disclosed this.

Nor is Kucherlapati cumulative of Zou. (Davis Tr. Decl. ¶ 220.) Zou discloses a genetically modified mouse having human Ig DNA inserted into the mouse heavy

chain locus, and breeding that with a genetically modified mouse having human Ig DNA inserted into the mouse kappa chain locus. (Id. ¶ 221.)  This is not disclosed in any of the references before PTO, including Kucherlapati.   In addition, Zou discloses the importance and benefits of maintaining the endogenous mouse transmembrane and the cytoplasmic tail, "to minimize the danger of disturbing membrane expression and signaling of the humanized IgG1 in the mouse." (DX 72 at 1100; see also Davis Tr. Decl. ¶ 71.)  This, in turn, leads to the substantial benefit of a mouse which produces antibodies at the same level and efficiency as wild-type mice.  These disclosures of technique, benefit and motivation were not disclosed in Kucherlapati.

Kucherlapati is also not cumulative of Wood.  (Davis Tr. Decl. ¶ 237.)   Wood instructs the use of the endogenous mouse μ (mu) region – Kucherlapati does not. Indeed, Kucherlapati deletes and replaces the endogenous mouse μ (mu) region.  In addition, Kucherlapati's motivation for targeting the mouse Ig locus is for transformation efficiency, not to utilize the endogenous mouse μ (mu) constant region.  (Id.)

Finally, Kucherlapati is also not cumulative of the Brüggemann reference. Brüggemann teaches the benefits of targeted insertion as taking advantage of the regulatory regions distal to the protein-coding regions and the expectation that mouse regulatory sequences distal to the protein coding regions will remain intact. (Id. ¶ 208.)  In contrast, Kucherlapati states that "the xenogeneic locus will be placed substantially in the same region as the analogous host locus, so that any

regulation associated with the position of the locus will be substantially the same for the xenogeneic immunoglobulin locus." (DX 5, 10:51-55.)

B. Lonberg & Jakobovits

Lonberg similarly does not render Brüggemann cumulative. Lonberg did not teach targeted insertions of functional DNA into the mouse Ig locus, and simply used random integration to add functional human Ig DNA. (Davis Tr. Decl. ¶ 218.) One example of the lack of cumulativeness is evident in a comparison of Lonberg, Kucherlapati, and Jakobovits (individually or collectively) to Wood. Wood teaches a DNA construct which includes human V, D and J segments, including human unrearranged variable region gene segments, and that this construct may be used in conjunction with the endogenous mouse mu region, prior to recombination. Wood also discloses use of the μ (mu) constant region from the mouse itself. (DX 6.) None of the references before the PTO, including Kucherlapati, Lonberg or Jakobovits disclose these things.

Additionally, unlike the Withheld References, both Lonberg and Jakobovits refer to a "knock-out"[38] plus transgene mouse made via random insertion. None of the Withheld References require knock-out, and each discusses targeted – not random – insertion. Moreover, the Jakobovits '364 Patent only targets the mouse Ig locus to insert lox sites, not exogenous functional Ig DNA. The insertion of lox sites is the first step in that patent's goal of modifying hybridomas, not insertion of immunoglobulin gene segments into a transgenic mouse. (Davis Tr. Decl. ¶ 221

---

[38] The '018 Patent defines "gene knockout" as genetic modification resulting from disruption of the genetic information encoded in a locus. ('018 Patent, 9:16-18.)

n.189.) In sum, unlike the Withheld References, Jakobovits provides no motivation to target the mouse Ig locus with exogenous DNA. Finally, Lonberg does not teach insertion of human Ig DNA into an endogenous mouse Ig locus and therefore also provides different motivation than that evident in the Withheld References. (Davis Tr. Decl. ¶ 219.)

Based on the evidence of how one skilled in the art would understand the references before the Examiner compared to the Withheld References, the Court finds that the Withheld References are not cumulative. This is a finding of fact by the Court.

## VIII.  THE BASIS OF OTHER REJECTIONS[39]

The '018 Patent is only one of a large number of related patents or applications in the same family. In connection with prosecution of related applications with substantially similar claims, Regeneron's patent counsel have filed disclosure forms ("IDS") specifically referencing the Withheld References. The prosecution history with regard to these patents and applications is highly relevant to the issue of the but-for materiality of the Withheld References. As set forth below, Examiners have found that Taki, Brüggemann, and Wood, three of the Withheld References at issue here, form a basis for rejection of claims substantially

---

[39] Regeneron argues that rejections of other applications is not equivalent to proving but-for materiality. The Court agrees. Nevertheless, the ways the PTO treated the Withheld References when considering claims substantially similar to those in the '018 Patent are, without a doubt, probative of the Withheld References' materiality.

**A149**

similar to claim 1 (as well as others) in the '018 Patent.  (See, e.g., Davis Tr. Decl. ¶ 165 et seq.)[40]

A.    Rejections by the PTO

The list of applications in which claims substantially similar to the claims in the '018 Patent were rejected on the basis of the references Regeneron withheld during prosecution of the '018 Patent is extensive.  The Court considers a few relevant examples.[41]  Consider first U.S. Patent Application Number 11/809,473. (DX 17.)  Claims 1, 8, and 9 of the '473 Application were similar to claims 1 and 5 of the '018 Patent:  the two sets of claims each refer to modifying a mouse endogenous chromosomal locus by using a targeting vector to insert a genomic fragment larger than 20 kb and then using an MOA assay to detect modification.  (Id. at 200.) However, Brüggemann was disclosed in the prosecution of the '473 Application, and the PTO cited it as a basis to reject the overlapping claims on obviousness grounds. (Id. at 214.)  The basis for this rejection is thus probative of whether the Brüggemann reference was but-for material.

The Court also considers U.S. Patent Application No. 13/719,842. (DX 16.) This Regeneron applications contain claims largely similar to claims 1 and 2 of the '018 Patent.  For example, claim 4 of the '842 Application concerns "insertion" of

---

[40] While Zou has not itself been cited in rejections, Zou is cited and relied upon in the Brüggemann reference here at issue.  "Zou informs the skilled artisan of the particular regions within the mouse locus that are important for producing humanized antibodies at the same level of efficiency as wild-type mice."  (Davis Tr. Decl. ¶ 187.)
[41] The Court finds that all of the examples described advance claims sufficiently similar to those in the '018 Patent to make the Examiners' treatment of the Withheld References relevant to the materiality of those references in the prosecution of the '018 Patent.

"unrearranged human immunoglobulin sequences" "at" "a non-human immunoglobulin locus," while claim 9 concerns performing this method in "a mouse cell." (Id. at 39.)  This claim compares with claim 1 of the '018 Patent, which concerns "[a] genetically modified mouse, comprising in its germline human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus."  ('018 Patent, 29:24-26.)

During the application process for the '842 Application, Dr. Smeland produced an IDS that identified the same material submitted in an IDS in connection with prosecution of the '018 Patent; that is to say, that did not contain the Withheld References.  (Id. at 76-80.)  Although Brüggemann was not included in Dr. Smeland's IDS, it was part of the basis for the PTO's initial rejection of claims 3, 4, 8, and 9; the examiner stated that "Brüggemann et al. teach that an attractive alternative of the mice would be to replace the mouse Ig locus with the human Ig locus; in this way, it might also be possible to retain and exploit any possible regulatory sequences in the mouse loci that are located distal to the protein-coding regions."  (Id. at 95-96 (emphasis in original).)

After Regeneron amended the claims in the '842 Application and the PTO maintained its rejection of claims 3, 4, 8, and 9 on the basis of, inter alia, Brüggemann, a Third Party Submission ("TPS") disclosed Taki and described its relevance and materiality to the pending claims.  (Id. at 147.)  Dr. Smeland then submitted an additional IDS that contained the Brüggemann, Taki, and Zou Withheld References.  (Id. at 172-74.)  Subsequently, the Examiner rejected all of

the pending claims in the '842 Application in view of several references, including Taki and Lonberg. (Id. at 276.) Regeneron's appeal of the rejection is pending. As with the '473 Application, the role Brüggemann and Taki played in the rejection of the claims in the '842 Application that are similar to the claims in the '018 Patent tends to prove the materiality of those references.

In another example, U.S. Patent Application No. 13/719,819, several claims were so similar to those in the '018 Patent that the Examiner initially rejected them on grounds of nonstatutory double patenting. (DX 18, at p. 164-65.) The Examiner also rejected these claims, which it labeled "not patentably distinct from" the claims in the '018 Patent, on the ground that Taki, when combined with Lonberg and other references, made the claims in the '819 Application so "prima facie obvious" that they only amounted to "combining prior art elements according to known methods to yield predictable results," and in a manner that "[o]ne of ordinary skill in the art would be motivated to do." (Id. at 163.) This rejection is probative of how Taki would have been material to the decisions of the Examiner during prosecution of the '018 Patent, had it been disclosed.

A final relevant example is U.S. Patent Application No. 14/036,514. (DX 25.) Like several of the claims in the '819 Application, claims 1-16 of the '514 Application were rejected as an attempt at double patenting in view of claims 1-20 of the '018 Patent. (Id. at 96.) The Examiner also rejected these claims as obvious in view of the combination of certain references disclosed during prosecution of the '018 Patent

(Lonberg and Kucherlapati) with three of the Withheld References (Wood, Taki, and Brüggemann).  (Id. at 94.)

Regeneron amended the proposed claims in the '514 Application.  One of the amendments added an additional limitation of "operably linked" in claims 17 and 19 of the application, requiring that the heavy chain variable gene region segments be "operably linked to a mouse heavy chain constant region gene at an endogenous mouse heavy chain immunoglobulin locus."  (Id. at 478.)  Based on the addition of the "operably linked" limitation, these claims were then allowed. (Id. at 498.) Notably, claims 1-5 of the '018 Patent do not contain an "operably linked" limitation.

Regeneron has filed a number of additional patent applications which are continuations of the '976 Application. (See DX 26; DX 27; DX 32; DX 33; DX 19; DX 34.)  The prosecution histories of these applications contain issues similar to those described above.[42]  The events in the prosecution of those applications are material to consideration of the claims of the '018 Patent.  The Court finds those events, which include negative actions by the PTO in light of the Withheld References, to be probative of those references' but-for materiality.

B.    Underline European Patent '287

European Patent 1,360,287 B1 ("EP '287") is the European counterpart to the '018 Patent.  A Regeneron press release refers to them as "similar" and that they both have "claims covering genetically modified mice that have unrearranged

---

[42] For instance, claims of U.S. Patent Application No. 14,046,291 were rejected over Wood. (Davis Tr. Decl. ¶¶ 188-91.)

human variable immunoglobulin variable region gene segments at endogenous mouse immunoglobulin loci." (DX 180.) Dr. Davis testified credibly that one skilled in the art would understand the claims in EP '287 to be materially similar to those in the '018 Patent. (Davis Tr. Decl. ¶ 239.)

In June 2013, pursuant to procedures allowed in Europe, Merus filed an Opposition against EP '287. (DX 64.) A hearing was held on September 16 and 17, 2014. (DX 65.) The Taki reference was specifically included as part of the argument against patentability. Following that hearing, the Opposition Division of the European Patent Office revoked EP '287 in its entirety. (DX 69 at sheets 2, 8-9.) Referring to Taki, the Opposition Division stated:

> [Regeneron] argues that D4 does not provide the skilled person with the motivation to use <u>in situ</u> replacement but merely discloses the use of a transgene. D4 teaches on pages 74-76 the inactivation of the endogenous mouse immunoglobulin loci by homologous recombination. Therefore starting from D4 [Lonberg] the skilled person would be motivated to insert the hybrid locus and to inactivate the endogenous locus by homologous recombination. D7 [Taki] teaches the simultaneous integration of a transgene and the inactivation of the endogenous immunoglobulin heavy chain locus by homologous recombination. D7 [Taki] further teaches that targeting the transgene in the endogenous locus has the advantage of a proper regulation of the locus (see D7 [Taki], page 1268, first column). (<u>Id.</u> at sheet 22; ECF No. 241 ¶¶ 148, 150.)

C.  <u>Knowledge</u>

The evidence establishes that Dr. Smeland knew of the Withheld References and the European Opposition Briefs during prosecution of the '018 Patent. (<u>See</u> DX 16; DX 17; DX 23; DX 64; DX 65; DX 178 at p. 2; DX 179 at p. 7; DX 840, Smeland Dep. Tr. at 265:25-266:5; DX 349.) Dr. Murphy had knowledge of at least Zou and

Brüggemann prior to the issuance of the '018 Patent. (DX 178, Regeneron's Third Supp. Response to the Court's Interrogs. 1 and 2.)

## IX.  MISCONDUCT

### A.  Patent Prosecution Misconduct

Merus alleges that Regeneron committed affirmative egregious misconduct in connection with prosecution of the '018 Patent. This conduct included (1) statements in the specification disproven by Regeneron's own subsequent patent applications (Davis Tr. Decl. ¶¶ 257-72); (2) the specification making inaccurate or incomplete statements with regard to the use of LTVECs (Id. ¶¶ 273-87); and (3) a presentation to the PTO which contained statements that Regeneron knew at the time to be false. The Court agrees.

#### 1.  Representations regarding probing

The specification describes not only targeted insertion but also a method to probe to locate and confirm such insertion. The specification describes this portion of the invention as "An analysis to determine the rare eukaryotic cells in which the targeted allele has been modified as desired, involving an assay for modification of allele (MOA) of the parental allele that does not require sequence information outside of the targeting sequence, such as, for example, quantitative PCR." ('018 Patent, 3:21-26.) Various embodiments include using a quantitative assay to detect modifications of allele (MOA) in the eukaryotic cells (see, e.g., id., 3:36-38, 4:24-28, 4:58-60), or "a method wherein the quantitative assay comprises quantitative PCR …" (Id., 3:53-54.) Figures 3A-D of the Patent are tables of numbers described as

"Sequence of the mouse OCR10 cDNA (upper strand, SEQ ID NO:5), homology box 1 (hb1), homology box 2 (hb2), and TAQMAN probes and primers used in a quantitative PCR assay to detect modification of allele (MOA) in ES cells …" (Id., 8:19-23.)

The specification specifically states that the assay "does not require sequence information outside of the targeting sequence" (id., 3:24-25) and that "it is not necessary to know the complete sequence and gene structure of a gene(s) of interest to apply the method of the subject invention to produce LTVECs" (id., 11:22-25) and finally that "[e]ukaryotic cells that have been successfully modified by targeting the LTVEC into the locus of interest can be identified using a variety of approaches that can detect modification of allele within the locus of interest and that do not depend on assays spanning the entire homology arm or arms." (Id., 13:65-14:2.)

Dr. Davis persuasively opines that these statements create the inaccurate impression that to probe for a modification, a scientist need not know the sequence of the mouse Ig loci, but need only probe the sequence targeted, and that this was incorrect. (Davis Tr. Decl. ¶ 259.) The evidence as amassed and described by Dr. Davis clearly demonstrates that to confirm an appropriate targeting, one would need to know the full sequence of the mouse Ig loci and probe not just the region targeted but the flanking region (the integrated DNA and the regions flanking the integrated DNA); Regeneron did no possess this information when it filed the application in February 2001. (Id. ¶¶ 260-72.) Internal documents reveal that the

probing strategy discussed in the specifications was first carried out after February 16, 2001.  (Id. ¶ 264.)

In addition, a complete sequence of the locus is necessary because certain regions, including the mouse Ig heavy chain, are repetitive; one cannot probe for a loss of allele and be certain that the result obtained is accurate.  (Davis Tr. Decl. ¶ 265.)  Another internal Regeneron presentation from 2002 identifies as one of the "challenges" the fact that the "locus is more complex (repetitive) than any other targeted by VelociGene . . ." and "LOA/TaqMan Screening – additional probes required due to locus complexity."  (Davis Tr. Decl. ¶ 267, DX 165.)

### 2.    '018 Patent's LTVEC description

Dr. Davis persuasively opines that the specification's statements regarding the use of LTVECs is incomplete and/or inaccurate.  (Davis Tr. Decl. ¶ 273.)  The evidence suggests that Regeneron lacked the necessary DNA sequence information to construct a targeting vector with the 5'.  As stated elsewhere in this Opinion, Regeneron did not know the 5' end of the mouse Ig locus in 2001.  (Id. ¶¶ 274-75; DX 71; DX 94.)  But the specification of the '018 Patent nonetheless described a LTVEC in which a homology arm was the 5'.  (DX 337, Murphy Dep. Tr. at 200:20-201:22; '018 Patent 22:32-45.)

Moreover, the evidence demonstrates that as of February 2001 Regeneron could not, in fact, accomplish the very large insertions described by the '018 Specification.  (Davis Tr. Decl. ¶¶ 285-87.)  In a 2003 presentation, Dr. Murphy informed the Regeneron board that manipulation of the large loci required

development of proprietary technology.  (DX 161.)  That statement is contrary to the representations to the PTO in a presentation in January 2013 that the VelocImmune mouse is "made" by the claimed methods.  (DX 002.)[43]  "Proprietary technology" is not disclosed technology; the disclosures in the specifications of the '018 Patent were, therefore, insufficient to practice the invention.  Without access to the proprietary technology referred to in this presentation one skilled in the art could not have manipulated the large loci.

       3.    <u>Presentation to the PTO</u>

Merus's third point on affirmative egregious misconduct is that a January 2013 presentation, authored by Dr. Murphy and provided to the PTO by Dr. Smeland, had several false statements.  The Court agrees; this is a finding of fact.  The presentation at issue is that discussed earlier in this Opinion in connection with the prosecution history of the '018 Patent.  In the presentation to the PTO, Regeneron made the following statements:

      1.    The mouse disclosed in the '018 Patent was the VelocImmune mouse "[c]reated only by virtue of VelociGene and VelociMouse technologies." (DX 2 at 215.)

      2.    The "[p]recisely humanized Ig genes in the [VelocImmune] mouse function more efficiently than previous platforms." (<u>Id.</u> at 215.)

---

[43] Dr. Oettinger responds to each of Dr. Davis's points here – but her counterarguments are unpersuasive.  For instance, her response to the need for a complete sequence is that one only needs some of the sequence to detect a modification.  This ignores, however, that the detection here is focused on the insertion.  To detect the insertion as discussed in the Patent, Dr. Davis has persuasively opined, the complete sequence is necessary.  (Davis Tr. Decl. ¶¶ 291-92.)  Use of the MOA assay as instructed by the Patent only works with sequence information of the targeted region of the host.

3.      The "VelocImmune Solution" indicates that Regeneron had in fact replaced 3 Mb of the endogenous mouse IgH locus I with 150 kb of human genes in a single step.  (Id. at 224.)

4.      A list of characteristics of the VelocImmune mouse are compared to a "normal mouse":  normal somatic hypermutation, normal serum levels for all Ig isotypes, normal kappa:lambda light chain ratios, etc. (Id. at 227.)

5.      The VelocImmune mice display "normal B cell populations in the spleen and lymph nodes" and show "normal B cell differentiation." (Id. at 228-29.)

The evidence is overwhelming that at the time the '176 Application was filed, there was no VelocImmune mouse and these results did not exist.  But worse, some of the results referenced in the presentation could not have existed.  (Davis Tr. Decl. ¶¶ 307-30.)  For instance, as of February 2001 and for a number of years thereafter, Regeneron lacked information concerning the size, composition, and regulatory elements associated with the endogenous mouse loci. (DX 145 at pp. 10055692-94; DX 166 at p. 804; DX 160 p. 241; DX 161 at p. 70; DX 37 at 9174-84.)

The lack of capability to make the necessary large DNA vectors with large homology arms frustrated enablement. (PX 835, Murphy Dep. Tr. at 141:17-22.)  Dr. Murphy acknowledged that his team went a year believing that they had target locations for the proximal and distal regions of the locus, but that they had been wrong. (Id. at 158:3-10.)  Despite this, Dr. Smeland argued to the Examiner that an embodiment of the claims – the VelocImmune mouse – was superior to the prior art.

At the March 11, 2013 meeting with the PTO, Dr. Jones, supervised by Dr. Smeland who had retained him and was present, told the Examiner that the VelocImmune mouse was the embodiment of the claimed invention, and was "only

possible through VelociGene technology." (PX 840, Smeland Dep. Tr. at 232:14-233:15.) The emphasis and focus at this meeting, according to Dr. Smeland, was expressing Regeneron's view that the Examiner's prior rejections of the claims in the '176 Application, which had been based in part on Lonberg, were incorrect because Lonberg taught random rather than targeted insertion. (Id. at 246:6-13.) But Dr. Davis persuasively establishes that while this feature may have distinguished the '176 Application from Lonberg, it did not distinguish it from the prior art contained in the Withheld References, which a person skilled in the art would have understood to provide the motivation and instructions for the relevant insertion. (Davis Tr. Decl. ¶¶ 385-88.)

In addition to the clear evidence that the VelocImmune mouse did not exist at the time of the filing of the '176 Application, the description of its characteristics once it did exist was misleading. Dr. Davis persuasively explains that one familiar in the art and aware of Taki and Zou would not find the VelocImmune mouse's comparability to a "normal mouse" on a number of criteria at all unexpected. (Davis Tr. Decl. ¶¶ 347-53.)

The Court finds by clear and convincing evidence, and without need for application of an adverse inference, that Regeneron made false and misleading statements. The Court finds by clear and convincing evidence that this constitutes egregious affirmative misconduct.

B.  Discovery and Trial Misconduct

    1.  Claim Construction

From the outset, this Court has been concerned about Regeneron's litigation tactics.  Early on, when the Court's Individual Patent Rules required that Regeneron disclose to Merus its infringement contentions, broken down by element, (See Indiv. Patent Rules 1(a)(iii).) Regeneron claimed that it could not comply. Instead, Regeneron provided a chart with infringement contentions that listed each claim as consisting of a single limitation – that is, a single element.  Merus moved to compel – seeking real infringement contentions.  (See ECF No. 76.)  In that same motion, Merus also moved to compel production of documents as required by the Court's rules relating to the conception and reduction to practice of the '018 Patent. Regeneron claimed to have very few such documents and did not include in its production a key document written by Dr. Murphy, one of the inventors, setting forth the '018 Patent's conception and reduction to practice.  (DX 145.)[44]

The Court issued a written decision in response to Merus's motion to compel Regeneron to detail its infringement contention.  (ECF No. 82.)  At a subsequent conference, the Court discussed its concerns with Regeneron's conduct and gave Regeneron an opportunity to correct it.  Regeneron chose not to.   In both its order and at that conference, the Court noted that the infringement claim that Regeneron

---

[44] This document – which, as to certain facts such as enablement and location of the 5', one could reasonably call a "smoking gun" – was not among those initially produced.  Only when Merus later learned of the document's existence did Merus move to compel its production, a motion the Court granted.  (ECF No. 182.)

had asserted – as with all infringement claims – required an element-by-element identity between the accused product and the '018 Patent.  See Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1296 (Fed. Cir. 2009).  The Court stated explicitly, both in its written decision on this issue and at a hearing held soon thereafter, that it was troubled by Regeneron's refusal.  At that time, experienced patent counsel (subsequently replaced by Regeneron's trial counsel here) asserted that he did not understand what the Court was asking for or  how to break a claim down into elements.   This made no sense and was clearly a tactical choice – seeking to shift the plaintiff's burden in an infringement case to define the elements of a claim to the defendant, maintaining maneuvering room as a result.  In retrospect, the reasons for this choice have become clear:  an element-by-element breakdown of the claim eliminates the host of additional, non-claim specific limitations that are necessary for Regeneron to prevail.

The shenanigans continued.

During claim construction, Regeneron again chose tactics over substance.  As the plaintiff, the Court's rules required that Regeneron propose its claim constructions, then that the defendant respond.  (See Indiv. Patent Rule 2(a)(i), 2(c)(i).)  Regeneron took the position that no terms required construction.  The Court issued an order (ECF No. 81) expressing its concern that Regeneron was attempting to "game" the system by shifting the burden to Merus to propose constructions and then to take shots at those proposals.  The Court required Regeneron to live by its plain language constructions.  (The short-sightedness of

Regeneron's position is all the more clear in light of the extensive constructions offered by Dr. Oettinger.)

Questionable conduct continued.

2. The Jones Memo

Although the conduct relating to what is referred to as the "Jones Memo" is not the primary basis for the Court's instant decision to impose sanctions, is worth reviewing for multiple reasons. First, it follows the pattern of misconduct the Court has already described. Second, Regeneron has sought to use it as a cloak for the misconduct that is the primary bases for the Court's sanctions decision: the broad waivers effectuated by the Smeland declaration and the host of discovery issues revealed by the Court's ensuing review of Regeneron's privilege log. When, as discussed below, Regeneron broadly waived the privilege in the Smeland trial affidavit but argued it was justified in nonetheless maintaining its privilege as to numerous documents on the same topics on its privilege log, its confusing defense was that, as it had complied with the Court's waiver order regarding the Jones Memo, an entirely different issue, it had no obligation to make such disclosure. The Court still cannot understand how an order on waiver as to one situation could provide any reasonable basis for failure to disclose in another.[45]

The Jones Memo issue developed as follows. Discovery was in process and depositions ongoing. On the eve of Dr. Jones's deposition, Regeneron made a tactical decision to disclose a helpful chart and memorandum Dr. Jones had

---

[45] Much of the Court's discussion on the Jones Memo issue is also set forth in other orders. (ECF Nos. 223, 272.) The Court includes this summary for convenience.

**A163**

prepared in connection with his review of whether to disclose the Withheld References during patent prosecution.  These materials had previously been listed on Regeneron's privilege log on the basis of attorney-client privilege.[46]

Merus asserted a broad privilege waiver and brought a motion to compel. (ECF No. 203.)

The evidence presented to the Court on that motion demonstrated that on November 7, 2013, Dr. Jones had attached the chart to an email to Dr. Smeland, and wrote, "While we discussed this analysis in numerous calls, I don't know if I have ever sent you this document.  For your records, I have also attached a memo I drafted regarding the third-party disclosures made in the other U.S. case." (ECF No. 223.)  That email was forwarded to Regeneron's then outside counsel on the same day.  On November 11, 2014, Regeneron's outside counsel wrote an email to Regeneron stating, "I believe Brendan also discussed his analysis with Tor around the time that Brendan prepared these memos."  That same e-mail notes that Dr. Jones "was asked to analyze [] whether certain references that came up in the European Opposition and the Third Party Submission should be disclosed to the PTO", and that "[t]here are several documents that he prepared on this subject in late June 2013."

In fact, the memorandum, written by Dr. Jones on June 28, 2013, appeared in all respects to be formatted and have the content of a legal memo to Regeneron – though it is designated as a memo to file.  Printed on Foley Hoag letterhead and

---

[46] As described above, Dr. Jones was the outside patent attorney retained to represent Regeneron in the final stages of prosecution of what became the '018 Patent.

beginning with entry lines for "to", "cc", "from" and "regarding", the memo read "Privileged and Confidential," began with a summary section, contains footnotes, and is organized under formal headings. It described basic standards for the duty to disclose prior art, and analyzes the materiality of three publications. The memo amounted to an elucidation of the rationale underlying the charts and is inextricably connected to the charts. The document was plainly one created in connection with Dr. Jones's provision of legal advice to Regeneron.

The references to discussions of the chart and analysis made clear that Dr. Jones analyzed the prior art and arrived at a legal conclusion regarding a disclosure obligation as part of his advisory role to Regeneron. He contemporaneously communicated the substance of the very same advice to his client. The Court found that Regeneron's argument in opposition to the motion to compel – that the documents were not privileged because Dr. Jones had merely used them to assist himself in connection with some professional obligation unrelated to his advisory role to Regeneron – was "seriously incorrect." (ECF No. 223 at 7.)

As part of its inquiry into this waiver – now called the Jones Memo issue – and particularly for the purpose of understanding what the universe of documents were that would be implicated by such waiver, the Court requested that Regeneron provide it with "[a]ll documents relating to groups or individuals who at the time of creation or subsequently thereto received a copy of the chart or memo" and "[a]ll documents and communications ... referring or relating in any way to Dr. Jones's chart and memo." (ECF No. 214 (emphasis added).) The Court sought these

documents for its <u>in camera</u> review and anticipated that all documents discussing the materiality or cumulativeness of the Withheld References that had been withheld on the basis of privilege would be included in any such production.

Regeneron subsequently provided a single binder to the Court containing what it represented constituted the universe of such materials (subject to an explicit disclosure as to that which it had held back, which related solely to certain specified litigation materials). (ECF No. 223 at n.2.)  The Court was thus led to believe that it had before it all of the documents that related "in any way" to Dr. Jones's chart and memo.  As it has turned out, this was not the case.  Regeneron had not in fact provided the Court with the entire universe, but had sua sponte imposed its own limitation that required any documents be <u>directly</u> related to the chart and memo – not "<u>in any way</u>" related, as the Court's order required.  Thus, the Court's intention to include all documents concerning the subject matter was circumscribed – and appears to have included only documents directly and explicitly related to the chart and memo themselves.  The Court believed the binder provided insight into all that was at issue; but the Court was in a dark room and mistook the leg of an elephant for a pillar.  The Court ruled on the motion.

Because Regeneron affirmatively produced these two documents to Merus prior to a deposition, believing they were helpful,[47] it waived the attorney-client

---

[47] On November 12, 2014, David Gindler, then Regeneron's outside counsel, recommended disclosing the particular documents as they "provide a helpful and concise contemporaneous summary" and a "thoughtful overview of all the prior art."  (ECF No. 223 at 9.)

privilege with regards to the same subject matter.[48]  The Court found that this presented a classic "sword and a shield" issue.  See In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991).  The Court ordered that "Regeneron and Foley Hoag [] produce to Merus all relevant documents concerning the decision to not disclose prior art during the patent prosecution."  (ECF No. 223 at 9.)   The Court assumed that this covered the universe and that the universe was thus contained in the binder.  Only Regeneron knew what in fact existed.

In retrospect, given this internal line drawing that only Regeneron understood, it should have come as no surprise that there was a dispute as to the scope of the waiver.  The Court approached the dispute based on its experience on

---

[48] A party may not use the attorney-client privilege as both a "sword and a shield".  See United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991); In re von Bulow, 828 F.2d 94, 103 (2d Cir. 1987).   "In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."  In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); see also Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 474 (2d Cir. 1993) (the privilege can be waived when the "privilege holder releases only communications or portions of communications favorable to his litigating position, while withholding any unfavorable ones"); Bilzerian, 926 F.2d at 1292 (there is an implied waiver of the privilege when a party "asserts a claim that in fairness requires examination of protected communications").  Courts make determinations of waiver on a case-by-case basis, taking into account, inter alia, whether a party's disclosure was demonstrably prejudicial to the other party.  In re Grand Jury Proceedings, 219 F.3d at 183.  The Supreme Court has noted that "[p]arties may forfeit a privilege by exposing privileged evidence, but do not forfeit one merely by taking a position that the evidence might contradict."  United States v. Salerno, 505 U.S. 317, 323 (1992).
Waiver of the privilege "allows the attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed."  In re von Bulow, 828 F.2d at 102-03; see also United States v. Jacobs, 117 F.3d 82, 89-90 (2d Cir. 1997) (petitioners waived attorney-client privilege to a document where they disclosed the substance of the opinion at issue while withholding the actual document), abrogated on other grounds by Loughrin v. United States, 134 S.Ct. 2384 (2014).  However, the attacking party should not reach beyond those matters that were actually revealed where "disclosures of privileged information are made extrajudicially and without prejudice to the opposing party."  In re von Bulow, 828 F.3d at 103 (dealing with the publication of a tell-all book about the high-profile defense of Claus von Bulow).

the prior motion and in light of the binder of privileged documents previously

provided.  Regeneron represented that it had produced:

> all documents and communications related to any decision, analysis or advice by Dr. Jones or anyone at Regeneron on whether or not to disclose references from Dr. Jones' charts and memo during prosecution of the '018 patent.  In searching for this information, Regeneron: searched documents from Messrs./Drs. Pobursky, Kang, Gregg, Yang, Smeland, Yancopoulos, Sheasby, Murphy, Stevens, MacDonald, Karow, Valenzuela, and Economides… (ECF No. 262, Exh. 12.)

Regeneron also asserted broadly that it had produced all of its communications or

attachments thereto from the time period of the prosecution of the '018 Patent "that

even <u>mentioned</u> <u>the content</u> of any of the references cited" in the chart and memo.

(ECF No. 261, pp. 7-8 (first emphasis in original, second emphasis added).)

Regeneron argued against Merus's request to impose sanction for non-compliance

with the Court's order by stating that it had explained to Merus that its production

was tailored to the <u>subject matter</u> of the Jones documents.  Regeneron also argued

that broader disclosure could result in serious prejudice as it could impact a

pending appeal it had for EP '287, which was then in the midst of being briefed.

(ECF No. 261, p. 8.)

At that time, the Court viewed the issue as a good-faith dispute over the

scope of the Court's December 5 Order and read Regeneron's representations as

statements that any references in any of its privileged documents to the Withheld

References during the appropriate timeframe had been produced.  As subject matter

waiver seeks to readjust the essential unfairness in disclosing part, but not all, of

an attorney-client communication, <u>see</u> <u>In re Claus von Bulow</u>, 828 F.2d 94, 101, 102-

**A168**

03 (2d Cir. 1987), the required remedy should be addressed to that particular unfairness. See In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000).

In terms of scope, and of course based on what the Court believed was the universe of documents at issue, the Court sought to determine what – in fairness – Merus needed to receive to avoid the sword/shield issue. The Court determined that fairness required Regeneron to produce any documents which reflected <u>additional thoughts, concerns and considerations given to whether certain references should have been disclosed</u>. Put another way, if it turned out that there were other memos or communications related to the prosecution of the '018 Patent which stated that such references should be disclosed to the PTO, those memos or communications would have to be produced. Included within this would be drafts of Dr. Jones's chart or memo which might have contained a different conclusion, memos of others who questioned Dr. Jones's conclusion, and the like.

The Court found that the Order did not encompass the entirety of all things which Regeneron had an obligation to disclose to the PTO generally, nor did it extend to Regeneron's analysis of draft claim language. It also did not necessarily extend as far as requiring all consideration of all disclosures for other patents, even in the same family. The Court required Regeneron to confirm to Merus that it had produced or would produce:

> 1. All documents from anyone involved directly or indirectly in prosecuting the '018 Patent, <u>relating to</u> whether prior art should be or should have been disclosed as part of the prosecution of the '018 Patent….

2.  To avoid any doubt, the following documents are included within the scope of the above directive:

    a.  All documents of any kind from the files of Dr. Jones and others with whom he worked on the prosecution of the '018 Patent regarding whether or not to disclose prior art to the PTO.

    b.  All documents of any kind from the files of anyone else who was involved (directly or indirectly) in the prosecution of the '018 Patent and who may not be captured in paragraph 1 above, who gave consideration to the relevance or applicability of prior art to the '018 Patent.  (ECF No. 272, pp. 6-7 (emphasis added).)

Regeneron confirmed it had produced what was required.

### 3.    The Smeland Trial Affidavit

These events lead us up to trial.  A bench trial on Merus's claim of inequitable conduct was scheduled to commence on June 8, 2015.  On May 29, 2015, and in compliance with this Court's rules which require a party's witnesses to testify by declaration/affidavit on direct (subject to live cross-examination and re-direct), Regeneron submitted trial affidavits from Drs. Smeland and Jones, both attorneys acting as attorneys.  At this time, Regeneron's privilege log indicated that it had withheld many documents from Dr. Smeland's files and that he had authored or received on the basis of the attorney/client privilege and/or work product doctrine.  The same was true with regard to Dr. Jones except as to those which Regeneron had earlier produced following the motion practice described above.

Merus cried foul.  It argued that Regeneron was again engaging in a sword/shield use of the attorney client privilege and moved to strike these affidavits based on, inter alia, the assertion that Regeneron had shielded privileged documents from disclosure that were now directly implicated by the trial declarations.  According to Merus, the Jones Trial Affidavit relies heavily on

information that Regeneron failed to disclose during fact discovery and in response to the Court's prior waiver order. In particular, Merus cited Dr. Jones's deposition testimony that apart from a phone call that he had made to the PTO to schedule a meeting, he could not recall a single other communication with the Examiner during the '018 Patent prosecution. Late-produced billing records were now referenced in Dr. Jones's trial affidavit. The issue was, if anything, far worse with regard to Dr. Smeland. With regard to Dr. Smeland, Merus argued that he was now proposing to testify as to his views regarding the meaning of claim language and broadly regarding his subjective understanding of the meaning of various aspects of the Withheld References, when Regeneron had withheld from its production numerous documents on those topics on the basis of privilege.

The Court reviewed each of the trial affidavits. The Court agreed that a comparison of these affidavits with entries on Regeneron's privilege logs raised a number of concerns. In his affidavit, Dr. Smeland made dozens of assertions regarding his understanding of the scope of the invention in the '176 application, his state of mind, and what he knew and thought about each of the Withheld References at the time of patent prosecution continuing up to "today." While the Court will not recite all of his assertions in this regard, a lengthy list is appropriate given the seriousness of the issue and to demonstrate obvious breadth of the waiver[49]:

---

[49] The Court's references are to the "revised" Affidavit for Dr. Smeland. On June 4, 2015, after waiving privilege with the submission of the declarations on May 29, 2015, Regeneron sought to voluntarily withdraw portions of the Smeland declaration. At that point, Regeneron could not put the genie back in the bottle. In any event, efforts to withdraw selected portions of the declaration did

- "I firmly believed – and still believe today – that Brüggemann, Taki, Zou and Wood were not material to patentability because they were substantially different from the mice claimed in the '176 application … and were cumulative of other information before the Patent Examiner."  (Smeland Aff. ¶ 4 (emphasis added).)

- "I considered the statements made in the Merus and Kymab Oppositions as attorney argument and not material to patentability." (Id. (emphasis added).)

- "I believed—and still believe today—that the statements I made and the information that I provided to the Patent Office were not false and were not misrepresentations." (Id. (emphasis added).)

- He was responsible for prosecution of the '473 Patent Application and its "claims were directed to specific steps of making modifications to genes within organisms, but were not directed to a mouse with a human variable region inserted at its endogenous mouse immunoglobulin locus (i.e., a reverse chimeric mouse) in its germline as were later prosecuted in the '176 application." (Id. ¶ 23)

- He has an extensive discussion of his actions and bases for those actions in connection with prosecution of the '473 Application (Id. ¶¶ 24-29).  He stated, "[i]t was my view that an ordinary skilled artisan would not have understood that Brüggemann, in combination with other art, taught or disclosed the pending claims in the '473 application." (Id. ¶ 25 (emphasis added).)

- He states further, "[g]iven my responsibilities with preparing, filing, and prosecuting applications that are part of the 780 docket [the family of patents related to the '018], I gained an extensive and in-depth understanding of the prior art and Regeneron's inventions." (Id. ¶ 35.)

- With regard to the '018 Patent, he states, "[a]s I understood the claim during prosecution of the '176 application, it encompasses

---

not change the fact that Smeland's declaration remained focused on his state of mind at the time of patent prosecution.  For example, Regeneron sought to strike "and still believe today" from the fourth paragraph of the Smeland declaration: "I firmly believed – and still believe today – that Brüggemann, Taki, Zou and Wood were not material to patentability . . ."  The remaining portions of the declaration still implicate a broad waiver of the privilege.

a mouse with a functional reverse chimeric immunoglobulin locus in its germline DNA. …  As is clear from the specification, the reverse chimeric locus must be functional…  The '018 Patent invention describes the first such mouse of which I am aware." (Id. ¶ 37 (emphasis added).)

- "I stated this understanding of the claims in my communications with the Patent Office during prosecution of the '176 application."  (Id. ¶ 38.)

- "It was not my understanding that the ordinary skill artisan would have the view that mice of the '018 Patent claims must be made using any particular method or assays." (Id. ¶ 39 (emphasis added).)

- "One of the advantages of the '018 Patent inventions includes the fact that mice encompassed by the claims have 'natural' B-cell development processes along with the ability to obtain high affinity reverse chimeric antibodies." (Id. ¶ 40.)

- "I believed that the Examiner misunderstood Lonberg, which disclosed transgenes randomly inserted at unknown loci. … Lonberg recognized that the rearranged variable region of a randomly inserted human segment could sometimes join to a portion of the endogenous mouse immunoglobulin, resulting in an antibody consisting of human variable and mouse constant heavy chain (although not in the germline). …  It is not possible to breed Lonberg mice so as to have reverse chimeric loci in the germline." (Id. ¶ 46 (first emphasis added).)

- "On January 11, 2013, I amended the claims and again explained why the disclosures in Lonberg did not anticipate the claimed inventions. …  I also…pointed out that Regeneron's VELOCIMMUNE mice, which I understood were embodiments of the claims, exhibited features that were unexpected in light of the prior art." (Id. ¶ 49 (emphasis added).)

- "I believed that [the Examiner] was misunderstanding the science and Lonberg as well as the difference between the Lonberg reference and the claims.  As a result, I decided to appeal…" (Id. ¶ 51 (emphasis added).)

- "I expected the appeals process to take a year and a half or more, but I was confident that the Examiner was

misunderstanding Lonberg and that the Board would agree." (Id. ¶ 52 (emphasis added).)

- "I filled Dr. Jones in on the status of the '176 case and, after Dr. Jones was engaged, he suggested that we set up an in-person interview with the Examiner to see if Lonberg could be better explained in person prior to moving forward with an appeal." (Id. ¶ 53.)

- "…the EP '287 Patent inventions related to reverse chimeric modifications…" (Id. ¶ 61.)

- In footnote 21 Dr. Smeland describes his understanding of what a materiality analysis for inequitable conduct involves: "Regardless of whether I satisfied the minimum requirements of being an ordinary skilled artisan, I felt comfortable evaluating the art from that perspective during the prosecution of the '176 application. When I did have questions, however, I did not hesitate to reach out to those with more experience and knowledge." (Id. ¶ 70 n.21.)

- "I routinely made Regeneron inventors aware of the foregoing obligations when providing them with invention declarations." (Id. ¶ 73.)

- With regard to the Withheld References, "I did not believe that the information contained in the foregoing references and oppositions was material to patentability…" (Id. ¶ 74 (emphasis added).)

- With regards to Brüggemann and Zou, "I was generally familiar with the subject matter of those two references… [a]t no time did I consider these references to be material to patentability to the claims pending in the '176 application." (Id. ¶ 75 (emphasis added).)

- "Because of this experience [prosecuting the '176 application as well as the '287 Patent], I was readily familiar with both prior art that was before the Examiner in the '176 application and the pending claims of the '176 application." (Id. ¶ 76 (emphasis added).)

- "I viewed the analysis [relating to the Withheld References] as straightforward." (Id. ¶ 78 (emphasis added).)

- "I concluded that [the Withheld References], alone or combined with other prior art of which I was aware, were cumulative of information already before the Examiner.  Furthermore, it was my view that the skilled artisan would not have viewed them as teaching the reverse chimeric inventions that the Examiner had allowed in the '176 application." (Id. ¶ 79 (emphasis added).)

- Dr. Smeland stated his rationale for not filing a Request for Continued Examination. (Id. ¶ 80).

- Dr. Smeland then proceeded to make a number of detailed statements regarding his views and understanding of the technology in each of the Withheld References and comparing it to the claims in the '176 application. (See id. ¶¶ 83-115.)  As to each, he states what he "believed" at the time, and that he continues to hold that belief "today."  (E.g., id. ¶¶ 88, 94, 102, 114.)

- Dr. Smeland then testifies as to the meaning of claim terms in the '018 Patent.  (See id. ¶¶ 129-135.)

- With regard to the slide presentation to the PTO, he again makes a number of assertions as to why he believes each of the statements contained in that document are true; he states, "Finally, given that I understand that the presentation was prepared for internal use and I did not alter any slides, I highly doubt that those who prepare the presentation intended to mislead others at Regeneron." (Id. ¶ 143 (emphasis added).)

- With regard to the MOA assay, he states, "[d]uring the prosecution of the '176 application I did not believe that the pending claims required use of any particular MOA assay." (Id. ¶ 144 (emphasis added).)

- Dozens of pages that follow containing state of mind assertions as well.

These statements and others implicate Dr. Smeland's knowledge and state of mind directly – both during patent prosecution and continuing to date.  He is using these statements to counter Merus's assertion that he acted in bad faith by discussing what he knew, believed, understood, communicated, etc.  There is

107

**A175**

certainly a good tactical reason to confront Merus's position with testimony from Dr. Smeland. However, that tactical choice must occur in the context of other choices made throughout the litigation – choices as to whether to waive attorney-client privilege or not. Here, Regeneron made a litigation choice to maintain the attorney-client privilege as to Dr. Smeland's work with regard to prosecution of the '176 application and his knowledge and thoughts regarding the Withheld References generally over time and specifically with regard to the prosecution of the '176 application. In maintaining its assertion of privilege on these topics, Regeneron used the protections of the Federal Rules of Civil Procedure to shield Dr. Smeland's documents relating to those topics from disclosure. This was a choice that was within Regeneron's discretion – but not a choice that allows them to have it both ways at trial. By making the choice to maintain the privilege and withhold the documents, Regeneron chose the tactical path of not delving into state of mind or knowledge to defend against the claim of inequitable conduct. And of course, given the heavy burden that a proponent of an inequitable conduct bears of proving materiality and intent by clear and convincing evidence, this was not an unreasonable choice. As with any affirmative disclosure of information otherwise protected by the attorney-client privilege, once the disclosure of the affidavit was made, as it was not inadvertent, the waiver was complete.

Thus, on the day that Regeneron disclosed Dr. Smeland's trial affidavit, it waived the privilege as to the subject matter of each of the topics the affidavit addressed. This was intentional and permanent. As described above, this included

**A176**

his views on meaning and scope of claim language, understanding of the technology, materiality (including cumulativeness) of each of the Withheld References. Many of his documents are to or from Dr. Murphy, while others involve Dr. Jones. And as noted below, this process revealed a host of withheld non-privileged documents. Thus, the waiver rippled throughout the case.

The problem, of course, was how this position at trial interacted with Regeneron's discovery obligations. In order to take this position at trial, Regeneron was obligated to have previously produced the documents from Dr. Smeland's files that would have allowed Merus to test his various assertions. This would have substantially altered a significant swath of discovery, including Dr. Smeland's deposition, the deposition of others with whom he interacted, expert discovery, and on. Regeneron did not fulfill its discovery obligations in this regard. That is clear both from a review of the log and the Court's in camera review of documents on the log. There are dozens of documents on Regeneron's privilege log which are from Dr. Smeland's files, and which concern these very topics.[50]

The Court conducted an in camera review of the documents on the log. Regeneron was, after all, asserting it had done all it was obligated to do. Merus pointed to seemingly inconsistent entries on the log. As it turned out, the log was "Pandora's Box." The Court's in camera review revealed that Merus was certainly correct – there were dozens of "Smeland documents" as to which the privilege had now been waived. But the in camera review revealed far more. It revealed

---

[50] For a more extensive discussion of the documents themselves, the Court refers to the post-trial briefing of the parties on this issue, including the documents attached thereto.

additional serious discovery issues: a number of <u>non-privileged</u> documents related to topics at issue throughout the litigation had been withheld on the basis of privilege, and other documents that should have been produced pursuant to the order regarding the Jones Memo issue had not in fact been disclosed.

In all, there were three categories of documents that presented serious concerns of discovery misconduct:

1. Non-privileged documents that were not produced and instead have resided throughout this case on the privilege log (e.g. numerous Excel spreadsheets with scientific test results, third party filings to the PTO, fact statements by non-lawyers not seeking legal advice, etc.).

2. Previously privileged documents as to which Regeneron affirmatively waived the privilege and that this Court ordered be produced pursuant to its February 25, 2015 order. (ECF No. 272.)

3. Documents on the privilege log relating to precisely those topics waived by Regeneron on May 29, 2015 when it filed its trial declarations.

The Court determined that failure to make full and adequate production of documents in the first two categories during the period of fact discovery itself and independently of the trial misconduct warranted serious sanction. The production failure is undoubtedly larger than the few exemplars revealed by the Court's own review. Given the many thousands of documents on Regeneron's privilege log, the Court cannot know the full extent of the problem.

As to the first category, there were spreadsheets related to scientific tests, published articles, correspondence with third parties – all of which were relevant to issues in the case. The ultimate importance of the documents in this category is unclear, but that Merus should have had them long ago is not.

In the second category, there are a number of documents on the log which Dr. Jones is on discussing communication with the PTO, before and after the meeting on March 2013. These should have been produced as part of the "Jones Memo" waiver issue.

The third category of documents presents its own very serious issues. Many documents on the log are directly relevant to the topics as to which privilege has been waived. Some of those documents contain statements directly contradictory to Smeland's sworn trial declaration.

To allow into evidence at trial declarations from witnesses to whom these three categories of documents relate could only occur – in fairness – if there was a wholesale re-opening of discovery. As a first step, a top-to-bottom re-review of the Regeneron privilege log would be necessary. This would have to be followed by additional document production, fact depositions, and revised expert reports and depositions. Given the Court's concerns with Regeneron's process to date, the Court would require that any such process only occur with the direct oversight of a special master. It is clear that this process and the attendant discovery would consume substantial time and cost. It would also undoubtedly require further judicial resources. At this point in the litigation, this is not a fair burden for Merus or this Court.

The Court has considered whether striking the trial affidavits and precluding Smeland and Murphy from testifying at trial would be a sufficient remedy.[51] It

---

[51] The Court bifurcated the trial. The first determination which must be made in a trial on inequitable conduct is the materiality of the information. <u>Therasense, Inc. v. Becton, Dickinson &</u>

would not, though such an order is a minimum starting point. Based on the considerations discussed below and as set forth in the Court's prior decision, simply striking those two declarations and precluding trial testimony from just them would not sufficiently address the many issues now in play; those issues spread broadly into the case.

First, the first two categories of documents themselves revealed a separate need for a re-review of the privilege log, production, and of course depositions as needed. Second, striking the declarations and precluding certain witnesses alone fails to remedy the substantial disruption and delay that would be caused by Regeneron's conduct. Third, merely striking the declarations and precluding certain witnesses would fail to recognize Regeneron's pattern of conduct throughout this litigation. That conduct included, <u>inter alia</u>, a host of issues at the outset regarding infringement contentions, positions in relation to claim construction and positions and representations with regard to the Court's February 25 Order (the Jones Memo Order). The Court also understands that current trial counsel was not responsible for the preparation of the privilege log and was not counsel at the outset of this case when the first issued occurred (though they were counsel for the Jones Memo order). In all events, this pattern by Regeneron is just that – a pattern. It is troubling to say the least. Merely striking the declarations and precluding

---

<u>Co.</u>, 649 F.3d 1276, 1291 (Fed Cir. 2011) (en banc). The Court therefore bifurcated that inquiry from the second determination: Regeneron's intent. The Court's rationale was that the first topic would be addressed by the experts and through documents, and the second (which involved testimony from Drs. Smeland and Murphy) was only necessary if the Court determined the first issue in Merus's favor.

testimony treats the most recent issues as isolated and remediable – when they are yet another step in a long pattern of litigation choices that have caused delay, inefficient use of resources, and diversion from the merits.

The Court has carefully considered the appropriate combination of remedies that best – and most narrowly – addresses where we find ourselves in this litigation today. The Court includes in its analysis of appropriate remedy the history of conduct that Regeneron has engaged in to this point.

Under these highly unusual circumstances, it is appropriate to preclude the testimony of Smeland, Murphy and Jones. In recognition of the implications the discovery conduct has on the entirety of the case, it is additionally appropriate for the Court to impose the sanction of an adverse inference as to the intent of Smeland and Murphy with regard to inequitable conduct during patent prosecution. See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-10 (2d Cir. 2002). The Court therefore infers that Drs. Smeland and Murphy together knew of each of the Withheld References, knew they were material, and made a deliberate decision to withhold them. In short, they acted with the specific intent to deceive the patent office. The Court finds that this is "the single most reasonable inference able to be drawn from the evidence". Therasense, 649 F.3d at 1290 (quoting Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008)); see also Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002) (discussing circumstances in which "[t]he sanction of an adverse inference may be appropriate"). The Court therefore finds by clear and convincing evidence

**A181**

that Drs. Smeland and Murphy knew of the Withheld References, knew of their materiality, and made the deliberate decision to withhold them.

## X.    CONCLUSION

For the reasons set forth above, the Court finds that Regeneron has engaged in inequitable conduct in connection with prosecution of the '018 Patent.

The parties shall confer on a form of order of judgment and file either a joint proposed order or competing proposed orders within fourteen (14) days.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated:        New York, New York
              November 2, 2015

_____
       KATHERINE B. FORREST
       United States District Judge

REGENERON PHARM. INC.
V. MERUS B.V.
14-cv-1650

PTX 1

(12) **United States Patent**
      Murphy et al.

(10) **Patent No.:**  **US 8,502,018 B2**
(45) **Date of Patent:**  **\*Aug. 6, 2013**

(54) **METHODS OF MODIFYING EUKARYOTIC CELLS**

(75) Inventors: **Andrew J. Murphy**, Croton-on-Hudson, NY (US); **George D. Yancopoulos**, Yorktown Heights, NY (US)

(73) Assignee: **Regeneron Pharmaceuticals, Inc.**, Tarrytown, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/164,176**

(22) Filed: **Jun. 20, 2011**

(65) **Prior Publication Data**

US 2011/0283376 A1    Nov. 17, 2011

**Related U.S. Application Data**

(60) Continuation of application No. 13/154,976, filed on Jun. 7, 2011, which is a continuation of application No. 11/595,427, filed on Nov. 9, 2006, which is a continuation of application No. 10/624,044, filed on Jul. 21, 2003, now abandoned, which is a division of application No. 09/784,859, filed on Feb. 16, 2001, now Pat. No. 6,596,541, which is a continuation-in-part of application No. 09/732,234, filed on Dec. 7, 2000, now Pat. No. 6,586,251, application No. 13/164,176, which is a continuation of application No. 11/595,427, filed on Nov. 9, 2006.

(60) Provisional application No. 60/244,665, filed on Oct. 31, 2000.

(51) **Int. Cl.**
*A01K 15/00*    (2006.01)
*A01K 67/027*   (2006.01)
*C12N 15/63*    (2006.01)
*C12N 5/00*     (2006.01)

(52) **U.S. Cl.**
USPC ...... **800/18**; 800/8; 800/21; 800/22; 435/325; 435/320.1

(58) **Field of Classification Search**
USPC ................. 800/18, 8, 21, 22; 435/325, 320.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,436,149 A | 7/1995 | Barnes | |
| 5,770,429 A | 6/1998 | Lonberg et al. | |
| 5,789,215 A | 8/1998 | Berns et al. | |
| 5,877,397 A | 3/1999 | Lonberg et al. | |
| 6,114,598 A | 9/2000 | Kucherlapati et al. | |
| 6,130,364 A | 10/2000 | Jakobovits et al. | |
| 6,998,514 B2 \* | 2/2006 | Bruggemann | 800/18 |
| 7,501,552 B2 | 3/2009 | Lonberg et al. | |
| 2006/0015957 A1 \* | 1/2006 | Lonberg et al. | 800/18 |

FOREIGN PATENT DOCUMENTS

WO    94/02602    2/1994

OTHER PUBLICATIONS

Kawasaki et al, (Genome Research, 7: 250-261, 1997).\*
Popov et al. (Gene, 177: 195-201, 1996).\*
Angrand Po, et al. "Simplified generation of targeting constructs using ET recombination." Nucleic Acids Res. (1999) 27(17): e16.
Cheng S, et al. "Long PCR." Nature (1994) 369(6482): 684-685.
Deng C, et al. "Reexamination of gene targeting frequency as a function of the extent of homology between the targeting vector and the target locus." Mol. Cell. Biol. (1992) 12(8): 3365-3371.
Durdik J, et al. "Isotype Switching by a Microinjected mu Immunoglobulin Heavy Chain Gene in Transgenic Mice." Proc. Natl. Acad. Sci. USA. (1989) 86(7): 2346-2350.
Fishwild DM, et al. "High-Avidity Human IgGkappa Monoclonal Antibodies From a Novel Strain of Minilocus Transgenic Mice." Nat. Biotechnol. (1996) 14(7): 845-851.
Foord OS, et al. "Long-distance PCR." PCR Methods Appl. (1994) 3(6): S149-S161.
Forozan F, et al. "Genome screening by comparative genomic hybridization." Trends Genet. (1997) 13(10): 405-409.
Gerstein RM, et al. "Isotype Switching of an Immunoglobulin Heavy Chain Transgene Occurs by DNA Recombination Between Different Chromosomes." Cell. (1990) 63(3): 537-548.
Herault Y, et al. "Engineering chromosomes in mice through targeting meiotic recombination (TAMERE)." Nat. Genet. (1998) 20(4): 381-384.
Hill F, et al. "BAC trimming: minimizing clone overlaps." Genomics. (2000) 64(1): 111-113.
Houldsworth J, et al. "Comparative Genomic Hybridization: An Overview." Am. J. Pathol. (1994) 145(6): 1253-1260.
Laan M, et al. "Solid-phase minisequencing confirmed by FISH analysis in determination of gene copy number." Hum. Genet. (1995) 96(3): 275-280.
Lie YS, et al. "Advances in quantitative PCR technology: 5' nuclease assays." Curr. Opin. Biotechnol. (1998) 9(1): 43-48.

(Continued)

*Primary Examiner* — Gerald Leffers, Jr.
*Assistant Examiner* — Magdalene Sgagias
(74) *Attorney, Agent, or Firm* — Foley Hoag LLP

(57)    **ABSTRACT**

A method for engineering and utilizing large DNA vectors to target, via homologous recombination, and modify, in any desirable fashion, endogenous genes and chromosomal loci in eukaryotic cells. These large DNA targeting vectors for eukaryotic cells, termed LTVECs, are derived from fragments of cloned genomic DNA larger than those typically used by other approaches intended to perform homologous targeting in eukaryotic cells. Also provided is a rapid and convenient method of detecting eukaryotic cells in which the LTVEC has correctly targeted and modified the desired endogenous gene(s) or chromosomal locus (loci) as well as the use of these cells to generate organisms bearing the genetic modification.

**20 Claims, 7 Drawing Sheets**

A249

US 8,502,018 B2

Page 2

OTHER PUBLICATIONS

Lizardi PM, et al. "Mutation detection and single-molecule counting using isothermal rolling circle amplification." Nat. Genet. (1998) 19(3): 225-232.

Mitra RD, et al. "In situ localized amplification and contact replication of many individual DNA molecules." Nucleic Acis Res. (1999) 27(24): e34.

Muyrers JP, et al. "Rapid modification of bacterial artificial chromosomes by ET-recombination." Nucleic Acids Res. (1999) 27(6): 1555-1557.

Ponce MR, et al. "PCR amplification of long DNA fragments." Nucleic Acids Res. (1992) 20(3): 623.

Scott CT. "Mice with a Human Touch." Nat. Biotech. (2007) 25(10): 1075-1077.

Smithies O, et al. "Insertion of DNA sequences into the human chromosomal beta-globin locus by homologous recombination." Nature. (1985) 317(6034): 230-234.

Tan W, et al. "Molecular beacons: a novel DNA probe for nucleic acid and protein studies." Eur. J. Chem. (2000) 6(7): 1107-1111.

Taylor I.D. "Human Immunoglobulin Transgenes Undergo Rearrangement, Somatic Mutation and Class Switching in Mice That Lack Endogenous IgM." Int. Immunol. (1994) 6(4): 579-591.

Thomas KR, et al. "Site-directed mutagenesis by gene targeting in mouse embryo-derived stem cells." Cell. (1987) 51(3): 503-512.

Thompson CT, et al. "Cytogenetic Profiling Using Fluorescence In Situ Hybridization (FISH) and Comparative Genomic Hybridization (CGH)." J Cell. Biochem. Suppl.(1993) 17G: 139-143.

Tomizuka K, et al. "Double trans-chromosomic mice: maintenance of two individual human chromosome fragments containing Ig heavy and kappa loci and expression of fully human antibodies." Proc. Natl. Acad. Sci. USA. (2000) 97 (2): 722-727.

Yang XW, et al. "Homologous recombination based modification in *Escherichia coli* and germline transmission in transgenic mice of a bacterial artificial chromosome." Nat. Biotechnol. (1997) 15(9): 859-865.

Yu D, et al. "An efficient recombination system for chromosome engineering in *Escherichia coli*." Proc. Natl. Acad. Sci. USA. (2000) 97(11): 5978-5983.

Zhang Y, et al. "A new logic for DNA engineering using recombination in *Escherichia coli*." Nat. Genet. (1998) 20(2): 123-128.

"Chapter 1: Gene Targeting, principles, and practice in mammalian cells." Gene Targeting—A Practical Approach, 2nd Ed. Edited by Joyner AL, Hasty P, et al. (2000) pp. 1-35.

Butler. Revue Scientifique et Technique Office Interational Des Epizooties. (1998) 17(1): 43-70.

Soukharev S, et al. "Segmental genomic replacement in embryonic stem cells by double lox targeting." Nucleic Acids Res. (1999) 27(18): e21.

Clark M. "Antibody humanization: a case of the 'Emperor's new clothes'?" Immunol. Today. (2000) 21(8): 397-402.

Jensen M, et al. "One step generation of fully chimeric antibodies using Cgamma1- and Ckappa mutant mice." J. Immunother. (2007) 30(3): 338-349.

Hochepied T, et al. "Breaking the species barrier: derivation of germline-competent embryonic stem cells from Mus spretus × C57BL/6 hybrids." Stem Cells (2004) 22(4): 441-447.

Schoonjans L, et al. "Improved generation of germline-competent embryonic stem cell lines from inbred mouse strains." Stem Cells (2003) 21(1): 90-97.

* cited by examiner

REGN-AM-00000002

Figure 1



REGN-AM-00000003

Figure 2



REGN-AM-00000004

FIGURE 3A

```
          10         20         30         40         50         60
CCCCGGGCTT CCTGTTCTAA TAAGAATACC TCCTAGGTCC CCCATGGGCT AACCTCATCT
GGGGCCCGAA GGACAAGATT ATTCTTATGG AGGATCCAGG GGGTACCCGA TTGGAGTAGA


          70         80         90        100        110        120
TTGGTACTCA ACAGGGGTCT TCTTTATGAG CTTCGGACCA GCTCTTTTGA TGTGGCAGGG
AACCATGAGT TGTCCCCAGA AGAAATACTC GAAGCCTGGT CGAGAAAACT ACACCGTCCC


         130        140        150        160        170        180
ACTGACCCTG GGTGGGGAAG CCACTCAGTG CATGACCCCA GCTGGTTCAC CACATATACC
TGACTGGGAC CCACCCCTTC GGTGAGTCAC GTACTGGGGT CGACCAAGTG GTGTATATGG


         190        200        210        220        230
ACATACTTTT CTTGCAGGTC TGGGACACAG C ATG CCC CGG GGC CCA GTG GCT GCC
TGTATGAAAA GAACGTCCAG ACCCTGTGTC G TAC GGG GCC CCG GGT CAC CGA CGG
                                  Met Pro Arg Gly Pro Val Ala Ala>


        240        250        260        270        280
TTA CTC CTG CTG ATT CTC CAT GGA GCT TGG AGC TGC CTG GAC CTC ACT
AAT GAG GAC GAC TAA GAG GTA CCT CGA ACC TCG ACG GAC CTG GAG TGA
Leu Leu Leu Leu Ile Leu His Gly Ala Trp Ser Cys Leu Asp Leu Thr>


        290        300        310        320        330
TGC TAC ACT GAC TAC CTC TGG ACC ATC ACC TGT GTC CTG GAG ACA CGG
ACG ATG TGA CTG ATG GAG ACC TGG TAG TGG ACA CAG GAC CTC TGT GCC
Cys Tyr Thr Asp Tyr Leu Trp Thr Ile Thr Cys Val Leu Glu Thr Arg>


        340        350        360        370
AGC CCC AAC CCC AGC ATA CTC AGT CTC ACC TGG CAA GAT GAA TAT GAG
TCG GGG TTG GGG TCG TAT GAG TCA GAG TGG ACC GTT CTA CTT ATA CTC
Ser Pro Asn Pro Ser Ile Leu Ser Leu Thr Trp Gln Asp Glu Tyr Glu>


380        390        400        410        420
GAA CTT CAG GAC CAA GAG ACC TTC TGC AGC CTA CAC AAG TCT GGC CAC
CTT GAA GTC CTG GTT CTC TGG AAG ACG TCG GAT GTG TTC AGA CCG GTG
Glu Leu Gln Asp Gln Glu Thr Phe Cys Ser Leu His Lys Ser Gly His>


430        440        450        460        470
AAC ACC ACA CAT ATA TGG TAC ACG TGC CAT ATG CGC TTG TCT CAA TTC
TTG TGG TGT GTA TAT ACC ATG TGC ACG GTA TAC GCG AAC AGA GTT AAG
Asn Thr Thr His Ile Trp Tyr Thr Cys His Met Arg Leu Ser Gln Phe>


        480        490        500        510        520
CTG TCC GAT GAA GTT TTC ATT GTC AAC GTG ACG GAC CAG TCT GGC AAC
GAC AGG CTA CTT CAA AAG TAA CAG TTG CAC TGC CTG GTC AGA CCG TTG
Leu Ser Asp Glu Val Phe Ile Val Asn Val Thr Asp Gln Ser Gly Asn>


        530        540        550        560        570
AAC TCC CAA GAG TGT GGC AGC TTT GTC CTG GCT GAG AGC ATC AAG CCA
TTG AGG GTT CTC ACA CCG TCG AAA CAG GAC CGA CTC TCG TAG TTC GGT
Asn Ser Gln Glu Cys Gly Ser Phe Val Leu Ala Glu Ser Ile Lys Pro>
```

A253

REGN-AM-00000005

FIGURE 3B

```
          580           590           600           610
GCT CCC CCC TTG AAC GTG ACT GTG GCC TTC TCA GGA CGC TAT GAT ATC
CGA GGG GGG AAC TTG CAC TGA CAC CGG AAG AGT CCT GCG ATA CTA TAG
Ala Pro Pro Leu Asn Val Thr Val Ala Phe Ser Gly Arg Tyr Asp Ile>

  620           630           640           650           660
TCC TGG GAC TCA GCT TAT GAC GAA CCC TCC AAC TAC GTG CTG AGA GGC
AGG ACC CTG AGT CGA ATA CTG CTT GGG AGG TTG ATG CAC GAC TCT CCG
Ser Trp Asp Ser Ala Tyr Asp Glu Pro Ser Asn Tyr Val Leu Arg Gly>

  670           680           690           700           710
AAG CTA CAA TAT GAG CTG CAG TAT CGG AAC CTC AGA GAC CCC TAT GCT
TTC GAT GTT ATA CTC GAC GTC ATA GCC TTG GAG TCT CTG GGG ATA CGA
Lys Leu Gln Tyr Glu Leu Gln Tyr Arg Asn Leu Arg Asp Pro Tyr Ala>

      720           730           740           750           760
GTG AGG CCG GTG ACC AAG CTG ATC TCA GTG GAC TCA AGA AAC GTC TCT
CAC TCC GGC CAC TGG TTC GAC TAG AGT CAC CTG AGT TCT TTG CAG AGA
Val Arg Pro Val Thr Lys Leu Ile Ser Val Asp Ser Arg Asn Val Ser>

      770           780           790           800           810
CTT CTC CCT GAA GAG TTC CAC AAA GAT TCT AGC TAC CAG CTG CAG ATG
GAA GAG GGA CTT CTC AAG GTG TTT CTA AGA TCG ATG GTC GAC GTC TAC
Leu Leu Pro Glu Glu Phe His Lys Asp Ser Ser Tyr Gln Leu Gln Met>

      820           830           840           850
CGG GCA GCG CCT CAG CCA GGC ACT TCA TTC AGG GGG ACC TGG AGT GAG
GCC CGT CGC GGA GTC GGT CCG TGA AGT AAG TCC CCC TGG ACC TCA CTC
Arg Ala Ala Pro Gln Pro Gly Thr Ser Phe Arg Gly Thr Trp Ser Glu>

  860           870           880           890           900
TGG AGT GAC CCC GTC ATC TTT CAG ACC CAG GCT GGG GAG CCC GAG GCA
ACC TCA CTG GGG CAG TAG AAA GTC TGG GTC CGA CCC CTC GGG CTC CGT
Trp Ser Asp Pro Val Ile Phe Gln Thr Gln Ala Gly Glu Pro Glu Ala>

  910           920           930           940           950
GGC TGG GAC CCT CAC ATG CTG CTC CTG GCT GTC TTG ATC ATT GTC
CCG ACC CTG GGA GTG TAC GAC GAC GAG GAC CGA CAG AAC TAG TAA CAG
Gly Trp Asp Pro His Met Leu Leu Leu Ala Val Leu Ile Ile Val>

      960           970           980           990          1000
CTG GTT TTC ATG GGT CTG AAG ATC CAC CTG CCT TGG AGG CTA TGG AAA
GAC CAA AAG TAC CCA GAC TTC TAG GTG GAC GGA ACC TCC GAT ACC TTT
Leu Val Phe Met Gly Leu Lys Ile His Leu Pro Trp Arg Leu Trp Lys>

      1010          1020          1030          1040          1050
AAG ATA TGG GCA CCA GTG CCC ACC CCT GAG AGT TTC TTC CAG CCC CTG
TTC TAT ACC CGT GGT CAC GGG TGG GGA CTC TCA AAG AAG GTC GGG GAC
Lys Ile Trp Ala Pro Val Pro Thr Pro Glu Ser Phe Phe Gln Pro Leu>
```

A254

FIGURE 3C

```
         1060            1070          1080          1090
    TAC AGG GAG CAC AGC GGG AAC TTC AAG AAA TGG GTT AAT ACC CCT TTC
    ATG TCC CTC GTG TCG CCC TTG AAG TTC TTT ACC CAA TTA TGG GGA AAG
    Tyr Arg Glu His Ser Gly Asn Phe Lys Lys Trp Val Asn Thr Pro Phe>

  1100         1110          1120          1130          1140
    ACG GCC TCC AGC ATA GAG TTG GTG CCA CAG AGT TCC ACA ACA ACA TCA
    TGC CGG AGG TCG TAT CTC AAC CAC GGT GTC TCA AGG TGT TGT TGT AGT
    Thr Ala Ser Ser Ile Glu Leu Val Pro Gln Ser Ser Thr Thr Thr Ser>

  1150         1160          1170          1180          1190
    GCC TTA CAT CTG TCA TTG TAT CCA GCC AAG GAG AAG AAG TTC CCG GGG
    CGG AAT GTA GAC AGT AAC ATA GGT CGG TTC CTC TTC TTC AAG GGC CCC
    Ala Leu His Leu Ser Leu Tyr Pro Ala Lys Glu Lys Lys Phe Pro Gly>

         1200            1210          1220          1230          1240
    CTG CCG GGT CTG GAA GAG CAA CTG GAG TGT GAT GGA ATG TCT GAG CCT
    GAC GGC CCA GAC CTT CTC GTT GAC CTC ACA CTA CCT TAC AGA CTC GGA
    Leu Pro Gly Leu Glu Glu Gln Leu Glu Cys Asp Gly Met Ser Glu Pro>

         1250            1260          1270          1280          1290
    GGT CAC TGG TGC ATA ATC CCC TTG GCA GCT GGC CAA GCG GTC TCA GCC
    CCA GTG ACC ACG TAT TAG GGG AAC CGT CGA CCG GTT CGC CAG AGT CGG
    Gly His Trp Cys Ile Ile Pro Leu Ala Ala Gly Gln Ala Val Ser Ala>

         1300            1310          1320          1330
    TAC AGT GAG GAG AGA GAC CGG CCA TAT GGT CTG GTG TCC ATT GAC ACA
    ATG TCA CTC CTC TCT CTG GCC GGT ATA CCA GAC CAC AGG TAA CTG TGT
    Tyr Ser Glu Glu Arg Asp Arg Pro Tyr Gly Leu Val Ser Ile Asp Thr>

  1340         1350          1360          1370          1380
    GTG ACT GTG GGA GAT GCA GAG GGC CTG TGT GTC TGG CCC TGT AGC TGT
    CAC TGA CAC CCT CTA CGT CTC CCG GAC ACA CAG ACC GGG ACA TCG ACA
    Val Thr Val Gly Asp Ala Glu Gly Leu Cys Val Trp Pro Cys Ser Cys>

  1390         1400          1410          1420          1430
    GAG GAT GAT GGC TAT CCA GCC ATG AAC CTG GAT GCT GGC AGA GAG TCT
    CTC CTA CTA CCG ATA GGT CGG TAC TTG GAC CTA CGA CCG TCT CTC AGA
    Glu Asp Asp Gly Tyr Pro Ala Met Asn Leu Asp Ala Gly Arg Glu Ser>

         1440            1450          1460          1470          1480
    GGT CCT AAT TCA GAG GAT CTG CTC TTG GTC ACA GAC CCT GCT TTT CTG
    CCA GGA TTA AGT CTC CTA GAC GAG AAC CAG TGT CTG GGA CGA AAA GAC
    Gly Pro Asn Ser Glu Asp Leu Leu Leu Val Thr Asp Pro Ala Phe Leu>

         1490            1500          1510          1520          1530
    TCT TGT GGC TGT GTC TCA GGT AGT GGT CTC AGG CTT GGG GGC TCC CCA
    AGA ACA CCG ACA CAG AGT CCA TCA CCA GAG TCC GAA CCC CCG AGG GGT
    Ser Cys Gly Cys Val Ser Gly Ser Gly Leu Arg Leu Gly Gly Ser Pro>
```

A255

Figure 3D

```
          1540          1550          1560          1570
     GGC AGC CTA CTG GAC AGG TTG AGG CTG TCA TTT GCA AAG GAA GGG GAC
     CCG TCG GAT GAC CTG TCC AAC TCC GAC AGT AAA CGT TTC CTT CCC CTG
     Gly Ser Leu Leu Asp Arg Leu Arg Leu Ser Phe Ala Lys Glu Gly Asp>

     1580          1590          1600          1610          1620
     TGG ACA GCA GAC CCA ACC TGG AGA ACT GGG TCC CCA GGA GGG GGC TCT
     ACC TGT CGT CTG GGT TGG ACC TCT TGA CCC AGG GGT CCT CCC CCG AGA
     Trp Thr Ala Asp Pro Thr Trp Arg Thr Gly Ser Pro Gly Gly Gly Ser>

     1630          1640          1650          1660          1670
     GAG AGT GAA GCA GGT TCC CCC CCT GGT CTG GAC ATG GAC ACA TTT GAC
     CTC TCA CTT CGT CCA AGG GGG GGA CCA GAC CTG TAC CTG TGT AAA CTG
     Glu Ser Glu Ala Gly Ser Pro Pro Gly Leu Asp Met Asp Thr Phe Asp>

          1680          1690          1700          1710          1720
     AGT GGC TTT GCA GGT TCA GAC TGT GGC AGC CCC GTG GAG ACT GAT GAA
     TCA CCG AAA CGT CCA AGT CTG ACA CCG TCG GGG CAC CTC TGA CTA CTT
     Ser Gly Phe Ala Gly Ser Asp Cys Gly Ser Pro Val Glu Thr Asp Glu>

          1730          1740          1750          1760          1770
     GGA CCC CCT CGA AGC TAT CTC CGC CAG TGG GTG GTC AGG ACC CCT CCA
     CCT GGG GGA GCT TCG ATA GAG GCG GTC ACC CAC TCC TGG GGA GGT
     Gly Pro Pro Arg Ser Tyr Leu Arg Gln Trp Val Val Arg Thr Pro Pro>

          1780          1790          1800
     CCT GTG GAC AGT GGA GCC CAG AGC AGC TAG
     GGA CAC CTG TCA CCT CGG GTC TCG TCG ATC
     Pro Val Asp Ser Gly Ala Gln Ser Ser ***>
```

A256

REGN-AM-00000008

Figure 4A–4D

Figure 4A  Human Ig heavy chain locus (total length ≈1Mb, not drawn to scale):

Vs    Ds    Js    constant region

additional human sequences

human insert in LTVEC2 (≈200-300 kb)

human insert in LTVEC1 (≈200-300 kb)

Figure 4B  Mouse IG heavy chain locus (total length ≈1Mb, not drawn to scale):

Vs    Ds    Js    constant region

mouse homology arms in LTVEC2

mouse homology arms in LTVEC1

Figure 4C LTVEC2:

lox511  loxP    PGK-hyg

Figure 4D LTVEC1:

PGK-neo    loxP

REGN-AM-00000009

US 8,502,018 B2

1

# METHODS OF MODIFYING EUKARYOTIC CELLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. Ser. No. 13/154, 976, filed 7 Jun. 2011, which is a continuation of U.S. Ser. No. 11/595,427, filed 9 Nov. 2006, which is a continuation of U.S. Ser. No. 10/624,044 filed 21 Jul. 2003, which is a divisional of U.S. Ser. No. 09/784,859, filed 16 Feb. 2001, now U.S. Pat. No. 6,596,541, which is a continuation-in-part of U.S. Ser. No. 09/732,234, filed 7 Dec. 2000, now U.S. Pat. No. 6,585, 251, which claims the benefit of U.S. Ser. No. 60/244,665, filed 31 Oct. 2000, now abandoned; this application is also a continuation of U.S. Ser. No. 11/595,427, filed 9 Nov. 2006, which is a continuation of U.S. Ser. No. 10/624,044 filed 21 Jul. 2003, which is a divisional of U.S. Ser. No. 09/784,859, filed 16 Feb. 2001, now U.S. Pat. No. 6,596,541, which is a continuation-in-part of U.S. Ser. No. 09/732,234, filed 7 Dec. 2000, now U.S. Pat. No. 6,585,251, which claims the benefit of U.S. Ser. No. 60/244,665, filed 31 Oct. 2000, now abandoned; each of which is incorporated by reference herein.

## FIELD OF THE INVENTION

The field of this invention is a method for engineering and utilizing large DNA vectors to target, via homologous recombination, and modify, in any desirable fashion, endogenous genes and chromosomal loci in eukaryotic cells. The field also encompasses the use of these cells to generate organisms bearing the genetic modification, the organisms, themselves, and methods of use thereof.

## BACKGROUND

The use of LTVECs provides substantial advantages over current methods. For example, since these are derived from DNA fragments larger than those currently used to generate targeting vectors, LTVECs can be more rapidly and conveniently generated from available libraries of large genomic DNA fragments (such as BAC and PAC libraries) than targeting vectors made using current technologies. In addition, larger modifications as well as modifications spanning larger genomic regions can be more conveniently generated than using current technologies. Furthermore, the present invention takes advantage of long regions of homology to increase the targeting frequency of "hard to target" loci, and also diminishes the benefit, if any, of using isogenic DNA in these targeting vectors.

The present invention thus provides for a rapid, convenient, and streamlined method for systematically modifying virtually all the endogenous genes and chromosomal loci of a given organism.

Gene targeting by means of homologous recombination between homologous exogenous DNA and endogenous chromosomal sequences has proven to be an extremely valuable way to create deletions, insertions, design mutations, correct gene mutations, introduce transgenes, or make other genetic modifications in mice. Current methods involve using standard targeting vectors, with regions of homology to endogenous DNA typically totaling less than 10-20 kb, to introduce the desired genetic modification into mouse embryonic stem (ES) cells, followed by the injection of the altered ES cells into mouse embryos to transmit these engineered genetic modifications into the mouse germline (Smithies et al., Nature, 317:230-234, 1985; Thomas et al., Cell, 51:503-512,

2

1987; Koller et al., Proc Natl Acad Sci USA, 86:8927-8931, 1989; Kuhn et al., Science, 254:707-710, 1991; Thomas et al., Nature, 346:847-850, 1990; Schwartzberg et al., Science, 246:799-803, 1989; Doetschman et al., Nature, 330:576-578, 1987; Thomson et al., Cell, 5:313-321, 1989; DeChiara et al., Nature, 345:78-80, 1990; U.S. Pat. No. 5,789,215, issued Aug. 4, 1998 in the name of GenPharm International) In these current methods, detecting the rare ES cells in which the standard targeting vectors have correctly targeted and modified the desired endogenous gene(s) or chromosomal locus (loci) requires sequence information outside of the homologous targeting sequences contained within the targeting vector. Assays for successful targeting involve standard Southern blotting or long PCR (see for example Cheng, et al., Nature, 369:684-5, 1994; U.S. Pat. No. 5,436,149) from sequences outside the targeting vector and spanning an entire homology arm (see Definitions); thus, because of size considerations that limit these methods, the size of the homology arms are restricted to less than 10-20 kb in total (Joyner, The Practical Approach Series, 293, 1999).

The ability to utilize targeting vectors with homology arms larger than those used in current methods would be extremely valuable. For example, such targeting vectors could be more rapidly and conveniently generated from available libraries containing large genomic inserts (e.g. BAC or PAC libraries) than targeting vectors made using current technologies, in which such genomic inserts have to be extensively characterized and trimmed prior to use. In addition, larger modifications as well as modifications spanning larger genomic regions could be more conveniently generated and in fewer steps than using current technologies. Furthermore, the use of long regions of homology could increase the targeting frequency of "hard to target" loci in eukaryotic cells, since the targeting of homologous recombination in eukaryotic cells appears to be related to the total homology contained within the targeting vector (Deng and Capecchi, Mol Cell Biol, 12:3365-71, 1992). In addition, the increased targeting frequency obtained using long homology arms could diminish any potential benefit that can be derived from using isogenic DNA in these targeting vectors.

The problem of engineering precise modifications into very large genomic fragments, such as those cloned in BAC libraries, has largely been solved through the use of homologous recombination in bacteria (Zhang, et al., Nat Genet, 20:123-8, 1998; Yang, et al., Nat Biotechnol, 15:859-65, 1997; Angrand, et al., Nucleic Acids Res, 27:e16, 1999; Muyrers, et al., Nucleic Acids Res, 27:1555-7, 1999; Narayanan, et al., Gene Ther, 6:442-7, 1999), allowing for the construction of vectors containing large regions of homology to eukaryotic endogenous genes or chromosomal loci. However, once made, these vectors have not been generally useful for modifying endogenous genes or chromosomal loci via homologous recombination because of the difficulty in detecting rare correct targeting events when homology arms are larger than 10-20 kb (Joyner supra). Consequently, vectors generated using bacterial homologous recombination from BAC genomic fragments must still be extensively trimmed prior to use as targeting vectors (Hill et al., Genomics, 64:111-3, 2000). Therefore, there is still a need for a rapid and convenient methodology that makes possible the use of targeting vectors containing large regions of homology so as to modify endogenous genes or chromosomal loci in eukaryotic cells.

In accordance with the present invention, Applicants provide novel methods that enables the use of targeting vectors containing large regions of homology so as to modify endogenous genes or chromosomal loci in eukaryotic cells via

REGN-AM-00000010

US 8,502,018 B2

3
4

homologous recombination. Such methods overcome the above-described limitations of current technologies. In addition, the skilled artisan will readily recognize that the methods of the invention are easily adapted for use with any genomic DNA of any eukaryotic organism including, but not limited to, animals such as mouse, rat, other rodent, or human, as well as plants such as soy, corn and wheat.

SUMMARY OF THE INVENTION

In accordance with the present invention, Applicants have developed a novel, rapid, streamlined, and efficient method for creating and screening eukaryotic cells which contain modified endogenous genes or chromosomal loci. This novel methods combine, for the first time: 1. Bacterial homologous recombination to precisely engineer a desired genetic modification within a large cloned genomic fragment, thereby creating a large targeting vector for use in eukaryotic cells (LTVECs); 2. Direct introduction of these LTVECs into eukaryotic cells to modify the endogenous chromosomal locus of interest in these cells; and 3. An analysis to determine the rare eukaryotic cells in which the targeted allele has been modified as desired, involving an assay for modification of allele (MOA) of the parental allele that does not require sequence information outside of the targeting sequence, such as, for example, quantitative PCR.

A preferred embodiment of the invention is a method for genetically modifying an endogenous gene or chromosomal locus in eukaryotic cells, comprising: a) obtaining a large cloned genomic fragment containing a DNA sequence of interest; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in the eukaryotic cells (LTVEC); c) introducing the LTVEC of (b) into the eukaryotic cells to modify the endogenous gene or chromosomal locus in the cells; and d) using a quantitative assay to detect modification of allele (MOA) in the eukaryotic cells of (c) to identify those eukaryotic cells in which the endogenous gene or chromosomal locus has been genetically modified. Another embodiment of the invention is a method wherein the genetic modification to the endogenous gene or chromosomal locus comprises deletion of a coding sequence, gene segment, or regulatory element; alteration of a coding sequence, gene segment, or regulatory element; insertion of a new coding sequence, gene segment, or regulatory element; creation of a conditional allele; or replacement of a coding sequence or gene segment from one species with an homologous or orthologous coding sequence from a different species. An alternative embodiment of the invention is a method wherein the alteration of a coding sequence, gene segment, or regulatory element comprises a substitution, addition, or fusion, wherein the fusion comprises an epitope tag or bifunctional protein. Yet another embodiment of the invention is a method wherein the quantitative assay comprises quantitative PCR, comparative genomic hybridization, isothermic DNA amplification, or quantitative hybridization to an immobilized probe, wherein the quantitative PCR comprises TAQMAN® technology or quantitative PCR using molecular beacons. Another preferred embodiment of the invention is a method wherein the eukaryotic cell is a mammalian embryonic stem cell and in particular wherein the embryonic stem cell is a mouse, rat, or other rodent embryonic stem cell. Another preferred embodiment of the invention is a method wherein the endogenous gene or chromosomal locus is a mammalian gene or chromosomal locus, preferably a human gene or chromosomal locus or a mouse, rat, or other rodent gene or chromosomal locus. An additional preferred embodiment is

one in which the LTVEC is capable of accommodating large DNA fragments greater than 20 kb, and in particular large DNA fragments greater than 100 kb. Another preferred embodiment is a genetically modified endogenous gene or chromosomal locus that is produced by the method of the invention. Yet another preferred embodiment is a genetically modified eukaryotic cell that is produced by the method of the invention. A preferred embodiment of the invention is a non-human organism containing the genetically modified endogenous gene or chromosomal locus produced by the method of the invention. Also preferred in a non-human organism produced from the genetically modified eukaryotic cells or embryonic stem cells produced by the method of the invention.

A preferred embodiment is a non-human organism containing a genetically modified endogenous gene or chromosomal locus, produced by a method comprising the steps of: a) obtaining a large cloned genomic fragment containing a DNA sequence of interest; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector (LTVEC) for use in embryonic stem cells; c) introducing the LTVEC of (b) into the embryonic stem cells to modify the endogenous gene or chromosomal locus in the cells; d) using a quantitative assay to detect modification of allele (MOA) in the embryonic stem cells of (c) to identify those embryonic stem cells in which the endogenous gene or chromosomal locus has been genetically modified; e) introducing the embryonic stem cell of (d) into a blastocyst; and f) introducing the blastocyst of (e) into a surrogate mother for gestation.

An additional preferred embodiment of the invention is a non-human organism containing a genetically modified endogenous gene or chromosomal locus, produced by a method comprising the steps of: a) obtaining a large cloned genomic fragment containing a DNA sequence of interest; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in eukaryotic cells (LTVEC); c) introducing the LTVEC of (b) into the eukaryotic cells to genetically modify the endogenous gene or chromosomal locus in the cells; d) using a quantitative assay to detect modification of allele (MOA) in the eukaryotic cells of (c) to identify those eukaryotic cells in which the endogenous gene or chromosomal locus has been genetically modified; e) removing the nucleus from the eukaryotic cell of (d); f) introducing the nucleus of (e) into an oocyte; and g) introducing the oocyte of (f) into a surrogate mother for gestation.

Yet another preferred embodiment is a non-human organism containing a genetically modified endogenous gene or chromosomal locus, produced by a method comprising the steps of: a) obtaining a large cloned genomic fragment containing a DNA sequence of interest; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in eukaryotic cells (LTVEC); c) introducing the LTVEC of (b) into the eukaryotic cells to genetically modify the endogenous gene or chromosomal locus in the cells; d) using a quantitative assay to detect modification of allele (MOA) in the eukaryotic cells of (c) to identify those eukaryotic cells in which the endogenous gene or chromosomal locus has been genetically modified; e) fusing the eukaryotic cell of (d) with another eukaryotic cell; f) introducing the fused eukaryotic cell of (e) into a surrogate mother for gestation.

A preferred embodiment of the invention is a method for genetically modifying an endogenous gene or chromosomal locus of interest in mouse embryonic stem cells, comprising:

A259

REGN-AM-00000011

US 8,502,018 B2

5

6

a) obtaining a large cloned genomic fragment greater than 20 kb which contains a DNA sequence of interest, wherein the large cloned DNA fragment is homologous to the endogenous gene or chromosomal locus; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in the mouse embryonic stem cells, wherein the genetic modification is deletion of a coding sequence, gene segment, or regulatory element; c) introducing the large targeting vector of (b) into the mouse embryonic stem cells to modify the endogenous gene or chromosomal locus in the cells; and d) using a quantitative assay to detect modification of allele (MOA) in the mouse embryonic stem cells of (c) to identify those mouse embryonic stem cells in which the endogenous gene or chromosomal locus has been genetically modified, wherein the quantitative assay is quantitative PCR. Also preferred is a genetically modified mouse embryonic stem cell produced by this method; a mouse containing a genetically modified endogenous gene or chromosomal locus produced by this method; and a mouse produced from the genetically modified mouse embryonic stem cell.

Another preferred embodiment is a mouse containing a genetically modified endogenous gene or chromosomal locus of interest, produced by a method comprising the steps of: a) obtaining a large cloned genomic fragment greater than 20 kb which contains a DNA sequence of interest, wherein the large cloned DNA fragment is homologous to the endogenous gene or chromosomal locus; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in the mouse embryonic stem cells, wherein the genetic modification is deletion of a coding sequence, gene segment, or regulatory element; c) introducing the large targeting vector of (b) into the mouse embryonic stem cells to modify the endogenous gene or chromosomal locus in the cells; and d) using a quantitative assay to detect modification of allele (MOA) in the mouse embryonic stem cells of (c) to identify those mouse embryonic stem cells in which the endogenous gene or chromosomal locus has been genetically modified, wherein the quantitative assay is quantitative PCR; e) introducing the mouse embryonic stem cell of (d) into a blastocyst; and f) introducing the blastocyst of (e) into a surrogate mother for gestation.

One embodiment of the invention is a method of replacing, in whole or in part, in a non-human eukaryotic cell, an endogenous immunoglobulin variable region gene locus with an homologous or orthologous human gene locus comprising: a) obtaining a large cloned genomic fragment containing, in whole or in part, the homologous or orthologous human gene locus; b) using bacterial homologous recombination to genetically modify the cloned genomic fragment of (a) to create a large targeting vector for use in the eukaryotic cells (LTVEC); c) introducing the LTVEC of (b) into the eukaryotic cells to replace, in whole or in part, the endogenous immunoglobulin variable gene locus; and d) using a quantitative assay to detect modification of allele (MOA) in the eukaryotic cells of (c) to identify those eukaryotic cells in which the endogenous immunoglobulin variable region gene locus has been replaced, in whole or in part, with the homologous or orthologous human gene locus.

Another embodiment is a method of replacing, in whole or in part, in a non-human eukaryotic cell, an endogenous immunoglobulin variable region gene locus with an homologous or orthologous human gene locus further comprising the steps: e) obtaining a large cloned genomic fragment containing a part of the homologous or orthologous human gene locus that differs from the fragment of (a); f) using bacterial

homologous recombination to genetically modify the cloned genomic fragment of (e) to create a second LTVEC; g) introducing the second LTVEC of (f) into the eukaryotic cells identified in step (d) to replace, in whole or in part, the endogenous immunoglobulin variable gene locus; and h) using a quantitative assay to detect modification of allele (MOA) in the eukaryotic cells of (g) to identify those eukaryotic cells in which the endogenous immunoglobulin variable region gene locus has been replaced, in whole or in part, with the homologous or orthologous human gene locus.

Another embodiment of the above method is a method wherein steps (e) through (h) are repeated until the endogenous immunoglobulin variable region gene locus is replaced in whole with an homologous or orthologous human gene locus.

Another embodiment of the method is one in which the immunoglobulin variable gene locus is a locus selected from the group consisting of a) a variable gene locus of the kappa light chain; b) a variable gene locus of the lambda light chain; and c) a variable gene locus of the heavy chain.

A preferred embodiment is a method wherein the quantitative assay comprises quantitative PCR, FISH, comparative genomic hybridization, isothermic DNA amplification, or quantitative hybridization to an immobilized probe, and in particular wherein the quantitative PCR comprises TAQ-MAN®. technology or quantitative PCR using molecular beacons.

Yet another preferred embodiment is a method of replacing, in whole or in part, in a mouse embryonic stem cell, an endogenous immunoglobulin variable region gene locus with its homologous or orthologous human gene locus comprising: a) obtaining a large cloned genomic fragment containing, in whole or in part, the homologous or orthologous human gene locus; b) using bacterial homologous recombination to genetically modify the large cloned genomic fragment of (a) to create a large targeting vector for use in the embryonic stem cells; c) introducing the large targeting vector of (b) into mouse embryonic stem cells to replace, in whole or in part, the endogenous immunoglobulin variable gene locus in the cells; and d) using a quantitative PCR assay to detect modification of allele (MOA) in the mouse embryonic stem cells of (d) to identify those mouse embryonic stem cells in which the endogenous variable gene locus has been replaced, in whole or in part, with the homologous or orthologous human gene locus.

In another embodiment, the method further comprises: e) obtaining a large cloned genomic fragment containing a part of the homologous or orthologous human gene locus that differs from the fragment of (a); f) using bacterial homologous recombination to genetically modify the cloned genomic fragment of (e) to create a large targeting vector for use in the embryonic stem cells; g) introducing the large targeting vector of (f) into the mouse embryonic stem cells identified in step (d) to replace, in whole or in part, the endogenous immunoglobulin variable gene locus; and h) using a quantitative assay to detect modification of allele (MOA) in the mouse embryonic stem cells of (g) to identify those mouse embryonic stem cells in which the endogenous immunoglobulin variable region gene locus has been replaced, in whole or in part, with the homologous or orthologous human gene locus.

Another preferred embodiment is a genetically modified immunoglobulin variable region gene locus produced by the methods described above; a genetically modified eukaryotic cell comprising a genetically modified immunoglobulin variable region gene locus produced by the methods described above; a non-human organism comprising a genetically

REGN-AM-00000012

US 8,502,018 B2

7                                                                        8

modified immunoglobulin variable region gene locus produced by the methods described above; and a mouse embryonic stem cell containing a genetically modified immunoglobulin variable region gene locus produced by the methods described above.

Also preferred is an embryonic stem cell wherein the mouse heavy chain variable region locus is replaced, in whole or in part, with a human heavy chain variable gene locus; an embryonic stem cell of claim wherein the mouse kappa light chain variable region locus is replaced, in whole or in part, with a human kappa light chain variable region locus; an embryonic stem cell wherein the mouse lambda light chain variable region locus is replaced, in whole or in part, with a human lambda light chain variable region locus; and an embryonic stem cell wherein the heavy and light chain variable region gene loci are replaced, in whole, with their human homologs or orthologs.

Yet another preferred embodiment is an antibody comprising a human variable region encoded by the genetically modified variable gene locus of described above; an antibody further comprising a non-human constant region; and an antibody further comprising a human constant region.

Also preferred is a transgenic mouse having a genome comprising entirely human heavy and light chain variable region loci operably linked to entirely endogenous mouse constant region loci such that the mouse produces a human variable region and a mouse constant region in response to antigenic stimulation; a transgenic mouse having a genome comprising human heavy and/or light chain variable region loci operably linked to endogenous mouse constant region loci such that the mouse produces a serum containing an antibody comprising a human variable region and a mouse constant region in response to antigenic stimulation; a transgenic mouse containing an endogenous variable region locus that has been replaced with an homologous or orthologous human variable locus, such mouse being produced by a method comprising: a) obtaining one or more large cloned genomic fragments containing the entire homologous or orthologous human variable region locus; b) using bacterial homologous recombination to genetically modify the cloned genomic fragment(s) of (a) to create large targeting vector(s) for use in mouse embryonic stem cells; c) introducing the large targeting vector(s) of (b) into mouse embryonic stem cells to replace the entire endogenous variable region locus in the cells; and d) using a quantitative PCR assay to detect modification of allele (MOA) in the mouse embryonic stem cells of (c) to identify those mouse embryonic stem cells in which the entire endogenous variable region locus has been replaced with the homologous or orthologous human variable region locus; e) introducing the mouse embryonic stem cell of (d) into a blastocyst; and f) introducing the blastocyst of (e) into a surrogate mother for gestation.

Still yet another preferred embodiment of the invention is a method of making a human antibody comprising: a) exposing the mouse described above to antigenic stimulation, such that the mouse produces an antibody against the antigen; b) isolating the DNA encoding the variable regions of the heavy and light chains of the antibody; c) operably linking the DNA encoding the variable regions of (b) to DNA encoding the human heavy and light chain constant regions in a cell capable of expressing active antibodies; d) growing the cell under such conditions as to express the human antibody; and e) recovering the antibody. In another preferred embodiment, the cell described above is a CHO cell. Also preferred is a method of wherein the DNA of step (b) described above is isolated from a hybridoma created from the spleen of the mouse exposed to antigenic stimulation in step (a) described above.

BRIEF DESCRIPTION OF THE FIGURES

FIG. **1**: Schematic diagram of the generation of a typical LTVEC using bacterial homologous recombination. (hb1=homology box 1; hb2=homology box 2; RE=restriction enzyme site).

FIG. **2**: Schematic diagram of donor fragment and LTVEC for mouse OCR10. (hb1=homology box 1; lacZ=β-galactosidase ORF; SV40 polyA=a DNA fragment derived from Simian Virus 40, containing a polyadenylation site and signal; PGKp=mouse phosphoglycerate kinase (PGK) promoter; EM7=a bacterial promoter; neo=neomycin phosphotransferase; PGK polyA=3' untranslated region derived from the PGK gene and containing a polyadenylation site and signal; hb2=homology box 2)

FIGS. **3A-3D**: Sequence of the mouse OCR10 cDNA (upper strand, SEQ ID NO:5), homology box 1 (hb1), homology box 2 (hb2), and TAQMAN® probes and primers used in a quantitative PCR assay to detect modification of allele (MOA) in ES cells targeted using the mOCR10 LTVEC. hb1: base pairs 1 to 211; hb2: base pairs 1586 to 1801; TAQMAN® probe and corresponding PCR primer set derived from mOCR10 exon 3: TAQMAN® probe: nucleotides 413 to 439—upper strand; Primer ex3-5': nucleotides 390 to 410—upper strand; Primer ex3-3': nucleotides 445 to 461—lower strand; TAQMAN® probe and corresponding PCR primer set derived from mOCR10 exon 4: TAQMAN® probe: nucleotides 608 to 639—upper strand; Primer ex4-5': nucleotides 586 to 605—upper strand; Primer ex4-3': nucleotides 642 to 662—lower strand.

FIG. **4A-4D**: (SEQ ID NO:5-6) Schematic diagram of the two LTVECs constructed to replace the mouse VDJ region with human VDJ region. A: Large insert (BAC) clones spanning the entire VDJ region of the human heavy chain locus are isolated. B: In this example, large insert (BAC) clones are isolated from the ends of the mouse VDJ region as a source of homology arms which are used to direct integration via homologous recombination of the human VDJ sequences in a two step process. C-D: In the first step, LTVEC1 is constructed by bacterial homologous recombination in *E. coli*. LTVEC1 contains, in order: a large mouse homology arm derived from the region upstream from the mouse DJ region, but whose absolute endpoints are not important; a cassette encoding a selectable marker functional in ES cells (PGK-neomycinR); a loxP site; a large human insert spanning from several V gene segments through the entire DJ region; and a mouse homology arm containing the region immediately adjacent to, but not including, the mouse J segments. In the second step, LTVEC2 is constructed by bacterial homologous recombination in *E. coli*. LTVEC2 contains, in order: a large mouse homology arm containing the region adjacent to the most distal mouse V gene segment, but not containing any mouse V gene segments; a large insert containing a large number of distal human V gene segments; a mutant loxP site called lox511 in the orientation opposite to that of the wild type loxP sites in LTVEC2 and LTVEC1 (this site will not recombine with wild type loxP sites but will readily recombine with other lox511 sites); a wild type loxP site; a second selectable marker (PGK-hygromycinR); and a mouse homology arm derived from the V region, but whose absolute endpoints are not important.

DETAILED DESCRIPTION

A "targeting vector" is a DNA construct that contains sequences "homologous" to endogenous chromosomal

A261

REGN-AM-00000013

US 8,502,018 B2

9

nucleic acid sequences flanking a desired genetic modification(s). The flanking homology sequences, referred to as "homology arms", direct the targeting vector to a specific chromosomal location within the genome by virtue of the homology that exists between the homology arms and the corresponding endogenous sequence and introduce the desired genetic modification by a process referred to as "homologous recombination".

"Homologous" means two or more nucleic acid sequences that are either identical or similar enough that they are able to hybridize to each other or undergo intermolecular exchange.

"Gene targeting" is the modification of an endogenous chromosomal locus by the insertion into, deletion of, or replacement of the endogenous sequence via homologous recombination using a targeting vector.

A "gene knockout" is a genetic modification resulting from the disruption of the genetic information encoded in a chromosomal locus. A "gene knockin" is a genetic modification resulting from the replacement of the genetic information encoded in a chromosomal locus with a different DNA sequence. A "knockout organism" is an organism in which a significant proportion of the organism's cells harbor a gene knockout. A "knockin organism" is an organism in which a significant proportion of the organism's cells harbor a gene knockin.

A "marker" or a "selectable marker" is a selection marker that allows for the isolation of rare transfected cells expressing the marker from the majority of treated cells in the population. Such marker's gene's include, but are not limited to, neomycin phosphotransferase and hygromycin B phosphotransferase, or fluorescing proteins such as GFP.

An "ES cell" is an embryonic stem cell. This cell is usually derived from the inner cell mass of a blastocyst-stage embryo. An "ES cell clone" is a subpopulation of cells derived from a single cell of the ES cell population following introduction of DNA and subsequent selection.

A "flanking DNA" is a segment of DNA that is collinear with and adjacent to a particular point of reference.

"LTVECs" are large targeting vectors for eukaryotic cells that are derived from fragments of cloned genomic DNA larger than those typically used by other approaches intended to perform homologous recombination in eukaryotic cells.

"Modification of allele" (MOA) refers to the modification of the exact DNA sequence of one allele of a gene(s) or chromosomal locus (loci) in a genome. This modification of allele (MOA) includes, but is not limited to, deletions, substitutions, or insertions of as little as a single nucleotide or deletions of many kilobases spanning a gene(s) or chromosomal locus (loci) of interest, as well as any and all possible modifications between these two extremes.

"Orthologous" sequence refers to a sequence from one species that is the functional equivalent of that sequence in another species.

General Description

Applicants have developed a novel, rapid, streamlined, and efficient method for creating and screening eukaryotic cells which contain modified endogenous genes or chromosomal loci. In these cells, the modification may be gene(s) knockouts, knockins, point mutations, or large genomic insertions or deletions or other modifications. These cells may be embryonic stem cells which are useful for creating knockout or knockin organisms and in particular, knockout or knockin mice, for the purpose of determining the function of the gene(s) that have been altered, deleted and/or inserted.

The novel methods described herein combine, for the first time: 1. Bacterial homologous recombination to precisely engineer a desired genetic modification within a large cloned

10

genomic DNA fragment, thereby creating a large targeting vector for use in eukaryotic cells (LTVECs); 2. Direct introduction of these LTVECs into eukaryotic cells to modify the corresponding endogenous gene(s) or chromosomal locus (loci) of interest in these cells; and 3. An analysis to determine the rare eukaryotic cells in which the targeted allele has been modified as desired, involving a quantitative assay for modification of allele (MOA) of the parental allele.

It should be emphasized that previous methods to detect successful homologous recombination in eukaryotic cells cannot be utilized in conjunction with the LTVECs of Applicants' invention because of the long homology arms present in the LTVECs. Utilizing a LTVEC to deliberately modify endogenous genes or chromosomal loci in eukaryotic cells via homologous recombination is made possible by the novel application of an assay to determine the rare eukaryotic cells in which the targeted allele has been modified as desired, such assay involving a quantitative assay for modification of allele (MOA) of a parental allele, by employing, for example, quantitative PCR or other suitable quantitative assays for MOA.

The ability to utilize targeting vectors with homology arms larger than those used in current methods is extremely valuable for the following reasons: 1. Targeting vectors are more rapidly and conveniently generated from available libraries containing large genomic inserts (e.g. BAC or PAC libraries) than targeting vectors made using previous technologies, in which the genomic inserts have to be extensively characterized and "trimmed" prior to use (explained in detail below). In addition, minimal sequence information needs to be known about the locus of interest, i.e. it is only necessary to know the approximately 80-100 nucleotides that are required to generate the homology boxes (described in detail below) and to generate probes that can be used in quantitative assays for MOA (described in detail below). 2. Larger modifications as well as modifications spanning larger genomic regions are more conveniently generated and in fewer steps than using previous technologies. For example, the method of the invention makes possible the precise modification of large loci that cannot be accommodated by traditional plasmid-based targeting vectors because of their size limitations. It also makes possible the modification of any given locus at multiple points (e.g. the introduction of specific mutations at different exons of a multi-exon gene) in one step, alleviating the need to engineer multiple targeting vectors and to perform multiple rounds of targeting and screening for homologous recombination in ES cells. 3. The use of long regions of homology (long homology arms) increase the targeting frequency of "hard to target" loci in eukaryotic cells, consistent with previous findings that targeting of homologous recombination in eukaryotic cells appears to be related to the total homology contained within the targeting vector. 4. The increased targeting frequency obtained using long homology arms apparently diminishes the benefit, if any, from using isogenic DNA in these targeting vectors. 5. The application of quantitative MOA assays for screening eukaryotic cells for homologous recombination not only empowers the use of LTVECs as targeting vectors (advantages outlined above) but also reduces the time for identifying correctly modified eukaryotic cells from the typical several days to a few hours. In addition, the application of quantitative MOA does not require the use of probes located outside the endogenous gene(s) or chromosomal locus (loci) that is being modified, thus obviating the need to know the sequence flanking the modified gene(s) or locus (loci). This is a significant improvement in the way the screening has been performed in the past and makes it a much

A262

US 8,502,018 B2

11 12

less labor-intensive and much more cost-effective approach to screening for homologous recombination events in eukaryotic cells.

Methods

Many of the techniques used to construct DNA vectors described herein are standard molecular biology techniques well known to the skilled artisan (see e.g., Sambrook, J., E. F. Fritsch And T. Maniatis. Molecular Cloning: A Laboratory Manual, Second Edition, Vols 1, 2, and 3, 1989; Current Protocols in Molecular Biology, Eds. Ausubel et al., Greene Publ. Assoc., Wiley Interscience, NY). All DNA sequencing is done by standard techniques using an ABI 373A DNA sequencer and Taq Dideoxy Terminator Cycle Sequencing Kit (Applied Biosystems, Inc., Foster City, Calif.).

Step 1. Obtain a Large Genomic DNA Clone Containing the Gene(s) or Chromosomal Locus (Loci) of Interest.

A gene(s) or locus (loci) of interest can be selected based on specific criteria, such as detailed structural or functional data, or it can be selected in the absence of such detailed information as potential genes or gene fragments become predicted through the efforts of the various genome sequencing projects. Importantly, it should be noted that it is not necessary to know the complete sequence and gene structure of a gene(s) of interest to apply the method of the subject invention to produce LTVECs. In fact, the only sequence information that is required is approximately 80-100 nucleotides so as to obtain the genomic clone of interest as well as to generate the homology boxes used in making the LTVEC (described in detail below) and to make probes for use in quantitative MOA assays.

Once a gene(s) or locus (loci) of interest has been selected, a large genomic clone(s) containing this gene(s) or locus (loci) is obtained. This clone(s) can be obtained in any one of several ways including, but not limited to, screening suitable DNA libraries (e.g. BAC, PAC, YAC, or cosmid) by standard hybridization or PCR techniques, or by any other methods familiar to the skilled artisan.

Step 2. Append Homology Boxes 1 and 2 to a Modification Cassette and Generation of LTVEC.

Homology boxes mark the sites of bacterial homologous recombination that are used to generate LTVECs from large cloned genomic fragments (FIG. 1). Homology boxes are short segments of DNA, generally double-stranded and at least 40 nucleotides in length, that are homologous to regions within the large cloned genomic fragment flanking the "region to be modified". The homology boxes are appended to the modification cassette, so that following homologous recombination in bacteria, the modification cassette replaces the region to be modified (FIG. 1). The technique of creating a targeting vector using bacterial homologous recombination can be performed in a variety of systems (Yang et al. supra; Muyrers et al. supra; Angrand et al. supra; Narayanan et al. supra; Yu, et al., Proc Natl Acad Sci USA, 97:5978-83, 2000). One example of a favored technology currently in use is ET cloning and variations of this technology (Yu et al. supra). ET refers to the recE (Hall and Kolodner, Proc Natl Acad Sci USA, 91:3205-9, 1994) and recT proteins (Kusano et al., Gene, 138:17-25, 1994) that carry out the homologous recombination reaction. RecE is an exonuclease that trims one strand of linear double-stranded DNA (the donor DNA fragment described infra) 5' to 3', thus leaving behind a linear double-stranded fragment with a 3' single-stranded overhang. This single-stranded overhang is coated by recT protein, which has single-stranded DNA (ssDNA) binding activity (Kovall and Matthews, Science, 277:1824-7, 1997). ET cloning is performed using E. coli that transiently express the E. coli gene products of recE and recT (Hall and

Kolodner, Proc Natl Acad Sci USA, 91:3205-9, 1994; Clark et al., Cold Spring Harb Symp Quant Biol, 49:453-62, 1984; Noirot and Kolodner, J Biol Chem, 273:12274-80, 1998; Thresher et al., J Mol Biol, 254:364-71, 1995; Kolodner et al., Mol Microbiol, 11:23-30, 1994; Hall et al., J Bacteriol, 175:277-87, 1993) and the bacteriophage lambda (λ) protein λgam (Murphy, J Bacteriol, 173:5808-21, 1991; Poteete et al., J Bacteriol, 170:2012-21, 1988). The kgam protein is required for protecting the donor DNA fragment from degradation by the recBC exonuclease system (Myers and Stahl, Annu Rev Genet, 28:49-70, 1994) and it is required for efficient ET-cloning in recBC+ hosts such as the frequently used E. coli strain DH10b.

The region to be modified and replaced using bacterial homologous recombination can range from zero nucleotides in length (creating an insertion into the original locus) to many tens of kilobases (creating a deletion and/or a replacement of the original locus). Depending on the modification cassette, the modification can result in the following: (a) deletion of coding sequences, gene segments, or regulatory elements; (b) alteration(s) of coding sequence, gene segments, or regulatory elements including substitutions, additions, and fusions (e.g. epitope tags or creation of bifunctional proteins such as those with GFP); (c) insertion of new coding regions, gene segments, or regulatory elements, such as those for selectable marker genes or reporter genes or putting new genes under endogenous transcriptional control; (d) creation of conditional alleles, e.g. by introduction of loxP sites flanking the region to be excised by Cre recombinase (Abremski and Hoess, J Biol Chem, 259:1509-14, 1984), or FRT sites flanking the region to be excised by Flp recombinase (Andrews et al., Cell, 40:795-803, 1985; Meyer-Leon et al., Cold Spring Harb Symp Quant Biol, 49:797-804, 1984; Cox, Proc Natl Acad Sci USA, 80:4223-7, 1983); or (e) replacement of coding sequences or gene segments from one species with orthologous coding sequences from a different species, e.g. replacing a murine genetic locus with the orthologous human genetic locus to engineer a mouse where that particular locus has been 'humanized'.

Any or all of these modifications can be incorporated into a LTVEC. A specific example in which an endogenous coding sequence is entirely deleted and simultaneously replaced with both a reporter gene as well as a selectable marker is provided below in Example 1, as are the advantages of the method of the invention as compared to previous technologies.

Step 3 (Optional). Verify that Each LTVEC has been Engineered Correctly.

Verify that each LTVEC has been engineered correctly by: a. Diagnostic PCR to verify the novel junctions created by the introduction of the donor fragment into the gene(s) or chromosomal locus (loci) of interest. The PCR fragments thus obtained can be sequenced to further verify the novel junctions created by the introduction of the donor fragment into the gene(s) or chromosomal locus (loci) of interest. b. Diagnostic restriction enzyme digestion to make sure that only the desired modifications have been introduced into the LTVEC during the bacterial homologous recombination process. c. Direct sequencing of the LTVEC, particularly the regions spanning the site of the modification to verify the novel junctions created by the introduction of the donor fragment into the gene(s) or chromosomal locus (loci) of interest.

Step 4. Purification, Preparation, and Linearization of LTVEC DNA for Introduction Into Eukaryotic Cells.

a. Preparation of LTVEC DNA:

Prepare miniprep DNA (Sambrook et al. supra; Tillett and Neilan, Biotechniques, 24:568-70, 572, 1998; of the selected LTVEC and re-transform the miniprep LTVEC DNA into E.

REGN-AM-00000015

US 8,502,018 B2

13

*coli* using electroporation (Sambrook et al. supra). This step is necessary to get rid of the plasmid encoding the recombinogenic proteins that are utilized for the bacterial homologous recombination step. It is useful to get rid of this plasmid (a) because it is a high copy number plasmid and may reduce the yields obtained in the large scale LTVEC preps; (b) to eliminate the possibility of inducing expression of the recombinogenic proteins; and (c) because it may obscure physical mapping of the LTVEC. Before introducing the LTVEC into eukaryotic cells, larger amounts of LTVEC DNA are prepared by standard methodology; Sambrook et al. supra; Tillett and Neilan, Biotechniques, 24:568-70, 572, 1998). However, this step can be bypassed if a bacterial homologous recombination method that utilizes a recombinogenic prophage is used, i.e. where the genes encoding the recombinogenic proteins are integrated into the bacterial chromosome (Yu, et al. supra), is used.

b. Linearizing the LTVEC DNA:

To prepare the LTVEC for introduction into eukaryotic cells, the LTVEC is preferably linearized in a manner that leaves the modified endogenous gene(s) or chromosomal locus (loci) DNA flanked with long homology arms. This can be accomplished by linearizing the LTVEC, preferably in the vector backbone, with any suitable restriction enzyme that digests only rarely. Examples of suitable restriction enzymes include NotI, PacI, SfiI, SrfI, SwaI, FseI, etc. The choice of restriction enzyme may be determined experimentally (i.e. by testing several different candidate rare cutters) or, if the sequence of the LTVEC is known, by analyzing the sequence and choosing a suitable restriction enzyme based on the analysis. In situations where the LTVEC has a vector backbone containing rare sites such as Cos N sites, then it can be cleaved with enzymes recognizing such sites, for example λ terminase (Shizuya et al., Proc Natl Acad Sci USA, 89:8794-7, 1992; Becker and Gold, Proc Natl Acad Sci USA, 75:4199-203, 1978; Rackwitz et al., Gene, 40:259-66, 1985).

Step 5. Introduction of LTVEC into Eukaryotic Cells and Selection of Cells where Successful Introduction of the LTVEC has Taken Place.

LTVEC DNA can be introduced into eukaryotic cells using standard methodology, such as transfection mediated by calcium phosphate, lipids, or electroporation (Sambrook et al. supra). The cells where the LTVEC has been introduced successfully can be selected by exposure to selection agents, depending on the selectable marker gene that has been engineered into the LTVEC. For example, if the selectable marker is the neomycin phosphotransferase (neo) gene (Beck, et al., Gene, 19:327-36, 1982), then cells that have taken up the LTVEC can be selected in G418-containing media; cells that do not have the LTVEC will die whereas cells that have taken up the LTVEC will survive (Santerre, et al., Gene, 30:147-56, 1984). Other suitable selectable markers include any drug that has activity in eukaryotic cells, such as hygromycin B (Santerre, et al., Gene, 30:147-56, 1984; Bernard, et al., Exp Cell Res, 158:237-43, 1985; Giordano and McAllister, Gene, 88:285-8, 1990), Blasticidin S (Izumi, et al., Exp Cell Res, 197:229-33, 1991), and other which are familiar to those skilled in the art.

Step 6.

Screen for homologous recombination events in eukaryotic cells using quantitative assay for modification of allele (MOA). Eukaryotic cells that have been successfully modified by targeting the LTVEC into the locus of interest can be identified using a variety of approaches that can detect modi-

14

fication of allele within the locus of interest and that do not depend on assays spanning the entire homology arm or arms. Such approaches can include but are not limited to: (a) quantitative PCR using TAQMAN® (Lie and Petropoulos, Curr Opin Biotechnol, 9:43-8, 1998); (b) quantitative MOA assay using molecular beacons (Tan, et al., Chemistry, 6:1107-11, 2000); (c) fluorescence in situ hybridization FISH (Laan, et al., Hum Genet, 96:275-80, 1995) or comparative genomic hybridization (CGH) (Forozan, et al., Trends Genet, 13:405-9, 1997; Thompson and Gray, J Cell Biochem Suppl, 13943, 1993; Houldsworth and Chaganti, Am J Pathol, 145:1253-60, 1994); (d) isothermic DNA amplification (Lizardi et al., Nat Genet, 19:225-32, 1998; Mitra and Church, Nucleic Acids Res, 27:e34, 1999); and (e) quantitative hybridization to an immobilized probe(s) (Southern, J. Mol. Biol. 98: 503, 1975; Kafatos et al., Nucleic Acids Res 7(6):1541-52, 1979).

Applicants provide herein an example in which TAQ-MAN® quantitative PCR is used to screen for successfully targeted eukaryotic cells. For example, TAQMAN® is used to identify eukaryotic cells which have undergone homologous recombination wherein a portion of one of two endogenous alleles in a diploid genome has been replaced by another sequence. In contrast to traditional methods, in which a difference in restriction fragment length spanning the entire homology arm or arms indicates the modification of one of two alleles, the quantitative TAQMAN® method will detect the modification of one allele by measuring the reduction in copy number (by half) of the unmodified allele. Specifically, the probe detects the unmodified allele and not the modified allele. Therefore, the method is independent of the exact nature of the modification and not limited to the sequence replacement described in this example. TAQMAN® is used to quantify the number of copies of a DNA template in a genomic DNA sample, especially by comparison to a reference gene (Lie and Petropoulos, Curr. Opin. Biotechnol., 9:43-8, 1998). The reference gene is quantitated in the same genomic DNA as the target gene(s) or locus (loci). Therefore, two TAQMAN® amplifications (each with its respective probe) are performed. One TAQMAN® probe determines the "Ct" (Threshold Cycle) of the reference gene, while the other probe determines the Ct of the region of the targeted gene(s) or locus (loci) which is replaced by successful targeting. The Ct is a quantity that reflects the amount of starting DNA for each of the TAQMAN® probes, i.e. a less abundant sequence requires more cycles of PCR to reach the threshold cycle. Decreasing by half the number of copies of the template sequence for a TAQMAN® reaction will result in an increase of about one Ct unit. TAQMAN® reactions in cells where one allele of the target gene(s) or locus (loci) has been replaced by homologous recombination will result in an increase of one Ct for the target TAQMAN® reaction without an increase in the Ct for the reference gene when compared to DNA from non-targeted cells. This allows for ready detection of the modification of one allele of the gene(s) of interest in eukaryotic cells using LTVECs.

As stated above, modification of allele (MOA) screening is the use of any method that detects the modification of one allele to identify cells which have undergone homologous recombination. It is not a requirement that the targeted alleles be identical (homologous) to each other, and in fact, they may contain polymorphisms, as is the case in progeny resulting from crossing two different strains of mice. In addition, one special situation that is also covered by MOA screening is targeting of genes which are normally present as a single copy

REGN-AM-00000016

15

in cells, such as some of the located on the sex chromosomes and in particular, on the Y chromosome. In this case, methods that will detect the modification of the single targeted allele, such as quantitative PCR, Southern blottings, etc., can be used to detect the targeting event. It is clear that the method of the invention can be used to generate modified eukaryotic cells even when alleles are polymorphic or when they are present in a single copy in the targeted cells.

Step 8. Uses of genetically modified eukaryotic cells. (a) The genetically modified eukaryotic cells generated by the methods described in steps 1 through 7 can be employed in any in vitro or in vivo assay, where changing the phenotype of the cell is desirable. (b) The genetically modified eukaryotic cell generated by the methods described in steps 1 through 7 can also be used to generate an organism carrying the genetic modification. The genetically modified organisms can be generated by several different techniques including but not limited to: 1. Modified embryonic stem (ES) cells such as the frequently used rat and mouse ES cells. ES cells can be used to create genetically modified rats or mice by standard blastocyst injection technology or aggregation techniques (Robertson, Practical Approach Series, 254, 1987; Wood, et al., Nature, 365:87-9, 1993; Joyner supra), tetraploid blastocyst injection (Wang, et al., Mech Dev, 62:137-45, 1997), or nuclear transfer and cloning (Wakayama, et al., Proc Natl Acad Sci USA, 96:14984-9, 1999). ES cells derived from other organisms such as rabbits (Wang, et al., Mech Dev, 62:137-45, 1997; Schoonjans, et al., Mol Reprod Dev, 45:439-43, 1996) or chickens (Pain, et al, Development, 122: 2339-48, 1996) or other species should also be amenable to genetic modification) using the methods of the invention. 2. Modified protoplasts can be used to generate genetically modified plants (for example see U.S. Pat. No. 5,350,689 "Zea mays plants and transgenic Zea mays plants regenerated from protoplasts or protoplast-derived cells", and U.S. Pat. No. 5,508,189 "Regeneration of plants from cultured guard cell protoplasts" and references therein). 3. Nuclear transfer from modified eukaryotic cells to oocytes to generate cloned organisms with modified allele (Wakayama, et al., Proc Natl Acad Sci USA, 96:14984-9, 1999; Baguisi, et al., Nat Biotechnol, 17:456-61, 1999; Wilmut, et al., Reprod Fertil Dev, 10:639-43, 1998; Wilmut, et al., Nature, 385:810-3, 1997; Wakayama, et al., Nat Genet, 24:108-9, 2000; Wakayama, et al., Nature, 394:369-74, 1998; Rideout, et al., Nat Genet, 24:109-10, 2000; Campbell, et al., Nature, 380:64-6, 1996). 4. Cell-fusion to transfer the modified allele to another cell, including transfer of engineered chromosome(s), and uses of such cell(s) to generate organisms carrying the modified allele or engineered chromosome(s) (Kuroiwa, et al.. Nat Biotechnol, 18:1086-1090, 2000). 5. The method of the invention are also amenable to any other approaches that have been used or yet to be discovered.

While many of the techniques used in practicing the individual steps of the methods of the invention are familiar to the skilled artisan, Applicants contend that the novelty of the method of the invention lies in the unique combination of those steps and techniques coupled with the never-before-described method of introducing a LTVEC directly into eukaryotic cells to modify a chromosomal locus, and the use of quantitative MOA assays to identify eukaryotic cells which have been appropriately modified. This novel combination represents a significant improvement over previous technologies for creating organisms possessing modifications of endogenous genes or chromosomal loci.

16

EXAMPLES

Example 1

Engineering Mouse ES Cells Bearing a Deletion of the OCR10 Gene

a. Selection of a Large Genomic DNA Clone Containing mOCR10.

A Bacterial Artificial Chromosome (BAC) clone carrying a large genomic DNA fragment that contained the coding sequence of the mouse OCR10 (mOCR10) gene was obtained by screening an arrayed mouse genomic DNA BAC library (Incyte Genomics) using PCR. The primers employed to screen this library were derived from the mOCR10 gene cDNA sequence. Two primer pairs where used: (a) OCR10.RAA (SEQ ID NO:1) and OCR10.PVIrc (SEQ ID NO:2) which amplifies a 102 bp DNA; and (b) OCR10.TDY (SEQ ID NO:3)) and OCR10.QETrc (SEQ ID NO:4)) which amplifies a 1500 bp DNA. This mOCR10 BAC contained approximately 180 kb of genomic DNA including the complete mOCR10 coding sequence. This BAC clone was used to generate an LTVEC which was subsequently used to delete a portion of the coding region of mOCR10 while simultaneously introducing a reporter gene whose initiation codon precisely replaced the initiation codon of OCR10, as well as insertion of a selectable marker gene useful for selection both in E. coli and mammalian cells following the reporter gene (FIG. 2). The reporter gene (LacZ), encodes the E. coli β-galactosidase enzyme. Because of the position of insertion of LacZ (its initiating codon is at the same position as the initiation codon of mOCR10) the expression of lacZ should mimic that of mOCR10, as has been observed in other examples where similar replacements with LacZ were performed using previous technologies (see "Gene trap strategies in ES cells", by W Wurst and A. Gossler, in Joyner supra). The LacZ gene allows for a simple and standard enzymatic assay to be performed that can reveal its expression patterns in situ, thus providing a surrogate assay that reflects the normal expression patterns of the replaced gene(s) or chromosomal locus (loci).

b. Construction of Donor Fragment and Generation of LTVEC.

The modification cassette used in the construction of the mOCR10 LTVEC is the lacZ-SV40 polyA-PGKp-EM7-neo-PGK polyA cassette wherein lacZ is a marker gene as described above, SV40 polyA is a fragment derived from Simian Virus 40 (Subramanian, et al., Prog Nucleic Acid Res Mol Biol, 19:157-64, 1976; Thimmappaya, et al., J Biol Chem, 253:1613-8, 1978; Dhar, et al., Proc Natl Acad Sci USA, 71:371-5, 1974; Reddy, et al., Science, 200:494-502, 1978) and containing a polyadenylation site and signal (Subramanian, et al., Prog Nucleic Acid Res Mol Biol, 19:157-64, 1976; Thimmappaya, et al., J Biol Chem, 253:1613-8, 1978; Dhar, et al., Proc Natl Acad Sci USA, 71:371-5, 1974; Reddy, et al., Science, 200:494-502, 1978), PGKp is the mouse phosphoglycerate kinase (PGK) promoter (Adra, et al., Gene, 60:65-74, 1987) (which has been used extensively to drive expression of drug resistance genes in mammalian cells), EM7 is a strong bacterial promoter that has the advantage of allowing for positive selection in bacteria of the completed LTVEC construct by driving expression of the neomycin phosphotransferase (neo) gene, neo is a selectable marker that confers Kanamycin resistance in prokaryotic cells and G418 resistance in eukaryotic cells (Beck, et al., Gene, 19:327-36, 1982), and PGK polyA is a 3' untranslated region derived

A265

US 8,502,018 B2

17 | 18

from the PGK gene and containing a polyadenylation site and signal (Boer, et al., Biochem Genet, 28:299-308, 1990).

To construct the mOCR10 LTVEC, first a donor fragment was generated consisting of a mOCR10 homology box 1 (hb1) attached upstream from the LacZ gene in the modification cassette and a mOCR10 homology box 2 (hb2) attached downstream from the neo-PGK polyA sequence in the modification cassette (FIG. 2), using standard recombinant genetic engineering technology. Homology box 1 (hb1) consists of 211 bp of untranslated sequence immediately upstream of the initiating methionine of the mOCR10 open reading frame (mOCR10 ORF) (FIG. 3A-3D). Homology box 2 (hb2) consists of last 216 bp of the mOCR10 ORF, ending at the stop codon (FIG. 3A-3D).

Subsequently, using bacterial homologous recombination (Zhang, et al. supra; Angrand, et al., supra; Muyrers, et al. supra; Narayanan et al. supra; Yu et al. supra), this donor fragment was used to precisely replace the mOCR10 coding region (from initiation methionine to stop codon) with the insertion cassette, resulting in construction of the mOCR10 LTVEC (FIG. 2). Thus, in this mOCR10 LTVEC, the mOCR10 coding sequence was replaced by the insertion cassette creating an approximately 20 kb deletion in the mOCR10 locus while leaving approximately 130 kb of upstream homology (upstream homology arm) and 32 kb of downstream homology (downstream homology arm).

It is important to note that LTVECs can be more rapidly and conveniently generated from available BAC libraries than targeting vectors made using previous technologies because only a single bacterial homologous recombination step is required and the only sequence information required is that needed to generate the homology boxes. In contrast, previous approaches for generating targeting vectors using bacterial homologous recombination require that large targeting vectors be "trimmed" prior to their introduction in ES cells (Hill et al., Genomics, 64:111-3, 2000). This trimming is necessary because of the need to generate homology arms short enough to accommodate the screening methods utilized by previous approaches. One major disadvantage of the method of Hill et al., is that two additional homologous recombination steps are required simply for trimming (one to trim the region upstream of the modified locus and one to trim the region downstream of the modified locus). To do this, substantially more sequence information is needed, including sequence information spanning the sites of trimming.

In addition, another obvious advantage, illustrated by the above example, is that a very large deletion spanning the mOCR10 gene (approximately 20 kb) can be easily generated in a single step. In contrast, using previous technologies, to accomplish the same task may require several steps and may involve marking the regions upstream and downstream of the coding sequences with loxP sites in order to use the Cre recombinase to remove the sequence flanked by these sites after introduction of the modified locus in eukaryotic cells. This may be unattainable in one step, and thus may require the construction of two targeting vectors using different selection markers and two sequential targeting events in ES cells, one to introduce the loxP site at the region upstream of the coding sequence and another to introduce the loxP site at the region downstream of the coding sequence. It should be further noted that the creation of large deletions often occurs with low efficiency using the previous targeting technologies in eukaryotic cells, because the frequency of achieving homologous recombination may be low when using targeting vectors containing large deletion flanked by relatively short homology arms. The high efficiency obtained using the method of the invention (see below) is due to the very long homology arms present in the LTVEC that increase the rate of homologous recombination in eukaryotic cells.

c. Verification, Preparation, and Introduction of mOCR10 LTVEC DNA into ES Cells.

The sequence surrounding the junction of the insertion cassette and the homology sequence was verified by DNA sequencing. The size of the mOCR10 LTVEC was verified by restriction analysis followed by pulsed field gel electrophoresis (PFGE) (Cantor, et al., Annu Rev Biophys Biophys Chem, 17:287-304, 1988; Schwartz and Cantor, Cell, 37:67-75, 1984). A standard large-scale plasmid preparation of the mOCR10 LTVEC was done, the plasmid DNA was digested with the restriction enzyme NotI, which cuts in the vector backbone of the mOCR10 LTVEC, to generate linear DNA. Subsequently the linearized DNA was introduced into mouse ES cells by electroporation (Robertson, Practical Approach Series, 254, 1987; Joyner supra; Sambrook, et al. supra). ES cells successfully transfected with the mOCR10 LTVEC were selected for in G418-containing media using standard selection methods.

d. Identification of Targeted ES Cells Clones Using a Quantitative Modification of Allele (MOA) Assay.

To identify ES cells in which one of the two endogenous mOCR10 genes had been replaced by the modification cassette sequence, DNA from individual ES cell clones was analyzed by quantitative PCR using standard TAQMAN® methodology as described (Applied Biosystems, TAQ-MAN® Universal PCR Master Mix, catalog number P/N 4304437). The primers and TAQMAN® probes used are as described in FIG. 3A-3D (SEQ ID NO:5-6). A total of 69 independent ES cells clones where screened and 3 were identified as positive, i.e. as clones in which one of the endogenous mOCR10 coding sequence had been replaced by the modification cassette described above.

Several advantages of the MOA approach are apparent: (i) It does not require the use of a probe outside the locus being modified, thus obviating the need to know the sequence flanking the modified locus. (ii) It requires very little time to perform compared to conventional Southern blot methodology which has been the previous method of choice, thus reducing the time for identifying correctly modified cells from the typical several days to just a few hours. This is a significant improvement in the way screening has been performed in the past and makes it a much less labor-intensive and more cost-effective approach to screening for homologous recombination events in eukaryotic cells. Yet another advantage of the method of the invention is that it is also superior to previous technologies because of its ability to target difficult loci. Using previous technologies, it has been shown that for certain loci the frequency of successful targeting may be as low as 1 in 2000 integration events, perhaps even lower. Using the method of the invention, Applicants have demonstrated that such difficult loci can be targeted much more efficiently using LTVECs that contain long homology arms (i.e. greater than those allowed by previous technologies). As the non-limiting example described above demonstrates, the Applicants have targeted the OCR10 locus, a locus that has previously proven recalcitrant to targeting using conventional technology. Using the method of the invention, Applicants have shown that they have obtained successful targeting in 3 out of 69 ES cells clones in which the mOCR10 LTVEC (containing more than 160 kb of homology arms, and introducing a 20 kb deletion) had integrated, whereas using previous technology for ES cell targeting using a plasmid-based vector with homology arms shorter than 10-20 kb while also introducing a deletion of less than 15 kb, no targeted events were identified among more than 600

REGN-AM-00000018

US 8,502,018 B2

19                                                              20

integrants of the vector. These data clearly demonstrate the superiority of the method of the invention over previous technologies.

## Example 2

Increased Targeting Frequency and Abrogation of the Need to Use Isogenic DNA when LTVECs are Used as the Targeting Vectors

As noted above, the increased targeting frequency obtained using long homology arms should diminish the benefit, if any, derived from using genomic DNA in constructing LTVECs that is isogenic with (i.e. identical in sequence to) the DNA of the eukaryotic cell being targeted. To test this hypothesis, Applicants have constructed numerous LTVECs using genomic DNA derived from the same mouse substrain as the eukaryotic cell to be targeted (presumably isogenic), and numerous other LTVECs using genomic DNA derived from mouse substrains differing from that of the eukaryotic cell to be targeted (presumably non-isogenic). The two sets of LTVECs exhibited similar targeting frequencies, ranging from 1-13%, indicating that the rate of successful targeting using LTVECs does not depend on isogenicity.

The approach of creating LTVECs and directly using them as targeting vectors combined with MOA screening for homologous recombination events in ES cells creates a novel method for engineering genetically modified loci that is rapid, inexpensive and represents a significant improvement over the tedious, time-consuming methods previously in use. It thus opens the possibility of a rapid large scale in vivo functional genomics analysis of essentially any and all genes in an organism's genome in a fraction of the time and cost necessitated by previous methodologies.

## Example 3

Use of LTVECs to Produce Chimeric and Human Antibodies

a. Introduction.

The rearrangement of variable region genes during the initial development of B cells is the primary mechanism whereby the immune system produces antibodies capable of recognizing the huge number of antigens that it may encounter. Essentially, through DNA rearrangements during B cell development, a huge repertoire of variable (V) region sequences are assembled which are subsequently joined to a constant (C) region to produce complete heavy and light chains which assemble to form an antibody. After functional antibodies have been assembled, somatic hypermutation which occurs in the secondary lymphoid organs, introduces further diversity which enables the organism to select and optimize the affinity of the antibody.

The production of antibodies to various antigens in non-human species initially provided great promise for the large scale production of antibodies that could be used as human therapeutics. Species differences, however, leads to the production of antibodies by humans which inactivate the foreign antibodies and cause allergic reactions. Attempts were subsequently made to "humanize" the antibodies, thus making them less likely to be recognized as foreign in humans. Initially, this process involved combining the antigen binding portions of antibodies derived from mice with the constant region of human antibodies, thereby creating recombinant antibodies that were less immunogenic in humans. A second approach which was developed was phage display, whereby

human V regions are cloned into a phage display library and regions with the appropriate binding characteristics are joined to human constant regions to create human antibodies. This technology is limited, however, by the lack of antibody development and affinity maturation which naturally occurs in B cells.

More recently, endogenous genes have been knocked out of mice, and the genes replaced with their human counterparts to produce entirely human antibodies. Unfortunately, the use of these constructs has highlighted the importance of an endogenous constant region in the development and optimization of antibodies in B cells. Human antibodies produced by transgenic mice with entirely human constructs have reduced affinity as compared to their mouse counterparts. Accordingly, the much acclaimed methods of producing humanized antibodies in mice and other organisms, wherein endogenous variable and constant regions of the mice are knocked out and replaced with their human counterparts, has not resulted in optimal antibodies.

The use of chimeric antibodies, which utilize human variable regions with mouse constant regions through B cell maturation, followed by subsequent engineering of the antibodies to replace the mouse constant regions with their human counterparts, has been suggested (U.S. Pat. No. 5,770, 429). However, the only methodology that has existed to date for making such chimeras has been trans-switching, wherein the formation of the chimeras is only a rare event which occurs only in heavy chains. Heretofore, there has been no mechanism to produce, in transgenic animals, large scale replacement of the entire variable gene encoding segments with human genes, thereby producing chimeras in both the heavy and light chains. Utilizing Applicants' technology, as disclosed herein, chimeric antibodies are generated which can then be altered, through standard technology, to create high affinity human antibodies.

b. Brief Description.

A transgenic mouse is created that produces hybrid antibodies containing human variable regions and mouse constant regions. This is accomplished by a direct, in situ replacement of the mouse variable region genes with their human counterparts. The resultant hybrid immunoglobulin loci will undergo the natural process of rearrangements during B-cell development to produce the hybrid antibodies.

Subsequently, fully-human antibodies are made by replacing the mouse constant regions with the desired human counterparts. This approach will give rise to therapeutic antibodies much more efficiently than previous methods, e.g. the "humanization" of mouse monoclonal antibodies or the generation of fully human antibodies in HUMAB™ mice. Further, this method will succeed in producing therapeutic antibodies for many antigens for which previous methods have failed. This mouse will create antibodies that are human variable region-mouse constant region, which will have the following benefits over the previously available HUMAB™ mice that produce totally human antibodies. Antibodies generated by the new mouse will retain murine Fc regions which will interact more efficiently with the other components of the mouse B cell receptor complex, including the signaling components required for appropriate B cell differentiation (such as Iga and Igb). Additionally, the murine Fc regions will be more specific than human Fc regions in their interactions with Fc receptors on mouse cells, complement molecules, etc. These interactions are important for a strong and specific immune response, for the proliferation and maturation of B cells, and for the affinity maturation of antibodies.

Because there is a direct substitution of the human V-D-J/V-J regions for the equivalent regions of the mouse loci all of

A267

REGN-AM-00000019

US 8,502,018 B2

21 22

the sequences necessary for proper transcription, recombination, and/or class switching will remain intact. For example, the murine immunoglobulin heavy chain intronic enhancer, Em, has been shown to be critical for V-D-J recombination as well as heavy chain gene expression during the early stages of B cell development (Ronai et al. Mol Cell Biol 19:7031-7040 (1999)], whereas the immunoglobulin heavy chain 3' enhancer region appears to be critical for class switching (Pan et al. Eur J Immunol 30:1019-1029 (2000)) as well as heavy chain gene expression at later stages of B cell differentiation (Ong, et al. J Immunol 160:4896-4903 (1998)). Given these various, yet crucial, functions of the transcriptional control elements, it is desirable to maintain these sequences intact.

The required recombination events which occur at the immunoglobulin loci during the normal course of B cell differentiation may increase the frequency of aberrant, non-productive immunoglobulin rearrangements when these loci are inserted at improper chromosomal locations, or in multiple copies, as in currently available mice. With reductions in productive immunoglobulin rearrangement and, therefore, appropriate signaling at specific steps of B cell development the aberrant cells are eliminated. Reductions of B cell numbers at early stages of development significantly decreases the final overall B cell population and greatly limits the immune responses of the mice. Since there will be only one, chimeric, heavy or light chain locus (as opposed to mutated immunoglobulin loci and with human transgenic loci integrated at distinct chromosomal locations for heavy and light chains in the currently available mice) there should be no trans-splicing or trans-rearrangements of the loci which could result in non-productive rearrangements or therapeutically irrelevant chimeric antibodies (Willers et al. Immunobiology 200:150-164 (2000); Fujieda et al. J. Immunol. 157:3450-3459 (1996)).

The substitutions of the human V-D-J or V-J regions into the genuine murine chromosomal immunoglobulin loci should be substantially more stable, with increased transmission rates to progeny and decreased mosaicism of B cell genotypes compared with the currently available mice (Tomizuka et al Proc Natl Acad Sci (USA) 97:722-727 (2000)). Furthermore, introduction of the human variable regions at the genuine murine loci in vivo will maintain the appropriate global regulation of chromatin accessibility previously shown to be important for appropriately timed recombination events (Haines et al. Eur J Immunol 28:4228-4235 (1998)).

Approximately ⅓ of human antibodies contain lambda light chains, as compared to mice in which only ⅟₂₀ of murine antibodies contain lambda light chains. Therefore, replacing murine lambda light chain V-J sequences with lambda light chain V-J sequences derived from the human locus will serve to increase the repertoire of antibodies as well as more closely match the genuine human immune response, thus increasing the likelihood of obtaining therapeutically useful antibodies.

An additional benefit of integrating the human sequences into the genuine murine immunoglobulin loci is that no novel integration sites are introduced which might give rise to mutagenic disruptions at the insertion site and preclude the isolation of viable homozygous mice. This will greatly simplify the production and maintenance of a breeding mouse colony.

c. Materials and Methods:

Precise replacement of the mouse heavy chain locus variable region (VDJ) with its human counterpart is exemplified using a combination of homologous and site-specific recombination in the following example, which utilizes a two step process. One skilled in the art will recognize that replacement of the mouse locus with the homologous or orthologous

human locus may be accomplished in one or more steps. Accordingly, the invention contemplates replacement of the murine locus, in whole or in part, with each integration via homologous recombination.

Large insert (BAC) clones spanning the entire VDJ region of the human heavy chain locus are isolated (FIG. **4**A). The sequence of this entire region is available in the following GenBank files (AB019437, AB019438, AB019439, AB019440, AB019441, X97051 and X54713). In this example, large insert (BAC) clones are isolated from the ends of the mouse VDJ region as a source of homology arms (FIG. **4**B) which are used to direct integration via homologous recombination of the human VDJ sequences in a two step process.

In the first step, LTVEC1 (FIG. **4**D) is constructed by bacterial homologous recombination in *E. coli*. LTVEC1 contains, in order: a large mouse homology arm derived from the region upstream from the mouse DJ region, but whose absolute endpoints are not important; a cassette encoding a selectable marker functional in ES cells (PGK-neomycinR); a loxP site; a large human insert spanning from several V gene segments through the entire DJ region; and a mouse homology arm containing the region immediately adjacent to, but not including, the mouse J segments. Mouse ES cells will be transformed by standard techniques, for example, electroporation, with linearized LTVEC1, and neomycin resistant colonies will be screened for correct targeting using a MOA assay. These targeted ES cells can give rise to mice that produce antibodies with hybrid heavy chains. However, it will be preferable to proceed with subsequent steps that will eliminate the remainder of the mouse variable segments.

In the second step, LTVEC2 (FIG. **4**C) is constructed by bacterial homologous recombination in *E. coli*. LTVEC2 contains, in order: a large mouse homology arm containing the region adjacent to the most distal mouse V gene segment, but not containing any mouse V gene segments; a large insert containing a large number of distal human V gene segments; a mutant loxP site called lox511 (Hoess et al. Nucleic Acids Res. 14:2287-2300 (1986)), in the orientation opposite to that of the wild type loxP sites in LTVEC2 and LTVEC1 (this site will not recombine with wild type loxP sites but will readily recombine with other lox511 sites); a wild type loxP site; a second selectable marker (PGK-hygromycinR); and a mouse homology arm derived from the V region, but whose absolute endpoints are not important. Mouse ES cells that were correctly targeted with LTVEC1 will then be transformed by standard techniques with linearized LTVEC2, and hygromycin resistant colonies will be screened for correct targeting using a MOA assay. Correctly targeted ES cells resulting from this transformation will hereafter be referred to as "double targeted ES cells".

Subsequent transient expression of CRE recombinase in the double targeted ES cells will result in deletion of the remainder of the mouse V region. Alternatively, the double targeted ES cells can be injected into host blastocysts for the production of chimeric mice. Breeding of the resultant chimeric mice with mice expressing CRE recombinase early in development will result in deletion of the remainder of the mouse V region in the progeny F1. This later alternative increases the likelihood that the hybrid heavy chain locus will be passed through the germline because it involves culturing the ES cells for fewer generations.

The inclusion of lox511 in LTVEC2 will allow for the insertion of additional human V gene segments into the hybrid locus. One approach would be to use bacterial homologous recombination to flank a large genomic DNA clone containing many additional human V gene segments

A268

US 8,502,018 B2

23

with lox511 and loxP sites. Co-transformation of such a modified large genomic DNA clone into double targeted ES cells with a plasmid that transiently expresses CRE recombinase will result in the introduction of the additional V gene segments by cassette exchange (Bethke et al. Nucleic Acids Res. 25:2828-2834 (1997)).

A second approach to the incorporation of additional V gene segments is to independently target a large genomic DNA clone containing many additional human V gene segments into the mouse locus using, for instance, the same mouse homology arms included in LTVEC2. In this case, the additional human V gene segments would be flanked by lox511 and loxP sites, and the targeted ES cells would be used to create a mouse. The mice derived from double targeted ES cells and the mice derived from the ES cells containing the additional V gene segments would be bred with a third mouse that directs expression of CRE recombinase during meiosis. The close proximity of the two recombinant loci during meiotic pairing would result in a high frequency of CRE induced inter-chromosomal recombination as has been seen in other systems (Herault et al. Nature Genetics 20: 381-384 (1998)).

The final steps in creating the human variable/mouse constant monoclonal antibody producing-mouse will be per-

24

forming the equivalent variable region substitutions on the lambda and kappa light chain loci and breeding all three hybrid loci to homozygosity together in the same mouse. The resultant transgenic mouse will have a genome comprising entirely human heavy and light chain variable gene loci operably linked to entirely endogenous mouse constant region such that the mouse produces a serum containing an antibody comprising a human variable region and a mouse constant region in response to antigenic stimulation. Such a mouse may then be used as a source of DNA encoding the variable regions of human antibodies. Using standard recombinant technology, DNA encoding the variable regions of the heavy and light chains of the antibody is operably linked to DNA encoding the human heavy and light chain constant regions in cells, such as a CHO cells, which are capable of expressing active antibodies. The cells are grown under the appropriate conditions to express the fully human antibodies, which are then recovered. Variable region encoding sequences may be isolated, for example, by PCR amplification or cDNA cloning. In a preferred embodiment, hybridomas made from transgenic mice comprising some or all of the human variable region immunoglobulin loci (Kohler et al. Eur. J. Immunol., 6:511-519 (1976) are used as a source of DNA encoding the human variable regions.

---

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 6

<210> SEQ ID NO 1
<211> LENGTH: 25
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 gene primer

<400> SEQUENCE: 1

agctaccagc tgcagatgcg ggcag                                    25


<210> SEQ ID NO 2
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 gene primer

<400> SEQUENCE: 2

ctccccagcc tgggtctgaa agatgacg                                 28


<210> SEQ ID NO 3
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 gene primer

<400> SEQUENCE: 3

gacctcactt gctacactga ctac                                     24


<210> SEQ ID NO 4
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 gene primer

<400> SEQUENCE: 4
```

**A269**

US 8,502,018 B2

<table>
<tr><td>25</td><td>26</td></tr>
</table>

-continued

```
acttgtgtag gctgcagaag gtctcttg                                          28


<210> SEQ ID NO 5
<211> LENGTH: 1799
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 cDNA

<400> SEQUENCE: 5

ccccgggctt cctgttctaa taagaatacc tcctaggtcc cccatgggct aacctcatct        60

ttggtactca acaggggtct tctttatgag cttcggacca gctcttttga tgtggcaggg       120

actgaccctg ggtggggaag ccactcagtg catgacccca gctggttcac cacatatacc       180

acatactttt cttgcaggtc tgggacacag catgccccgg ggcccagtgg ctgccttact        240

cctgctgatt ctccatggag cttggagctg cctggacctc acttgctaca ctgactacct        300

ctggaccatc acctgtgtcc tggagacacg gagccccaac cccagcatac tcagtctcac        360

ctggccaagat gaatatgagg aacttcagga ccaagagacc ttctgcagcc tacacaagtc       420

tggccacaac accacacata tatggtacac gtgccatatg cgcttgtctc aattcctgtc        480

cgatgaagtt ttcattgtca acgtgacgga ccagtctggc aacaactccc aagagtgtgg        540

cagctttgtc ctggctgaga gcatcaagcc agctcccccc ttgaacgtga ctgtggcctt        600

ctcaggacgc tatgatatct cctgggactc agcttatgac gaaccctcca actacgtgct        660

gagaggcaag ctacaatatg agctgcagta tcggaacctc agagaccccct atgctgtgag        720

gccggtgacc aagctgatct cagtggactc aagaaacgtc tctcctccct gaagagttcc        780

acaaagattc tagctaccag ctgcagatgc gggcagcgcc tcagccaggc acttcattca       840

gggggaccctg gagtgagtgg agtgaccccg tcatctttca gacccaggct ggggagcccg       900

aggcaggctg ggaccctcac atgctgctgc tcctggctgt cttgatcatt gtcctggttt       960

tcatgggtct gaagatccac ctgccttgga ggctatggaa aaagatatgg gcaccagtgc      1020

ccaccctga gagtttcttc cagccccgt acagggagca cagcgggaac ttcaagaaat      1080

gggttaatac ccctttcacg gcctccagca tagagttggt gccacagagt tccacaacaa      1140

catcagcctt acatctgtca ttgtatccag ccaaggagaa gaagttcccg gggctgccgg      1200

gtctggaaga gcaactggag tgtgatggaa tgtctgagcc tggtcactgg tgcataatcc      1260

ccttggcagc tggccaagcg gtctcagcct acagtgagga gagagaccgg ccatatggtc      1320

tggtgtccat tgacacagtg actgtgggag atgcagaggg cctgtgtgtc tggccctgta      1380

gctgtgagga tgatgctat ccagccatga acctggatgc tggcagagag tctggtccta      1440

attcagagga tctgctcttg gtcacagacc ctgctttttct gtcttgtggc tgtgtctcag      1500

gtagtggtct caggcttggg ggctccccag gcagcctact ggacaggttg aggctgtcat      1560

ttgcaaagga aggggactgg acagcagacc caacctggag aactgggtcc ccaggagggg      1620

gctctgagag tgaagcaggt tccccccctg gtctggacat ggacacattt gacagtggct      1680

ttgcaggttc agactgtggc agccccgtgg agactgatga aggaccccct cgaagctatc      1740

tccgccagtg ggtggtcagg accctccac ctgtggacag tggagcccag agcagctag      1799


<210> SEQ ID NO 6
<211> LENGTH: 529
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Mouse OCR10 protein
```

**A270**

REGN-AM-00000022

US 8,502,018 B2

<table>
<tr><td>27</td><td>28</td></tr>
</table>

-continued

```
<400> SEQUENCE: 6

Met Pro Arg Gly Pro Val Ala Ala Leu Leu Leu Leu Ile Leu His Gly
1               5                   10                  15

Ala Trp Ser Cys Leu Asp Leu Thr Cys Tyr Thr Asp Tyr Leu Trp Thr
            20                  25                  30

Ile Thr Cys Val Leu Glu Thr Arg Ser Pro Asn Pro Ser Ile Leu Ser
        35                  40                  45

Leu Thr Trp Gln Asp Glu Tyr Glu Glu Leu Gln Asp Gln Glu Thr Phe
    50                  55                  60

Cys Ser Leu His Lys Ser Gly His Asn Thr Thr His Ile Trp Tyr Thr
65                  70                  75                  80

Cys His Met Arg Leu Ser Gln Phe Leu Ser Asp Glu Val Phe Ile Val
                85                  90                  95

Asn Val Thr Asp Gln Ser Gly Asn Asn Ser Gln Glu Cys Gly Ser Phe
            100                 105                 110

Val Leu Ala Glu Ser Ile Lys Pro Ala Pro Pro Leu Asn Val Thr Val
        115                 120                 125

Ala Phe Ser Gly Arg Tyr Asp Ile Ser Trp Asp Ser Ala Tyr Asp Glu
    130                 135                 140

Pro Ser Asn Tyr Val Leu Arg Gly Lys Leu Gln Tyr Glu Leu Gln Tyr
145                 150                 155                 160

Arg Asn Leu Arg Asp Pro Tyr Ala Val Arg Pro Val Thr Lys Leu Ile
                165                 170                 175

Ser Val Asp Ser Arg Asn Val Ser Leu Leu Pro Glu Glu Phe His Lys
            180                 185                 190

Asp Ser Ser Tyr Gln Leu Gln Met Arg Ala Ala Pro Gln Pro Gly Thr
    195                 200                 205

Ser Phe Arg Gly Thr Trp Ser Glu Trp Ser Asp Pro Val Ile Phe Gln
    210                 215                 220

Thr Gln Ala Gly Glu Pro Glu Ala Gly Trp Asp Pro His Met Leu Leu
225                 230                 235                 240

Leu Leu Ala Val Leu Ile Ile Val Leu Val Phe Met Gly Leu Lys Ile
                245                 250                 255

His Leu Pro Trp Arg Leu Trp Lys Lys Ile Trp Ala Pro Val Pro Thr
            260                 265                 270

Pro Glu Ser Phe Phe Gln Pro Leu Tyr Arg Glu His Ser Gly Asn Phe
        275                 280                 285

Lys Lys Trp Val Asn Thr Pro Phe Thr Ala Ser Ser Ile Glu Leu Val
    290                 295                 300

Pro Gln Ser Ser Thr Thr Thr Ser Ala Leu His Leu Ser Leu Tyr Pro
305                 310                 315                 320

Ala Lys Glu Lys Lys Phe Pro Gly Leu Pro Gly Leu Glu Glu Gln Leu
                325                 330                 335

Glu Cys Asp Gly Met Ser Glu Pro Gly His Trp Cys Ile Ile Pro Leu
            340                 345                 350

Ala Ala Gly Gln Ala Val Ser Ala Tyr Ser Glu Glu Arg Asp Arg Pro
        355                 360                 365

Tyr Gly Leu Val Ser Ile Asp Thr Val Thr Val Gly Asp Ala Glu Gly
    370                 375                 380

Leu Cys Val Trp Pro Cys Ser Cys Glu Asp Asp Gly Tyr Pro Ala Met
385                 390                 395                 400

Asn Leu Asp Ala Gly Arg Glu Ser Gly Pro Asn Ser Glu Asp Leu Leu
                405                 410                 415
```

**A271**

REGN-AM-00000023

29

30

-continued

```
Leu Val Thr Asp Pro Ala Phe Leu Ser Cys Gly Cys Val Ser Gly Ser
        420             425             430

Gly Leu Arg Leu Gly Gly Ser Pro Gly Ser Leu Ser Asp Arg Leu Arg
        435             440             445

Leu Ser Phe Ala Lys Glu Gly Asp Trp Thr Ala Asp Pro Thr Trp Arg
        450             455             460

Thr Gly Ser Pro Gly Gly Gly Ser Glu Glu Ala Ala Ser Pro Pro
465             470             475             480

Gly Leu Asp Met Asp Thr Phe Asp Ser Gly Phe Ala Gly Ser Asp Cys
            485             490             495

Gly Ser Pro Val Glu Thr Asp Glu Gly Pro Pro Arg Ser Tyr Leu Arg
        500             505             510

Gln Trp Val Val Arg Thr Pro Pro Pro Val Asp Ser Gly Ala Gln Ser
        515             520             525

Ser
```

We claim:

**1**. A genetically modified mouse, comprising in its germ-line human unrearranged variable region gene segments inserted at an endogenous mouse immunoglobulin locus.

**2**. The mouse of claim **1**, wherein the human unrearranged variable region gene segments are heavy chain gene segments, and the mouse immunoglobulin locus is a heavy chain locus.

**3**. The mouse of claim **1**, wherein the human unrearranged variable region gene segments are light chain gene segments, and the mouse immunoglobulin locus is a light chain locus.

**4**. The mouse of claim **3**, wherein the light chain gene segments are human kappa light chain gene segments.

**5**. The mouse of claim **1**, wherein the unrearranged variable region gene segments are contained on a genomic DNA fragment larger than 20 kb.

**6**. The mouse of claim **1**, wherein the human variable region gene segments are capable of rearranging to form a functional V region gene.

**7**. The mouse of claim **1**, where following rearrangement the mouse expresses a functional antigen-binding molecule encoded by the human gene segments.

**8**. The mouse of claim **1**, wherein rearrangement of the human variable gene segments in the mouse results in a variable region gene that comprises a rearranged human variable region gene linked to a mouse constant region gene.

**9**. The mouse of claim **1**, wherein the mouse produces an antibody that comprises a human variable region and a mouse constant region.

**10**. The mouse of claim **1**, wherein the mouse does not comprise a human immunoglobulin constant gene.

**11**. A genetically modified mouse, comprising in its germ-line human unrearranged variable region gene segments linked to a mouse constant region gene, wherein the mouse lacks a human constant region gene, and wherein the mouse constant region gene is at an endogenous mouse immunoglobulin locus.

**12**. The mouse of claim **11**, wherein the human unrearranged variable region gene segments are heavy chain gene segments.

**13**. The mouse of claim **11**, wherein the human unrearranged variable region gene segments are light chain gene segments.

**14**. The mouse of claim **13**, wherein the light chain gene segments are human kappa light chain gene segments.

**15**. The mouse of claim **11**, wherein the unrearranged variable region gene segments are contained on a genomic DNA fragment larger than 20 kb.

**16**. The mouse of claim **11**, wherein the human variable region gene segments are capable of rearranging to form a functional variable region gene.

**17**. The mouse of claim **11**, where following rearrangement the mouse expresses a functional antigen-binding molecule encoded by the human gene segments.

**18**. The mouse of claim **11**, wherein rearrangement of the human variable region gene segments in the mouse results in a variable region gene that comprises a rearranged human variable region gene operably linked to a mouse constant region gene.

**19**. The mouse of claim **11**, wherein the mouse produces an antibody that comprises a human variable region and a mouse constant region.

**20**. A mouse, comprising a modification in the germline of the mouse, wherein the modification comprises

(a) a hybrid heavy chain locus comprising an insertion of human immunoglobulin heavy chain V, D, and J gene segments, wherein the human heavy chain immunoglo-bulin V, D, and J gene segments are linked to a mouse immunoglobulin heavy chain gene, wherein the mouse immunoglobulin heavy chain gene is at an endogenous mouse immunoglobulin locus;

(b) a hybrid light chain locus comprising an insertion of human immunoglobulin light chain V and J gene segments, wherein the human V and J gene segments are linked to a mouse immunoglobulin light chain constant region gene sequence;

wherein (a) rearranges to form a hybrid heavy chain sequence comprising a human variable region linked to a mouse constant region, and (b) rearranges to form a hybrid light chain sequence comprising a human variable region linked to a mouse constant region, and wherein the mouse is incapable of forming an antibody that comprises a human variable region and a human constant region.

\* \* \* \* \*

**A272**

REGN-AM-00000024

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 8,502,018 B2        Page 1 of 1
APPLICATION NO. : 13/164176
DATED : August 6, 2013
INVENTOR(S) : Andrew J. Murphy et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page at item number (75) Inventors: replace:

"Andrew J. Murphy, Croton-on-Hudson, NT (US);
George D. Yancopoulos, Yorktown Heights, NY (US)" with

-- Andrew J. Murphy, Croton-on-Hudson, NT (US);
George D. Yancopoulos, Yorktown Heights, NY (US);
Margaret Karow, Santa Rosa Valley, CA (US);
Lynn Macdonald, White Plains, NY (US);
Sean Stevens, San Francisco, CA (US) --

Signed and Sealed this
Tenth Day of September, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

**A273**

REGN-AM-00000025

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,502,018 B2                                          Page 1 of 1
APPLICATION NO.  : 13/164176
DATED                  : August 6, 2013
INVENTOR(S)        : Andrew J. Murphy et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page at item number (75) Inventors: replace:

"Andrew J. Murphy, Croton-on-Hudson, NY (US);
George D. Yancopoulos, Yorktown Heights, NY (US)" with

-- Andrew J. Murphy, Croton-on-Hudson, NY (US);
George D. Yancopoulos, Yorktown Heights, NY (US);
Margaret Karow, Santa Rosa Valley, CA (US);
Lynn Macdonald, White Plains, NY (US);
Sean Stevens, San Francisco, CA (US) --

This certificate supersedes the Certificate of Correction issued September 10, 2013.

Signed and Sealed this
Seventeenth Day of December, 2013

*Margaret A. Focarino*

Margaret A. Focarino
*Commissioner for Patents of the United States Patent and Trademark Office*

**A274**

REGN-AM-00000026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this Brief for Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been has been prepared in Times New Roman 14-point font using Microsoft Word 2010.


/s/ Neal Kumar Katyal
Neal Kumar Katyal

*Counsel for Appellant Regeneron Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2016, the foregoing Corrected Brief for Appellant was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

*Counsel for Appellant Regeneron Pharmaceuticals, Inc.*